FILED

2007 Mar-06  AM 10:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **KENNETH GLENN THOMAS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **CASE No. CV 01-S-0772-NE** |
| | ) | |
| **MICHAEL HALEY, Commissioner,** | ) | |
| **Alabama Department of Corrections,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

This action seeks habeas corpus relief with respect to petitioner's state court conviction and death sentence on a charge of capital murder. A state prisoner is entitled to federal habeas relief only if he is held "in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2254(a),[1] and, the violation rises to the level of a "fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure." *Reed v. Farley*, 512 U.S. 339, 348 (1994) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)) (alteration in original). Habeas relief is not available to correct violations of state law, *see, e.g., Estelle v. McGuire*, 502 U.S.

---

[1] *See also* 28 U.S.C. § 2241(c)(3) (2006) ("The writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States . . . .").

62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court-determinations on state-law questions."),[2] unless the errors were of "constitutional dimension" — that is, "render[ed] the entire trial fundamentally unfair." *Carrizales v. Wainwright*, 699 F.2d 1053, 1054 (11th Cir. 1983) (*per curiam*) (citing *Smith v. Smith*, 454 F.2d 572, 579 (5th Cir. 1971)).

Upon full consideration of the record and briefs, this court finds that petitioner is entitled to relief on only one claim, "R" — the contention that he is mentally retarded, and that his execution will constitute cruel and unusual punishment in violation of the Eighth Amendment, as made applicable to the states through the Due Process Clause of the Fourteenth Amendment.  On all other grounds, his petition will be denied.

## TABLE OF CONTENTS

|  | Page No. |
| --- | --- |
| I.  THE OFFENSE | 7 |
| II.  PROCEDURAL HISTORY | 14 |
| III.  THE CLAIMS | 17 |
| IV.  STANDARDS OF REVIEW | 21 |

---

[2] *See also*, *e.g.*, *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a mere error of state law is not a denial of due process.  If the contrary were true, then every erroneous decision by a state court on state law would come [to this Court] as a federal constitutional question."); *Cabberiza v. Moore*, 217 F.3d 1329, 1333 (11th Cir. 2000) (observing that 28 U.S.C. § 2254 "was not enacted to enforce State-created rights") (citing *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988)).

**A**.   *The Effect of AEDPA* ........................................................ 22

**B**.   *Claims of Ineffective Assistance of Counsel* ..................... 27

   **1**.   *The performance prong* ............................................. 28

   **2**.   *The prejudice prong* ................................................. 31

   **3**.   *Deference accorded state court findings of historical fact* ... 32

**C**.   *Procedural Defaults* ......................................................... 32

   **1**.   *Overcoming procedural defaults* ............................. 34

     **a**.   *The "cause and prejudice" standard* ............... 35

     **b**.   *The "fundamental miscarriage of justice" standard* ... 36-37

**V. DISCUSSION** ..................................................................... 37

**A**.   *Denial of Motion to Change Venue* ................................. 38

   **1**.   *Petitioner's "actual prejudice" claim* .................... 43

     **a**.   *Alan Boyd and Johnie Eckstein* ...................... 44

       **i**.   *Voir dire of Alan Boyd* ..................... 45

       **ii**.   *Voir dire of Johnie Eckstein* .............. 49

       **iii**.   *Conclusions regarding challenges to Boyd and Eckstein* ... 53

     **b**.   *Paul Skipworth* ............................................... 55

     **c**.   *Conclusions on petitioner's "actual prejudice" claim* ... 56

   **2**.   *Petitioner's "presumed prejudice" claim* ............... 57

     **a**.   *Newspaper articles* ....................................... 59

       **i**.   *State court discussion of newspaper publicity* ... 62

       **ii**.   *Conclusions on newspaper coverage* ... 67

**b**.  *Electronic media accounts of the case*    69

**c**.  *Public opinion survey*    69-70

**d**.  *Voir dire process*    71

     **i**.  *Barry Broadway*    73-74

     **ii**.  *Mary Gray*    74

     **iii**.  *Robert Haney*    75

     **iv**.  *Naomi Lovell*    76

     **v**.  *Jerry Pack*    77-78

     **vi**.  *William Turpen*    79

     **vii**.  *Harry Patterson*    81

     **viii**.  *Conclusions on voir dire process*    82

**e**.  *Conclusions on petitioner's "presumed prejudice" claim*    87

**B**.  *Ineffective Assistance of Counsel in Presentation of Motion to Change Venue*    88

   **1**.  *The state courts' rulings*    91

   **2**.  *Conclusion*    92

**C**.  *Failure to Excuse Jurors for Cause*    93

   **1**.  *Challenges based upon fixed opinions of guilt*    93

   **2**.  *Challenges based upon fixed bias against insanity defense*    94-95

**D**.  *Funds for Jury Expert*    97

**E**.  *Racially Discriminatory Use of Peremptory Challenges*    102

**F**.  *Prosecutorial Misconduct*    107

**G**.  *Ineffective Assistance of Counsel for Failing to Object, or Appeal, Acts of*

4

*Prosecutorial Misconduct*   108

**1.**   *Trial counsel's strategy*   110

**2.**   *Prejudicial remarks specifically addressed in petitioner's brief*   114

    **a**.   *References to indictment during opening statement*   115

    **b**.   *Prejudicial references to petitioner*   122

    **c**.   *Contrasting the rights of petitioner and the victim*   131

    **d**.   *References to the victim's life and character*   139

    **e**.   *The suggestion that petitioner might escape*   146-47

    **f**.   *Inappropriate comments regarding the evidence*   152-53

**3.**   *Cumulative effect of the prosecutor's remarks*   155

**H**.   *Exclusion of Testimony Offered by Petitioner's Mother*   160

**1.**   *Failure to reoffer the excluded testimony during penalty phase*   169

**I**.   *Exclusion of Testimony Offered by Patricia Carter*   172

**1.**   *Trial court error*   174

**2.**   *Ineffective assistance of counsel for failing to present Ms. Carter's testimony during the guilt phase of trial*   175

**3.**   *Failure to appeal the exclusion of Ms. Carter's testimony*   176

**J**.   *Exclusion of Testimony Offered by Sandra Gibson*   178

**K**.   *Ineffectiveness of Trial Counsel for Failing to Investigate, Discover, and Present Expert Forensic Testimony*   182

**L**.   *Failure to Consider Mitigating Evidence at Sentencing*   184

**1.**   *Construction of petitioner's claim*   184

**2.**   *The trial court's findings*   188-89

        **a**.  *The trial court's consideration of statutory mitigating circumstances*    191

        **b**.  *The trial court's consideration of allegedly* non-statutory *mitigating circumstances*    194

    **3**.  *Counsel's failure to "properly appeal"*    203

**M**. *Denial of Competency Hearing*    210

    **1**.  *Ineffectiveness of counsel for failing to request a competency hearing*    213

**N**. *Ineffective Assistance of Counsel for Failing to Investigate and Present Evidence of Organic Brain Damage*    214

**O**. *Incompetent Mental Health Expert*    217

**P**. *Ineffective Assistance of Counsel During the Penalty and Sentencing Phases*    220

**Q**. *Erroneous Admission of Oral Statements*    225-26

    **1**.  *Ineffective assistance of counsel*    230

**R**. *Petitioner is Mentally Retarded, and His Execution Will Constitute Cruel and Unusual Punishment*    231

    **1**.  *Procedural history of this claim*    231

    **2**.  *The issue of procedural default*    236

    **3**.  *Section 2254(d) review of the state appellate court's alternative holding*    237-38

    **4**.  *Section 2254(d) review of the Rule 32 trial court's factual finding*    238

        **a**.  *Standards for determining mental retardation suggested by the Supreme Court's opinion in* Atkins v. Virginia    238

        **b**.  *The Alabama standard for determining mental retardation*    241

        **c**.  *The evaluation of petitioner's claim by the Rule 32 court*    243

        **d**.  *Conclusions regarding the Rule 32 court's finding*    248

    **5**.  *The sufficiency of the evidence before this court*    250

6

**S**.   *Erroneous Admission of Pocketknife*                                    254

    **1**.   *Admission of pocketknife*                                       255

    **2**.   *Ineffective assistance of counsel*                              257

**T**.   *Unconstitutionally Vague Statutory Aggravating Circumstance*      261

**U**.   *Failure to Instruct on Manslaughter as a Lesser Included Offense*  262

    **1**.   *Resolution of the substantive claim*                            263

    **2**.   *Resolution of the ineffective assistance of counsel claim*      270

"**II**" *The Applicability of the Supreme Court's Holding in* Ring v. Arizona   275

**VI.  CONCLUSION**                                                           279

**APPENDIX**                                                                  281

----------------------------------------------------------------------------------------------

# I. THE OFFENSE

_____The following summary of the evidence relevant to the offense of conviction is taken from the opinion of the Alabama Court of Criminal Appeals denying petitioner post-conviction relief.  *See Thomas v. State,* 766 So. 2d 860, 870-74 (Ala. Crim. App. 1998).

       At approximately 2:00 a.m. on December 15, 1984, Veronica Grizzard was driving down East Street in Athens, Alabama, with two of her friends.  As Grizzard passed the Athens Middle School, she noticed smoke coming from a house across the street from this school.  Grizzard went to a neighboring house and awakened one Jerry Stephens. Stephen's wife telephoned the Athens Fire  Department.

       Stephens then went to the burning house which was located at 521 East Street and threw rocks through the windows in an attempt to arouse

the occupant of the house, Flossie McLemore.  The front and back doors were too hot to open.

At this time, the fire department arrived.  The firemen began fighting the fire at the front of the house.  After a few minutes, one of the firemen, Jerry Day, was able to enter the house.  He found the body of Flossie McLemore lying on her back in the middle bedroom of the house.

The victim was naked except that her green nightgown was pulled up around her chest.  Her legs were spread in an unnatural position, with one leg in the hallway and the other around the corner of the door into the bedroom.  The coroner was called to the scene and the house was secured.

The firemen noticed the house was in shambles and they noticed blood all over the house.  The kitchen stove and oven were on and the oven door was open.  There were cloth items on the oven door and some burning paper inside the oven in a frying pan.  However, the firemen stated that the oven was not the cause of the house fire.  The living room was the most heavily damaged part of the house.

Several Athens police officers came to the scene shortly after the firemen arrived.  One of the officers noticed a red Chevrolet  parked in the parking lot of the Athens Middle School.  When the officers walked up to the car, one of them saw a man lying down on the front seat of the car.  At this point, the man raised up and one of the officers recognized the man as this appellant.  The appellant had blood all over his chest and pants [the pants were heavily saturated with wet blood and he was not wearing a shirt], and he smelled of alcohol.

At this point, the appellant became belligerent and began cursing.  He was asked to get out of the car and he was placed under arrest for public intoxication.  One of the police officers "patted down" the appellant, and he found a rusty knife and some blood-soaked bills in the appellant's pants pocket.  The appellant then jumped back in the car and locked the doors.  The appellant was persuaded to exit the car and one of

the policemen found a knife on the front seat of this car.  The knife had some blood and hairs on it.

The appellant kept insisting to the police officers that he hadn't done anything.  He said that he had blood on him because he had been in a fight that night and had cut someone "real bad" at 31 Blue Spot in Ardmore, Tennessee.  The appellant was then handcuffed and taken to the police station.  It took several officers to put him in the police car.

An autopsy was performed on the body of the victim by Dr. Joseph Embry.  The autopsy revealed numerous wounds, bruises, and abrasions to the body of the victim.  Embry found numerous post-mortem wounds to the victim's neck, chest, abdomen and pubic area.

Embry also found the existence of several ante-mortem wounds. There was a deep tear in the back wall of the vagina which extended to the area between the vagina and the rectum.  Embry found several other tears to the vagina and rectum and numerous cuts to the buttocks area. Embry stated that the wounds to the vagina and rectum were inflicted with a blunt instrument using considerable force and were indicative of sexual abuse.  Embry also stated that some of the stab wounds and cuts were consistent with having been made by a knife.  [The wounds were consistent with having been made by the knife seized from the driver's seat of petitioner's car].

The victim also sustained several broken ribs.  However, Embry stated that none of the above described injuries were life-threatening. Embry testified that the victim died as a result of asphyxiation caused by a hand or similar instrument applied with force.  There were bruises and tears inside the mouth as well as marked hemorrhaging.

After the appellant was placed in jail, his clothes were confiscated. There was blood all over his body, including his pubic area.   The appellant had a cut to his hand between his third and fourth fingers.

On the morning of December 15, 1984, officers from the Athens Police Department, along with John Kimbrough of the Department of

9

Forensic Sciences, began collecting evidence.  Spots of blood were found leading from the doorstep of the victim's house through the yard and across the street to the point where the appellant's car had been parked. A blood-soaked Kleenex was found in the street.

The appellant and the victim both were type "O" in the ABO blood type system.  However, in the PGM system, the appellant is "type one" and the victim was "type two one."  The spots of blood leading from the house to the appellant's car were consistent with the appellant's blood type as was the blood found on the Kleenex.  A cloth found inside the appellant's car had bloodstains consistent with the appellant's and the victim's blood types.

The officers found what appeared to be screwdriver marks on the window facing the front bedroom at the victim's house.  There was blood on the inside wall of this window.  In this bedroom, the mattress was shoved to the side of the bed and the contents of the dresser drawers were scattered on the floor.  A pillowcase was found under some insulation on the floor.  The pillowcase contained some money and jewelry and a car key.  The key was to the ignition of the appellant's car.  A bloodstained shirt was also found in this bedroom.

A hair found on this shirt was consistent with the defendant's hair. The appellant was identified as having worn this shirt earlier on the night in question.

The rest of the house was similarly in shambles.  Every drawer, closet, and cabinet had been opened and the contents of each strewn about.  Bloodstains were found all over the house, but only a few could be typed due to the heat from the fire.  Two of the bloodstains were consistent with the appellant's blood type.

A check with a bloody fingerprint on it was found in the storage room of the victim's house.  It matched the known left thumb print of this appellant.

Two of the fibers from the knife found inside the appellant's car were similar to fibers from the victim's nightgown and a blanket on her bed. Hair fragments from the knife were consistent with the head and pubic hair of the victim. Trace fibers from the appellant's jeans were consistent with the victim's nightgown. A hair consistent with the victim's was also found on the appellant's jeans. [Fibers found on the soles of Thomas's shoes were similar to the fibers in the carpet in the victim's bedroom.]

Brenda Presnell testified that she was following a red Chevrolet on the night of December 14, 1984, at approximately 11:45 on her way home from work. The car pulled into the parking lot of the Athens Middle School, and the person in the car had curly hair similar to the appellant's.

Penny Corum stated that she was driving home on the night of December 14, 1984, near midnight. She stopped at the corner of East Street and Forrest Avenue and noticed a man crossing the street from the Athens Middle School parking lot. As she turned the corner, she saw the man in the victim's front yard. She identified this man as the appellant.

The appellant presented numerous witnesses who testified as to the appellant's unfortunate childhood. The appellant's father, who was a big influence on the appellant, was an alcoholic and he spent many years in prison. The father died a few weeks before this murder. During his childhood, the appellant was moved from foster home to foster home.

The defense also introduced evidence that the appellant was borderline mentally retarded and a paranoid schizophrenic. They also introduced testimony from a psychologist who believed the appellant had suffered brain damage from the overuse of drugs.

The appellant testified in his behalf. He stated that his father was a role model for him and that he was with his father when he would strip cars and set fires. The appellant also testified that he had used various types of drugs from 1978 until 1983.

11

The appellant's testimony concerning the night in question was similar to the statement he gave the police.  He stated that he went to work on December 14, 1984, and smoked marijuana throughout the day.  That night, he went to a party and smoked pot and drank beer and whiskey.  When he left the party, he went to 31 Blue Spot in Ardmore, Tennessee.  He beat a guy in cards and this person cut him on his hand as he was leaving the club.

The appellant then returned to Athens.  His car went dead in front of the Athens Middle School.  [The appellant's car started when the officer used the key found in the victim's bedroom.]  The appellant got out of his car and began walking home through the victim's yard to his house which was located on the next block.

The appellant noticed the front door to the victim's house was open, and he went inside.  He saw the victim lying on the floor and he "freaked out."  The next thing he remembered was waking up in his car.

The State presented two witnesses on rebuttal who testified that they had evaluated the appellant and found him to be competent to stand trial.  These witnesses were on the lunacy commission, which examined this appellant.

In reviewing the allegations of this petition and the circuit court's findings, we find helpful a more detailed synopsis of Thomas's testimony in regard to the crimes than is found in the original opinion.  Thomas explained:

> [W]hen I turned up yonder to go [to his mother's] home down by the middle school . . . right there at the track, as I was  approaching that hill, my car just went dead.  Good Lord knows I'm telling the truth.  It's done that one or two times going to work.  I just coasted down there to the parking lot, you know.  I put it up in park and got my key and put it in my pocket.  I was going to go down there to get my brother to help me get it to the house, you know.  Besides walking down the road — the city police is bad to go up and down through there all the time any way.  Besides going down

12

the road, I walked through [the victim's] yard. . . .   [W]hen I walked across the yard, I looked up, and her front door was standing open.  I don't know why I went in the house.  Something told me to go in that house.  I might have seen a shadow or something, but I went in there.  Stuff was scattered, and I looked down, and there laid the poor lady.  She had blood on her.  Then I freaked out.  I never seen nothing like that before.  The next thing I know, the police was knocking on my car window.  I raised up, and you know, I guess they was shining a flashlight.  I can't remember.  I rolled down my window.  They opened the door.  The only thing I remember was that I said, "I'm trying to help."  They said, "You ain't trying to help nobody, man."  I felt pain where they put handcuffs behind my back and handcuffed me.  I woke up the next morning in the city jail.  I was wanting to get out because I had to go to work.  All they was supposed to have me for was being drunk.  Later on, up in the morning, they said, "I'm going to charge you for murder."  I didn't even know who I was supposed to have killed.

(R. 1728-29).  When asked to describe specifically where the victim was when he saw her, he testified,

She was [lying] in the middle of the house close to the kitchen.  She was in a door.  I guess it was a bedroom door.  She was [lying] at the door.  Half of her was in it and half of her was out of it, best I can remember.  I broke down when I seen that.  That was the awfulest thing to see.  You know, she was just [lying] there.  I remember that one leg was out and one was up.

(R. 1729).  He also remembered that he saw a Bible on a table, so he turned to the Twenty-third Psalm and read it to her.  He also remembered that he knelt on one knee and put his head next to hers to see if she was still alive, but he did not hear anything and that then "he just freaked out." (R. 1730.)  He admitted that the knife seized from his car was his.  He guessed that his knife must have dropped out of his back pocket onto the car seat; that he must have dropped his car key in the victim's house when he looked for it in his pocket; and that the blood that covered him

13

was blood from his finger, which, he said, had been cut by the cardplayer at the "beer joint" in Tennessee and he had got it on him by rubbing his finger up and down his pants leg.  He could not explain why his fingerprint was on one of the victim's checks.  He adamantly denied that he was stealing anything from the victim.  On cross-examination, Thomas could not explain how his shirt had gotten in one of the victim's bedrooms; why he was looking for his car key even though he said that his car would probably not have started; or why he did not go home after leaving the victim's house.  He guessed that he got fibers from her nightgown on his pants when he knelt down to check her heartbeat.  He further testified that if his knife was on the seat of his car it must have fallen from his pocket onto the seat while he was in Tennessee, and it was not in his pocket when he went in the house.  When asked if he went from room to room, he testified, "I don't remember if I done it because I was trying to find my way back to the front door.  It's hard on me this right here, you know.  My mind goes and comes.  It gets mixed up.  I've been like that for a long time.  Drugs done it to me.  I don't know.  If I did it, it was because I was trying to find my way to the front door."  Thomas further declared, "I don't feel guilty about this because I know I hadn't done nothing but drunk [sic]. . . .  I'm sorry it happened."  (R. 1751.)  When asked if his lawyer was correct in saying that Thomas did not know whether he committed the crimes, he replied, "If I did do it, I sure don't remember doing it.  I don't know if I did or didn't.  I don't believe I could do nothing like that . . . .  I never did do it . . . .  I know I didn't."  (R. 1751-52.)

*Thomas v. State*, 766 So. 2d 860, 870-74 (Ala. Crim. App. 1988) (bracketed alterations in original) (internal quotation marks omitted), *aff'd sub nom Ex parte Thomas*, 766 So. 2d 975 (Ala. 2000).

## II.  PROCEDURAL HISTORY

The Limestone County, Alabama grand jury returned an indictment against Kenneth Glenn Thomas ("petitioner") during January of 1985, charging him with the

intentional murder of Flossie McLemore during the course of a burglary, in violation of Alabama Code § 13A-5-40(a)(4) (1975).[3]  He was convicted by a jury verdict on March 26, 1986.  The following day, at the conclusion of the penalty phase of trial, the jury voted unanimously to recommend a sentence of death.  The trial judge conducted a formal sentencing hearing as required by Alabama Code § 13A-5-47 on April 3, 1986, and, in accordance with the jury's recommendation, sentenced petitioner to death.[4]  The trial judge found the existence of two aggravating circumstances — *i.e.*, the capital offense was committed while the defendant was engaged in the commission

---

[3] The indictment was framed in four counts, and the first charged the capital offense.  It read as follows:

> The Grand Jury of said County charge that[,] before the finding of this indictment, Kenneth Glenn Thomas, whose name is otherwise unknown to the Grand Jury, did, intentionally cause the death of Flossie McLemore, by obstructing her air passage, thereby suffocating or asphyxiating her, using a blunt instrument, object, or artifact, and Kenneth Glenn Thomas caused said death during the time that Kenneth Glenn Thomas knowingly and unlawfully entered or remained, or attempted to enter or remain unlawfully[,] in the dwelling of Flossie McLemore, with intent to commit the crime of theft therein, and while effecting entry or while in the dwelling or in the immediate flight therefrom, said Kenneth Glenn Thomas was armed with a knife, a deadly weapon, in violation of § 2(a) of Act No. 81-178, Code of Alabama, 1975, § 13A-5-40(a)(4), against the peace and dignity of the State of Alabama.

Trial Court Record ("C.R."), at 20.  The remaining counts of the indictment charged defendant with: arson in the first degree, in violation of Ala. Code § 13A-7-41 (1975) (Count Two); robbery in the first degree, in violation of *id*. § 13A-8-41 (Count Three); and sexual abuse in the first degree, in violation of *id*. § 13A-6-66 (Count Four).

[4] In addition, the trial judge sentenced petitioner to life imprisonment without the possibility parole for his convictions on the robbery, arson, and sexual abuse offenses charged in Counts Two through Four.

15

of a burglary in the first or second degree,[5] and, the capital offense was especially heinous, atrocious, or cruel, compared to other capital offenses[6] — but no mitigating circumstances, statutory or non-statutory. *See* C.R. at 294-99, 300-01;[7] *see also* Ala. Code § 13A-5-48 (1975).

The Alabama Court of Criminal Appeals affirmed petitioner's conviction and death sentence in a published opinion entered on March 22, 1988. *See Thomas v. State,* 539 So. 2d 375 (Ala. Crim. App. 1988). Rehearing was denied on April 26, 1988. The Supreme Court of Alabama affirmed the conviction and sentence on December 16, 1988. *See Ex parte Thomas*, 539 So. 2d 399 (Ala. 1988) (*per curiam*). Rehearing was denied on January 16, 1989. The United States Supreme Court denied *certiorari* on June 19, 1989. *See Thomas v. Alabama,* 491 U.S. 910 (1989).

After exhausting his direct appeal rights, petitioner filed a "petition for relief from judgment" in the trial court pursuant to Temporary Rule 20 of the provisional *Alabama Rules of Criminal Procedure*. He later filed an amended petition based upon

---

[5] *See* Ala. Code § 13A-5-49(4) (1975).

[6] *Id*. § 13A-5-49(8).

[7] For purposes of consistency, and to minimize confusion when reviewing the voluminous record in this case, this court adopts petitioner's method of referencing documents and transcript excerpts: *i.e*., references to the original trial transcript are designated "**R.___**"; references to the trial court record are designated "**C.R. ___**"; references to specific pages in the transcript of the Rule 32 post-conviction hearing are designated "**Rule 32 R. ___**"; and references to the clerk's record of the Rule 32 proceedings are designated "**Rule 32 C.R.___**".

16

Rule 32 of the permanent procedural rules.  The trial court convened an evidentiary hearing on March 4, 1993, and denied post-conviction relief on December 30, 1993. *See* Rule 32 C.R.,[8] at 719-55.  The Alabama Court of Criminal Appeals affirmed the denial of post-conviction relief in a published opinion entered on September 4, 1998. *See Thomas v. State,* 766 So. 2d 860 (Ala. Crim. App. 1998).  Rehearing was denied on October 23, 1998.  The Supreme Court of Alabama affirmed the denial of post-conviction relief in a published opinion entered on March 31, 2000.  *See Ex parte Thomas*, 766 So. 2d 975 (Ala. 2000).  Thomas filed his current petition seeking relief from judgment pursuant to 28 U.S.C. § 2254 on March 28, 2001.

### III.  THE CLAIMS

The original petition contains twenty-one claims, identified by the letters "A" through "U":

A.  The trial court's failure to grant Mr. Thomas' motion for a change of venue violated his right to a fair trial by an impartial jury guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the constitution and laws of the State of Alabama.  *Sheppard v. Maxwell*, 384 U. S. 333 (1966).

B.  Trial counsel was ineffective for failing to fully research, prepare and argue the motion for a change of venue in violation of his right to counsel under the Sixth Amendment to the United States Constitution and the laws of the State of Alabama.  *Strickland v. Washington*, 466 U.S. 668 (1984).

---

[8] *See supra* note 7.

C.    Mr. Thomas was deprived of a fair and impartial jury and to due process of law in violation of his rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the constitution and laws of the State of Alabama by the trial court's failure to excuse for cause certain jurors who expressed fixed opinions about his guilt or who indicated that they would automatically impose the death penalty if Mr. Thomas was convicted. *Wainwright v. Witt*, 469 U.S. 412 (1985).

D.    Mr. Thomas was deprived of due process, equal protection, and a fair trial and sentencing due to the trial court's refusal to provide funds for expert assistance for a jury expert.

E.    Mr. Thomas was deprived of a fair trial by an impartial jury by the prosecutor's racially discriminatory use of peremptory challenges. *Batson v. Kentucky*, 476 U.S. 79 (1986).

F.    The prosecutor's blatant misconduct exhibited throughout the guilt/innocence and sentencing phases of Mr. Thomas' trial and trial counsel's failure to object and appeal the prosecutorial misconduct severely prejudiced the trial atmosphere and denied Mr. Thomas a fair trial in violation of Mr. Thomas' rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the constitution and laws of the State of Alabama. *Darden v. Wainwright*, 477 U.S. 168 (1986).

G.    Trial counsel was ineffective for failing to object to or appeal the prosecutorial misconduct. *Strickland v. Washington*, 466 U.S. 688 (1984).

H.    Mr. Thomas' rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the constitution and laws of the State of Alabama were violated by the trial court's exclusion of mitigating evidence (the testimony of Ms. Ratliff) on the pretense that the evidence was not admissible under arbitrary and improperly applied evidentiary laws.

I.    Mr. Thomas' rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the constitution and laws of the State of Alabama were violated by the trial court's exclusion of mitigating

18

evidence (the testimony of Pat Carter) on the pretense that the evidence was not admissible under arbitrary and improperly applied evidentiary laws.

J.  Mr. Thomas' rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the constitution and laws of the State of Alabama were violated by the trial court's exclusion of mitigating evidence (the testimony of Sandra Gibson) on the pretense that the evidence was not admissible under arbitrary and improperly applied evidentiary laws.

K.  Trial counsel was ineffective for failing to investigate, discover and present expert testimony on forensic evidence and other evidence at the crime scene.

L.  The trial court failed to consider statutory and nonstatutory mitigating evidence at sentencing and Mr. Thomas' attorneys failed to appeal this issue in violation of Mr. Thomas' rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the constitution and laws of the State of Alabama.

M.  Mr. Thomas was denied his right to a constitutionally adequate competency hearing and his attorneys were ineffective for failing to request one in violation of Mr. Thomas' rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the constitution and laws of the State of Alabama. *Pate v. Robinson*, 383 U.S. 375 (1966).

N.  Mr. Thomas did not receive effective assistance of counsel at the guilt/innocence or sentencing phases of his trial in violation of his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the constitution and laws of the State of Alabama because his trial counsel failed to investigate and present to the jury that Mr. Thomas suffered from organic brain damage. *Strickland v. Washington*, 466 U.S. 668 (1984).

O.  Mr. Thomas' rights to a fair trial and a fair sentencing guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the constitution and laws of the State of Alabama were violated because the defense's expert witness failed to provide assistance in a minimally competent manner. *Ake v. Oklahoma*, 470 U.S. 68 (1985).

P.     Mr. Thomas did not receive effective assistance of counsel at the sentencing phase of his trial in violation of his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the constitution and laws of the State of Alabama because his trial counsel failed to investigate and present to the jury mitigating evidence regarding Mr. Thomas' background. *Strickland v. Washington*, 466 U.S. 668 (1984).

Q.     The trial court erroneously permitted Mr. Thomas' oral statements to the police to be admitted into evidence in violation of his rights guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the constitution and laws of the State of Alabama. *Miranda v. Arizona*, 384 U.S. 436 (1966).

R.     The execution of Mr. Thomas, who is mentally retarded, would violate his rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and laws of the State of Alabama.

S.     Mr. Thomas' rights to a fair trial and due process of law guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of Alabama were violated by the failure of the police to follow proper procedures to preserve potentially exculpatory evidence and his attorneys' failure to appeal the admission of certain evidence. *Arizona v. Youngblood*, 488 U.S. 51 (1988).

T.     Mr. Thomas' death sentence was imposed in violation of his rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the Constitution of Alabama because the statutory aggravating circumstances enumerated in Section 13A-5-49(8), Code of Alabama (Supp. 1988), are unconstitutionally vague as applied. *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980).

U.     The trial court's failure to instruct the jury on the lesser included offense of manslaughter and his trial counsel's failure to properly preserve and appeal this issue deprived Mr. Thomas of his rights to due process of law and a fair trial in violation of his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the Constitution and laws

of the State of Alabama. *Beck v. Alabama*, 447 U.S. 625 (1980); *Strickland v. Washington*, 466 U.S. 668 (1984).

Petitioner's supplemental brief includes an augmentation of his eighteenth claim ("R"), based upon the Supreme Court's intervening decision in *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (holding that the execution of mentally retarded persons constitutes "cruel and unusual punishment" in violation of the Eighth Amendment). In addition, petitioner relies upon the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), as the basis for a new claim: *i.e.*, the Alabama statute under which he was sentenced to death violates the Sixth Amendment to the United States Constitution because it requires the trial judge, without the aid of a jury, to make the findings necessary for imposition of a death sentence.[9]

## IV. STANDARDS OF REVIEW

On April 24, 1996, President Clinton signed into law the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), amending the pre-existing habeas statutes. The present petition was filed after that date. Accordingly, AEDPA's provisions apply to the claims in this case. *See id.*

---

[9] Doc. no. 74 (Petitioner's Supplemental Brief), at 22.

21

§ 107(c), 110 Stat. at 1226; *Martin v. Hadix*, 527 U.S. 343, 356 (1999) (discussing retroactivity of AEDPA amendments to § 2254)[10]

**A**.   *The Effect of AEDPA*

AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)).  The Act requires federal courts to give greater deference to state court determinations of federal constitutional claims than was accorded such decisions under previous law.  *See*, *e.g.*, *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001).  For example, a state court's factual determinations are presumed to be correct unless rebutted by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005).  Moreover, when a state court fairly addresses the merits of a federal constitutional claim and adequately explains the basis for its decision, habeas relief cannot be granted unless it is determined that the state court's adjudication of the claim:

---

[10] *See also*, *e.g.*, *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (applying AEDPA to habeas petitions filed after Act's effective date); *Hightower v. Schofield*, 365 F.3d 1008, 1013 (11th Cir. 2004) (same).  *Cf. Lindh v. Murphy*, 521 U.S. 320, 327 (1997) (holding that ADEPA's amendments do not apply to habeas petitions filed prior to the Act's effective date); *Johnson v. Alabama*, 256 F.3d 1156, 1169 (11th Cir. 2001) (same); *Thompson v. Haley*, 255 F.3d 1292, 1295 (11th Cir. 2001) (same).

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).   The statutory phrase "clearly established federal law, as determined by the Supreme Court of the United States," refers to "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., majority opinion); *see also*, *e.g.*, *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have been "interpreted as independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) (citing *Williams*, 529 U.S. at 405-07).[11]   A state-court

---

[11] *See also Williams v. Taylor*, 529 U.S. at 404 (O'Connor, J., majority opinion) ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court.  Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States*," or (2) "*involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States*.") (emphasis supplied).

23

determination can be "contrary to" clearly established Supreme Court precedent in at least two ways:

> *First*, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. *Second*, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams*, 529 U.S. at 405 (emphasis supplied). *See also*, *e.g.*, *Brown v. Payton*, 544 U.S. 133, 141 (2005) (same); *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*) (same); *Putman v. Head*, 268 F.3d 1223, 1240-41 (11th Cir. 2001) (same). The Eleventh Circuit has observed that the majority opinion in *Williams* does not limit the construction of § 2254(d)(1)'s "contrary to" clause to the two examples set forth above. Instead, the statutory language "simply implies that 'the state court's decision must be substantially different from the relevant precedent of [the Supreme] Court.'" *Alderman v. Terry*, 468 F.3d at 791 (quoting *Williams*, 529 U.S. at 405).[12]

---

[12] Indeed, the possible permutations are not just two, but at least four in number, as one commentator has observed.

> The word "contrary" denotes incompatibility or logical inconsistency. Two propositions are incompatible with one another if both cannot be true or correct. Thus, a state court decision is contrary to federal law if that decision and the applicable federal law cannot both be true or correct. Given this premise, there appears to be four possible combinations of state court adjudications and resulting decisions that are pertinent to this textual inquiry:

> - the state court applies the correct federal standard and arrives at a correct outcome;

On the other hand, a state-court determination of a federal constitutional claim can result in an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

> *First*, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. *Second*, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams*, 529 U.S. at 407 (emphasis supplied). *See also*, *e.g., Putman v. Head*, 268 F.3d 1223, 1240-41 (11th Cir. 2001) (same). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of

---

- the state court applies an incorrect federal standard and arrives at an incorrect outcome;

- the state court applies an incorrect federal standard and arrives at a correct outcome; and,

- the state court applies the correct federal standard and arrives at an incorrect outcome.

Allan Ides, *Habeas Standards of Review Under 28 U.S.C. § 2254(d)(1): A Commentary on Statutory Text and Supreme Court Precedent*, 60 WASH. & LEE L. REV. 677, 685 (2003) (footnotes omitted).

clearly established federal law was *objectively* unreasonable." *Williams*, 529 U.S. at 409 (emphasis added).[13]

In other words, the question that should be asked is *not* whether the state court "correctly" applied Supreme Court precedent when deciding the federal constitutional issue, but whether the state court's determination was "reasonable," *even if incorrect.* *See*, *e.g.*, *Bell*, 535 U.S. at 694 (observing that the "focus" of the inquiry into the reasonableness of a state court's determination of a federal constitutional issue "is on whether the state court's application of clearly established federal law is objectively unreasonable," and, "an unreasonable application is different from an incorrect one"); *Williams*, 529 U.S. at 411 (holding that a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

---

[13] The Eleventh Circuit recently observed that § 2254(d)(1)'s "unreasonable application" provision is the proper statutory lens for viewing the "run-of-the-mill state-court decision applying the correct legal rule." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006).

> In other words, if the state court identified the correct legal principle but unreasonably applied it to the facts of a petitioner's case, then the federal court should look to § 2254(d)(1)'s "unreasonable application" clause for guidance. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively* unreasonable."

*Id*. (quoting *Williams v. Taylor*, 529 U.S. at 409).

In addition to the companion provisions of § 2254(d)(1), subsection (d)(2) regulates federal court review of state court findings of fact.  That provision limits the availability of relief to decisions that were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  *See also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

**B**.    *Claims of Ineffective Assistance of Counsel*

The Supreme Court established a two-pronged standard for judging, under the Sixth Amendment, the effectiveness of attorneys who represent criminal defendants at trial or on direct appeal in *Strickland v. Washington*, 466 U.S. 668 (1984).[14]

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  *First*, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious

---

[14] Ineffective assistance of counsel claims are specifically limited to the performance of attorneys who represent a defendant at trial or on direct appeal from the conviction.  *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").  *See also Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings.  Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.") (citations omitted).

> that counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. *Second*, the defendant must show
> that the deficient performance prejudiced the defense. This requires
> showing that counsel's errors were so serious as to deprive the defendant
> of a fair trial, a trial whose result is reliable. Unless a defendant makes
> both showings, it cannot be said that the conviction or death sentence
> resulted from a breakdown in the adversary process that renders the result
> unreliable.

*Id*. at 687 (emphasis supplied); *see also Williams v. Taylor*, 529 U.S. 362, 390 (2000)

(same).

The two parts of the *Strickland* standard are conjunctive, and a petitioner

accordingly bears the burden of proving *both* "deficient performance" *and* "prejudice"

by "a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d

1305, 1313 (11th Cir. 2000) (*en banc*). Thus, a court is not required to address both

aspects of the *Strickland* standard when a habeas petitioner makes an insufficient

showing on one of the prongs. *See, e.g., Holladay v. Haley*, 209 F.3d 1243, 1248

(11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a

violation of the Sixth Amendment, the court need not address the performance prong

if the defendant cannot meet the prejudice prong, or vice versa.").

**1**.    *The performance prong*

To satisfy the deficient performance prong of the *Strickland* test, a defendant

must prove that counsel made errors so serious that he or she was not functioning as

the counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The standard for gauging attorney performance is "reasonableness under prevailing professional norms." *Id*. at 688; *see also Williams*, 529 U.S. at 390-91 (same); *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (same).

Judicial scrutiny of counsel's performance is required to be "highly deferential," because representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. *See Strickland*, 466 U.S. at 697. Indeed, reviewing courts are instructed that they "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689.

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; *that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy*. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (emphasis supplied) (citations and internal quotation marks omitted); *see also*, *e.g.*, *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994) (holding that, "[w]hen reviewing whether an attorney is ineffective, courts should always presume strongly that counsel's performance was reasonable and adequate") (internal quotation marks omitted)).

The reasonableness of counsel's performance is judged from the perspective of the attorney, at the time of the alleged error, and, in light of all circumstances. *See*, *e.g.*, *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) (giving lawyers "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1285-86 (11th Cir. 1998) (noting that *Strickland* performance review is a "deferential review of all of the circumstances from the perspective of counsel at the time of the alleged errors").

> Under this standard, there are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted. [*Chandler*, 218 F.3d] at 1317. Indeed, as we have recognized, "[a]bsolute rules would interfere with counsel's independence — which is also constitutionally protected — and would restrict the wide latitude counsel have in making tactical decisions." *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).

*Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005).

In order to rebut the presumption that counsel's conduct fell within the wide range of reasonable professional assistance, a habeas petitioner must establish that "no

competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315 (footnote and citation omitted). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d at 386.

**2**.    *The prejudice prong*

To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694; s*ee also Williams*, 529 U.S. at 391 (same).  The fact that counsel's error may have "had some conceivable effect on the outcome of the proceeding" is not sufficient to show prejudice.  *Strickland*, 466 U.S. at 693; *see also Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (same); *Tompkins v. Moore*, 193 F.3d 1327, 1336 (11th Cir. 1999) (same).  Instead, a petitioner must present competent evidence proving "that trial counsel's deficient performance deprived him of 'a trial whose result is reliable.'" *Brown v. Jones*, 255 F.3d 1272, 1278 (11th Cir. 2001) (quoting *Strickland*, 466 U.S. at 687).  Stated somewhat differently, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict

31

rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (quoting *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996) (in turn quoting *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986))) (internal quotation marks omitted); *see also*, *e.g.*, *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (holding that, to show prejudice, "a defendant must show that counsel's errors were so serious that they rendered the defendant's trial unfair or unreliable, not merely that the outcome would have been different").

A habeas petitioner "must affirmatively prove prejudice, because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.'" *Gilreath*, 234 F.3d at 551 (quoting *Strickland*, 466 U.S. at 693).

### 3. *Deference accorded state court findings of historical fact*

"State court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)[(2) and (e)(1)]." *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001).

### C. *Procedural Defaults*

It is a well-settled principle of law that, when a state prisoner fails to present a federal constitutional claim in the state courts in a timely and proper manner, and the state courts refuse to address the merits of the claim based on state law principles, a

federal habeas court also is precluded from addressing the claim, absent a showing of cause for the default and actual prejudice as a result, or evidence establishing that the failure to consider the claim would result in a fundamental miscarriage of justice. *See*, *e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 81-88 (1977); *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001); *Presnell v. Kemp*, 835 F.2d 1567, 1567-68 (11th Cir. 1988).

This so-called "procedural default doctrine" bars federal habeas review of state court rejections of a state prisoner's claim when three circumstances converge:  *i.e.*, (*i*) the last state court to review the claim (*ii*) states clearly and expressly that its disposition of the claim rests on a state-law bar, and (*iii*) the state-law ground "is *independent* of the federal question and *adequate* to support the judgment." *Coleman*, 501 U.S. at 729-30 (emphasis supplied); *see also*, *e.g.*, *Harris v. Reed*, 489 U.S. 255, 262-63 (1989); *Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991).

The default doctrine applies with equal force "regardless of 'whether the state-law ground is substantive or procedural.'"  *Lee v. Kemna*, 534 U.S. 362, 374 (2002) (quoting *Coleman*, 501 U.S. at 729); *see also id*. at 375 (same).

A state-law bar is "*independent* of the federal question" when it "rests solidly on state law grounds [that are] not intertwined with an interpretation of federal law."

33

*Judd*, 250 F.3d at 1313 (emphasis supplied) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)).

A state-law bar is deemed to be "*adequate* to support the judgment" when it is "firmly established and regularly followed," *Hurth v. Mitchem*, 400 F.3d 857, 858 (11th Cir. 2005) (emphasis supplied),[15] *and*, it is not "applied in an arbitrary or unprecedented fashion" that is "'manifestly unfair' in its treatment of the petitioner's federal constitutional claim." *Judd*, 250 F.3d at 1313 (quoting *Card*, 911 F.2d at 1517). "'[T]he adequacy of state procedural bars to the assertion of federal questions' . . . is not within the State's prerogative finally to decide; rather adequacy 'is itself a federal question.'" *Lee v. Kemna*, 534 U.S. at 375 (quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).

**1**.    *Overcoming procedural defaults*

There are only three circumstances in which a state-law ground will not bar a federal habeas court from considering a constitutional claim that was defaulted in state court: (*a*) the petitioner shows cause for, and actual prejudice as a result of, failing to comply with the state-law ground; or (*b*) failure to consider the petitioner's claim will result in a "fundamental miscarriage of justice"; or (*c*), as discussed in the previous

---

[15] *See also*, *e.g.*, *Lee v. Kemna*, 534 U.S. 362, 376 (2002); *Hill v. Jones*, 81 F.3d 1015, 1023 (11th Cir. 1996); *Cochran v. Herring*, 43 F.3d 1404, 1408, *modified on reh'g*, 61 F.3d 20 (11th Cir. 1995).

34

section in connection with the "adequacy" of a state bar, the state-law ground was not "firmly established and regularly followed." *See Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring). *See also*, *e.g.*, *Coleman*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."); *Smith v. Murray*, 477 U.S. 527, 537 (1986) (same); *Davis v. Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (in turn quoting *Murray v. Carrier*, 477 U.S. at 496)).

### *a*.   *The "cause and prejudice" standard*

The "cause *and* prejudice" standard obviously is framed in the conjunctive and, therefore, a petitioner must prove both parts.  To show "cause," a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts to

comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Examples of "objective" impediments to compliance with a state-law substantive or procedural rule include, but are not limited to, such factors as: (*i*) the novelty of the claim, *see Reed v. Ross*, 468 U.S. 1, 16 (1984) ("[W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures."); (*ii*) *constitutionally* ineffective assistance of counsel, *see McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) ("Attorney error short of ineffective assistance of counsel . . . does not constitute cause and will not excuse a procedural default."); or (*iii*) some interference by state officials that make compliance impracticable. *See Murray v. Carrier*, 477 U.S. at 488 (citing *Brown v. Allen*, 344 U.S. 443, 486 (1953)).

If "cause" for the default is established, a habeas petitioner also must prove "prejudice." He must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

> ***b***.    *The "fundamental miscarriage of justice" standard*

In a rare, extraordinary, and a narrow class of cases,[16] a federal court may consider a procedurally defaulted claim in the absence of a showing of "cause" for the procedural default, but only *if* (*i*) a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537-38 (1986) (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982), and *Murray v. Carrier*, 477 U.S. at 496), or *if* (*ii*) the petitioner shows "by clear and convincing evidence that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323, 327 & n.44 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)); *see also, e.g., Smith v. Murray*, 477 U.S. at 537-38.

## V.  DISCUSSION

*We have, in most instances, found that our attempt to determine exactly what Thomas is arguing has been more challenging than our consideration of the substance of the legal issues presented. We have repeatedly been frustrated by the manner in which Thomas has presented issues for this court's review.*

---

[16] *See Schlup v. Delo*, 513 U.S. 298, 321 (1995) ("To ensure that the fundamental miscarriage of justice exception would remain '*rare*' and would only be applied in the '*extraordinary* case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.") (emphasis supplied); *McClesky v. Zant*, 499 U.S. 467, 494 (1991) ("Federal courts retain the authority to issue the writ of habeas corpus in a further, *narrow class of cases* despite a petitioner's failure to show cause for a procedural default.   These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime. We have described this class of cases as implicating a fundamental miscarriage of justice.") (emphasis supplied) (citing *Murray v. Carrier*, 477 U.S. 478, 485 (1986)).

*Thomas v. State*, 766 So. 2d 860, 884 n.5 (Ala. Crim. App. 1998) (emphasis supplied).[17]

**A**.    *Denial of Motion to Change Venue*

Petitioner claims that the trial court's failure to grant his motion for change of venue violated his right to a fair trial by an impartial jury,[18] and that the decisions of the state appellate courts affirming that ruling were contrary to clearly established federal law, as determined by the Supreme Court's holdings in *Sheppard v. Maxwell*, 384 U.S. 333 (1966), and *Irvin v. Dowd*, 366 U.S. 717 (1961),[19] and "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings."[20]  *See* 28 U.S.C. § 2254(d).

---

[17] *See also Thomas v. State*, 766 So. 2d at 876 (characterizing petitioner's brief as, "for the most part, a maze of one insignificant allegation after another, without any meaningful discussion of law or facts") (footnote omitted).  In the omitted footnote, the Alabama Court of Criminal Appeals observed that

> [t]he length of this opinion is directly attributable to Rule 32 appellate counsel's failure to adhere to the requirements of Rule 28, Ala. R. App. P.  Although this failure has in no way diminished our level of review of the points raised, we consider it an indication that appellate counsel believes the majority of points in issue are not worthy of argument, i.e., they are clearly without merit.

*Id*. at 876 n.3.  This court concurs with all of the above.

[18] *See* doc. no. 1 (Petition) ¶¶ 69-86 (Claim "A").

[19] *See* doc. no. 35 (Petitioner's Brief), at 23.

[20] *Id*. at 24 (quoting 28 U.S.C. § 2254(d)(2)).

38

The right to a fair and impartial jury, free from the prejudicial influence of external factors like inflammatory publicity, is clearly established.  The Supreme Court has recognized that publicity of a criminal case, either before or during a trial, can prejudice jurors and, thereby, deprive a defendant of the right to a fair trial by an impartial jury.  *See*, *e.g.*, *Chandler v. Florida*, 449 U.S. 560, 574 (1981) (observing that any highly publicized criminal trial presents a risk of compromising a defendant's right to a fair trial); *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966) (holding that a jury's deliberations should be based upon evidence presented in open court, not on external publicity).

The standards governing the question of whether a defendant's motion for a change of venue should be granted because of extensive publicity prejudicial to the interests of the accused derive from the Fourteenth Amendment's Due Process Clause, "which safeguards a defendant's Sixth Amendment right to be tried by a panel of impartial, indifferent jurors." *Coleman v. Kemp*, 778 F.2d 1487, 1489 (11th Cir. 1985) (internal citations and quotation marks omitted); *see also*, *e.g.*, *United States v. Davis*, 583 F.2d 190, 197 (5th Cir. 1978) ("A fundamental principle of due process requires that the jury's verdict be based on evidence received in open court, not from outside sources.").[21]

---

[21] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down

> In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136. In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as "indifferent as he stands unsworne." Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807). "The theory of the law is that a juror who has formed an opinion cannot be impartial." *Reynolds v. United States*, 98 U.S. 145, 155.

*Irvin v. Dowd*, 366 U.S. at 722 (some citations omitted).

Nevertheless, "even pervasive, adverse publicity does not inevitably lead to an unfair trial." *Nebraska Press Association v. Stuart*, 427 U.S. 539, 554-55 (1976). It follows, therefore, that a change of venue is not mandated simply because "potential jurors have been exposed to the facts of the case." *Meeks v. Moore*, 216 F.3d 951, 960 (11th Cir. 2000). Instead, the question a trial court must ask when considering a defendant's motion for change of venue is whether the publicity surrounding the case has given jurors such fixed opinions that they cannot impartially judge the defendant's guilt or innocence based upon evidence presented at trial. That was the holding of *Patton v. Yount*, 467 U.S. 1025 (1984), where the Supreme Court said:

---

prior to the close of business on September 30, 1981.

> The Court of Appeals below thought that the fact that the great majority of veniremen "remembered the case" showed that time had not served "to erase highly unfavorable publicity from the memory of [the] community." This conclusion, without more, is essentially irrelevant. *The relevant question is* not whether the community remembered the case, but *whether the jurors* at [the petitioner's] trial *had such fixed opinions that they could not judge impartially the guilt of the defendant.*

*Id*. at 1035 (emphasis supplied) (citing *Irvin v. Dowd*, 366 U.S. at 723).

When addressing that question, the trial judge should recognize that the constitutional requirement of impartiality does not require that only those persons having *no knowledge* of the underlying criminal offense be seated as jurors.

> *It is not required . . . that the jurors be totally ignorant of the facts and issues involved.*  In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in criminal cases.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.*

*Irvin v. Dowd*, 366 U.S. at 722-23 (emphasis supplied) (citations omitted).  *See also*, *e.g.*, *Mills v. Singletary*, 63 F.3d 999, 1011-12 (11th Cir. 1995) (holding that the jury in a capital murder case was not prejudiced to the extent that it gave rise to a constitutional violation, even though 74 of 80 venirepersons (92.5 %) had some

41

knowledge of the case, 55 of those (74 %) had read at least one article about the case, and 24 of the 80 prospective jurors (30 %) were stricken for bias, because the media coverage "was essentially factual and was not directed at arousing or inciting the passion of the community") (quoting *Devier v. Zant*, 3 F.3d 1445, 1462 (11th Cir. 1993) (*per curiam*)).

A habeas petitioner must prove the coexistence of at least two circumstances in order to establish juror bias that rises to the level of a constitutional violation:  first, he must establish that pretrial publicity was "inflammatory [and] prejudicial," *Coleman v. Kemp*, 778 F.2d 1487, 1490 (11th Cir. 1985) (quoting *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980)); and, second, he must demonstrate that such publicity *either* (a) actually prejudiced an individual juror who deliberated on verdicts, *see*, *e.g.*, *Murphy v. Florida*, 421 U.S. 794, 800-03 (1975); *Mills v. Singletary*, 63 F.3d at 1009, *or* (b) so saturated the community from which jurors were summoned, and so pervaded the trial proceedings, that it gives rise to a presumption of inherent prejudice. *See*, *e.g.*, *Sheppard*, 384 U.S. at 355-57 (prejudice presumed because trial judge allowed reporters free reign in the courtroom, and failed to take protective measures); *Estes v. Texas*, 381 U.S. 532, 544 (1965) (prejudice presumed, despite no identifiable showing of prejudice to any defendant, because the trial court proceedings were televised); *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963) (prejudice presumed

because defendant's confession was televised prior to trial); *Woods v. Dugger*, 923 F.2d 1454, 1460 (11th Cir. 1991) (prejudice presumed due to the hostile atmosphere pervading the small, rural community in which defendant's capital murder trial for the killing of a prison guard occurred, and, a number of prison guards attended the trial in full uniform to show solidarity with the deceased); *Coleman v. Kemp*, 778 F.2d 1487, 1540 (11th Cir. 1985) (prejudice presumed because of "inflammatory and prejudicial pretrial publicity that so pervaded the [small town in which the murders occurred] as to render virtually impossible a fair trial before an impartial jury"); *Isaacs v. Kemp*, 778 F.2d 1482, 1484-86 (11th Cir. 1985) (same).

**1**.    *Petitioner's "actual prejudice" claim*

Petitioner argues that voir dire of the venire summoned for the trial of his case demonstrated "a clear connection between the publicity generated by the media and the existence of actual jury prejudice."[22]   He identified ten prospective jurors that his trial attorneys challenged for cause, because each allegedly held either fixed opinions as to his guilt or a bias against his insanity defense, but who were not removed from the venire:  *i.e*., Alan Boyd, Barry Broadway, Johnie Eckstein, Mary Gray, Robert Haney, Naomi Lovell, Jerry Pack, Harry Patterson, Paul Skipworth, and William

---

[22] Doc. no. 1 (Petition) ¶ 79, at 14-15.

Turpen.[23]   However, only three of these ten venirepersons — Alan Boyd, Johnie Eckstein, and Paul Skipworth — were seated as members of petitioner's trial jury.  To determine whether petitioner suffered "actual prejudice," therefore, this court will focus upon only those jurors.

> To find the existence of actual prejudice, two basic prerequisites must be satisfied.  First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty.   Second, these jurors, it must be determined, could not have laid aside these preformed opinions and rendered a verdict based on the evidence presented in court.

*Coleman v. Zant*, 708 F.2d 541, 544 (11th Cir. 1983) (internal citations and quotation marks omitted); *see also Meeks v. Moore*, 216 F.3d at 961 (same).

      **a**.   *Alan Boyd and Johnie Eckstein*

According to petitioner, jurors Boyd and Eckstein "stated that a person should be punished even if he is insane."[24]   Eckstein also allegedly placed "too heavy a burden on [petitioner] to prove insanity," because he "stated that a person was not insane who had no history of [a] mental disorder."[25]   Petitioner argues on the basis of these allegations that Boyd and Eckstein failed to consider whether he was "under the

---

[23] *Id*. ¶ 81, at 15.

[24] Doc. no. 1 (Petition) ¶ 104, at 21 (asserting that four jurors — Broadway, Boyd, Eckstein, and Pack — made this statement).

[25] *Id*. ¶ 106, at 21 (citing R. 266-67).

44

influence of [an] extreme mental or emotional disturbance" at the time of the offense,[26]

and that their views "concerning mental illness prevented or substantially impaired the

performance of their duties as jurors to consider mitigating circumstances" as required

by Alabama Code § 13A-5-51.[27]

The primary problem with petitioner's argument lies in the fact that neither

attitude is attributable to prejudicial pretrial publicity. Moreover, petitioner presents

only piecemeal portions of the individual *voir dire* of the jurors at issue. As the

Supreme Court observed in *Wainwright v. Witt*, 469 U.S. 412 (1985), a habeas

petitioner's

> attempt to separate the answers from the questions misses the mark; the
> trial court, hopefully imbued with a fair amount of common sense as well
> as an understanding of the applicable law, views the questioning as a
> whole. . . . One of the purposes of § 2254(d) was to prevent precisely
> this kind of parsing of trial court transcripts to create problems on
> collateral review where none were seen at trial.

*Id.* at 434. A close examination of the entire *voir dire* of jurors Boyd and Eckstein

does not support petitioner's contentions.

### ***i***.    *Voir dire of Alan Boyd*

Boyd acknowledged pretrial exposure to print and electronic media accounts of

the case. With regard to television, he had viewed broadcasts on Channel 19 that

---

[26] *Id.* ¶ 107, at 21.

[27] *Id.* ¶ 108, at 22.

included video footage of petitioner being placed in a sheriff's patrol car, and heard petitioner's verbal denial of committing a crime.[28]  When asked whether anything he had seen or heard was of such "quantity or quality" that he could not serve as an impartial juror, however, Boyd answered in the negative, and affirmed that he could lay all media accounts of the case aside, and base his verdicts on the evidence presented at trial.[29]  When asked whether anything he had read or heard made him believe that petitioner was "more than likely guilty," Boyd answered, "No, sir."[30]

Boyd had no personal experiences with persons who suffered from "nervous problems," "mental problems," "schizophrenia," or "mental retardation,"[31] but

---

[28] *See* R. 201.

[29] R. 201.

[30] R. 202.

[31] The Alabama Court of Criminal Appeals noted in its opinion on collateral review that, during the voir dire process,

> defense counsel's initial questioning of the veniremembers as a group revealed those veniremembers who knew, in any degree, anyone who was retarded; who were very close to anyone who had psychological problems; who had taken psychology courses in college; and who, among those having taken college psychology courses, had taken an interest in psychology.  Then, on individual voir dire of all of the veniremembers, defense counsel thoroughly explored the veniremembers' experiences with anyone who was mentally retarded or mentally ill and explored their views on mental illness, on mental retardation, on the possibilities of remission of a mental illness and temporary insanity, on the benefits of treatment by mental health professionals, and on the insanity defense and on the punishment of a person for a crime committed while suffering from a mental disease or defect, particularly an awful capital crime. This questioning certainly indicated each member's willingness or lack thereof to consider any possible mitigating evidence relating to Thomas's mental capacity and mental health.

expressed a belief that subjective mental diseases or defects can be just as "real" to persons so afflicted as objectively physical disorders, and he demonstrated a basic understanding of the psychotic conditions of "schizophrenia" and "paranoid schizophrenia."[32] Significantly, Boyd said that persons who are mentally ill should be placed where "people could work with them," and agreed that psychiatrists and psychologists were "very helpful."[33]

The actual basis for petitioner's objection to Boyd is grounded in that juror's general attitude about persons who commit crimes and then plead an insanity defense. Boyd said that, in his opinion, such persons abused the system. When asked whether he thought insanity could ever be a valid plea, however, Boyd answered in the affirmative, and gave the following as an example of when such a defense might be appropriate: "I guess, if the person was drugged up, and it was proved that he was drugged up. To me, he would be insane."[34] That attitude dovetailed neatly into the evidence of alcohol and substance abuse subsequently presented by petitioner in his defense case. The remainder of Boyd's *voir dire* statements, focusing upon the linkage between the issues of insanity and punishment, is set out below:

*Thomas v. State*, 766 So. 2d 860, 890-91 (Ala. Crim. App. 1998).

[32] R. at 202-04.

[33] *Id*. at 205-06.

[34] *Id*. at 207.

MR. BARKSDALE:  Do you feel that pleading insanity is just a trick that people use to get off, or is it sometimes valid?  How do you feel about it?

THE JUROR:  Well, I guess if a doctor or specialist could prove he was insane, it would be alright [sic].

MR. BARKSDALE:  Okay.  I'm going to ask you which of these three categories that you fall into in relation to the defense of insanity:  it can be a valid defense.  You think it has its place.  It should be abolished as a defense, or you are not sure one way or the other.

THE JUROR:  I'm not sure.

MR. BARKSDALE:  Do you feel that someone should be punished even though they may not be mentally competent?  If they do something real bad and real wrong, should they be punished no matter if they are mentally competent or incompetent[?]  How do you feel about that?

THE JUROR:  If they do something wrong, I feel like they should be punished.

MR. BARKSDALE:  No matter if they are mentally ill or have all their wits about them or not?

THE JUROR:  They should be punished if they do something wrong.

MR. BARKSDALE:  Even if they are sick in the head?

THE JUROR:  Yes, sir.

MR. BARKSDALE:  I guess I may be a little bit confused.  I thought you told me if someone was mentally ill and charged with a crime that they ought to be helped.

THE JUROR:  Well, a person who is mentally ill shouldn't be by himself.  If the person hurts somebody, they should be punished.

48

MR. BARKSDALE:  Even though they may be mentally ill?

THE JUROR:  Yes, sir.

MR. BARKSDALE:  That's all.

MR. FRY:  Could I have one followup question, Your Honor?  I don't want to draw it out.

THE COURT:  Yes.

MR. FRY:  Just briefly, Mr. Boyd.  You have already answered this out there, I believe.  Regardless of whatever your personal feelings are, would you be able to listen to the Judge's instructions at the end of the case and follow whatever the law is and disregard whatever your personal feelings may be?

THE JUROR:  Yes, sir.[35]

### ii.    Voir dire of Johnie Eckstein

Johnie Eckstein read one newspaper article concerning the murder, "when it first happened," but had not seen or heard anything more about the case.[36] Significantly, he had personal experiences with a friend who suffered with a mental illness.  Moreover, Eckstein's son suffered from autism and, at times, had been stigmatized as "mentally retarded."  Eckstein also agreed that:  a mental disease or defect could be as real to a person so afflicted as a disease of the body; "sanity" could be transitory; and, it was possible for a person who experienced psychotic episodes to

---

[35] R. 207-10.

[36] Id. at 261.

not remember what had occurred during such mental states.[37]  When asked whether

mentally ill or retarded persons should be punished for criminal acts, Eckstein

answered:  "I don't know.  It depends on what kind of situation they got in or what

they done or how serious it was or whatever.  If he was in that bad a shape, he should

have been put somewhere else for that time."[38]  Although Eckstein had no personal

experiences with psychologists or psychiatrists, he believed that such professionals

"help[] some."[39]  The remainder of Eckstein's *voir dire* statements, focusing upon the

linkage between the issues of insanity and punishment, is set out below:

>MR. BARKSDALE:  How do you feel about people in general who commit crimes and plead insanity as a defense?
>
>THE JUROR:  Well, sometime I believe they are using it for a crutch, and sometimes it's for real.  They are using it because it's more or less a loophole.  Sometimes it's for real.
>
>MR. BARKSDALE:  If you believe that somebody committed a crime from all the evidence[,] but you also believe they were insane when they did this, what do you feel should be done with that person?
>
>THE JUROR:  Well, I feel like they ought to be put away somewhere.
>
>MR. BARKSDALE:  Punished or what?

---

[37] *Id*. at 263.

[38] *Id*. at 264.

[39] *Id*.

THE JUROR:  Well, I don't know how severe a punishment you are talking about.  Are you talking about being electrocuted?

MR. BARKSDALE:  Let's start with that.

THE JUROR:  I don't know.  I would have to see the evidence.  If it was without a doubt in my mind that I thought he was guilty and he was insane at the time he done it, I would say he needs capital punishment.

MR. BARKSDALE:  Even though he was insane and sick at the time he did it?

THE JUROR:  It all depends.  If he had a record of it over the years, back in the past he had a history of it, and then all of a sudden he done something like this, I could see where it wouldn't be capital punishment. If he had been sane all his life and all of the a sudden this come up and then he done something like that, I don't know if I could go for it then.

MR. BARKSDALE:  You wouldn't have any problem with capital punishment all things being equal?

THE JUROR:  What do you mean?

MR. BARKSDALE:  You don't have any problem with the issue of capital punishment, somebody going to the electric chair, is that what you were saying?

THE JUROR:  If it was without a doubt he done something, like I said, and he didn't have no past record of being mentally disordered, and then all of a sudden something came up and he came up pleading temporarily insane, then I think he ought to be punished.

MR. BARKSDALE:  Electrocuted?

THE JUROR:  Yes.

MR. BARKSDALE:  Even though it was proven to you that he was mentally defective you still think he ought to be electrocuted?

THE JUROR:  If it was the first time it happened, no.

MR. BARKSDALE:  I believe that's all I have.

MR. FRY:  Mr. Eckstein, let me follow up a little bit.  Jerry said, if it was proved to you, you would do that?  Is what you are really saying, if [you] really had a doubt as to whether or not someone was insane at the time they committed the crime, that's where you would not hesitate to recommend capital punishment?

THE JUROR:  What, now?

MR. FRY:  It would only be a case where you have real substantial doubt as to whether or not someone is really insane that you would recommend capital punishment; is that right?

THE JUROR:  If I was in doubt of him doing it?

MR. FRY:  Yes.

THE JUROR:  If I was in doubt of him doing it, I wouldn't recommend it.

THE COURT:  I don't think the question is quite logical.

MR. FRY:  I'm talking about where there's doubt as to insanity.

THE JUROR:  Yes.

MR. FRY:  If you weren't convinced that the people were insane, then you would have no problem with capital punishment?

THE JUROR:  Yes.

MR. FRY:  Is that what you were saying a minute ago?

THE JUROR:  Yes.

MR. FRY:  If you were convinced that a person was insane and out of their mind and didn't know who they were or what they were at the time they committed the crime, would you be more hesitant about recommending some kind of punishment?

THE JUROR:  Yes.

MR. FRY:  Would you be opposed to punishing someone who actually was legitimately insane?

THE JUROR:  If he was at the time they done it, yes, sir.[40]

### iii.   Conclusions regarding challenges to Boyd and Eckstein

Clearly, jurors Boyd and Eckstein expressed some equivocation regarding the linkages between the issues of mental illness, an insanity defense, and punishment. Even so, petitioner has failed to show that either of them "entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty." *Coleman v. Zant*, 708 F.2d at 544.  There also is ample support in the *voir dire* of each to support the trial court's decision to overrule petitioner's challenges for cause, and allow both to remain in the venire subject to peremptory strikes, because each affirmed that he could lay aside any preformed opinions, and base verdicts upon the evidence presented at trial and the court's instructions on the rules of law that applied to the

---

[40] R. 264-69.

case.  *See id.* (holding that the second requirement for a showing of actual prejudice is a determination that the jurors in question "could not have laid aside these preformed opinions and rendered a verdict based on the evidence presented in court"); *see also Meeks v. Moore*, 216 F.3d at 961 (same).

Therefore, viewing the historical facts in deference to the trial judge — the person in the best position to observe the demeanor and credibility of prospective jurors — this court cannot conclude that his refusal to grant petitioner's motions to strike jurors Boyd and Eckstein for cause resulted in actual prejudice.  *See*, *e.g.*, *Wainwright v. Witt*, 469 U.S. 412, 429-30 (1985) (holding that a trial court's determination of juror bias is a matter of fact, to be reviewed as such under 28 U.S.C. § 2254); *Hightower v. Schofield*, 365 F.3d 1008, 1040 (11th Cir. 2004) ("Given the difficulty of reviewing such equivocal answers from the cold record, years after they were uttered, it is obvious why [reviewing courts] accord great deference to trial judge determinations of juror bias."), *vacated and remanded on other grounds*, 545 U.S. 1124 (2005).

Stated differently, petitioner has not carried his § 2254(e)(1) burden of rebutting, with clear and convincing evidence, the presumption of correctness that attaches to the state trial court's factual findings regarding juror bias.  *See*, *e.g.*, *Patton v. Yount*, 467 U.S. 1025, 1036-38 (1984) (holding that a state court's finding of a

54

juror's impartiality is presumed correct because the question is "plainly one of historical fact"); *Spivey v. Head*, 207 F.3d 1263, 1274 (11th Cir. 2000) (holding that a trial judge's determination of juror bias "is a factual finding deserving deference on habeas review") (citing *Wainwright v. Witt*, 469 U.S. at 428-29); *Miniel v. Cockrell*, 339 F.3d 331, 338-39 (5th Cir. 2003) ("A state trial court's refusal of a petitioner's challenge for cause is a factual finding entitled to a presumption of correctness.") (citing *Jones v. Butler*, 864 F.2d 348, 362 (5th Cir. 1988)).

> **b**.    *Paul Skipworth*

Petitioner argues that he suffered actual prejudice from the denial of his challenge to juror Paul Skipworth, because the trial judge initially stated, "I think everybody agrees that Mr. Skipworth ought to go off," but later denied petitioner's challenge for cause.[41]

Questions concerning the ability of Paul Skipworth to sit as an unbiased juror did not arise from prejudicial pretrial publicity, but from the fact that he and his wife were friends of the victim's niece.[42] Skipworth's wife became upset when she learned that her husband was included within the pool of prospective jurors, due to her

---

[41] *See* doc. no. 1 (Petition) ¶ 84.

[42] *See* R. 667-69.

55

concern that their friendship might be adversely affected.[43]   Mr. Skipworth, nevertheless, had no personal knowledge of the case, and was not even aware the case had been docketed for trial until he reported for jury duty.[44]   Moreover, Skipworth readily accepted the presumption of innocence, and unhesitatingly acknowledged the pernicious effects of mental diseases, because his own grandmother had suffered from a serious mental illness and, during periods that she was not institutionalized in a state mental hospital, resided in his childhood home.[45]

Finally, even though Paul Skipworth was selected to sit on petitioner's jury, he did not deliberate on verdicts.   Instead, as a result of the hospitalization of his wife during the guilt-innocence phase of trial, Skipworth was excused, and replaced by an alternate juror.   Consequently, petitioner's belief that Skipworth was predisposed to find petitioner guilty, even if correct, is a moot issue.   *See, e.g.*, *Meeks v. Moore*, 216 F.3d at 961; *Coleman v. Zant*, 708 F.2d at 544 (same).

c.     *Conclusions on petitioner's "actual prejudice" claim*

For all of the foregoing reasons, this court finds that petitioner has failed to demonstrate that he suffered "actual prejudice" as a result of the trial court's denial of

---

[43] *Id*. at 372.

[44] *Id*. at 374.

[45] *Id*. at 275-78.

56

his challenges for cause to prospective jurors Alan Boyd, Johnie Eckstein, and Paul Skipworth.  The decisions of the state trial and appellate courts on those issues were neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).  Moreover, the rulings were not an unreasonable determination of the facts in light of the evidence before the state courts.  *Id*. § 2254(d)(2).  Finally, petitioner failed to shoulder his § 2254(e)(1) burden of rebutting, with clear and convincing evidence, the presumption of correctness that attaches to the state trial court's factual findings regarding juror partiality.  *See*, *e.g.*, *Patton v. Yount*, 467 U.S. at 1036-38 (holding that a state court's finding of a juror's impartiality is presumed correct because the question is "plainly one of historical fact"); *Miniel v. Cockrell*, 339 F.3d at 338-39 ("A state trial court's refusal of a petitioner's challenge for cause is a factual finding entitled to a presumption of correctness.") (citing *Jones v. Butler*, 864 F.2d 348, 362 (5th Cir. 1988)).

### 2.   *Petitioner's "presumed prejudice" claim*

When a habeas petitioner cannot establish actual prejudice, he is relegated to the "demanding" and "rarely applicable" presumed prejudice standard.  *Meeks v. Moore,* 216 F.3d at 961; *Coleman v. Kemp*, 778 F.2d 1487, 1537 (11th Cir. 1985). The analysis of such a claim involves review of many factors, to determine whether the totality of circumstances gives rise to a presumption of prejudice.  *See*, *e.g.*, *Patton*

*v. Yount*, 467 U.S. at 1031; *Irvin v. Dowd*, 366 U.S. at 723. Courts within the Eleventh Circuit focus upon two questions: was pretrial publicity egregiously prejudicial and flagrantly inflammatory, *and*, did the publicity saturate the community in which the trial was held? *See*, *e.g.*, *Mills v. Singletary*, 63 F.3d 999, 1010 (11th Cir. 1995). *See also*, *e.g.*, *Spivey*, 207 F.3d at 1270 ("To establish that pretrial publicity prejudiced [petitioner] without an actual showing of prejudice in the jury box, he must show first that the pretrial publicity was sufficiently prejudicial and inflammatory and second that the prejudicial pretrial publicity saturated the community where the trial was being held.").

The answers to these questions must be viewed through the lens of a corollary principle: the presumed prejudice principle "is reserved for an extreme situation." *Coleman v. Kemp*, 778 F.2d at 1490 (citation and internal quotation marks omitted); *see also Meeks v. Moore,* 216 F.3d at 961 (same); *Mills v. Singletary*, 63 F.3d at 1010 (same); *Bundy v. Dugger*, 850 F.2d at 1424 (same).

Thus, a petitioner's burden of persuasion when attempting to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury, in the absence of "an actual showing of prejudice in the jury box," is "an extremely heavy one.'" *Spivey*, 207 F.3d at 1270 (quoting *Coleman v. Kemp*, 778 F.2d at 1537). Indeed, it is *only* "where a petitioner adduces evidence of inflammatory, prejudicial pretrial

58

publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, [that jury] prejudice [will be] presumed and there is no further need to establish bias." *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980) (citation and internal quotation marks omitted) (alterations added).

These principles now will be applied to the evidence relied upon by petitioner as a basis for his claim of "presumed prejudice."

    **a**.   *Newspaper articles*

Petitioner complains of newspaper articles that allegedly contained references to "evidence that was incompetent and inadmissible at trial,"[46] and published statements attributed to the police chief and prosecutor "indicating their belief in Mr. Thomas' guilt for crimes for which he had not yet been tried."[47]  For example, the edition of the Athens *News Courier* published on December 18, 1984 (*i.e.*, three days after the murder) quoted Limestone County District Attorney James Fry as stating that he would, "[a]bsolutely, without a doubt, [seek an indictment against petitioner,] if I'm alive to get to the grand jury with the evidence.  I would be amazed if the grand jury

---

[46] Doc. no. 35 (Petitioner's Brief), at 20.

[47] *Id*. at 21.

doesn't return several counts of capital murder against [petitioner]."[48]   The Athens police chief was quoted in an article published the following day as saying that investigators were not searching for an accomplice, because petitioner had "never said anyone else was involved."[49]   This same article, however, also contained petitioner's denial of culpability:   "Authorities said Thomas admitted Sunday, while being transferred from Athens City Jail to the Limestone County Jail, that he was inside the McLemore home the night of the murder.   However, he said Mrs. McLemore was already dead.   He denied having anything to do with the killing."[50]

Petitioner also complains of articles stating that the victim had been "sexually assaulted,"[51] and "brutally" or "savagely" murdered,[52] as well as those quoting the indictment's accusation that he "obstruct[ed] [the victim's] air passage, thereby

---

[48] Doc. no. 1 (Petition) ¶ 76, at 14 (citing C.R. 236).

[49] Doc. no. 35 (Petitioner's Brief), at 21 (citing C.R. 238).

[50] C.R. 238.

[51] This term is found in nineteen articles.   References to rape or sexual assault appeared several times, but generally the phrase "first degree sexual abuse," as charged in the indictment, was reported in combination with other counts in the indictment.   *See* C.R. at 235, 236, 238, 242, 244-256, 256, 253.

[52] The use of the words "brutal" or "brutally" in reference to the murder occurred in six articles published between Dec. 29, 1984 and Nov. 27, 1985.   *See* C.R. at 239, 246, 251, 248, 258, 260.   The word "savagely" appeared only once, in the article dated Feb. 10, 1985.   *See* C.R. 247.

suffocating or asphyxiating her, using a blunt instrument, object or artifact,"[53] and those reporting that the victim "had been stabbed repeatedly or 'cut to pieces.'"[54]

Some articles reported that petitioner "had been found in his car across the street from the [victim's] house, that there was a trail of blood from the car to the house, and that [petitioner] was covered with blood and in the possession of two knives."[55] Other articles stated that petitioner had an "extensive past criminal record," and a "long history of arrests for both misdemeanors and felonies"; that his "notoriety among law enforcement officials was one reason [petitioner] was arrested"; and that petitioner's tattoos indicated that he had "more than a passing knowledge of the world of illegal drugs."[56] Some articles "emphasized" that petitioner had been found "competent to stand trial" by state agents, thus allegedly tainting the ability of jurors to fairly

---

[53] Doc. no. 1 (Petition), ¶ 75 (citing C.R. 249, 253-54). This portion of the indictment was published five times between Jan. 25, 1985 and Mar. 13, 1986. *See* C.R. 244, 253, 254, 258, 263.

[54] Doc. no. 1 (Petition), ¶ 75. The phrase "cut to pieces" appeared in three articles published between Dec. 18, 1984 and May 5, 1985. *See* C.R. 236, 246, 253.

[55] Doc. no. 1 (Petition), ¶ 75. These statements are found in three articles published between Dec. 16, 1984 and Jan. 10, 1985. C.R. 235, 236, 247.

[56] Doc. no. 35 (Petitioner's Brief) at 20.

consider "an independent psychiatric evaluation."[57]  Finally, "[t]wo articles described

a bogus threat [petitioner] made against the prosecutor after his arrest."[58]

### i.    State court discussion of newspaper publicity

The Alabama Court of Criminal Appeals examined these same claims on direct

appeal, and entered the following findings of fact and conclusions of law.

> The appellant, in support of his motion for change of venue, submitted twenty-nine newspaper articles to the trial court.  (See R. 235-63).  Two of these articles did not mention the appellant or this case.  However, in most of these articles the appellant and his case were prominently mentioned.  In many of these articles, the appellant's case was the main story within the article.

> The offense with which the appellant was charged occurred on December 14, 1984.  Nineteen of the articles submitted were published within six months of the crime and the majority of these were published within two months following the crime.  There was over a three-month period when no articles concerning this case were in fact published.  The other eight articles appeared in the six months before the appellant's trial began on March 17, 1986.  Only one of these articles, however, was published within two months of the trial.

> While we admit there was extensive pre-trial publicity concerning this case, this fact alone does not necessarily mean the appellant could

---

[57] Doc. no. 1 (Petition) ¶ 74.  Six articles published between May 5, 1985 and Jan. 10, 1986 reported that doctors associated with Alabama's Taylor Hardin Secure Medical Facility had found petitioner competent to stand trial.  C.R. 253, 255, 256, 258, 259, 261.

[58] *Id.*  In articles published on Dec. 18 and 19, 1984, it was reported that, when the trial judge granted the prosecutor's request to hold petitioner without bond, petitioner threatened the district attorney in open court, saying: "'I'll get you, man.'"  C.R. 236-37.

not receive a fair and impartial trial.  *Fike v. State*, 447 So. 2d 850 (Ala. Crim. App.1983), *cert. denied*, 447 So. 2d 850 (Ala. 1984).  The vast majority of the publicity surrounding this case took place immediately after the crime was committed and more than one year before the appellant's trial began.  The passage of time between the crime and its accompanying publicity and the actual trial of the defendant cannot be ignored as a factor in bringing objectivity to the trial.  *Robinson v. State*, 430 So. 2d 883 (Ala. Crim. App.)*, cert. denied*, 430 So. 2d 883 (Ala. 1983); *Langham v. State*, 494 So. 2d 910 (Ala. Crim. App.), *cert. denied*, 494 So. 2d 910 (Ala. 1986).

   We have reviewed the articles submitted by the appellant and find that all but one of them were objective and factual and were merely articles detailing the crime and the developments in this appellant's case.

   However, one of the articles could be considered prejudicial because it contained "sensational, accusational or denunciatory statements" concerning the appellant.  *McLaren v. State*, 353 So. 2d 24, 31 (Ala. Crim. App.), *cert. denied*, 353 So. 2d 35 (Ala. 1977).

   This article appeared in the Athens News Courier on February 10, 1985 and contained the headline "'*Wild Man' Thomas has extensive local arrest record*." (R. 247).  In this article, the appellant was accused of "savagely" murdering the victim.  The article stated that the appellant had an "extensive past criminal record" and a "long history of arrests for both misdemeanors and felonies."  The article then set out the appellant's arrests and convictions and the details concerning them.  The article stated that "his [the appellant's] notoriety among law enforcement officials was one reason the suspect was arrested" and that he was out of prison as a result of the "good time law" at the time of the murder.

   One of the statements in the article was that "Thomas's record shows he has never been arrested on any drug-related felony charge, although tatoos on his body might indicate he has more than passing knowledge of the world of illegal drugs."  The article then detailed the

numerous tatoos on the appellant's body and their location.  The article states that the appellant goes by the nickname "Wild Man."

Although we do find that this article was inflamatory and intended to be sensational, we cannot say that the publication of this one article deemed the pre-trial publicity surrounding this case as a whole "inherently suspect."

The appellant has failed to demonstrate that this one prejudicial article had "so saturated the community as to have a probable impact upon the prospective jurors."  The appellant made no showing as to the circulation of the Athens News Courier or even the number of prospective jurors who subscribed or read this newspaper.

Furthermore, there was no showing that any prospective juror read the prejudicial article.  *See Anderson* [*v. State*, 362 So. 2d 1296 (Ala. Crim. App. 1978)] (where this court held that there had been no showing that any prospective juror had read articles wherein the district attorney labeled the defendant as "garbage" and a "sadistic killer" and linked the defendant with separate and distinct criminal offenses.)[.]  Also this article was published one year before the appellant's trial began.

The appellant also submitted a public opinion survey (R. 225-29) in support of his motion for change of venue.  Ninety-three people were contacted in connection with this survey.  Of those persons, 81.1 percent indicated they recalled the murder.  Of these persons, 44.8 percent learned of the murder through the newspaper and 16.7 percent learned of the murder through television.  Of all the persons contacted, only 24.7 percent felt the appellant was definitely guilty and only 7.5 percent felt he was probably guilty.  We do not find that this survey sufficiently demonstrates "a community saturated with inherently prejudicial information or feeling." *Grayson v. State*, 479 So. 2d 69, 73 (Ala. Crim. App. 1984), *aff'd, Ex parte Grayson*, 479 So. 2d 76 (Ala. 1985).

Thus, we do not find that the pre-trial publicity in this case, including this one prejudicial article, even approached the magnitude of the prejudicial publicity condemned by the United States Supreme Court in *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961). See also *Estes v. Texas*, 381 U.S. 532, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). "Outside influences had not so infiltrated the community at large as to render the existence of community prejudice against the appellant probable." *Langham*, 494 So. 2d at 914.

The appellant's trial was not "utterly corrupted by press coverage." *Dobbert v. Florida*, 432 U.S. 282, 97 S. Ct. 2290, 2302, 53 L. Ed. 2d 344 (1977) (quoting *Murphy v. Florida*, 421 U.S. 794, 95 S. Ct. 2031, 2035, 44 L. Ed. 2d 589 (1975)). *See also Langham*, 494 So. 2d at 914.

\* \* \* \*

The voir dire examination in this case consisted of more than 600 pages of the transcript. The voir dire was extensive and thorough as to each prospective juror's knowledge of the case and any bias which he or she may have had based on his knowledge of the case. *See Fike*; *Arthur*, *supra*.

At the beginning of voir dire, every member of the venire stated he or she had read or heard about this case. As stated earlier, widespread publicity does not necessarily mean that an accused cannot get a fair and impartial trial, *Anderson*, particularly in "these days of swift, widespread and diverse methods of communications." *Nelson*, 440 So. 2d at 1131 (quoting *Irvin*).

Qualified jurors need not be totally ignorant of the facts and issues involved in a particular case in order to render an unbiased verdict. *Dobbert*; *Murphy*; *Irvin*; *Anderson*; *Nelson*; *Robinson*.

Although all of the sixty-seven prospective jurors indicated that they had heard about the case, only one indicated he had a fixed opinion as to the guilt of the appellant based on what he had read or heard.  This juror was excused.

The appellant challenged seven other prospective jurors on the basis that they had a fixed opinion as to the guilt of the appellant.  We have previously discussed three of these challenges and found that the challenges were properly denied by the trial court because the jurors' opinions were not fixed to the point that they would be unable to reach an unbiased verdict after listening to all of the evidence and the law and instructions given to them by the court.  None of these three jurors sat on this jury panel.

Two of the other jurors challenged for cause stated they had a bias against the appellant based on a connection with the victim's family.  These two jurors were excused.  The two other jurors had a bias against the appellant because they had discussed the case with law enforcement officials and firemen involved in the case.  These jurors were also excused.

Thus, the only juror who demonstrated a fixed opinion as to the appellant's guilt based on pre-trial publicity was excused.  Therefore, the appellant has failed to show a connection between the pre-trial publicity and the existence of actual jury prejudice.  *Langham.*

We find no error in the trial court's denial of the appellant's motion for change of venue.  . . .

*Thomas v. State*, 539 So. 2d 375, 392-94 (Ala. Crim. App.) (emphasis in original) (footnote omitted), *aff'd sub nom Ex parte Thomas*, 539 So. 2d 399 (Ala. 1988) (*per curiam*).

66

*ii*.    *Conclusions on newspaper coverage*

This court has reviewed each of the newspaper articles about which petitioner complains.  Certainly, the February 10, 1985 "Wild Man" article condemned by the state Court of Criminal Appeals contains sensational and accusatory statements.  Even so, detailed examination of the remaining, allegedly-prejudicial publications shows that each is "largely factual."  *United States v. De La Vega*, 913 F.2d 861, 865 (11th Cir. 1990).  This court also is not impressed by petitioner's complaints about repetitious reports listing, in short and antiseptic form, the charges in the grand jury's indictment, and is not convinced that use of the term "brutal" has a particularly prejudicial or inflammatory flavor.  Information describing the crime scene was included in three articles published during the first two weeks following the offense, but did not reappear in subsequent articles.  While the reference to petitioner's alleged "threat" against the state prosecutor certainly had sensational overtones, it appeared only twice, shortly after the murder.  Petitioner's trial began well over one year after the publication of all of these articles.  Finally, while the phrase "cut to pieces" has inflamatory qualities, it appeared only three times between December 18, 1984 and May 15, 1985.  Petitioner's trial began almost one year after the last printing.

The comments of the prosecutor and police chief — each published only once, and within four days of the murder — were neither blatantly prejudicial, nor obviously

67

intended to create an atmosphere of hostility.[59]   Additionally, the comment by the police chief was taken out of context.  The report that mental health professionals employed at Alabama's Taylor Hardin Secure Medical Facility had determined petitioner to be competent to stand trial is factual.

Moreover, petitioner failed to show the circulation of the Athens *News Courier* during the relevant time frame, the number of prospective jurors who then subscribed to that newspaper, or the number of prospective jurors who actually read any of the articles complained of — all of which is crucial to a determination of the pervasiveness of the allegedly prejudicial newspaper accounts of the case.   The evidence before this court is not comparable to that addressed by the Supreme Court in *Irvin v. Dowd*, where 46 newspaper articles, many containing *grossly* prejudicial information, were published and delivered to 95% of the households in Gibson County, Indiana (population 30,000) during a seven month period immediately preceding the defendant's trial.   *See* 366 U.S. at 724.

The bottom line on petitioner's contentions concerning the allegedly prejudicial newspaper articles is that prejudice will not be presumed simply because jurors were

---

[59] This is unlike the circumstances addressed in *Coleman v. Kemp*, 778 F.2d 1487, 1538 (11th Cir. 1985), where "law enforcement officials announced [that] the circumstantial evidence against the suspects was 'overpowering,'" that there was "no point in looking for anybody else," and the county sheriff stated that "he wanted to 'precook' [the defendants]."

exposed to inadmissible evidence of the defendant's criminal record, even when that record "is well publicized." *Bundy v. Dugger*, 850 F.2d 1402, 1425 (11th Cir. 1988); *see also*, *e.g.*, *Mills v. Singletary*, 63 F.3d 999, 1010-12 (11th Cir. 1995).

### b.   *Electronic media accounts of the case*

Petitioner admits that no evidence of the radio or television coverage of his case was presented to the trial court in support of his motion for change of venue,[60] but he nevertheless argues, on the basis of "information and belief," that "such television and radio evidence would have included sensational, accusational and denunciatory statements about [petitioner]."[61]   That dog will not hunt:  conjectural and conclusory assertions simply will not suffice to prove a claim of constitutional proportions.  A habeas petitioner must state all facts supporting each ground of relief specified by him. *See* 28 U.S.C. § 2254, Rule 2(c)(2), *Rules Governing Section 2254 Cases in the United States District Courts*.  Petitioner has completely failed to show that pretrial coverage of his case by electronic media outlets was prejudicial, or that it saturated the community in which the trial was held.

### c.   *Public opinion survey*

---

[60] *See Thomas v. State*, 539 So. 2d at 392 n.3 ("While we are sure that there was also extensive television and radio coverage of this case, there is no evidence to this effect in the record.").

[61] Doc. no. 35 (Petitioner's Brief) at 42.

Petitioner alleges that he conducted an opinion survey of one hundred Limestone County residents prior to trial, and that

> nearly 44.8 percent of those persons surveyed had learned about the incident through the local newspaper, while an additional 16.7 percent had learned of the incident through television. When asked whether they believed Mr. Thomas was innocent or guilty, 31.9 percent stated that they believed he was "definitely guilty" and an additional 9.7 percent said that he was "probably guilty." Thus, a total of 41.6 percent of those responding to the survey thought Mr. Thomas was guilty. *Less than three percent thought there was a possibility that Mr. Thomas might be innocent.*[62]

This court has examined the underlying statistical data, and finds that petitioner has misstated key information derived from the opinion survey. The findings of the Alabama Court of Criminal Appeals on direct appeal actually are correct: *i.e.*,

> Ninety-three people were contacted in connection with this survey. Of those persons, 81.1 percent indicated they recalled the murder. Of these persons, 44.8 percent learned of the murder through the newspaper and 16.7 percent learned of the murder through television. Of all the persons contacted, only 24.7 percent felt the appellant was definitely guilty and only 7.5 percent felt he was probably guilty.

*Thomas v. State*, 539 So. 2d at 392; *see also* C.R. at 227-232. These statistics do not establish that egregiously prejudicial pretrial publicity so pervaded and saturated the Limestone County community "as to render virtually impossible a fair trial by an

---

[62] Doc. no. 1 (Petition) ¶ 72 (emphasis in original). Petitioner contends that the population of Limestone County then was approximately 46,500, and that the victim was well known in the community.

impartial jury drawn from that community . . . and there is no further duty to establish bias." *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980); *see also Coleman v. Kemp*, 778 F.2d 1487, 1490 (11th Cir. 1985) (same).

**d**.   *Voir dire process*

Petitioner also contends that the *voir dire* process "confirmed" widespread media coverage of his case in Limestone County and the surrounding area, because "every member of the jury panel had heard about the case through newspaper, radio or television reports."[63]

Sixty-six persons were summoned as prospective jurors for the trial of petitioner's case,[64] and the record confirms that, when this venire initially was asked, as a group, whether any had read, heard, or viewed media accounts of the case, all responded affirmatively.[65]  The trial court sustained six defense challenges for cause, thereby removing the following venirepersons:  Jeffery Elmore, Stanley McNatt, Hugh Griggs, Susan Wilson, Janette Abernathy, and Hilliard Thomas.[66]  However, only one

---

[63] Doc. no. 1 (Petition) ¶ 73 (emphasis deleted).

[64] *See* doc. no. 1 (Petition) ¶ 85.

[65] *See* R. 85-86.  *But see* doc. no. 73 (Respondent's Brief), at 24 ("At one point, all the jurors on the venire apparently indicated that they had read or heard a news account of the case.  (R. 85-86) However, during individual voir dire, at least three jurors responded that they had <u>not</u> read or heard a news account about the case.  (R. 331, 374, 645-646).") (emphasis in original).

[66] *See* doc. no. 1 (Petition) ¶ 80.

of these persons, Jeffrey Elmore, was removed because he possessed a fixed opinion of petitioner's guilt based upon pretrial publicity.[67]  The remaining five venirepersons were removed for other reasons, such as relationships with the victim's family,[68] contacts with law enforcement agents who worked the case,[69] or a long-standing acquaintance with petitioner himself.[70]

Petitioner contends, nevertheless, that ten additional venirepersons should have been removed for cause:  *i.e.*, Alan Boyd, Barry Broadway, Johnie Eckstein, Mary Gray, Robert Haney, Naomi Lovell, Jerry Pack, Harry Patterson, Paul Skipworth, and William Turpen.[71]  The grounds for petitioner's challenges to Alan Boyd, Johnie Eckstein, and Paul Skipworth were discussed previously, in section V(A)(1) of this opinion, and will not be reiterated.  With regard to the remaining seven challenges, however, petitioner bears the burden of persuasion.  *Cf. Wainwright v. Witt*, 469 U.S.

---

[67] See R. 87, 269-71.

[68] Susan Wilson worked with the wife of the victim's grandson ("Jack Thomas's wife"), and had heard the grandson's wife talk about the case before being summoned as a prospective juror. (R. 123; *see also* R. 627-36).  Janette Abernathy was a close friend of Mrs. Marvolene Thomas, a relative of the victim.  (R. 197-200, 664.)

[69] Stanley McNatt was an Investigator for the Limestone County Sheriff's Department, and had talked about the case with the city police department's lead investigator. (R. 296-303).  Hilliard Thomas assisted in extinguishing the fire at the victim's home, and talked with one or more of the investigating officers.  (R. 548-55).

[70] Hugh Griggs grew-up with, and attended the same schools as, petitioner.  As a consequence, Griggs stated:  "I don't see how I could be fair about it."  (R. 303-04).

[71] *See* doc. no. 1 (Petition) ¶ 81.

412, 423-24 (1985) (discussing *Adams-Witherspoon* challenges based upon a juror's

views on capital punishment).[72]   Moreover, a state court's determination that a

particular venireperson was not biased is a finding of fact subject to a § 2254(e)(1)

presumption of correctness.  *See*, *e.g.*, *Patton v. Yount*, 467 U.S. at 1037-38.[73]

     *i.*    *Barry Broadway*

---

[72] Specifically, the *Witt* Court said that,

> [a]s with any other trial situation where an adversary wishes to exclude a juror because of bias, . . . it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality.  See *Reynolds v. United States*, 98 U.S. 145, 157 (1879).  It is then the trial judge's duty to determine whether the challenge is proper.  This is, of course, the standard and procedure outlined in *Adams*, but it is equally true of any situation where a party seeks to exclude a biased juror.  See, *e.g.*, *Patton v. Yount*, 467 U.S. 1025, 1036 (1984) (where a criminal defendant sought to excuse a juror for cause and the trial judge refused, the question was simply "did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestations of impartiality have been believed").

*Wainwright v. Witt*, 469 U.S. 412, 423-24 (1985).

[73] *Patton* held that the question whether jurors have opinions that disqualify them "is not one of mixed law and fact.  Rather it is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." 467 U.S. at 1037.  The Supreme Court reiterated that holding in *Wainwright v. Witt*, saying that, in *Patton*,

> [w]e noted that the question whether a venireman is biased has traditionally been determined through *voir dire* culminating in a finding by the trial judge concerning the venireman's state of mind.  We also noted that such a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.  Such determinations were entitled to deference even on direct review; "[t]he respect paid such findings in a habeas proceeding certainly should be no less."

*Wainwright v. Witt*, 469 U.S. at 428 (quoting *Patton*, 467 U.S. at 1038) (footnote omitted).

Mr. Broadway learned of the murder from the sister of his mother-in-law, who pointed to the location of the crime while driving Broadway through town. She did not, however, state the name of the person accused of committing the crime.[74] Broadway also was of the opinion that mentally ill persons should be committed to an asylum, rather than punished.[75] On direct appeal, the Alabama Court of Criminal Appeals affirmed the trial court's denial of petitioner's challenge to juror Broadway. *See Thomas v. State*, 539 So. 2d 375, 391 (Ala. Crim. App. 1988).

### *ii*. *Mary Gray*

Mrs. Gray learned of the crime through newspaper and television accounts,[76] but said that she did not want to look at gruesome photographs and, for that reason, would not be comfortable serving as a juror. Despite the subjective nature of mental illnesses, Gray believed they could be as real as physical ailments, and she also had some personal experiences with a person who suffered from mental retardation.[77] In Gray's opinion, mentally *retarded* persons should be punished like anyone else, but

---

[74] R. 230.

[75] R. 225.

[76] R. 288-89.

[77] R. 292.

she would not send a mentally *ill* person to the electric chair.[78]  Again, the Alabama

Court of Criminal Appeals affirmed on direct appeal the trial court's denial of

petitioner's challenge to juror Gray.  *See id.*

> ### *iii*.    *Robert Haney*

Mr. Haney learned that the victim had been murdered by stabbing, and her

house burned, from media accounts of the case,[79] and formed the impression that

petitioner committed the crime.   He nevertheless affirmed that he could lay his

impressions aside, and base verdicts on the evidence presented at trial,[80] saying: "That

is just what I've heard and read.  That's just in my mind right now.  As far as if [I am]

selected for the jury, all that can be set aside."[81]  On direct appeal, the Alabama Court

of Criminal Appeals extensively examined the voir dire of juror Haney, *see id.* at 380-

83, but found no error in the trial judge's denial of petitioner's challenge for cause.

> Although Haney at one point expressed the opinion that the appellant
> was guilty and the defense would have to prove him innocent, Haney
> later assured the trial court that he could set aside his personal opinion
> and could presume this appellant to be innocent.  Haney's testimony did

---

[78] R. 295.

[79] R. 311.

[80] R. 312-13.

[81] R. 314.  *See also* R. 318 ("Well, this is just based on the news and what I have known.  I don't know nothing about the case, not what kind of evidence is against him.  It's just what I have heard.  It's just based on the news.").

> not reveal a fixed opinion as to the appellant's guilt which would make Haney unable to render an unbiased verdict.  The challenge for cause as to Haney was properly denied.  *See Berard v. State*, 486 So. 2d 458 (Ala. Crim. App. 1984), *rev'd on other grounds*, *Ex parte Berard*, 486 So. 2d 476 (Ala. 1985), *on remand*, 486 So. 2d 482 (Ala. Crim. App. 1986); *Howard v. State*, 420 So. 2d 828 (Ala. Crim. App. 1982); *Jarrell v. State*, 355 So. 2d 747 (Ala. Crim. App. 1978).

*Thomas v. State*, 539 So. 2d at 383.

### iv.   Naomi Lovell

Mrs. Lovell also had been exposed to newspaper and radio accounts of the case,[82] and "assume[d] the person they arrested" committed the crime.[83]  She added: "I feel he's guilty from what I have read in the newspaper," and said that her feeling in that regard would prevail, "[u]nless I see other evidence that he's not."[84]  Despite such statements, Mrs. Lovell told both the District Attorney and defense counsel "I think I could be fair" (District Attorney),[85] or "I would try to be fair.  I think I could be fair" (defense).[86]  The trial judge denied defendant's challenge on that basis, as well

---

[82] R. 361 ("I just read what the newspaper had and what was on the radio.  I have no firsthand knowledge of it.").

[83] R. 365; *see also* R. 362 (stating in response to the District Attorney's question that "You assume that" law enforcement arrested the person responsible).

[84] R. 365.

[85] R. 361; *see also* R. 362.

[86] R. 366.

as his observation of Mrs. Lovell's demeanor when responding to counsels' questions.[87]

On direct appeal, the Alabama Court of Criminal Appeals thoroughly examined the voir dire of juror Lovell, *see id*. at 386-90, but ultimately concluded that the trial judge had not erred in refusing petitioner's challenge for cause.

> When we view Lovell's testimony as a whole, we cannot say that it affirmatively appears that she had a fixed opinion as to the guilt of the appellant to the extent which would necessarily bias the verdict which she would be required to render. During the course of her examination, she stated that she felt she could be fair and could set aside her personal opinions and base her decision on the evidence presented at trial. She also indicated that she would try her best to abide by the trial judge's instruction that the appellant is presumed to be innocent. She realized she had a duty to find the appellant not guilty, if the State failed to prove their case. Obviously Lovell's answers were confusing and somewhat contradictory[,] particularly when questioned by defense counsel.

> Therefore, we maintain that the trial judge was, indeed, in the best position to determine the total effect of Lovell's answers and make a decision based thereon. Thus, we do not find that the trial judge's denial of the challenge for cause as to juror Lovell was clearly erroneous, thus amounting to an abuse of discretion.

*Thomas v. State*, 539 So. 2d at 390-91 (footnote omitted).

> **v.**     *Jerry Pack*

---

[87] *See* R. 370-72.

Mr. Pack acquired knowledge of the crime through newspaper and television reports,[88] but stated in response to questions by the District Attoreney that neither media accounts, nor anything that had been said to him by others, had convinced him that petitioner was "already guilty."[89]  He also affirmed that he could follow the trial judge's instructions and base his verdicts on the evidence presented.[90]  The basis for petitioner's challenge to Mr. Pack, therefore, was his lack of exposure to persons afflicted with a mental illness, his equivocation on the reality of mental diseases,[91] and his opposition to the insanity defense:  "I don't think a person should commit a crime, and then . . . plead insanity."[92]  Nevertheless, the Alabama Court of Criminal Appeals

---

[88] *See* R. 414-16.

[89] R. 416.  *See also* R. 418 ("I haven't heard any facts or anything saying he is" guilty.); R. 419 ("I don't know whether he is guilty or innocent."); R. 420 stating, in response to questioning by defense counsel, "Somebody committed it.  I don't know who.  I mean, I haven't heard no facts.  I can't say that this guy done it.")).

[90] R. 417.

[91] R. 420 ("I guess a person can lose their mind and get mixed up.  It don't click sometimes.").

[92] R. 421.  When asked whether his opinion in that regard was "fixed," Mr. Pack responded as follows:

> THE JUROR:  Well, I don't really know.  I mean, I guess, sometimes a person's mind can snap and he can do things.  If he does something and he's aware that he's done it, I don't imagine that he should plead insanity.
>
> MR. BARKSDALE:  What if you were convinced in your mind that somebody committed the crime, yet, at the same time, you were convinced that they were mentally defective under our law?  If you had the power to deal with that person, what would you do?

affirmed the trial court's denial of petitioner's challenge for cause on direct appeal, saying that petitioner had failed to establish that juror Pack "possessed an absolute bias against the insanity defense itself." *Id*. at 391.

>*vi*.   *William Turpen*

Mr. Turpen read newspaper articles and heard about the case "on TV and just in the general area[:] everybody hears about it."[93]  On that basis, Mr. Turpen formed an opinion that petitioner was guilty, but denied that his impression was "a fixed opinion," saying: "I've got to see all the evidence and see what they have got to present, but they do have a stack of evidence."[94]  Even so, Mr. Turpen said that his opinion "could be changed. . . . It could go either way."[95]  Petitioner focuses upon the following exchange between Mr. Turpen and defense counsel:

> MR. MOFFATT:  Right now, starting from scratch, based on what you know right now, if we went out there starting the case, would we have to prove he was not guilty?

---

> * * * *

> THE JUROR:  Well, he needs to be punished even though he was insane. You need to keep people like that off the streets.

R. 421.

[93] R. 573.  *See also* R. 562-63.

[94] R. 574.

[95] R. 576.

THE JUROR:  Yes.

MR. MOFFATT:  Would we have to do that more than the State would have to prove his guilty?

THE JUROR: I think you would.[96]

When re-examined by the District Attorney, however, Mr. Turpen affirmed that he could abide by the trial judge's instructions on the presumption of innocence,[97] but added:

> He would have to dispute your [the State's] theory, in other words, and prove where you are wrong.  If you are wrong, then I would go along with him [the petitioner].  If you are correct, then I will go with you.  * * * You can't make a decision until the end of the trial.[98]

On direct appeal, the Alabama Court of Criminal Appeals thoroughly examined the voir dire of juror Turpen, *see id*. at 383-86, and found no error in the trial court's failure to strike him for cause.

> Juror Turpen stated during voir examination that he felt the appellant was guilty and the defense would have to prove him not guilty.  However, Turpen stated these were not fixed opinions and he would have to wait until he heard all of the evidence to determine the appellant's guilt or innocence and that he could follow the judge's instructions

---

[96] R. 576.

[97] R. 577.

[98] R. 578.

>concerning the presumption of innocence.  Based on this testimony, we do not conclude that Turpen had a fixed opinion as to the guilt of this appellant.  The trial court's denial of the challenge for cause as to Turpen was not error.  *See Howard* [*v. State*, 420 So. 2d 828 (Ala. Crim. App. 1982)]; *Willingham v. State*, 262 Ala. 550, 80 So. 2d 280 (1955); *Tucker v. State*, 429 So. 2d 1165 (Ala. Crim. App. 1983); *Peterson v. State*, 227 Ala. 361, 150 So. 156 (1933), *cert. denied*, 291 U.S. 661, 54 S. Ct. 439, 78 L. Ed. 1053 (1934).

*Thomas v. State*, 539 So. 2d at 386.

### vii.   Harry Patterson

Mr. Patterson was a city official who heard about the murder from an Athens police officer, Wilson Craig, who told him that police found petitioner sitting in an automobile across the street from the victim's burning house, and that "[w]hen they entered the fire, they didn't know there was anybody in there."[99]  Patterson also had attended school with the victim's youngest daughter ("Lorene"), and another daughter ("Eunice") and her husband ("Stanley") had lived in a house behind his mother's home for about ten years.[100]  Despite these relationships, Mr. Patterson was the most affirmative of any prospective juror when affirming his ability to abide by the presumption of innocence, and require the State to prove guilt beyond a reasonable

---

[99] R. 424.

[100] R. 427-28.

81

doubt.[101]   The rub from petitioner's point of view lies in Patterson's stated opinion

that, generally speaking, a person should be held responsible for his criminal acts,

regardless of whether he was "drunk, mentally ill, or perfectly sane" when committing

the act.[102]   When asked by defense counsel whether he could follow the law, however,

even if the law dictated that an "insane" person "not be punished but sent to a place

for treatment," Patterson said:  "I would have to follow the law."[103]

### *viii*.   *Conclusions on voir dire process*

Petitioner is correct when asserting that all, or virtually all,[104] of the persons

summoned as the venire for his trial acknowledged exposure to media accounts of the

case.  Even so, that fact, standing alone, is "essentially irrelevant."  The relevant

question is "whether the jurors at [petitioner's] trial had such fixed opinions that they

could not judge impartially the guilt of the defendant."  *Patton v. Yount*, 467 U.S. at

1035.  Focusing on that issue, the record confirms that only one venireperson, Jeffrey

---

[101] *See* R. 425-27.

[102] R. 430.  *See also* R. 431 ("I guess I feel that a person is responsible for their acts.  I don't know all of the laws governing that at this time.  That's my feeling at this time that I'm responsible for what I do whether I be mentally ill, drunk, or perfectly sane in anybody's mind.").

[103] R. 432.

[104] *See supra* note 65 and accompanying text.

Elmore, harbored a fixed opinion of petitioner's guilt based upon his exposure to pretrial publicity.  Mr. Elmore accordingly was removed for cause.[105]

The trial judge's refusal to grant petitioner's challenges to venirepersons Naomi Lovell and William Turpen is troubling, but "the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record." *Wainwright v. Witt*, 469 U.S. 412, 434 (1985) (citing *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983)).  *See also Patton v. Yount*, 467 U.S. at 1038 ("[T]he question is whether there is fair support in the record for the state courts' conclusion that the jurors [in question] would be impartial.").  *Cf. Adams v. Texas*, 448 U.S. 38, 45 (1980) (holding that the question to be asked when reviewing a trial judge's finding that a particular venireperson was due to be excluded on the basis of the *Adams-Witherspoon* standards is whether that determination is "fairly supported" by the "record . . . considered as a whole").

Moreover, as previously noted, a trial judge's determination that a particular person was not biased, and could remain in the venire subject to the peremptory strike process, is a finding of fact "to which habeas courts owe special deference."  *Patton v. Yount*, 467 U.S. at 1037 n.12 (citations omitted); *see also id*. at 1038 ("As we have said on numerous occasions, the trial court's resolution of such questions is entitled

---

[105] *See* R. 87, 270-71.

. . . to 'special deference.'") (citation omitted).[106]  That is because such determinations

are based upon an assessment of the venireperson's *demeanor* and *credibility*.  Such

intangible characteristics cannot be well reviewed on the basis of a cold, paper record

and, accordingly, are peculiarly within the trial judge's province.  *Wainwright v. Witt*,

469 U.S. at 429 (observing that a trial judge's "predominate function in determining

juror bias involves credibility findings whose basis cannot be easily discerned from

an appellate record," and that such findings are subject to deference under § 2254).

> Demeanor plays a fundamental role not only in determining juror credibility, but also in simply understanding what a potential juror is saying.  Any complicated voir dire calls upon lay persons to think and express themselves in unfamiliar terms, as a reading of any transcript of such a proceeding will reveal.  Demeanor, inflection, the flow of the questions and answers can make confused and conflicting utterances comprehensible.

*Patton v. Yount*, 467 U.S. at 1038 n.14; *see also*, *e.g.*, *Reynolds v. United States*, 98

U.S. 145, 156-57 (1879) ("[T]he manner of the juror while testifying is oftentimes

more indicative of the real character of his opinion than his words.  That is seen below,

but cannot always be spread upon the record.  Care should, therefore, be taken in the

---

[106] *Cf. Wainwright v. Witt*, 469 U.S. 412, 429 (1985) (holding in the context of a *Witherspoon* challenge that a finding of juror bias is a factual matter, reviewed as such under 28 U.S.C. § 2254); *Hightower v. Schofield*, 365 F.3d 1008, 1040 (11th Cir. 2004) (observing in the context of a *Batson* challenge that "[i]t is extraordinarily difficult upon the basis of the cold record to compare different jurors' predispositions toward the death penalty," and holding that, "[b]ecause such determinations turn largely on observable 'credibility,' the trial court's judgment is entitled to great deference"), *vacated and remanded on other grounds*, 545 U.S. 1124 (2005).

reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case.").

As noted above, the Alabama Court of Criminal Appeals closely examined the *voir dire* testimony of prospective jurors Haney and Turpen for bias in favor of guilt, and of juror Lovell for bias in favor of guilt and against mental illness. *See Thomas v. State*, 529 So. 2d at 383-90. All three gave ambiguous and, at times, contradictory responses. As the Supreme Court has observed, however, such circumstances are

> not unusual on *voir dire* examination, particularly in a highly publicized criminal case. It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading.

*Patton v. Yount*, 467 U.S. at 1039. It is in just such circumstances that "the federal court's deference must operate, for while the cold record arouses some concern, only the trial judge could tell which of [the challenged jurors'] answers was said with the greatest comprehension and certainty." *Id*. at 1040. The state trial judge in

petitioner's case said as much when overruling defense counsel's challenge to venireperson Naomi Lovell:

> Let me say this for the record. I think we went through this yesterday. It reminds me of the old song, when I am not with the girl I love, I love the girl I'm with. I think we found that we can sit here and play ping pong, and people would more or less agree with what every attorney was speaking with them at the time. Obviously, what we are running into is people at the moment they are being questioned agree with the attorney that's questioning them. They say, in effect, two different things. I think we have to listen to the whole set of questions.
>
> Now, [Mrs. Lovell] says that she can follow the law and she can apply the presumption of innocence. She says that she thinks he is guilty. The question is, whether the juror can subordinate the personal feelings that they have. The only way I know to do that is to take the total questions *plus the observation of the prospective juror. In my opinion, there is something to be gained by being able to observe a person, not only their answers on paper, but how they answer them and their general attitude towards the answers.* I think the juror said that she could follow the law and put aside any feeling that she has. I will deny the challenge.[107]

Given this court's narrow scope of review, it cannot be said that the trial judge committed error of constitutional magnitude when rejecting petitioner's challenges for cause to prospective jurors Alan Boyd, Barry Broadway, Johnie Eckstein, Mary Gray, Robert Haney, Naomi Lovell, Jerry Pack, Harry Patterson, Paul Skipworth, and William Turpen.[108] This conclusion is buttressed by the fact that Robert Haney,

---

[107] R. 371-72 (emphasis supplied).

[108] Doc. no. 1 (Petition) ¶ 81, at 15.

Naomi Lovell, and William Lovell did not sit on petitioner's jury. Further, those three, together with Jeffrey Elmore, who was struck for cause, constituted only six percent of the 66 persons summoned for the venire. Even if this court were to take into account all sixteen venirepersons identified by petitioner — the six persons actually struck for cause, plus the ten that petitioner contends should also have been removed — that number constitutes only twenty-four percent of the total panel. The Eleventh Circuit has observed that a "low percentage of venire men excused for prejudice resulting from pretrial publicity is strong evidence of the absence of prejudicial community bias." *Spivey v. Head*, 207 F.3d 1263, 1271 (11th Cir. 2000) (citation and internal quotation marks omitted). *Compare Patton v. Yount*, 467 U.S. at 1029 (77 % of venire admitted they would carry an opinion into the jury box), and *Irvin v. Dowd*, 366 U.S. at 727 (62 % excused for cause) *with Mills v. Singletary*, 63 F.3d 999, 1011-12 (11th Cir. 1995) (holding that the jury was not prejudiced, even though 74 of 80 venirepersons (92.5 %) had some knowledge of the case, 55 of those (74 %) had read at least one newspaper article about the case, and 24 of the 80 prospective jurors (30 %) were stricken for cause).

      **e**.   *Conclusions on petitioner's "presumed prejudice" claim*

After careful review of the record and briefs, this court concludes that petitioner's "presumed prejudice" claim should be denied. There is no evidence that

the trial court's denial of petitioner's motion to change venue, or the state appellate courts' affirmance of that ruling, was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it constitute an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  *See* 28 U.S.C. §§ 2254(d), (e)(1).

**B**.    *Ineffective Assistance of Counsel in Presentation of Motion to Change Venue*

Petitioner's second claim pivots off the following statement by the Alabama Court of Criminal Appeals in its opinion on direct appeal:  "While we are sure that there was also extensive television and radio coverage of this case, there is no evidence to this effect in the record."  *Thomas v. State*, 539 So. 2d. at 392 n.3. Petitioner alleges that he was denied constitutionally effective assistance of counsel by his trial attorneys' failure to fully research, prepare, and argue the motion for change of venue.[109]  He argues that, if counsel had done these things, "there is a reasonable probability that the trial court would have granted the change of venue and the result of Mr. Thomas' conviction would have been different in another venue."[110]

---

[109] *See* doc. no. 1 (Petition) ¶¶ 87-92.

[110] Doc. no. 35 (Petitioner's Brief), at 42.

88

Analysis of this claim implicates at least five principles gleaned from binding precedent.  First, the Constitution does not require the performance of trial and appellate counsel to be flawless.

> To state the obvious:  the trial lawyers, in every case, could have done something more or something different.  So, omissions are inevitable. But, the issue is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled . . . .  The petitioner must establish that particular and identified acts or omissions of counsel were outside the wide range of professionally competent assistance.

*Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*); *see also Johnson v. Alabama*, 256 F.3d 1156 1176 (11th Cir. 2001) (same).

Second, this court is required to "'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Chandler*, 218 F.3d at 1314 (quoting *Strickland*, 466 U.S. at 690).  *See also*, *e.g.*, *Atkins v. Singletary*, 965 F.2d 952, 958 (11th Cir. 1992) (observing that, when reviewing the effectiveness of counsel, courts "should always presume strongly that counsel's performance was reasonable and adequate").

Third, when examining the performance of an experienced trial lawyer, such as petitioner's lead trial attorney,[111] "the presumption that his conduct was reasonable is even stronger." *Chandler*, 218 F.3d at 1316 (citing *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) (stating that the "strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel," and holding that "[t]he more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in rejecting a defense" is reasonable)).

Fourth, as previously noted, the petitioner "must rebut this presumption of competence by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). *See also*, *e.g.*, *Gilreath v. Head*, 234 F.3d at 551 (holding that a habeas petitioner "must affirmatively prove prejudice").

Finally, an "ambiguous or silent record is not sufficient to disprove the strong and continuing presumption.  Therefore, 'where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and

---

[111] Petitioner's lead trial counsel, attorney Jerry R. Barksdale, had practiced law since 1967, focusing mainly on trial work, and petitioner's "case was primarily the only work that he did for the year preceding the trial." *Thomas v. State*, 766 So. 2d at 877.

that he exercised reasonable professional judgment.'" *Chandler*, 218 F.3d at 1314 n.15 (quoting *Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir. 1999)).

All of these principles combine to establish that petitioner's present claim should be rejected. He has not presented *any evidence* to establish that the radio and television coverage of his case was extensive or prejudicial. Instead, he simply alleges — and then only upon the basis of "information and belief" — that such coverage "included sensational, accusational and denunciatory statements about Mr. Thomas."[112] Conclusory and speculative assertions that are not grounded in specific facts are insufficient to rebut the strong presumption of competence that attends the actions of experienced trial attorneys.

**1**.    *The state courts' rulings*

Petitioner raised this same claim during collateral proceedings in state court,[113] and it was denied by both the Rule 32 court and the Alabama Court of Criminal Appeals. The latter court ruled as follows:

> Thomas failed to allege in his [Rule 32] petition, as amended, or to prove any specific deficiency of trial counsel in this regard, *i.e.*, he

---

[112] Doc. no. 35 (Petitioner's Brief), at 42; *see also* doc. no. 1 (Petition) ¶ 91 ("Upon information and belief, such television and radio evidence would have had sensational, accusational and denunciatory statements about Mr. Thomas.").

[113] *See* Rule 32 C.R., Tab. 38 at 5 ("Trial counsel inadequately researched, prepared and argued . . . a Motion for Change of Venue.").

failed to show any additional research, preparation, or argument that defense counsel could have made regarding any particular motion. A review of a claim of ineffective counsel is not triggered until "a petitioner has identified the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel's part." *Strickland*, 466 U.S. at 690, 104 S. Ct. 2052. It is only then that "the court must determine whether those acts or omissions fall 'outside the wide range of professionally competent assistance.'" *Id.* In rejecting this general claim, the circuit court listed the 40 written motions that defense counsel filed and noted that it found the motions to be "well written, fact specific, and detailed." (Rule 32 C.R. 743.) The court's ruling is proper. Thomas's claim is too undeveloped to require any further analysis. Conclusory allegations not supported by specifics do not warrant relief.

*Thomas v. State*, 766 So. 2d 860, 889 (Ala. Crim. App. 1998) (footnote omitted).[114]

## 2. *Conclusion*

In summary, petitioner has failed to show that the rulings of the Rule 32 trial court or the state appellate court unreasonably apply the *Strickland* standard, or that

---

[114] The omitted footnote reads as follows:

> In specific regard to the motion for a change of venue, we further note that the trial court denied the motion, and this court reviewed this ruling on direct appeal. We affirmed. *See Thomas*, 539 So. 2d at 392-94. We concur with the Rule 32 court's finding that "[n]o new evidence was adduced at the hearing held on Thomas's Rule 32 petition which would in any way indicate that the jury impanelled to hear Thomas's case was in any way prejudiced by any outside information." (Rule 32 C.R. 725.) The newspaper articles that were attached to Thomas's petition (Rule 32 C.R. 61-88) were the same as those submitted with Thomas's motion for a change of venue, minus two (C.R. 235-63).

*Thomas v. State*, 766 So. 2d 860 at 889 n.10.

such rulings were an unreasonable determination of the facts in light of the evidence before those courts.  This claim will be denied.

**C**.    *Failure to Excuse Jurors for Cause*

Petitioner's third claim is that the trial court's failure to excuse for cause the same ten venirepersons discussed in previous sections of this opinion deprived him of a fair trial, because each person allegedly was *either* prejudicially predisposed to find him guilty, *or* possessed a fixed bias against the insanity defense.[115]

**1**.    *Challenges based upon fixed opinions of guilt*

Petitioner alleges that Robert Haney, Naomi Lovell, and William Turpen harbored fixed opinions regarding his guilt before hearing any evidence in the case, and that the inclusion of these prospective jurors in the venire deprived him of a fair and impartial jury.[116]   None of these persons, however, actually sat as jurors at petitioner's trial.[117]   Consequently, this aspect of petitioner's third claim will not be

---

[115] *See* doc. no. 1 (Petition) ¶¶ 93-109.  Petitioner also alleged that some of these same jurors "indicated that they would automatically impose the death penalty if [petitioner] was convicted," *id.* ¶ 93, but he did not present evidence or argument to support the contention.  Accordingly, this aspect of petitioner's third claim is not further addressed.

[116] *Id.* ¶¶ 94-102.

[117] The twelve venirepersons selected to serve as regular jurors at petitioner's trial were Alan Boyd, Catherine Bridgeforth, John Eckstein, Marvin Garner, James Graham, Michael Lott, Bobby Marks, Peggy Mason, Mack Reynolds, Martha Wales, Vern Williams, and Paul Skipworth.  The alternate jurors were Judy Williams and Alyssa Perry.  When Mr. Skipworth was removed due to his wife's hospitalization, he was replaced by alternate juror Alyssa Perry.

discussed further.  A habeas petitioner may raise the denial of a challenge for cause as error only when the challenged venireperson actually sat on his jury.  *See*, *e.g.*, *Spivey v. Head*, 207 F.3d 1263, 1273 (11th Cir. 2000) ("Claims that the jury was not impartial must focus upon the jurors who actually sat.") (citing *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988) (holding that any claim that a jury was not impartial must focus "on the jurors who ultimately sat"), and *Heath v. Jones*, 941 F.2d 1126, 1133 (11th Cir. 1991) (holding that a habeas petitioner can only raise the trial court's denials of challenges for cause of those prospective jurors who eventually sat on the jury)).[118]

Moreover, as respondent notes, almost in passing, petitioner "does not assert that he used peremptory strikes to remove these jurors.  Thus, [petitioner] was not prejudiced, even if the judge erred when he denied the challenges for cause of these three jurors."[119]

**2**.    *Challenges based upon fixed bias against insanity defense*

---

[118] The Alabama Court of Criminal Appeals addressed and rejected these claims on direct appeal.  *See Thomas v. State*, 539 So. 2d at 380-83 (Haney), 383-86 (Turpen), and 386-91 (Lovell). Upon review of the record, briefs, and state court rulings, this court — if it were to address this claim on the merits — could not say that the state courts' decisions were either contrary to, or involved an unreasonable application of, clearly established federal law; nor could this court say that the rulings were based upon an unreasonable determination of the facts, in light of the evidence before the state courts.

[119] Doc. no. 73 (Respondent's Brief), at 71 n.5.

Petitioner challenged seven prospective jurors — *i.e.*, Alan Boyd, Barry Broadway, Johnie Eckstein, Mary Gray, Naomi Lovell, Jerry Pack and Harry Patterson — "on the basis that they had a bias against the affirmative defense of insanity."[120] Again, however, only two of these seven individuals — Alan Boyd and Johnie Eckstein — actually sat as jurors at petitioner's trial. Accordingly, only the denial of petitioner's challenges to those jurors will be reviewed.

According to petitioner, both Boyd and Eckstein "stated that a person should be punished even if he is insane."[121] Eckstein also allegedly placed "too heavy a burden on [petitioner] to prove insanity," because he "stated that a person was not insane who had no history of mental disorder."[122] Finally, petitioner alleges that these views prevented Boyd and Eckstein from fairly considering whether he committed the capital offense while under the influence of an extreme mental or emotional disturbance.[123]

The voir dire of these two jurors was previously examined at some length in Part V(A)(1)(a) *supra*, and that discussion will not be reiterated here. The conclusion

---

[120] Doc. no. 1 (Petition) ¶ 103, at 21.

[121] *Id*. ¶ 104.

[122] *Id*. ¶ 106 (citing R. 266-67).

[123] *See id*. ¶¶ 107-08 (citing Ala. Code § 13A-5-51).

remains the same, however, and bears repeating.  It is clear that jurors Boyd and Eckstein expressed some equivocation regarding the linkages between the issues of mental illness, the insanity defense, and punishment, but petitioner has failed to show that either of them "entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty."  *Coleman v. Zant*, 708 F.2d 541, 544 (11th Cir. 1983).  There also is ample support in the voir dire of each juror to support the trial court's decision to overrule petitioner's challenges for cause, and allow both to remain in the venire, because each affirmed that he could lay aside any preformed opinions, and base verdicts upon the evidence and the court's instructions regarding the rules of law that applied to the case.  *See id*. (holding that the second requirement for a showing of actual prejudice is a determination that the jurors in question "could not have laid aside these preformed opinions and rendered a verdict based on the evidence presented in court"); *see also Meeks v. Moore*, 216 F.3d 951, 961 (11th Cir. 2000) (same).

Therefore, viewing the historical facts in deference to the trial judge — the person in the best position to observe the credibility and demeanor of prospective jurors — this court cannot conclude that the trial judge's refusal to grant petitioner's motion to strike jurors Boyd and Eckstein for cause resulted in actual prejudice to petitioner.  *See*, *e.g.*, *Wainwright v. Witt*, 469 U.S. 412, 429-30 (1985) (holding that

96

a trial court's determination of juror bias is a matter of fact, to be reviewed as such under 28 U.S.C. § 2254); *Hightower v. Schofield*, 365 F.3d 1008, 1040 (11th Cir. 2004) ("Given the difficulty of reviewing such equivocal answers from the cold record, years after they were uttered, it is obvious why [reviewing courts] accord great deference to trial judge determinations of juror bias."), *rev'd on other grounds*, 545 U.S. 1124, 125 S. Ct. 2929 (2005). More fundamentally, however, petitioner has not carried his § 2254(e)(1) burden of rebutting, with clear and convincing evidence, the presumption of correctness that attaches to the state trial court's factual findings regarding juror partiality. *See*, *e.g.*, *Patton v. Yount*, 467 U.S. 1025, 1036-38 (1984) (holding that a state court's finding of a juror's impartiality is presumed correct because the question is "plainly one of historical fact"); *Miniel v. Cockrell*, 339 F.3d 331, 338-39 (5th Cir. 2003) ("A state trial court's refusal of a petitioner's challenge for cause is a factual finding entitled to a presumption of correctness.") (citing *Jones v. Butler*, 864 F.2d 348, 362 (5th Cir. 1988)).

**D**.   *Funds for Jury Expert*

Petitioner's fourth claim relates to his request for funds to retain a jury psychologist to assist his trial attorneys in selecting a jury.[124] Petitioner asserts that the trial court's denial of that request deprived him of "an opportunity to defeat the

---

[124] *See* doc. no. 1 (Petition) ¶¶ 110-12.

charges against him and gather adequate evidence to obtain a life sentence, thus violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments."[125] This issue was not raised as error on direct appeal, however.  Instead, the claim was presented for the first time on collateral review, in petitioner's Rule 32 petition, and found by the Rule 32 court to be procedurally barred by Alabama Rules of Criminal Procedure 32.2(a)(2) and (5).[126]  The Court of Criminal Appeals summarily affirmed the trial court's decision in the first paragraph of its discussion of the issue.

> N. *The trial court erroneously denied Thomas's request for expenses to hire a jury psychologist to assist defense counsel in the selection of a fair and impartial jury.*
>
> The underlying substantive issue, which is argued in Issue XIV, is procedurally barred:  the issue was presented and addressed in the trial court, Rule 32.2(a)(2), and it could have been, but was not, raised on direct appeal, Rule 32.2(a)(5).

*Thomas v. State*, 766 So. 2d at 921-22.   Accordingly, respondent argues that petitioner's fourth claim is procedurally defaulted, and may not be reviewed in this court.[127]

---

[125] *Id*. ¶ 112.

[126] *See* Rule 32 C.R. Tab. 38, at 24, and the trial court's order regarding same.  *Id*. at Tab 42, pp. 2-3 & 13.

[127] *See* doc. no. 17 (Respondent's Answer), at 15

The two sub-sections of Alabama Rule of Criminal Procedure 32.2(a) cited by the Alabama Court of Criminal Appeals as the basis for its determination that this claim was procedurally defaulted read as follows on the dates of petitioner's collateral proceedings in state court:

> (a) PRECLUSION OF GROUNDS. A petitioner will not be given relief under this rule based upon any ground:
>
>> (1) Which may still be raised on direct appeal under the Alabama Rules of Appellate Procedure or by post-trial motion under Rule 24; or
>>
>> (2) *Which was raised or addressed at trial*; or
>>
>> (3) Which could have been but was not raised at trial, unless the ground for relief arises under Rule 32.1(b); or
>>
>> (4) Which was raised or addressed on appeal or in any previous collateral proceeding; or
>>
>> (5) *Which could have been but was not raised on appeal*, unless the ground for relief arises under Rule 32.1(b).

Ala. R. Crim. P. 32.2(a) (2000) (emphasis added to portions relied upon by the state appellate court).

Rules 32.2(a)(2) and (a)(5) are "independent" grounds for rejecting petitioner's claim because each "rests solidly on state law grounds [that are] not intertwined with

an interpretation of federal law." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)).  The Eleventh Circuit implicitly recognized that conclusion when observing that, "[u]nder Alabama law, a failure to raise an issue either at trial or on direct appeal from the conviction constitutes a procedural bar to the assertion of the claim in a subsequent collateral proceeding" in the state court system.  *Ladd v. Jones*, 864 F.2d 108, 109 (11th Cir. 1989) (citing *Ex parte Ellison*, 410 So. 2d 130, 132 (Ala. 1982)[128]); *see also Pelmer v. White*, 877 F.2d 1518, 1521 (11th Cir. 1989) (same).

Moreover, it is clear that Alabama courts have regularly followed and applied the requirements of Rule 32.2(a)(2) and (a)(5).  *See, e.g., Holladay v. State*, 629 So. 2d 673 (Ala. Crim. App. 1992) (holding that capital murder defendant's claims for post-conviction relief were procedurally barred where defendant did not raise claims at trial or on direct appeal), *cert. denied*, 510 U.S. 1171 (1994); *Matthews v. State*, 555 So. 2d 283 (Ala. Crim. App. 1989) (holding that a defendant's failure to raise an objection or an issue at trial or on direct appeal precluded collateral relief under former

---

[128] The decision of the Supreme Court of Alabama in *Ex parte Ellison*, 410 So. 2d 130 (Ala. 1982), stands for the proposition that the common-law petition for writ of error *coram nobis* (functionally replaced by Rule 32 of the Alabama Rules of Criminal Procedure) cannot be used "as a delayed appeal of issues which could have been decided at the initial trial or on direct appeal."  *Id.* at 132 (citations omitted); *see also id.* ("'The writ of error coram nobis is not a substitute for other remedies such as an appeal, writ of error, certiorari, or motion for new trial.'") (quoting *Summers v. State*, 366 So. 2d 336 (Ala. Crim. App. 1978)).

Rule 20 of the temporary Alabama Rules of Criminal Procedure); *Wright v. State*, 593 So. 2d 111 (Ala. Crim. App. 1991) (holding that a defendant's failure to raise an issue at trial or on direct appeal barred collateral relief under the common-law predecessor of Ala. R. Crim. P. 32, the so-called "petition writ of error *coram nobis*"), *cert. denied*, 506 U.S. 844 (1992). Therefore, Rules 32.2(a)(2) and (5) are "adequate" state grounds.

Petitioner raised the issue of funds for a jury selection expert to advise his attorneys with the trial court and, accordingly, he was required by Alabama Rule of Criminal Procedure 32.2(a)(5) to raise the denial of his request as trial error on direct appeal, but he failed to do so. Rule 32.2(a)(5) is Alabama's rule-based statement of the "abandoned objection rule," which "bars the defendant from raising on collateral attack a trial court error that he did not raise on direct appeal." *Presnell v. Kemp*, 835 F.2d 1567, 1573 (11th Cir. 1988).[129] Therefore, when the claim was presented for the

---

[129] The Eleventh Circuit's opinion in *Presnell* explained the purposes of "abandoned objection rules" as follows:

> The abandoned objection rule . . . enhances finality [of a defendant's conviction and the execution of his sentence] in one of two ways. First, by requiring the defendant to present his objections to the appellate court, the rule makes that court, rather than the collateral attack court, the final arbiter of the merits of his objections. Second, if an objection has merit, necessitating a retrial, the retrial can be convened sooner than if retrial were ordered by the collateral attack court.

> The abandoned objection rule serves secondary objectives, too. By encouraging the defendant to present all of his claims of trial error to the appellate court, the rule improves the quality of appellate review because the appellate court

first time on collateral review, the Alabama Court of Criminal Appeals clearly, explicitly, and correctly ruled the claim to be procedurally barred on the basis of Rule 32.2(a)(5), an independent and adequate state procedural rule.

Petitioner has not attempted to establish cause for, or to demonstrate prejudice as a result of, his failure to properly raise the issue on direct appeal.[130]  (See the discussion of the procedural default doctrine in Part IV(C) of this opinion, *supra*.) Indeed, petitioner provides no response to respondent's argument.[131]  For all of these reasons, petitioner's fourth claim is due to be denied.

**E**.    *Racially Discriminatory Use of Peremptory Challenges*

The fifth claim alleged by petitioner, who is white, is that he was deprived of a fair trial by an impartial jury because the state prosecutor allegedly exercised

---

can review all of the defendant's claims of error together and assess the combined effect of the errors on his conviction.  If the appellate court finds reversible error and orders a retrial, the retrial can be commenced sooner than it could be if ordered by a collateral attack court.  Because it facilitates an earlier retrial, the rule increases the potential for a just verdict since the chance that the evidence will be stale is diminished.  Finally, the abandoned objection rule conserves judicial and parajudicial resources by eliminating the need for collateral proceedings to review objections that could be reviewed on direct appeal.

*Presnell*, 835 F.2d at 1574-75 (citation and footnote omitted).

[130] See the discussion of the procedural default doctrine in Part IV(C) of this opinion, *supra*.

[131] *See* doc. no. 35 (Petitioner's Brief), at 97-98.

peremptory strikes in a racially discriminatory manner.[132]  This claim was not raised either at trial or on direct appeal.  Instead, it was asserted for the first time in post-conviction proceedings.  Respondent accordingly argues that it was procedurally defaulted.[133]  The Alabama Court of Criminal Appeals addressed the claim in its opinion on collateral appeal as follows:

> G. *The prosecutor allegedly engaged in racial discrimination in exercising his peremptory strikes, thus denying Thomas his right to equal protection and a fair trial by an impartial jury comprised of a representative cross-section of the community.*
>
> Foremost, Thomas has not met his Rule 32.3 burden of proving factual support for his allegation.[134]  The record fails to reflect any factual basis to support a prima facia case of discrimination:  it does not indicate how many blacks, if any, the prosecutor struck, how many blacks were on the venire, or how many blacks served on the jury.  While Thomas's Rule 32 counsel stated at the hearing that he "believed" that two of three blacks were struck, the circuit court replied that it was governed by the record. (Rule 32 R. 194-97.) We can find no verification in the record that two of three blacks were struck.  While the trial transcript contains the venire list and strike sheet, the race of the veniremembers is not recorded.  (C.R. 276A.)  The only pertinent

---

[132] *See* doc. no. 1 (Petition) ¶¶ 113 and 114.

[133] *See* doc. no. 17 (Respondent's Answer), at 16-18; doc. no. 73 (Respondent's Brief), at 6.

[134] Alabama Rule of Criminal Procedure 32.3 provides that:

> The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence.

Ala. R. Crim. P. 32.3.

evidence introduced at the Rule 32 hearing was Barksdale's testimony that he had been previously involved in a case tried by the same prosecutor; that he had no basis for objecting to the prosecutor's use of preemptory strikes to remove blacks from the venire; and that he did not consider the prosecutor's exercise of his strikes in this case to be discriminatory.

Moreover, Thomas's claim that the prosecutor violated *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), is without merit, as a matter of law.  Thomas is white.  Although *Batson* was extended to whites in *Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991), Thomas was convicted on March 26, 1986, five years before *Powers* was decided.  His appeal was also final before *Powers*.  (The certificate of final judgment was issued by this court on January 20, 1989, and the United States Supreme Court denied Thomas's petition for writ of certiorari review on June 19, 1989.)  Thus, *Powers* was not applicable to Thomas's case.

Not only because this claim lacks factual support, but also because the trial and the direct appeal in this case pre-dated *Powers*, Thomas's trial and appellate attorneys were not ineffective for failing to raise a *Batson* claim.  *See Holladay v. State*, 629 So. 2d 673, 685-86 (Ala. Cr. App. 1992).  *See also Fortenberry v. State*, 659 So. 2d 194, 200 (Ala. Cr. App. 1994) (appellate counsel was not ineffective in failing to argue a *Batson* claim where the white appellant's direct appeal was final in 1990), *cert. denied*, 516 U.S. 846, 116 S. Ct. 137, 133 L. Ed. 2d 84 (1995); *McArthur v. State*, 652 So.2d 782 (Ala. Cr. App. 1994) (trial counsel was not ineffective for failing to raise a *Batson* claim for a white defendant, because that claim would not have been supported by law at the time of the trial), *cert. denied*, 515 U.S. 1135, 115 S. Ct. 2564, 132 L. Ed. 2d 816 (1995).  The circuit court properly denied Thomas's claims of ineffective counsel, based on the above rationale.

Moreover, Thomas's claim that he was denied a fair trial by an impartial jury comprised of a representative cross section of the

community is also without merit, as a matter of law. The Supreme Court in *Holland v. Illinois*, 493 U.S. 474, 110 S. Ct. 803, 107 L. Ed. 2d 905 (1990), held that exclusion of blacks from a petit jury by the exercise of peremptory challenges is not a violation of the Sixth Amendment. Accordingly, trial and appellate counsel were not ineffective for not arguing this point.

Finally, the underlying substantive issue asserted in Issue VII of Thomas's brief — whether the prosecutor's allegedly discriminatory use of peremptory challenges denied Thomas a fair trial by an impartial jury — is procedurally barred because it was not raised at trial or on appeal. Rule 32.2(a)(3) and (5). *See State v. Tarver*, 629 So. 2d 14, 19 (Ala. Cr. App. 1993), *cert. denied*, 511 U.S. 1078, 114 S. Ct. 1664, 128 L. Ed. 2d 380 (1994).

*Thomas v. State*, 766 So. 2d 860, 916 (Ala. Crim. App. 1998).

Petitioner offers nothing meriting extended discussion in opposition to respondent's contention that this claim is procedurally defaulted. This claim is barred, as the state appellate court clearly stated in the last paragraph quoted immediately above, because it was not raised at trial or on direct appeal as required by Alabama Rules of Criminal Procedure 32.2(a)(3) and (5).[135] Further, when asserted for the first

---

[135] Rule 32.2(a)(3) is Alabama's rule-based statement of the "contemporaneous objection rule," which concerns "errors that occur during the trial of a case; if the defendant wishes to complain of an error on appeal, he must first bring it to the trial court's attention by making a timely objection." *Presnell v. Kemp*, 835 F.2d at 1573. The Eleventh Circuit's opinion in *Presnell* explained the purposes of such procedural rules as follows:

> The contemporaneous objection rule, which bars a defendant from raising on appeal an objection that he could have presented to the trial court, enhances finality in one of two ways. First, by requiring the defendant to present his objection to the trial court, the rule may enable the trial court to prevent reversible error from

time in collateral proceedings, the proof presented to the Rule 32 court did not meet

the requirements of Alabama Rule of Criminal Procedure 32.3.[136]

The fact that the Alabama Court of Criminal Appeals initially addressed the

merits of this claim, and rejected it on the basis of federal law, is of no moment.  As

the Supreme Court observed in *Harris v. Reed*, 489 U.S. 255 (1989), "a state court

---

occurring and to eliminate grounds for an appeal.  In this situation, the conviction
may become final at the conclusion of the trial.  Second, if the trial court cannot
prevent reversible error and declares a mistrial, it can convene a retrial promptly,
accelerating the finality of the defendant's prosecution.  In the absence of a
contemporaneous objection rule, the reversible error might not be found until the
defendant's conviction is reviewed on appeal or collateral attack, therefore delaying
the finality of his prosecution.

The contemporaneous objection rule also serves secondary objectives.  By
encouraging the defendant to make his objection seasonably, the contemporaneous
objection rule increases the potential for an error-free trial and thus a verdict that
reflects the truth.  The rule produces two salutary effects even when reversible error,
necessitating a mistrial, occurs.  First, by encouraging the defendant to present his
objection to the trial court, the rule may save the defendant from the stigma resulting
from an unjust conviction.  Absent the rule and a contemporaneous objection, the
defendant may have to suffer the stigma throughout an appeal or collateral attack,
when his claim of reversible error can be heard and his conviction set aside.  Second,
the rule improves the potential for a just verdict on retrial, because the court, not
having to await the outcome of an appeal or collateral attack proceeding, can
commence the trial quickly, while the evidence is still fresh.  If the retrial does not
begin until the defendant's conviction is set aside on appeal or collateral attack, the
potential for a just verdict may be diminished because the evidence may have become
stale or lost due to the passage of time.  Finally, the contemporaneous objection rule
conserves judicial and parajudicial resources.  Whenever error is corrected by the
trial court-through remedial instructions to counsel or the jury or through the
declaration of a mistrial-the expenditure of judicial or parajudicial resources in
appellate or collateral proceedings convened to address the error is rendered
unnecessary.

*Id*. at 1573 (citations omitted).

[136] *See supra* note 134 for the text of Ala. R. Crim. P. 32.3.

may reach a federal question without sacrificing its interests in finality, federalism, and comity." *Id*. at 264 n.10; *see also*, *e.g.*, *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) (holding that, "where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim") (citing *Harris*, 489 U.S. at 264 n.10); *Hall v. Wainwright*, 733 F.2d 766, 777 (11th Cir. 1984) ("A state court is entitled to express its views on federal constitutional issues without waiving its procedural default rules.").

Finally, the decision of the state court was neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). For all of these reasons, petitioner's fifth claim is due to be denied.

## F.   *Prosecutorial Misconduct*

For his sixth claim, petitioner asserts that prejudicial remarks uttered by the prosecutor during the guilt and penalty phases of trial deprived him of a fair trial.[137] Only a small number of the remarks listed in the petition filed with this court were objected to by trial counsel; none were raised as trial error on direct appeal. On collateral review, therefore, the Rule 32 trial court and the state appellate court found

---

[137] *See* doc. no. 1 (Petition) ¶¶ 115-158.

the substantive components of these claims to be procedurally barred by the state rules mandating that each claim first be presented at trial or on direct appeal.[138]   The Appendix to this opinion matches each of the specific acts of alleged prosecutorial misconduct comprising petitioner's sixth claim to the corresponding pages of the Alabama Court of Criminal Appeals' opinion on which that claim is discussed.

Petitioner presents no meaningful reply to respondent's assertion that the substantive components of the forty-one specific contentions comprising Claim "F" are procedurally barred.[139]   Accordingly, this claim is due to be denied, and will not be discussed further.

**G**.   *Ineffective Assistance of Counsel for Failing to Object, or Appeal, Acts of Prosecutorial Misconduct*

Petitioner's seventh claim is that his trial and appellate attorneys were "ineffective for failing to object to or appeal the prosecutorial misconduct."[140] Respondent argues that this claim is due to be denied because petitioner failed to either "specifically identify," or "even list one instance of prosecutorial misconduct

---

[138] The relevant portions of the Rule 32 trial court proceedings are found in Rule 32 C.R. Tab. 38, at 26 and 30-40, and Tab 42, at 2-3 and 10-11.  *See also Thomas v. State*, 766 So. 2d at 891, 893, 902, and 922-960 (discussing each of the claims and holding that all were procedurally barred because they were either raised at trial but not appealed, or were neither raised at trial nor on appeal).

[139] *Compare* doc. no. 17 (Respondent's Answer), at 19-70 *with* doc. no. 35 (Petitioner's Brief), at 25-41.

[140] Doc. no. 1 (Petition), ¶ "G," at 33.

that his attorneys failed to object to or raise on appeal" in the habeas petition filed in this court.[141]  It is true that the four, slim paragraphs comprising Claim "G" are devoid of specificity.[142]   Respondent's argument, nevertheless, is disingenuous; one can reasonably assume that the acts of prosecutorial misconduct petitioner claims his attorneys should have objected to and appealed are those acts described in the immediately preceding claim, "F."

Even so, respondent's argument is valid to this extent:  petitioner's brief addresses only *some* of the acts of prosecutorial misconduct described in the previous claim as a basis for the argument that his attorneys provided ineffective assistance.[143]

---

[141] Doc. no. 17 (Respondent's Answer), at 70-71.

[142] The paragraphs of the petition addressing petitioner's seventh claim ("G") read as follows:

> 159.  Trial counsel did not object to the improper arguments, misleading statements of facts and law, and other misconduct of the prosecuting attorneys throughout the trial.

> 160.  Trial counsel's failures to object allowed the jurors, among other problems, to consider inadmissible evidence in their deliberations and to be swayed by the inflammatory remarks of the district attorneys.

> 161.  Trial counsel's failure to object promptly, secure curative instructions, and ensure that both jury and judge were influenced only by proper considerations rendered the outcome of petitioner's trial and sentencing unreliable.

> 162.  Trial counsel's failure to appeal this misconduct was also ineffective assistance under *Strickland*.

Doc. no. 1 (Petition), at 33-34.

[143] *See* doc. no. 35 (Petitioner's Brief), at 25-41.

This court accordingly will examine only those ineffective assistance claims attached to the alleged acts of prosecutorial misconduct actually argued and presented fully by petitioner in brief: *i.e.*, those acts or utterances described in paragraphs 117, 118, 125, 127, 131-134, 139, 143-146, 149, 151, and 158 of the petition. Before doing so, however, it is necessary to record the stated rationale of petitioner's lead trial counsel for not objecting to each act to be discussed.

**1**.    *Trial counsel's strategy*

As discussed above, in Part IV(B)(1) of this opinion, the *Strickland* standard requires reviewing courts to assess the performance of trial and appellate counsel in a "highly deferential" manner because representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. *See Strickland*, 466 U.S. at 697.

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. . . .

*Strickland*, 466 U.S. at 689*; see also Burger v. Kemp*, 483 U.S. 776, 789 (1987) (same); *Chandler v. United States*, 218 F.3d at 1316-17 (same).

110

In that regard, petitioner's lead trial attorney testified at the hearing conducted by the Rule 32 court, and explained his reasons for not objecting to every allegedly-prejudicial utterance of the state prosecutor as follows:

> I've been trying cases on a regular basis for 25 years, and I guess when I first started trying cases I thought, well, everything the other side does wrong or is perceived wrong, you get up and object. I guess that's what you learn in law school, but I found out later that that could be the worst thing you can do. I think that . . . if there's something that's objectionable that can affect the outcome of the trial, then . . . you need to get up and object, but if it's something of a minor nature, then when you get up and object, all you are going to do is just call attention to it a second time. I tried not to object unless it was something of a crucial nature because I think it hurts you otherwise.

*Thomas v. State*, 766 So. 2d at 928-29 (citation and quotation marks omitted). The Alabama Court of Criminal Appeals concluded that such tactics were reasonable under prevailing professional norms, saying:

> Failure to object to argument is within the "wide range" of reasonable professional assistance for which a strong presumption of sound judgment is due. As Judge Bowen explained in his special concurrence in *King v. State*, 518 So. 2d 191, 197-98 (Ala. Cr. App.1987):
>
> > "When a prosecutor makes an improper comment at trial, defense counsel has two choices. He can object and request curative instructions, hoping the trial judge will sustain his objection and give adequate instruction to the jury to disregard the improper remark. Whether or not the objection is sustained, he must question whether or not he has called the jury's attention to a bell that once rung cannot be unrung.

111

> "Defense counsel's second choice is to attempt to deflate the significance of the prosecutor's comment by not objecting to it when made and by either responding to the comment in his rebuttal argument or simply ignoring it altogether."

*Thomas v. State*, 766 So. 2d at 929.  As a general proposition, this court agrees with the state appellate court's conclusion.  *See Graham v. State*, 593 So. 2d 162, 166 (Ala. Crim. App. 1991) ("No particular decision to object or not object, even if it is a bad decision, is in itself proof that counsel's performance fell below acceptable professional standards.").[144]  The Eleventh Circuit also observed in a different, but nevertheless analogous, context that

> [t]he Supreme Court has recognized that because representation is an art and not a science, "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." [*Strickland*, 466 U.S.] at 689, 104 S. Ct. at 2065.  Three different defense attorneys might have defended [petitioner] three different ways, and all of them might have defended him differently from the way the members of this Court would have, but it does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance.

*Waters v. Thomas*, 46 F.3d 1506, 1522 (11th Cir. 1995) (*en banc*).

---

[144] *See* also, *e.g.*, *Stringfellow v. State*, 485 So. 2d 1238, 1243 (Ala. Crim. App. 1986) ("An attorney who objected to every question would be serving notice that, while he might hope to win his case on appeal, he had abandoned hope of winning at trial."); McElhaney, TRIAL NOTEBOOK 94 (1981) ("Never make an objection without a good reason for it.  A trial is not an evidence examination.").

Moreover, when, as here, "courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." *Chandler v. United States*, 218 F.3d at 1316 (citing *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) (stating that the "strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel," and observing that "[t]he more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in rejecting a defense" is reasonable)).

Even if the Alabama Court of Criminal Appeals had concluded that the explanation of petitioner's lead trial attorney was not a reasonable trial tactic, proper application of the second prong of the *Strickland* standard would entitle petitioner to relief only if his attorney's errors had "prejudiced the defense." *Strickland*, 466 U.S. at 687; *see also Massaro v. United States*, 538 U.S. 500, 505 (2003) ("[A] defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial."). To satisfy the prejudice prong of the *Strickland* standard, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

113

sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S at 694.

Applying this standard, the Alabama Court of Criminal Appeals found that:

> [T]he trial court instructed the jurors several times that their decision was
> to be based on the evidence alone, and that arguments of counsel were
> not evidence.

> As we further explain *infra*, we are confident that, absent the
> alleged misconduct and allegedly improper remarks of the prosecutor, the
> jury's decision would not have been different. Thomas's trial cannot be
> said to have been fundamentally unfair. Thomas has failed to satisfy the
> "but for" test of *Strickland*.

*Thomas v. State*, 766 So. 2d at 929.

**2**.    *Prejudicial remarks specifically addressed in petitioner's brief*

In order to test the correctness of the conclusion of the Alabama Court of
Criminal Appeals that, "absent the alleged misconduct and allegedly improper remarks
of the prosecutor, the jury's decision would not have been different," this court must
examine each instance of prosecutorial misconduct specifically addressed in
petitioner's brief. In doing so, however, it must be remembered that the "effectiveness
of counsel does not lend itself to measurement by picking through the transcript and
counting the places where objections might be made." *Brooks v. State*, 456 So.2d
1142, 1145 (Ala. Crim. App. 1984). Moreover, even if it should be determined that
"there were several instances where counsel could have objected, that does not

114

automatically mean that the [petitioner] did not receive an adequate defense in the context of the constitutional right to counsel." *O'Neil v. State*, 605 So. 2d 1247, 1250 (Ala. Crim. App. 1991) (internal quotation marks and citation omitted).

      **a**.   *References to indictment during opening statement*

Petitioner contends the prosecutor represented during opening statement that "the significance of the indictment was that a grand jury had already considered the evidence in the case and had decided that there was a "likelihood" that the defendant had committed the crime."[145]

> The prosecutor emphasized, "and those eighteen citizens on the Grand Jury, after hearing the evidence, returned an indictment against this man right here (Indicating), this Defendant." (R. 697-98). Rather than simply reading the indictment to the jurors, the prosecutor remarked that the likelihood that Mr. Thomas committed the crime "was important to the Grand Jury" and "it's important to us." (R. 699).

> 118. These improper comments instructed the jury that they should consider the indictment as *evidence* of Mr. Thomas' guilt which violated his right to a fair trial by attacking the presumption of innocence before any evidence had been presented.[146]

The Alabama Court of Criminal Appeals thoroughly and exhaustively examined these contentions in the context of petitioner's claim that trial counsel were ineffective

---

[145] Doc. no. 1 (Petition) ¶ 117 (citing R. 697-99).

[146] *Id*. ¶¶ 117 & 118; *see also* doc. no. 35 (Petitioner's Brief), at 27.

for not objecting to the comments, *see Thomas v. State*, 766 So. 2d at 893-903, and

condemned the prosecutor's statements as, at best, foolhardy:

> We cannot emphasize enough that the prosecutor should not risk reversal of a conviction by commenting on the functions of the grand jury. "We strongly condemn any statement by the prosecutor which conveys to the jury the impression that the grand jury would not have indicted the defendant if he had not been guilty." . . .

*Id*. at 902 (quoting *Breedlove v. State*, 439 So. 2d 1326, 1327 (Ala. Crim. App. 1983)).

Even so, the state appellate court ultimately concluded that petitioner had not

demonstrated actual prejudice. For one thing, the trial judge instructed the jury that

> *the indictment in this case is not evidence against the defendant. It is merely the formal method the law prescribes by which an accused is brought to trial. It provides no proof. There is no presumption or inference that the defendant is guilty of the offense because there's an indictment in the case.*

*Thomas v. State*, 766 So. 2d at 896 (emphasis in original). The intermediate state

appellate court also observed that,

> [i]n the present case, the jury *was* told (by defense counsel) that the grand jury proceedings are cursory:  that Thomas was not given an opportunity to appear, to have his attorney present, to ask questions, or to present evidence. The jury was further informed that no one appeared before the grand jury except the prosecutor and the police officers selected by the prosecutor. Defense counsel explained that because the grand jury proceedings were by their nature cursory, the indictment was nothing more than the procedure by which an accused is brought to trial. The trial court reiterated this conclusion when it instructed the jury that

116

the indictment is not evidence, that it provides no proof, that it raises no presumption of guilt, and that it is merely the formal method by which a defendant is brought to trial.

Moreover, the trial court repeatedly instructed the jurors that they had taken an oath to decide the case based only on the evidence from the witness stand and the law, that they were the sole determiners of the facts, and that the statements of the attorneys were not evidence. The trial court repeatedly instructed, and the attorneys reminded, the jury that the prosecution must prove guilt beyond a reasonable doubt. Defense counsel and the trial court reiterated that every defendant is presumed innocent. In fact, the trial court gave a thorough instruction on the presumption of innocence, as quoted *supra*.

When considering the contested comments in this case in conjunction with the comments and instructions by the trial court and also other argument by both counsel, we conclude that the jury was aware that the fact that an indictment had been returned by a grand jury was not evidence against petitioner and that the return of an indictment did not create any presumption or permit any inference of guilt. Therefore, Thomas cannot meet the *Strickland* requirement of prejudice. *See*, *e.g.*, *Daniels v. State*, 650 So. 2d 544, 558 (Ala. Cr. App. 1994) (in finding counsel was not ineffective in failing to ask for a mistrial when prosecutor stated in closing, "[The appellant is] here because the Grand Jury charged him, because the evidence is here. If the evidence wasn't here, we'd already be gone. The case would be over," because the trial court's instruction to disregard the comments removed any need for such drastic action), cert. denied, 514 U.S. 1024, 115 S. Ct. 1375, 131 L. Ed. 2d 230 (1995).

This finding is buttressed by the United States Supreme Court's holding in *Andres v. United States*, 333 U.S. 740, 68 S. Ct. 880, 92 L. Ed. 1055 (1948). We find *Andres* applicable because the jury in *Andres* was given information regarding the grand jury process that is very similar to that given the jury in Thomas's trial. Although the information in *Andres*

117

was conveyed by the trial court and the information here was relayed collectively by the prosecutor, defense counsel, and the trial court, this fact is all the more reason to rely on *Andres*:  if the United States Supreme Court approves the information conveyed by the trial court, having "the tremendous weight of its office" behind its instructions, surely similar comments by the prosecutor would have less of an impact on the jury.  In *Andres*, the jury had found the petitioner guilty of first-degree murder and he was sentenced to death;  the Supreme Court reviewed the propriety of the following instructions by the trial court, although no objection or exception was made:

"To the indictment which the grand jury returned against this defendant, this defendant entered a plea of not guilty.  That is to say, he denied the charge stated in the indictment and placed himself upon his Country for the purpose of trial.  The burden is upon the Government to show to your satisfaction, gentlemen, that this defendant is guilty beyond every reasonable doubt.  This burden does not change at any time during the course of the trial.  The defendant is presumed innocent of the charge stated in the indictment until he is proven guilty by the degree of proof to which I have previously referred.  The presumption of innocence in favor of the defendant is not a mere formality to be disregarded by the jury at its pleasure.  It is a substantive part of our criminal law.  The presumption of innocence continues with the defendant throughout the trial until you are convinced by the evidence that he is guilty beyond a reasonable doubt.

"When the indictment was returned by the grand jury against this defendant, the defendant had had no opportunity to present his side of the case.  *The indictment was found by the grand jury upon evidence presented to it by the Government alone, and created in the minds of the grand jury a belief that it was probable that a crime had been committed and that this defendant probably committed that crime.*

118

> "*Upon the evidence [which] it heard, the grand jury indicted this defendant, thereby indicating that it was probable that a crime had been committed, which should be disposed of in this court where both sides could be heard, and this is the stage which we have now reached*."

> "I advise you, gentlemen, that it is the indictment in this case which frames the issues of the case."

*Id*. at 744 n.5, 68 S. Ct. 880 (emphasis in original).  In addressing the propriety of these instructions, the Supreme Court stated that it did not consider the petitioner's argument to be of "sufficient doubt or importance to justify an extended discussion."  *Id*. at 742, 68 S. Ct. 880. It stated only the following in regard to this issue:

> "It is next contended that the trial was unfair because the instructions quoted [above] indicated to the jury that the indictment against the petitioner reflected a finding by the Grand Jury that he was probably guilty of the crime of murder in the first degree.  Perhaps the italicized [emphasized] language in the charge, read out of context is misleading and it might have been better to omit it completely.  However, when the language complained of is read in context, it seems to us that the petitioner had no real ground for complaint.  No material error resulted from the words."

*Id*. at 744-45, 68 S. Ct. 880.  *See also United States v. Popow*, 821 F.2d 483, 488 (8th Cir. 1987) (the appellant's argument that the trial court's instructions to the jury that grand jurors "just hear enough evidence to make the judgment that a crime has probably been committed and that the person to be charged has probably committed it" borders on the frivolous because the reference was generic, i.e., not specific to the grand jury that indicted the appellant and also because the court clearly admonished the jurors that the fact that an indictment had been returned by a grand jury was not evidence of any kind against an accused and that the return of an

indictment did not create any presumption of guilt or permit any inference of guilt). *Cf. Fiorella v. City of Birmingham*, 35 Ala. App. 384, 388, 48 So. 2d 761 (1950) (the appellant was not "probably injured in his substantial rights by reason" of the following statement by the trial court at the opening of the trial: "The matter before you comes by virtue of a law which allows any person convicted in the Recorder's Court to appeal his case into the Circuit Court, to be tried de novo, by a jury of his peers, and the matter before you, in short, a complaint by the City of Birmingham that . . . ."), *cert. denied*, 254 Ala. 515, 48 So. 2d 768 (1950), *cert. denied*, 340 U.S. 942, 71 S. Ct. 506, 95 L. Ed. 680 (1951).

*Thomas v. State*, 766 So. 2d at 898-900 (emphasis in original) (footnote omitted).

Of course, "it is always improper for a prosecutor to suggest that a defendant is guilty merely because he is being prosecuted or has been indicted." *Washington v. Hofbauer*, 228 F.3d 689, 701-02 (6th Cir. 2000) (quoting *United States v. Bess*, 593 F.2d 749, 754 (6th Cir.1979)).  Nevertheless,

> [i]t "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 699 F.2d at 1036. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Applying that standard, the Alabama Court of Criminal Appeals concluded that the prosecutor's improper comments concerning the indictment during opening statement did not overpower the effect of the trial court's repeated admonitions to petitioner's jury that

comments by the attorneys are not evidence and that the jury is under oath to decide the case based on only the evidence that comes from the witness stand.  In other words, the trial court injected the tremendous weight of its office in this case by properly instructing the jury, thus curing any harm arising from the prosecutor's comments. . . .

*Thomas v. State*, 766 So. 2d at 902 (internal quotation marks and alterations omitted).

The conclusion of the Alabama Court of Criminal Appeals that petitioner's attorneys did not render ineffective assistance of counsel by failing to object to the prosecutor's remarks in the trial court, or cite them as error on direct appeal, because petitioner failed to satisfy the prejudice prong of the *Strickland* test, is a finding of fact that is presumptively correct, unless petitioner rebuts it with clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *see also*, *e.g.*, *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001) (holding that a state court's "findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness"); *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005).  He has not done so.  Further, after carefully reviewing the Alabama Court of Criminal Appeals' thorough and exhaustive analysis of this claim, this court cannot conclude that its decision was contrary to, or an unreasonable application of, clearly established federal law, nor was that court's disposition of the claim an unreasonable determination of the facts in light of the evidence presented in the state court

proceedings. *See* 28 U.S.C. § 2254(d). The failure of petitioner's trial attorneys to object to the prosecutor's opening statement, and of his appellate counsel to raise the issue as trial error on direct appeal, was not "so serious as to deprive [petitioner] of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687.

       **b**.   *Prejudicial references to petitioner*

Petitioner next argues that his attorneys were ineffective for failing to object to, or allege as trial error on direct appeal, the prosecutor's disparaging references to petitioner during closing argument.[147] The paragraphs of the petition addressing this contention read as follows:

> 125. The prosecutor inflamed the jury against Mr. Thomas by repeatedly calling him "this street punk" (R. 1829 – three times), "this criminal" (R. 1828), "this thug" (R. 1831, 1834), "a murderer" (R. 1844), and a "manipulator" (R. 1851). At one point, the prosecutor blatantly misled the jury about Mr. Thomas' previous criminal record by telling them that he was "a street punk who has been excused by this community and society for everything that he ever did wrong before." (R. 1828). These direct personal attacks against Mr. Thomas constituted reversible error because Mr. Thomas never placed his good character in issue.

>       * * * *

> 143. The prosecutor derisively remarked that Mr. Thomas "had the advantage of having psychologists and counselors as he grew up to help him with whatever problems that he had, but all the social workers, the

---

[147] *See* doc. no. 35 (Petitioner's Brief), at 29-31.

preachers, the foster parents, the teachers, and the psychologists together couldn't keep this kid from being what he was and what he is: evil, mean and violent." (R. 1829). Once again, these personal onslaughts against Mr. Thomas coupled with the erroneous comments that no mitigating evidence existed constituted reversible error and violated Mr. Thomas's right to a fair trial.[148]

The Alabama Court of Criminal Appeals examined these claims on collateral review, *see Thomas v. State*, 766 So. 2d at 933-38, and determined that each was either a permissible comment upon the evidence, or a legitimate response to remarks of defense counsel. The relevant portions of that opinion read as follows:

> (b) *The prosecutor repeatedly referred to Thomas as "this street punk," "this criminal," "this thug," "a murderer," and a "manipulator."*
>
> Our review of the prosecutor's closing argument reflects that the prosecutor did not *repeatedly* call Thomas names: he called him "this street punk" three times; "this criminal" once; "this thug" twice; "a murderer" once; and a "manipulator" once. "[T]he prosecutor, in the appropriate case, may use opprobrious terms to characterize the accused or his conduct, provided that the remarks are in accord with the evidence." *Bankhead v. State*, 585 So. 2d at 105.
>
> We find the above characterizations appropriate in this case. For example, in regard to the prosecutor's descriptions of Thomas as a "street punk," a "criminal," and a "thug," we note that in opening argument (R. 740-45), defense counsel portrayed Thomas this way, and the defense relied on the evidence in presenting the circumstances and consequences of Thomas's childhood: he was taught by his father at age five to steal, he frequently stayed out all night with his father, he was arrested at age 12 for starting a fire at a church, he stole from a teacher as a child and

---

[148] Doc. no. 1 (Petition) ¶¶ 125, 143, at 26 and 29-30, respectively.

stole as an adult, he frequently took illegal drugs, etc.  *See*, *e.g.*, *Bankhead v. State*, 585 So. 2d at 106 (use of term "punk" to describe defendant supported by evidence).

The prosecutor used the term "murderer," saying that the "murderer" left a "calling card":  a bloody fingerprint on a check found in the victim's storage room.  This was a permissible comment. *Handley v. State*, 214 Ala. 172, 175, 106 So. 692, 695 (1925).  *See also Kinard v. State*, 495 So. 2d 705, 711-12 (Ala. Cr. App. 1986) (the prosecutor's statement that the appellant was "an unmitigated liar and murderer" in murder prosecution "resulted in no apparent prejudice to the appellant" and "did not have 'a natural tendency to influence the finding of the jury' and therefore would not require a reversal").

We also find that the prosecutor's reference to Thomas as a "manipulator" was supported by the evidence.  Thomas testified that he had "always had a way with women," and thus was able to talk a female cashier into cashing a forged check (R. 1711); that he maimed himself three or four times while in jail so that he could get "a shot of dope" at the hospital (R. 1715); that it is not "hard for [him] to get women" (R. 1719); and that he hid his drug abuse from his mother (R. 1736).  *See Arthur v. State*, 575 So. 2d 1165 (Ala. Cr. App. 1996) (the prosecutor's comment that the appellant was a manipulator was not improper and highly prejudicial because it was a reasonable inference from the facts in evidence, including his relationship with a number of females, his work-related behavior, and his exploitation of the work release program), *aff'd*, 711 So. 2d 1097 (Ala. 1997).

Based on the above considerations, we find that Thomas has failed to prove ineffective assistance of trial or appellate counsel (Issue IV) in this regard.

The underlying substantive issue, as presented in Issue XIX(b) (Brief, p. 75), is procedurally barred by Rule 32.2(a)(3) and (5).

* * * *

(d) *The prosecutor stated that this case was "about a street punk [who] took the very best that this community had to offer and spit in this community's face" and that Thomas "had the advantage of having psychologists and counselors as he grew up to help him with whatever problems that he had, but all the social workers, the preachers, the foster parents, the teachers, and the psychologists together couldn't keep this kid from being what he was and what he is — evil, mean, and violent*." (R. 1829.)

Thomas argues that, by these comments, the prosecutor was asking the jury to ignore mitigating evidence, was improperly characterizing mitigating evidence as aggravating evidence, and was grossly mischaracterizing Thomas's "sad and pitiable upbringing." (Rule 32 R. 551.)

We first note that these comments were made during the guilt phase and thus at that point any mitigating circumstance was not before the jury for consideration. Moreover, when the mitigating evidence did become relevant — at the sentencing phase before the jury — the trial court thoroughly and properly instructed the jury on all the statutory and nonstatutory mitigating circumstances. These comments during the guilt phase in no way restricted the jury's consideration of the mitigating circumstances. We are unwilling to hold that these comments were not legitimate references from the evidence made in the heat of debate. Even Thomas testified (on cross-examination) that, although as a minor he went from foster home to foster home, each trying to provide him a good home, he continued to steal, to forge checks, and to take drugs. (R. 1733-35.) Certainly, Thomas has failed to prove ineffective assistance of trial or appellate counsel (Issue IV) in this regard.

The underlying substantive issue, as presented in Issue XIX(d) (Brief, p. 76), is procedurally barred by Rule 32.2(a)(3) and (5).

(e) *The prosecutor stated, "This case is about a street punk who has been excused by this community and society for everything that he ever did wrong before*."  (R. 1828-29.)

Thomas contends that this comment misled the jury about his prior criminal record.  He fails to specify how this comment misled the jury.  We will not speculate.  Thomas's unlawful behavior, especially as a minor, was a significant topic in defense counsel's opening statement and was repeatedly referred to during the presentation of Thomas's case.  While Thomas had been incarcerated on a second conviction for theft, any inaccuracy in the prosecutor's comment quoted above is insignificant, especially in light of defense counsel's comments in opening, "He was sent to prison, as he should have been.  He paid his debt. . . ."  (R. 745.)  Again, Thomas has failed to prove ineffective assistance of trial or appellate counsel (Issue IV).

The underlying substantive issue, as presented in Issue XIX(e) (Brief, p. 76), is procedurally barred by Rule 32.2(a)(3) and (5).

*Thomas v. State*, 766 So. 2d at 933-38 (emphasis in original).

Petitioner argues that these factual determinations by the state appellate court were "unreasonable," and asserts that "*no* evidence" presented at trial reasonably supported the impression intended by the prosecutor's remark that "Mr. Thomas had a propensity towards violence," particularly when petitioner's criminal history "consisted only of property crimes and drug use."[149]  Specifically, petitioner argues that

---

[149] Doc. no. 35 (Petitioner's Brief), at 30 (emphasis in original).

> [n]othing in the record cited by the court below could be reasonably viewed as showing violent tendencies in Mr. Thomas.  Regardless, the prosecutor referred to Mr. Thomas as "evil, mean and violent" and a "thug," which is defined as "a brutal ruffian or assassin:  gangster, killer."  *Merriam Webster's Collegiate Dictionary*, 10th Ed. (1993).  Regardless of its precise definition, terms like "thug," "criminal," street punk," "evil," "violent" and the others served no purpose other than to inflame the passions of the jury and to result in extreme bias against Mr. Thomas in his trial.  . . .[150]

Petitioner cites the decision of the former Fifth Circuit in *Hall v. United States*, 419 F.2d 582 (5th Cir. 1969), as support for his argument that the prosecutor's disparaging references to him amounted to reversible error and, therefore, that his attorneys rendered ineffective assistance by not objecting to the statements at trial, or raising them as error on appeal.[151]  This court is not persuaded by that argument. The government's attorney in *Hall* made the following remarks in closing argument:

> There are some amazing things about this case.  The defendant Hall has testified here that Beck [a co-defendant] told him that he was intimidated by the F.B.I. or forced to make a statement saying that Hall stole the car.

> Now, gentlemen, I get a little tired of the police and the F.B.I. being the whipping boys of criminals and liars.  I just don't believe that Harry Degnan [the F.B.I. Agent] who took Beck's statement and whom you have seen in this courtroom all this time would force anybody to make a statement.  I know him to be a fine F.B.I. officer — absolutely the

---

[150] *Id.*

[151] *Id.* at 30-31.

>       finest I know.  A man of absolute integrity.  And I get a little tired of the
>       F.B.I. being whipping boys for hoodlums.  *And that is the only way I*
>       *know how to describe the defendant Donald Hall*, he is a hoodlum.

*Id*. at 585 (emphasis supplied).   A majority of the panel in *Hall* condemned the

prosecutor's remark, saying that:

>       This type of shorthand characterization of an accused, not based
>       on evidence, is especially likely to stick in the minds of the jury and
>       influence its deliberations.  Out of the usual welter of grey facts it starkly
>       rises — succinct, pithy, colorful, and expressed in a sharp break with the
>       decorum  which  the  citizen  expects  from  the  representative  of  his
>       government.

*Id*. at 587.   Even so, the prosecutor's characterization was not the sole, nor even the

most important, basis for the majority's opinion in *Hall*.   *See id*. at 588 (Choate, J.,

dissenting) ("The prosecutor's characterization of appellant as a 'hoodlum' was not

objected to at trial.  This short-hand statement was not unsupported by the evidence

and, while perhaps improper, was not fundamental error requiring reversal.").  Instead,

the prosecutor in *Hall* made other, far more egregious comments in closing argument.

For example, he asserted that defendant had tampered with government witnesses —

"a bald assertion of fact not in evidence and therefore improper," and, an inference

that "could not be drawn from what meager facts were in evidence."  *Hall v. United*

*States*, 419 F.2d at 585 (citations omitted).   Moreover, the prosecutor stated his

personal belief concerning a controverted issue of fact (*i.e.*, whether an FBI Agent had

128

intimidated a government witness and forced him to give a statement incriminating the defendant), and then compounded that error by stating his personal opinion or belief that the agent in question was "a fine F.B.I. officer — absolutely the finest I know. A man of absolute integrity." *Id*. Finally, the prosecutor told the jury that his office attempted "to prosecute only the guilty." *Id*. at 587. The accumulated weight of all these acts of prosecutorial misconduct impelled the majority to reverse the conviction.

*Hall* also is distinguishable from the present case for other reasons. As the Alabama Court of Criminal Appeals noted, the characterizations of petitioner as a "street punk," a "criminal," and a "thug" were uttered in response to statements of defense counsel, who graphically portrayed the "socioeconomic and cultural factors" of petitioner's childhood,[152] for the purpose of depicting how poverty, abuse, and the teachings of petitioner's mentally deficient father affected

> this little twig of a person, a little innocent child who had the eyes of innocence [that] soon began to harden and get cold as they looked out into the world that he lived in of the crime, the abuse. The little twig grew into a bent sapling [sic]. Finally this sapling [sic] grew into a twisted, knarled [sic] tree, so that the proverb as the tree is bent so grows the tree became a reality in his life. . . .

R. 740; *see also Thomas v. State*, 766 So. 2d at 934 (citing R. 740-45). The state prosecutor, therefore, can hardly be criticized for attempting to divert the jury's

---

[152] R. 739-40.

attention from a compassionate portrayal of petitioner to a different frame of reference. *Cf. McNair v. Campbell*, 307 F. Supp. 2d 1277, 1324 (M.D. Ala. 2004) ("'A prosecutor may refer to a defendant in unfavorable terms so long as the evidence warrants the use of the terms.'") (quoting *Nicks v. State*, 521 So. 2d 1018, 1022-23 (Ala. Crim. App. 1987)), *rev'd on other grounds*, 416 F.3d 1291 (11th Cir. 2005).

Even though the Limestone County District Attorney should not be commended for his choice of language, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether  the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations and internal quotation marks omitted).

In light of the full record, it was not unreasonable for the Alabama Court of Criminal Appeals to conclude that these statements did not rise to a level that undermined the fairness of petitioner's trial.  Petitioner has not offered clear and convincing evidence to rebut the presumption of correctness this court is required to accord the state court's findings. *See* 28 U.S.C. § 2254(e)(1); *see also*, *e.g.*, *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001) (holding that a state court's "findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness").  Further, he has not demonstrated that the state

130

appellate court's decision on this issue was contrary to, or an unreasonable application of, clearly established federal law, nor an unreasonable interpretation of the facts in light of the evidence before that court. *See* 28 U.S.C. § 2254(d). Therefore, it cannot be said that petitioner's trial and appellate counsel were objectively deficient for failing to object to, or appeal, the comments discussed.

Even if it should be determined that counsels' performance was objectively deficient, petitioner still has not satisfied the prejudice prong of the *Strickland* standard. Stated differently, this court does not find that the prosecutor's comments discussed in this section of the opinion were "so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (quoting citations omitted).

    **c.**     *Contrasting the rights of petitioner and the victim*

In the next section of his brief, petitioner jumbles several contentions that are only loosely related. For example, he initially contends that the prosecutor "portrayed the case as a contest between the 'rights of the Defendant and the 'victim's rights.'"[153] He next asserts that "the prosecutor told the jury that someone 'had to take responsibility' for the crime,"[154] and "then told the jury that it was 'setting the standard

---

[153] Doc. no. 35 (Petitioner's Brief), at 32 (citing R. 1884).

[154] *Id.* (citing R. 1879).

for what conduct is going to be in this community.'"[155]  "Finally, the prosecutor

improperly injected his background and beliefs into the argument in an attempt to get

the jury to identify and sympathize with the State."[156]  The petition paragraphs forming

the basis for these arguments read as follows:

> 144.   The prosecutor's closing rebuttal was also replete with
> improprieties.  He wrongly told the jury that somebody had "to take
> responsibility" for the crime, thereby framing the jury's task as a choice
> among disparate parties as to who would bear the blame, and appealing
> to the jury's prejudices by implying that if the jury did not convict Mr.
> Thomas no one would be held responsible:
>
> > Who is going to take the responsibility for the death of Mrs.
> > Flossie McLemore?  Me?  For being a dumb D.A. or a weak D.A.?
> > Bobby Smith?  For not being the best investigator in the world?
> > Police?  For not having a car on every street corner on December
> > the 14th of 1984?   The defense would have you put the
> > responsibility for her death and for that killing on everybody but
> > the one man in this whole wide world that could have prevented
> > that death and prevented that tragedy.  The one man who can only
> > be held responsible for it today.
>
> (R. 1879).  Equally damaging, he told the jury that it was "setting the
> standard for what conduct is going to be in this community," (R. 1885)
> and imploring the jury to convict Mr. Thomas so as not to "[ send] out a
> very bad message" to "other thugs and murderers."  (R. 1885).

---

[155] *Id*. at 33 (citing R. 1885).

[156] *Id*. (citing R. 1879-80).

145.  The prosecutor improperly injected his personal background and beliefs into the argument in an attempt to get the jury to sympathize and identify with the State:

> I'm not the head of some Gestapo or a bunch of Nazis trying to Kill somebody.  I'm Jimmy Fry who on a cold November morning in 1950 was born two blocks from here at Powers Hospital.[157] I'm here to see that the law and order is maintained, and that hopefully, beyond all else, justice is done so that the people of this county can go to sleep at night and be in bed and be safe and secure in their homes.

(R. 1879-80).

146.  The prosecutor improperly invoked the murdered victim's presence in the courtroom in an attempt to appeal to vengeance for the victims' family and to portray the case as a contest between the "rights of the Defendant" and the "victim's rights":

> You've heard the explanation of the rights of the Defendant in this case. . . . You know somebody else had rights, too.  There should have been a third chair over here this week between Bobby and I [sic].  If we had that chair it would be empty.  This is the chair for Mrs. Flossie McLemore.  She had rights, too.

---

[157] Perhaps the prosecutor was here drawing a contrast to the remarks of defense counsel in opening and closing.  In opening statement, defense counsel said that "Kenny was born on March the 7th, 1959 at the Athens-Limestone Hospital.  He was just like all the other babies that were born down there that day.  He had little clear innocent eyes, and little fat stubby fingers, and smelled fresh and clean and he was just as innocent as the rain that fell outside that hospital on that day in March in 1959."  R. 737.  In closing argument, defense counsel returned to the same theme, referring to "Kenneth Glenn Thomas, the little baby [who] was born on the cold rainy day down at the old red brick hospital[, and] who had the open innocent blue eyes and the innocent heart . . . ."  R. 1988-89.

133

(R. 1884).[158]

The Alabama Court of Criminal Appeals addressed these contentions in its opinion on collateral review as follows:

> 64.  *During the prosecutor's closing rebuttal argument in the guilt phase, the following allegedly improper comments were made*:
>
> (a) "*Who is going to take the responsibility for the death of Mrs. Flossie McLemore?  Me?  For being a dumb D.A. or a weak D.A?  Bobby Smith?  For not being the best investigator in the world?  Police?  For not having a car on every street corner on December 14, 1984?  The defense would have you put the responsibility for her death and for that killing on everybody but the one man in this whole wide world that could have prevented that death and prevented that tragedy.  The one man who can only be held responsible for it today.*"  (R. 1879.)
>
> Thomas contends that the prosecutor, in making these comments, framed the jury's task as a choice of placing blame among disparate parties and that the prosecutor implied that if the jury did not convict Thomas, no one would be held responsible.  We find that, by these comments, the prosecutor was urging the jury to hold Thomas responsible for his actions, which is proper argument.  *See Price v. State*, 725 So. 2d 1003 (Ala. Cr. App. 1997) (a plea to hold the defendant accountable for the capital murder is an acceptable appeal to law enforcement and as such, is permissible in closing argument).
>
> Accordingly, Thomas has failed to establish that either trial or appellate counsel were ineffective in failing to contest these comments.
>
> The underlying substantive issue, as presented in Issue XIX(a) (Brief, p. 80), is procedurally barred by Rule 32.2(a)(3) and (5).

---

[158] Doc. no. 1 (Petition), at 30-31.

(b) "*I'm not the head of some Gestapo or a bunch of Nazi's trying to kill somebody. I'm Jimmy Fry, who on a cold November morning in 1950 was born two blocks from here at Powers Hospital. I'm here to see that law and order is maintained, and that hopefully, beyond all else, justice is done so that the people of this county can go to sleep at night and be in bed and be safe and secure in their homes.*" (R. 1879-80.)

Thomas alleges that the prosecutor injected his personal background and beliefs in an attempt to get the jury to sympathize with and identify with the prosecution. While we do not wholeheartedly approve of such comments, we find them to be in the nature of an appeal for law enforcement, which is generally permissible argument.

Therefore, we find that Thomas has failed to establish ineffective trial or appellate counsel.

We further find that the underlying substantive issue, as presented in Issue XIX(b) (Brief, pp. 80-81), is procedurally barred by Rule 32.2(a)(3) and (5).

(c) *The prosecutor allegedly invoked the victim's presence in the courtroom.*

Thomas contends that, by the comments highlighted in the following passage, the prosecutor invoked the victim's presence to encourage the jury to do vengeance for the victim's family and to portray the case as a contest between the rights of Thomas and the rights of the victim.

"*You've heard the explanation of the rights of the Defendant in this case*, and all that we have to prove and all of the burden that's on Jimmy Fry as stated in this case. *You know somebody else had rights, too. There should have been a third chair over here this week between Bobby and I. If we had had that chair it would be empty. This is the chair for Mrs. Flossie McLemore.*

135

> *She had rights, too*. She had the right to love and be loved. She
> had the right to grow those flowers in her garden until her Maker
> called her home. She had the right to be lying there in her bed safe
> and secure after having locked her locks on her doors before
> having gone to bed on the night that she was broken into and raped
> and robbed."

(R. 1884.) (Emphasis added.)

We find the references invoking Mrs. McLemore's presence
permissible. *See McNair v. State*, 653 So. 2d 320, 335-36 (Ala. Cr. App.
1992) (by draping the victim's bloodstained nightgown over a chair and
referring to it as "Mrs. Riley," the victim, the prosecutor "did not venture
outside the circumstances of the offense to inflame the jury with
irrelevant emotional considerations"; "[t]his personification of the
evidence was undoubtedly an emotionally-charged part of the argument,
but the sensations evoked were those which legitimately arose from the
evidence itself and were not 'extraneous emotional factors'"), *aff'd*, 653
So. 2d 353 (Ala. 1994), *cert. denied*, 513 U.S. 1159, 115 S. Ct. 1121, 130
L. Ed. 2d 1084 (1995).

In regard to Thomas's allegation that the prosecutor's remarks
injected the victim's rights into the trial, we again find guidance in
*McNair v. State*. There, the prosecutor made numerous references in his
closing argument in the guilt phase to the victim's rights, including that
the victim's "right to live, a right to come and go, to breathe, and a right
to be protected. Just like [the appellant] has Constitutional rights that
should be protected, so does she." 653 So. 2d at 336. The court, in
finding no reversible error, stated:

> "The prosecutor made numerous references to the victim's rights
> and several times implied that her rights were to be weighed
> against the appellant's. This was clearly improper. However, we
> think these references were valued by the jury at their true worth,

as having been uttered in the heat of debate and were not expected
to become factors in the formation of the verdict."

*Id*. at 337-38 (citations omitted).  *See also Carroll v. State*, 599 So. 2d
1253, 1268 (Ala. Cr. App. 1992) ("the prosecutor's argument may be
construed as 'an attempt to illustrate for the jury the defendant's total
disregard of the rights of the victim, rather than an attempt to discredit'
the appellant for the exercise of his constitutional rights.  *Kirkpatrick v.
Blackburn*, 777 F.2d 272, 284 (5th Cir. 1985), *cert. denied*, 476 U.S.
1178, 106 S. Ct. 2907, 90 L. Ed. 2d 993 . . . (1986)."), *aff'd*, 627 So. 2d
874 (Ala.1993), *cert. denied*, 510 U.S. 1171, 114 S. Ct. 1207, 127 L. Ed.
2d 554 (1994).

Accordingly, Thomas has failed to establish that trial or appellate
counsel were ineffective in not contesting these comments.

We further find that the underlying substantive issue, as presented
in Issue XIX(c) (Brief, p. 81), is procedurally barred by Rule 32.2(a)(3)
and (5).

\* \* \* \*

(e) *The prosecutor stated that the jury was "setting the
standard for what conduct is going to be in this community" and
allegedly implored the jury to convict so as not to "[send] out a
very bad message" to "other thugs and murderers."* (R. 1884-85.)

The prosecutor made the above remarks in the following context:

"If you are satisfied under the law with this Defendant's guilt
and if you are convinced beyond a reasonable doubt and to a moral
certainty, it is your duty and obligation as a juror to convict him,
because what you are doing here today, if you are so convinced of
his guilt, is setting a standard for what conduct is going to be in this

137

community.  If you are convinced that he is guilty, and you don't
convict him, you are sending out a very bad message to people like
him out in the community, other thugs and murderers."


"Generally, the prosecutor is in error by exhorting the jury to 'do
what's right,' or to 'do its job,' if that exhortation 'impl[ies] that, in order
to do so, it can only reach a certain verdict, regardless of its duty to weigh
the evidence and follow the court's instructions on the law.'"  *McNair v.*
*State*, 653 So. 2d at 339-40 (quoting *Arthur v. State*, 575 So. 2d 1165,
1185 (Ala. Cr. App. 1990), *cert. denied*, 575 So. 2d 1191 (Ala. 1991))
(citation omitted).  Here, the prosecutor's exhortation to convict was
expressly dependent on the jury's satisfaction that Thomas was guilty
under the law.  The prosecutor's remarks were proper, as an appeal for
law enforcement.  "An abundance of case law exists holding that urging
the jury to render a verdict in such a manner as to punish crime, protect
the public from similar offenses, and deter others from committing similar
offenses is not improper argument."  *Sockwell v. State*, 675 So. 2d 4, 36
(Ala. Cr. App. 1993) ("send a message" to the people in the county by
convicting the defendant), *aff'd*, 675 So. 2d 38 (Ala. 1995), *cert. denied*,
519 U.S. 838, 117 S. Ct. 115, 136 L. Ed. 2d 67 (1996).  *See also Smith v.*
*State*, 698 So. 2d 189, 204 (Ala. Cr. App. 1996) ("send a message" is
proper appeal for law enforcement), *aff'd*, 698 So. 2d 219 (Ala. 1997),
*cert. denied*, 522 U.S. 957, 118 S. Ct. 385, 139 L. Ed. 2d 300 (1997).


Accordingly, we find that trial counsel's failure to object to these
comments was not ineffective nor was appellate counsel's failure to raise
them on appeal ineffective.


We further note that the underlying substantive issue, as presented
in Issue XIX(e) (Brief, pp. 81-82), is procedurally barred by Rule
32.2(a)(3) and (5).


*Thomas v. State*, 766 So. 2d at 944-47 (emphasis in original).

Upon consideration of the trial transcript and the quoted portions of the state appellate court's opinion, this court finds that petitioner has failed to show that the court's dispositions of these claims were either contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Further, the state court's conclusions were not an unreasonable determination of the facts in light of the evidence before that court. *Id.* § 2254(d)(2). It follows that counsel was not objectively deficient for failing to object to, or appeal, the prosecutor's comments, nor was petitioner deprived of a fundamentally fair trial.

**d**.  *References to the victim's life and character*

Petitioner's brief next addresses an argument made by the prosecutor at the close of the guilt-innocence phase of trial that, petitioner contends, "was an improper effort to project the trial as a contest between the victim, the victim's family[,] and Mr. Thomas."[159]  This contention was framed by the following paragraph in petitioner's habeas petition:

> 127.  The prosecutor then referred to the personal characteristics and life history of the victim in an improper effort to project the trial as a contest between the victim and the victim's family against Mr. Thomas. (R. 1828). The prosecutor stated:

---

[159] Doc. no. 35 (Petitioner's Brief), at 34.

"As a teenager, [the victim] saw the doughboys go off to Europe during World War I. As a young mother, she kept a family together and raised them during the great depression and then, as a fairly young adult, she saw two million persons go off again to Europe, many of them not returning, to fight in World War II. She lived through tornadoes and droughts and bad times. She lived through killer tornadoes in the 1930s that killed 200 people in the southeast and the killer tornadoes of 1974 that claimed the lives of 6 or 7 people here in this county."[160]

The Alabama Court of Criminal Appeals addressed this contention in its opinion on collateral review in the following manner:

62. and 63.   *The prosecutor made the following allegedly improper, prejudicial statements comments during his closing arguments of the guilt phase*:

(a)   *The prosecutor referred to the victim's personal characteristics and life history in an allegedly improper effort to project the trial as a contest between Thomas and the victim and the victim's family.*

By referring to R. 1828, we assume that Thomas is referring to the following comments:

"As a teenager, [the victim] saw the doughboys go off to Europe during World War I. As a young mother, she kept a family together and raised them during the great depression and then, as a fairly young adult, she saw two million persons go off again to Europe, many of them not returning, to fight in World War II. She lived through tornadoes and droughts and bad times. She lived through killer tornadoes in the 1930s that killed 200 people in the southeast and the killer tornadoes of 1974 that claimed the lives of 6 or 7 people here in this county."

---

[160] Doc. no. 1 (Petition), at 26.

The prosecutor concluded this vein of argument with, "About 11:45 on December 14, 1984, . . . the evidence has shown you that this man up here, this criminal, was going into her yard and about to commit one of the most atrocious crimes in the history of this county."

While we find that these comments were outside the evidence, we can find no prejudice, certainly none rising to such a level as to project the trial as a contest between Thomas and the victim and the victim's family. There is no reasonable likelihood that these comments so infected the trial as to deny Thomas a fair trial. Accordingly, Thomas has failed to prove ineffective assistance of trial or appellate counsel (Issue IV) in this regard.

The underlying substantive issue, as presented in Issue XIX(a) (Brief, p. 75), is procedurally barred by Rule 32.2(a)(3) and (5).

*Thomas v. State*, 766 So. 2d at 933 (emphasis in original) (footnote omitted).

Petitioner relies upon two cases to establish that his trial and appellate counsel rendered constitutionally ineffective assistance by failing to object to, or cite as error on direct appeal, the prosecutor's references to the victim's life and character: *Viereck v. United States*, 318 U.S. 236 (1943); and *New York Central Railroad Co. v. Johnson*, 279 U.S. 706 (1928). Neither decision provides support for his argument.

*Viereck* concerned a prosecution during the Second World War under the Foreign Agents Registration Act — a statute that had been enacted "in the critical period before the outbreak of the war" for the purpose of identifying "agents of foreign

principals who might engage in subversive acts or in spreading foreign propaganda," and requiring the agents "to make public record of the nature of their employment." 318 U.S. at 241. The defendant was an agent of German principals who allegedly had failed to disclose "numerous activities in which he had engaged during the period covered by the supplemental registration statement." *Id*. at 239. The Supreme Court reversed the conviction on the ground that the language of the Act, "fairly read," did not "demand[] the disclosure of the information which petitioner failed to give." *Id*. at 242. At the conclusion of the majority opinion,[161] Chief Justice Stone observed that, in closing arguments to the jury, the prosecuting attorney had "indulged in an appeal wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice." *Id*. at 247 (footnote omitted). Specifically, the Assistant United States Attorney had argued:

> "In closing, let me remind you, ladies and gentlemen, that this is war. This is war, harsh, cruel, murderous war. There are those who, right at this very moment, are plotting your death and my death; plotting our death and the death of our families because we have committed no other crime than that we do not agree with their ideas of persecution and concentration camps.

> "This is war. It is a fight to the death. The American people are relying upon you ladies and gentlemen for their protection against this sort of a crime, just as much as they are relying upon the protection of the

---

[161] Justices Jackson and Rutledge took no part in the consideration or decision of the case, and Justices Black and Douglas dissented.

men who man the guns in Bataan Peninsula, and everywhere else.  They are relying upon you ladies and gentlemen for their protection.  We are at war.  You have a duty to perform here.

"As a representative of your Government I am calling upon every one of you to do your duty."

*Viereck v. United States*, 318 at 247 n.3.  These remarks are wholly unlike those uttered by the state prosecutor in this case.  Moreover, the *Viereck* majority's characterization of the prosecutor's remarks as "highly prejudicial," and "offensive to the dignity and good order with which all proceedings in court should be conducted," *id*. at 248, was not a holding, but *dictum*.  *See id*. at 247 ("As the case must be remanded to the district court for further proceedings, we direct attention to conduct of the prosecuting attorney which we think prejudiced petitioner's right to a fair trial, and which independently of the error for which we reverse *might well have placed* the judgment of conviction in jeopardy.") (emphasis supplied).  As previously discussed in Part IV(A) of this opinion, § 2254(d)(1)'s statutory phrase "clearly established federal law, as determined by the Supreme Court of the United States," refers to "the holdings, as opposed to dicta, of the [Supreme Court's] decisions."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., majority opinion).

143

The Supreme Court's decision in *New York Central Railroad Co. v. Johnson*, 279 U.S. 310 (1929),[162] provides even less support for petitioner's argument.  That case concerned a civil action commenced by a married couple in the state courts of Missouri to recover for personal injuries sustained by the wife, and for the husband's loss of his wife's consortium.  The wife contended that, while riding as a passenger on one of the defendant's trains, she had been "thrown to the floor by a sudden and unusual motion of the train, receiving a blow on her head which caused paralysis on one side of the body, impaired locomotion, and other physical disabilities." *Id.* at 313.  The action was removed to federal court on the basis of the parties' diversity of citizenship.  At trial, and during cross-examination of the plaintiffs' witnesses, the attorney for New York Central Railroad

> elicited the fact that, following the accident, one of [the plaintiff-wife's] physicians had administered a treatment usually given for syphilis.  He asked other questions tending to show, had favorable answers been received, that she had exhibited symptoms recognized to be those of this disease; that the Wasserman test for syphilis, which had been applied to her by her physician with negative results, was not necessarily conclusive as to its nonexistence; that other more reliable tests had not been applied; that the disease might cause the paralysis complained of and the treatment for it produce the other symptoms exhibited by [the plaintiff wife].
>
>     The opening statement for [the Railroad] to the jury had contained no suggestion that the alleged condition of [the plaintiff-wife] was due to

---

[162] Petitioner incorrectly cites this case as "279 U.S. *706*, *710* (192*8*)."  Doc. no. 35 (Petitioner's Brief), at 35 (emphasis supplied).

syphilis.  No evidence to that effect was offered in its behalf, counsel contenting himself with calling witnesses to disprove only the negligence and the occurrence of the accident.  In the closing argument, [the Railroad's] counsel denied any belief that [the plaintiff-wife] was afflicted with the disease, and disclaimed any purpose to show that her present condition was due to it.  He then for the first time suggested, although there was no evidence to support it, that her condition was caused by the administration, by one of her physicians, of a specific for syphilis in consequence of a mistaken diagnosis.

Two counsel for [plaintiffs] participated in the closing argument. The first, who preceded counsel for [the Railroad], made the following statements to the jury, to which, at several points, objection was made, overruled, and an exception noted:

"But, gentlemen, the vilest defense made in this case, a defense which would bar that girl from all society, intimated in this case that she had the syphilis.  That is the defense in this case, that she had syphilis.

"Gentlemen of the jury, they would charge her with a disease which would brand her as bad as a leper and exclude her from the society of decent people.  That is the kind of a defense that is in this case, and I resent it.  I resent the New York Central coming into this town and saying that that girl has the syphilis and trying to make this jury believe that she has the syphilis."

*Id.*, at 313-14.  The jury returned a substantial verdict in favor of plaintiffs, and the

Railroad appealed.  The Circuit Court of Appeals affirmed, but the Supreme Court

granted *certiorari* and reversed.  In remanding the case for a new trial, the Court said,

in part, that:

145

However ill advised, counsel for [the Railroad] was within his rights in following this line of inquiry, and, even if it be assumed that the situation was one calling for comment on the evidence so elicited, neither [the Railroad] nor its counsel was on trial for pursuing it. Want of good judgment or good taste, or even misconduct on the part of either, was not an issue in the case for the jury, nor could it excuse like conduct on the part of [plaintiffs'] counsel. An exhibition of any or all of these faults was not ground for a verdict in [plaintiffs'] favor or for enhancing it.

Such a bitter and passionate attack on [the Railroad's] conduct of the case, under circumstances tending to stir the resentment and arouse the prejudice of the jury, should have been promptly suppressed.

*Id*. at 317-18.

The extreme factual and legal circumstances of *New York Central Railroad Co. v. Johnson* — a *civil* case no less — provide no support for petitioner's arguments that the prosecutor's argument in the present case was constitutionally prejudicial; that the decision of the Alabama Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented; or that petitioner's trial and appellate attorneys rendered constitutionally ineffective assistance by failing to object to the state prosecutor's statement in the trial court, or to cite it as error on appeal.

      **e**.    *The suggestion that petitioner might escape*

146

The next section of petitioner's brief addresses the suggestion of the prosecutor, uttered during closing argument at the penalty phase of trial, that the jury "may consider that if this man is sentenced to life without parole there's always the possibility of escape."[163]  This statement *was* objected to by trial counsel, and also made the basis of a motion for mistrial.  The trial judge sustained the objection, but denied the motion for mistrial.  Petitioner's appellate counsel, however, failed to cite either the statement, or the trial court's ruling on the motion for mistrial, as error on direct appeal.  In the opinion entered by the Alabama Court of Criminal Appeals on collateral review, that Court said:  "There is no question that the prosecutor's comment concerning escape was improper."  *Thomas v. State*, 766 So. 2d at 957.  Even so, that court concluded that the performance of appellate counsel had not been deficient.  Those portions of the state court's opinion addressing this issue read as follows:

> (d)  *The prosecutor stated that the jury "may consider that if this man is sentenced to life without parole there's always the possibility of escape*."  (R. 1983.)
>
> Thomas argues that this comment was calculated to arouse the jurors' allegedly preexisting concern about prison escapes, because, he argues, before Thomas's trial, there had been widespread publicity of prison escapes.  We first note that Thomas makes no reference to the record to support his allegation that, before his trial, there was widespread

---

[163] Doc. no. 35 (Petitioner's Brief), at 36 (citing R. 1983).  *See also* doc. no. 1 (Petition) ¶ 149, at 31 ("The prosecutor during sentencing suggested to the jury that it should sentence Mr. Thomas to death because it 'may consider that if this man is sentenced to life without parole there's always the possibility of escape.' (R. 1983).") (footnote omitted).

publicity of prison escapes. Thus, we discount this undocumented allegation in assessing possible prejudice arising from this remark; it is outside the evidence and the record before this court.

This isolated comment was followed by defense counsel's general objection.  After the trial court sustained the objection, the following occurred:

> "MR. MOFFATT [defense counsel]:  That's not the law of the State of Alabama nor of the United States Constitution by a well established line of cases.

> "THE COURT:  Ladies and gentlemen, I'm going to, at the end of the arguments, charge you as to the law, and you are to apply the law as I give it to you.  Now, the attorneys have the right to state what they feel the law is and what they feel the charge is going to be, but you are not to follow what they tell you the law is.  You are to follow what I say the law is and take what they state to you as only their argument.

> "MR. MOFFATT:  Judge, I believe it would be proper for us at this time, in fact, it's necessary, to reserve the right that we must move for a mistrial based on misconduct of the prosecutor.

> "THE COURT:  Well, I'll deny the motion then for a mistrial."

(R. 1983-84.)

Trial counsel's actions were sufficient to present the issue to the trial court; therefore, Thomas's argument that trial counsel were ineffective is without merit.  Thus, we turn to the question of whether appellate counsel were ineffective.

148

"[I]t has long been the law of this State that comments upon the probability or possibility of what might happen under a particular sentence, falling outside the evidence and the law of the case, constitute improper argument." *Ex parte Rutledge*, 482 So. 2d 1262, 1265 (Ala. 1984).   In *Rutledge*, the Alabama Supreme Court condemned the prosecutor's comment to the effect that as long as parole boards, federal courts, and the state legislature exist, there is a chance that, if given a sentence of life imprisonment without the possibility of parole, the defendant would eventually be released.  *See also Darden v. Wainwright*, 477 U.S. 168, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (in which the Court concurred in the lower courts' condemnation of the prosecutor's remarks to the effect that the death penalty is the only way to ensure that the defendant, who had murdered while on a weekend furlough from prison, would never be "out on the public" again, but also concurred with the lower courts' holding that these comments did not deprive the defendant of a fair trial); *Eaton v. State*, 278 Ala. 224, 227, 177 So. 2d 444 (1965) (remark — if defendant were to be sentenced to life imprisonment, "he would be out and around" — raised inference that defendant would either escape the penitentiary or be paroled, neither of which was for the jury's consideration).   There is no question that the prosecutor's comment concerning escape was improper.

However, "[i]t is not enough that the prosecutor's remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. at 181, 106 S. Ct. 2464 (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983)).   Rather the relevant question is whether the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.   *Id*.   In determining whether appellate counsel were ineffective in failing to contest this issue, we start with the following principle:

> "It is a general rule that where prejudicial statements are made in the heat of argument, even though improper, in accommodation of our adversary system, such statements are considered capable of being eradicated by the trial judge in

sustaining objections thereto or by appropriate instructions to the jury or both."

*Allred v. State*, 291 Ala. 34, 38, 277 So. 2d 339 (1973), *cert. denied*, 423 U.S. 859, 96 S. Ct. 113, 46 L. Ed. 2d 86 (1975).  In reviewing the prosecutor's improper reference during voir dire to the possibility of parole, this court in *Prince v. State*, 623 So. 2d 355, 358-59 (Ala. Cr. App. 1992), made the following statement, which we find to be applicable here:

> "'There is no question but that the argument of the solicitor to the effect that a man sentenced to the penitentiary will at some time become eligible for pardon or parole was improper. . . .

> "'The remarks of the solicitor were of the class of improper argument which may be remedied or their evil effect eradicated by instructions of the court.'

> "*Lee v. State*, 265 Ala. 623, 629, 93 So. 2d 757, 763 (1957).  *See also Eaton v. State*, 278 Ala. 224, 227, 177 So. 2d 444, 448 (1965). . . .

> > ". . . .

> "Although erroneous, '[a]rgument in the nature of that under consideration is not so inflammatory and prejudicial that its harmful quality cannot be eradicated.'  *Murray* [*v. State*], 359 So. 2d [1178,] 1181 [(Ala. Cr. App. 1978)].  *See Doyle* [*v. State*], 487 So. 2d [996,] 998-99 [(Ala. Cr. App. 1986)] (judge's action in sustaining objection and stating, 'Let's stick to the evidence' sufficient to cure error).  'Any prejudice suffered by the appellant as a result of the prosecutor's argument was eradicated by the trial judge's prompt action [in immediately sustaining defense counsel's objection].'  *Hooks v. State*, 534 So. 2d 329, 361 (Ala. Cr. App. 1987), *affirmed*, 534 So. 2d 371 (Ala. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 883, 102 L. Ed. 2d 1005 . . . (1989).  See *Thomas*

*v. State*, 373 So. 2d 1149, 1159-60 (Ala. Cr. App. 1979), *affirmed*, 373 So. 2d 1167 (Ala. 1979), *vacated on other grounds*, 448 U.S. 903, 100 S. Ct. 3043, 65 L. Ed. 2d 1133 . . . (1980)."

In *Hooks v. State*, 534 So. 2d 329, 360-61 (Ala. Cr. App. 1987), *aff'd*, 534 So. 2d 371 (Ala. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 883, 102 L. Ed. 2d 1005 (1989), a capital case, this court reviewed the following comments of the prosecutor:  "[Defense counsel] says [the defendant will] be locked up where he can't get into trouble.  I wish that it were true. . . .  Even in prison —."  The court, noting that the trial court sustained the objection, held, "Any prejudice suffered by the appellant as a result of the prosecutor's argument was eradicated by the trial judge's prompt action."  *Id*. at 361.  *Compare Rutledge*.

In reviewing the comment made in this case for prejudicial effect, we note a subtle distinction between it and comments concerning parole or commutation:  the possibility of escape is within a realm of common knowledge, while the laws of parole and commutation are not.  *See Brooks v. Kemp*, 762 F.2d 1383, 1411-12 and n.46 (11th Cir. 1985) (in discussing the propriety of prison escape argument in penalty phase, the court observed, "Although there was no record evidence concerning escape, the fact that escape is a possibility was within the common public knowledge."), *cert. denied*, 478 U.S. 1022, 106 S. Ct. 3337, 92 L. Ed. 2d 742 (1986); *People v. Hovey*, 44 Cal.3d 543, 244 Cal. Rptr. 121, 749 P.2d 776, 798 (1988) ("Rather than comment upon the possibility of parole or commutation, the prosecutor merely noted the possibility of an unspecified change in 'laws,' or an escape from prison"; although these matters were extraneous to the penalty determination, "they were also matters of common knowledge appreciated by every juror who must choose between a death sentence and a sentence of life without parole.").  While we find that this distinction does not save such a comment from condemnation, it does account for a less prejudicial effect.

We find here — given the nature of the comment and the fact that it was an isolated remark — that the trial court's swift, appropriate actions

were curative.  With the court's instruction immediately after the remark and the instructions given for the jury's deliberation of sentence recommendation, the prosecutor's comment did not divert the jury's attention from the offenses and the offender.  Under the circumstances here, there was no real danger that this isolated comment was likely to allow the jury to disregard its duty to determine the aggravating and mitigating circumstances and to then weigh such factors.

For these reasons, we do not believe that appellate counsel were ineffective for failing to contest the trial court's rulings on appeal.

The underlying substantive issue, which is argued in Issue XXV(d) (Brief p. 93), is procedurally barred because it was raised and addressed at trial, Rule 32.2(a)(2), and could have been, but was not, raised on appeal, Rule 32.2(a)(5).

*Thomas v. State*, 766 So. 2d at 956-58.

Petitioner cites cases from the states of Florida, Mississippi, and Pennsylvania in support of his contention that the Alabama Court of Criminal Appeals erred when holding that his appellate attorneys were not constitutionally ineffective for failing to contest the trial court's ruling on direct appeal.  Those decisions are not persuasive, and this court rejects the claim.  The decision of the Alabama Court of Criminal Appeals is not contrary to, or an unreasonable application of, clearly established *federal law*. Further, it is not an unreasonable determination of the facts in light of the evidence presented in the state court.

  **f**. *Inappropriate comments regarding the evidence*

The last portion of petitioner's brief addressing his sixth claim ("F") is a hodgepodge of contentions based on the following paragraphs of his petition:

131.   The prosecutor ignored undisputed testimony by two of the state's witnesses that the front door was unlocked.  (Don Pressnell R. 925); (Larry Gooch R. 837).  Instead, he told the jury that Officer Harlan tried to "force" the front door open but it was "locked."  (R. 1840).  Harlan never testified about the front door.

132.   The prosecutor wrongly impugned Mr. Thomas' character with evidence not admitted in the record when he remarked that Mr. Thomas had been "committing felonies" at a party earlier in the evening.  (R. 1836-37).  Arguing facts to the jury not admitted into evidence was improper and constitutes reversible error.

133.   The prosecutor falsely and improperly impugned defense witnesses by stating that they were "either cousins or best friends or were drunk and intoxicated and have at least admitted prejudice for this Defendant because they are either related or friends."  (R. 1838).  He wrongly suggested that defense witnesses were beholden to Mr. Thomas because "[h]e is the one that brings the dope and whiskey to the parties."  (R. 1838).

134.   The prosecutor also blatantly maligned the defense witness Charles Brown, M. D. by referring to him as "Little Charlie Brown."  (R. 1854).

* * * *

139.   The prosecutor impermissibly vouched for the State's expert witness, Dr. Clifford Hardin, by expressing his personal opinion to the jury that, "[i]n my judgment, the most probative witness to insanity alone was Dr. Hardin."  (R. 1855).  "[W]hat I thought was most important is that

153

[Dr. Hardin] said . . . that he was more or less convinced of this man's sanity about as strong as it [sic] ever has been of anyone" (R. 1856); and that "Dr. Hardin, I believe, sunk whatever defense of insanity there was." (R. 1856).

\* \* \* \*

151.   The prosecutor's remarks to a key defense witness' testimony were improper by asking the witness if she was "sure [she'd] never been treated for any kind of mental disease or defect?" and then commenting, when the witness answered affirmatively, "I guess we'll have to take your word for it." (R. 1949).[164]

Petitioner's contention in the first paragraph quoted above — the prosecutor ignored undisputed testimony by two of the state's witnesses that the front door of the victim's home was unlocked — was not asserted in the Rule 32 court, nor argued on collateral appeal, as a basis for the contention that defense counsel provided ineffective assistance.  Consequently, it is procedurally barred from consideration by this court. See, e.g., Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001) ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim unless he first properly raised the issue in the state court system."); Bailey v. Nagle, 172 F.3d 1299, 1303 (11th Cir. 1999) (observing that, "if the petitioner simply never raised a claim in state court, and it is obvious that the unexhausted claim would now be procedurally barred due to a state-law procedural default, the federal court may foreclose the

_____

[164] Doc. no. 1 (Petition), at 27-29, 32.

petitioner's filing in state court; [and] the exhaustion requirement and procedural default principles combine to mandate dismissal") (citing *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998)).

Each of the remaining contentions in paragraphs 132-134, 139, and 151 was thoroughly and thoughtfully addressed by the Alabama Court of Criminal Appeals in its opinion on collateral appeal (*see* the Appendix for parallel references to the pages of the state court's opinion on which each claim is addressed), and petitioner has offered nothing to persuade this court that the state court's conclusion — that trial and appellate counsel did not render constitutionally defective performance — was either contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Further, the state court's conclusion was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *Id*. § 2254(d)(2).

**3**.   *Cumulative effect of the prosecutor's remarks*

Petitioner's final argument in support of his seventh claim ("G") is that the cumulative effect of the prosecutorial misconduct discussed above, and the repeated failures of his attorneys to object to, or appeal, that misconduct, rendered "the trial

process unreliable," and the contrary conclusions of the Alabama Court of Criminal Appeals "an unreasonable application of federal law."[165]

"Reversal on the basis of prosecutorial misconduct requires that the misconduct be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *United States v. Crutchfield*, 26 F.3d 1098, 1099 (11th Cir. 1994) (quoting *United States v. McLain*, 823 F.2d 1457, 1462 (11th Cir. 1987) (in turn quoting *United States v. Weinstein*, 762 F.2d 1522, 1542 (11th Cir. 1985)).

The conduct of the Limestone County District Attorney who prosecuted petitioner certainly was not exemplary; he was, at best, a bumbling, bumptious blowhard. Nevertheless, the Supreme Court has said that

> a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.

> \* \* \* \*

> Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, . . . the remarks must be examined

---

[165] Doc. no. 35 (Petitioner's Brief), at 39; *see also* doc. no. 1 (Petition) ¶ 158 ("The combined effect of all of the prosecutor's improper arguments and comments during the guilt/innocence and penalty phases of the trial violated Mr. Thomas' rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the Alabama Constitutions.").

within the context of the trial to determine whether the prosecutor's
behavior amounted to prejudicial error.

*United States v. Young*, 470 U.S. 1, 11-12 (1985).

The question a reviewing court must ask is, absent the prosecutor's questioned
conduct, "is it clear beyond a reasonable doubt that the jury would have returned a
verdict of guilty?" *United States v. Hasting*, 461 U.S. 499, 510-11 (1983). The
linchpin upon which that inquiry hinges is an assessment of the strength of the
prosecution's case: *i.e.*, was the state's evidence of petitioner's guilt strong or weak?
*Compare*, *e.g.*, *Young*, 470 U.S. at 19-20 (affirming conviction because "the
overwhelming evidence" of the defendant's guilt "eliminates any lingering doubt that
the prosecutor's remarks unfairly prejudiced the jury's deliberations or exploited the
Government's prestige in the eyes of the jury"), and *Hasting*, 461 U.S. at 511-12
(affirming conviction despite prosecutorial misconduct, "because a more compelling
case of guilt is difficult to imagine") *with*, *e.g.*, *Berger v. United States*, 295 U.S. 78,
88-89 (1935) (reversing conviction because the evidence of defendant's guilt was
"weak," and stating that, "[i]f the case against Berger had been strong, or, as some
courts have said, the evidence of his guilt 'overwhelming,' a different conclusion might
be reached"), and *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984) ("the

relative strength of [defendant's] possession defense" tipped the scales in favor of reversal for prosecutorial misconduct).

Applying that standard to the whole record, this court is satisfied beyond a reasonable doubt that the acts of prosecutorial misconduct cited by petitioner were harmless, even when considered cumulatively. The evidence of petitioner's guilt was, by any standard, *overwhelming*. Indeed, it is difficult to imagine a stronger case for conviction. A trail of blood spots led from the doorstep of the victim's home, through her yard, and across the street to the place at which petitioner's automobile had been parked. When taken into custody at the scene, his bare chest was covered with blood, and his pants were heavily saturated with *wet* blood. Blood-soaked currency was in his pants pocket, and a knife containing hair fragments and fibers embedded in blood on the blade was found on the front seat of his vehicle. The hair fragments were later found to be consistent with the victim's head and pubic hairs. The state's forensic pathologist testified that some of the victim's stab wounds and cuts were consistent with having been made by this knife. A cloth found in the auto contained bloodstains consistent with the victim's blood type. *The ignition key to petitioner's automobile*, as well as a bloodstained shirt later identified as having been worn by petitioner earlier in the evening of the murder, *were found in a bedroom of the victim's home*. A check bearing a bloody fingerprint was found in the storage room of the victim's house, and

that print later was matched to petitioner's left thumb.  When petitioner's clothes were confiscated at the county jail, blood was observed all over his body, including his pubic area.  Trace fibers removed from his jeans were consistent with the victim's nightgown, and a hair found on the pants was determined to be consistent with the victim.  Fiber taken from the soles of petitioner's shoes were similar to carpet fibers from the victim's bedroom.

Even that was not all the evidence of petitioner's guilt.

It is difficult to imagine a more compelling case for conviction.

Moreover, the trial judge instructed the jury several times that their verdicts were to be based upon the evidence alone, and that the statements and arguments of counsel were not evidence.  Those instructions, together with the *overwhelming* weight of the state's evidence, reduce the possibility that the jury may have been swayed in its deliberations by the prosecutor's statements to a level of inconsequence.

To be sure, the prosecutor's conduct was not exemplary, and petitioner's trial was not flawless — few are — but neither was the trial rendered fundamentally unfair by the failure of petitioner's trial counsel to object to each of the prosecutor's remarks discussed above, nor by appellate counsel's failure to cite the remarks as trial error on direct appeal.  *See Strickland*, 466 U.S. at 696 (observing that "a verdict or conclusion

only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"). For all of the reasons discussed above, Claim "G" is rejected.

**H**.    *Exclusion of Testimony Offered By Petitioner's Mother*

Petitioner's eighth claim has two parts. He first contends that his constitutional rights were violated by the trial judge's exclusion of testimony that he attempted to offer through his mother during the guilt-innocence phase of trial.[166] He also contends that he was denied effective assistance of counsel when his trial attorneys did not attempt to reintroduce the same testimony during the penalty phase.[167]

During presentation of the defense case in the guilt-innocence phase of trial, petitioner's mother, Mrs. Annie Ratliff, was called to the stand. Petitioner's attorney attempted to introduce through her two hearsay statements allegedly uttered by petitioner's brother, Billy Ray Thomas. The first statement purportedly was made about 2:00 a.m. on the morning of the offense, after Mrs. Ratliff had been awakened by the sound of sirens, and had observed through her bedroom window the flashing lights of fire trucks at Mrs. McLemore's home. She then "went into Billy's bedroom" and "asked him, son, what happened up there[?]" The prosecutor's objection to what

---

[166] *See* doc. no. 1 (Petition) ¶¶ 163-65, at 34-36.

[167] *Id.* ¶¶ 166-69, at 36.

Billy allegedly said in response was sustained.[168]  Defense counsel made no offer of proof.[169]

The second statement attributed to Billy Ray Thomas allegedly was uttered later that same morning.

Q.    Did he [Billy] get up later?

A.    He got up at 6:30 the next morning.

Q.    Where did he go?

A.    He went up to the place where that happened.

Q.    Did he come on back?

A.    Yes, sir, he came back to the house.

Q.    What happened?

A.    He told me —

MR. FRY:  I object, Your Honor, to what he told [her].

THE COURT:  Sustained.

---

[168] *See id.* at 34-35 (citing R. 1514-16).

[169] *See generally* II Charles W. Gamble, *McElroy's Alabama Evidence* § 425.01(1), at 1705 (5th ed. 1996).

Q.      Well, Mr. Fry doesn't want you to tell what he said, but you can tell
        what he did.  Tell the jury what he did when he came in.

A.      Well, when he come back to the house, he came in the front door.
        He walked to the kitchen and turned around.  He come back in the
        living room.  He fell down beside my gas heater on the living room
        floor.  He went to patting his hands on the floor.  He said —

At that point, the prosecutor again objected on the ground of hearsay and the trial judge

sustained.   Defense counsel then made the following offer of proof outside the

presence of the jury:

Q.      Mrs. Ratliff, when Billy fell on the floor, I believe you said he
        started pounding the floor?

A.      Yes, sir.

Q.      What exactly did he say to you?

A.      He said, *Mom*, *I did not know Kenneth was going to come up
        there*.[170]

Petitioner claims that, when Billy Ray Thomas said that he "did not know Kenneth was

going to come up there," Billy Ray "virtually admitted to his mother that he was at the

scene of the crime and committed the murder himself."[171]   Petitioner argues that the

---

[170] Doc. no. 1 (Petition), at 35 (citing R. 1517) (emphasis supplied).

[171] *Id.* ¶ 165, at 36.

trial court erroneously excluded this statement, because it was not offered to prove the truth of the matter asserted in it — *i.e.*, that Billy "did not know [that petitioner] was going to come up" to the victim's home — but to show that Billy Thomas also had been at the scene of the crime the evening before, and that petitioner "had not committed the murder."[172]

Petitioner concedes that federal habeas proceedings normally cannot be used to review the correctness of state-court evidentiary rulings.[173]  *See*, *e.g.*, *Breedlove v. Moore*, 279 F.3d 952, 963-64 (11th Cir. 2002) (holding that, "absent extreme circumstances," federal habeas courts may not review a state court's interpretation of the state's evidentiary rules); *United States ex rel. Bleimehl v. Cannon*, 525 F.2d 414, 420 (7th Cir. 1975) ("[H]abeas corpus is not available to review errors in a state trial, in the conduct of the trial, the admission of evidence, or alleged prejudicial statements in the Court's charge, or by the prosecution, absent a showing that they deprive [the] defendant of a fundamentally fair trial.") (quoting *United States ex rel. Corby v. Conboy*, 337 F. Supp. 517, 519 (D.C.N.Y. 1971)).  "To hold otherwise would put the federal courts [as] reviewing courts over the courts of the states even when no

---

[172] *See* doc. no. 35 (Petitioner's Brief), at 76 ("Rather, the statement was offered to show that Billy had been at the scene of the crime and that Mr. Thomas had not committed the murder.").

[173] *See id.* at 77.

constitutional errors have been made." *United States ex rel. Harris v. State of Illinois*, 457 F.2d 191, 198 (7th Cir. 1972).

For that reason, petitioner argues that the hearsay statement attributed to Billy Ray Thomas was such "a crucial, critical, or highly significant factor in the context of the entire case" that its exclusion rendered his trial "fundamentally unfair."[174]

The Alabama Court of Criminal Appeals thoroughly discussed this contention on direct appeal, and concluded that the excluded evidence would not have exonerated petitioner.

> As a general rule, an accused may introduce any legal evidence that tends to show that someone else committed the crime for which he is charged. *Green v. State*, 258 Ala. 471, 64 So. 2d 84 (1953). *See generally* C. Gamble, *McElroy's Alabama Evidence*, § 48.01(1) (3rd ed. 1977); Schroeder, Hoffman and Thigpen, *Alabama Evidence*, § 4-4(a)(c) (1987).

> However, hearsay evidence is not legal evidence and is not admissible to show that someone other than the accused committed the offense at issue. *Houston v. State*, 208 Ala. 660, 95 So. 145 (1923). *See also McDonald v. State*, 241 Ala. 172, 1 So. 2d 658 (1941); *Morris v. State*, 25 Ala. App. 175, 142 So. 685 (1932).

> "A defendant can disprove his guilt by proving the guilt of some other person. *Brown v. State*, 120 Ala. 342, 25 South. 182; *McDonald v. State*, 165 Ala. 85, 51 South. 629. But this must be done by legal evidence, and not by the testimony of witnesses who

---

[174] *Id.*

164

heard another admit that he committed the offense; this is the merest hearsay — is but an extrajudicial confession or admission not admissible in evidence. *Welsh v. State*, 96 Ala. 92, 11 South. 450; *Underhill on Criminal Evidence* (2d Ed.) p. 276, § 145."

*Houston*, 208 Ala. at 663, 95 So. 145.

Furthermore,

"[e]ven though one accused of a crime may show his innocence by proof of the guilt of another, provided the evidence relates to the res gestae of the offense, such evidence must exonerate the accused.  As stated in *Blevins v. State*, 51 Ala. App. 214, 283 So. 2d 664 (1973):

> "'While it is always proper and relevant for an accused to show that someone else committed the crime without his aid or participation, the admissibility of evidence offered to establish such fact depends on the circumstances of the case as well as the character of the evidence offered; but in general competent evidence which tends to prove that another committed the crime for which the accused is being tried is admissible if it is inconsistent with the guilt of the accused."  (Emphasis supplied). (283 So. 2d [at] 670)."

*Allen v. State*, 382 So. 2d 1147, 1156 (Ala. Crim. App.), *cert. denied*, 382 So. 2d 1158 (Ala. 1980).

Here, the excluded evidence would not have exonerated this appellant.  It was merely evidence that Billy may have also been present at the victim's house on the night in question and may have also participated in her death.  This evidence is in no way inconsistent with the appellant's guilt.  In fact, it is more consistent with the appellant's guilt because this evidence placed him at the scene of the crime!

In *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), the United States Supreme Court reversed a conviction in which the defendant, Chambers, had tried to introduce evidence at trial that another committed the murder for which he was charged. In *Chambers*, the Court suggested that "it may violate due process to deny a defendant the right to introduce evidence that another committed the crime with which that defendant was charged." Schroeder, Hoffman and Thigpen, § 4.4 (fn. 147).

However, the facts of *Chambers* are readily distinguishable from the case at bar. In *Chambers*, the defendant was arrested for the murder of a police officer. Following Chambers' arrest, another person, Gable McDonald, made a written confession to that murder. This confession was later repudiated by McDonald. McDonald also confessed to three friends on separate occasions that he had killed the police officer.

At trial, defense counsel called McDonald as a witness. However, the trial court did not allow defense counsel to question McDonald as an adverse witness because, under the Mississippi common law "voucher rule," a party may not impeach his own witness. Therefore, defense counsel could not cross-examine McDonald as to the circumstances of his confessions and his repudiation of his written confession.

Further, the trial court excluded the testimony of McDonald's three friends concerning McDonald's confession to them on hearsay grounds.

The U.S. Supreme Court reversed Chambers' conviction and found that Chambers had been denied due process because he was not allowed to question McDonald as an adverse witness and because he was not allowed to introduce the testimonies of McDonald's friends concerning his confessions to them.

In determining that the hearsay statements of McDonald's three friends should have been allowed in evidence, the Supreme Court decided

166

that the hearsay statements "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Chambers*, 93 S. Ct. at 1048.

The reasons for this determination were that "each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred," "each one was corroborated by some other evidence in the case," "the sheer number of independent confessions provided corroboration for each[,]" and "each confession . . . was in a very real sense self-incriminatory and unquestionably against interest." *Chambers*, 93 S. Ct. at 1048.

The court also emphasized the significance of the fact that McDonald was available at trial and also for cross-examination by the State.

In the case at bar, we do not find any of the assurances of reliability that were present in *Chambers*. At the guilt phase of the trial, the lone hearsay statement was not corroborated by any other evidence and it was not "unquestionably" against Billy's interest. Billy's statement was made to his and the appellant's mother. Moreover, Billy did not testify at this trial and thus could not be cross-examined by the State.

However, the most important distinction between this case and *Chambers* is the effect of the excluded evidence on the guilt or innocence of the person on trial.

In *Chambers*, the hearsay statements which pointed to the guilt of McDonald also pointed to the innocence of Chambers. Here, as stated earlier, Billy's statement was possibly evidence of Billy's guilt in this crime but it was not evidence of the innocence of this appellant or inconsistent with the guilt of this appellant. *See Blevins*; *Allen*.

167

Thus, we find that the trial judge did not abuse his discretion by excluding Billy's hearsay statement made to his mother.  *See Alldredge v. State*, 431 So. 2d 1358 (Ala. Crim. App. 1983).

*Thomas v. State*, 539 So. 2d 375, 394-96 (Ala. Crim. App. 1988).

The state appellate court's affirmation of the trial court's exclusion of the hearsay statements attributed to Billy Ray Thomas was not contrary to, or an unreasonable application of, clearly established federal law.  Indeed, Supreme Court opinions handed-down subsequent to the Court's decision in *Chambers* have made it clear that *Chambers* was a "case-specific error correction."  *Montana v. Egelhoff*, 518 U.S. 37, 52 (1996).

> *Chambers* specifically confined its holding to the "facts and circumstances" presented in that case; we thus stressed that the ruling did not "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures."  *See Chambers v. Mississippi*, 410 U. S., at 302.  *Id.*, at 302-303.  *Chambers* therefore does not stand for the proposition that the defendant is denied a fair opportunity to defend himself whenever a state or federal rule excludes favorable evidence.

*United States v. Scheffer*, 523 U.S. 303, 316 (1998).

Further, the decision of the Alabama Court of Criminal Appeals was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  As that court correctly observed, the statement attributed to Billy

Ray Thomas was not clearly confessional:  it did not brand him as the killer, to the exclusion and exoneration of petitioner.  This aspect of claim "H" is denied.

### 1. *Failure to reoffer the excluded testimony during penalty phase*

The second part of petitioner's eighth claim is based upon Alabama Code § 13A-5-45(d), which provides, in part, that "[a]ny evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence . . . ."  Petitioner argues on the basis of this state statutory provision that his trial attorneys rendered constitutionally ineffective assistance by not attempting to reintroduce through Mrs. Ratliff the hearsay statements attributed to his brother during the penalty phase, following the jury's return of verdicts finding him guilty of all charges.

Petitioner also contends that corroboration of Billy Ray's statements was provided by Ms. Patricia Carter, who was called to the stand during the penalty phase of trial.  Ms. Carter testified — without objection by the state — that, on August 31, 1985 (more than eight months after the murder), Billy Ray Thomas told her that he had killed Mrs. McLemore,[175] and that "before he would let Kenny take the electric chair,

---

[175] *See* R. 1942.

he would tell the truth.  . . .  He said Kenneth was innocent and the truth would come out before he would be convicted."[176]

This aspect of petitioner's eighth claim — the failure of defense counsel to recall his mother to the stand during the penalty phase, and again attempt to introduce the hearsay statements allegedly uttered by Billy Ray Thomas — is procedurally defaulted. It was not raised during Rule 32 proceedings in the trial court, nor on collateral appeal to the Alabama Court of Criminal Appeals.[177]  Nevertheless, petitioner argues that his "state law default was due to the ineffective assistance of counsel," and that establishes sufficient "cause" to excuse the procedural default of this claim.[178]  In other words,

---

[176] R. 1943.  Ms. Carter gave several reasons for failing to disclose the statements allegedly made by Billy Ray Thomas until the time of trial:  "Well, for awhile I thought that they would find him innocent, and then I moved away and stayed for about six months.  Then I came back and for the last week I've been trying to get in touch with somebody where I could come forward."  (R. 1944.)  She also alleged to be "scared of Billy Ray."  (R. 1945).  *She did not, however, contact defense counsel until the night after the jury had returned verdicts finding petitioner guilty of all charges.*  (R. 1945-46, 1948.)

[177] Petitioner concedes his failure to raise this aspect of his claim during collateral review by the state trial and appellate courts in the following passage from his habeas brief:

Finally, the State argues this claim is procedurally barred from federal habeas review because the issue was not raised at the Rule 32 proceeding.  (Respondent's Brief at 79 n.7).  In order for a court to ignore the procedural bar and hear the merits of a particular claim, petitioner must show "cause for the procedural default and actual prejudice growing out of the violation of federal law."  *Coleman v. Thompson*, 501 U.S. 722 (1991); *see also Douglas v. Wainwright*, 714 F.2d 1532, 1547 (11th Cir. 1983).  . . .

Doc. no. 35 (Petitioner's Brief), at 79.

[178] *Id.*

170

petitioner is arguing the ineffectiveness of those attorneys who represented him during

Rule 32 proceedings and on collateral appeal.

Ineffective assistance of counsel claims, however, are specifically limited to the

performance of those attorneys who represented a defendant at trial or on direct appeal

from the conviction. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence

of counsel during Federal or State collateral post-conviction proceedings shall not be

a ground for relief in a proceeding arising under section 2254."); *Coleman v.*

*Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney

in state post-conviction proceedings.   Consequently, a petitioner cannot claim

constitutionally ineffective assistance of counsel in such proceedings.") (citations

omitted); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003) ("While

constitutionally ineffective assistance of counsel has been considered cause to excuse

a procedural default at a stage in the proceedings in which the defendant enjoys a Sixth

Amendment right to the effective assistance of counsel, there is no constitutional right

to an attorney in state post-conviction proceedings.") (citing *Coleman*, 501 U.S. at

752); *Baldwin v. Johnson*, 152 F.3d 1304, 1318 (11th Cir. 1998) ("'The Supreme Court

has clarified that attorney error or ineffective assistance of counsel in a state collateral

proceeding is not cause to override a procedural bar that precludes review of a claim

171

in federal court.'") (quoting *Weeks v. Jones,* 26 F.3d 1030, 1046 (11th Cir. 1994)

(citing *Coleman*, 501 U.S. at 752)).

> The [*Coleman*] Court went on to conclude that because errors of post-conviction counsel cannot be *constitutionally ineffective*, a petitioner "must 'bear the risk of attorney error that results in a procedural default.'" Thus, because [petitioner] had no constitutional right to counsel during his post-conviction proceedings, his attorneys' errors during those proceedings cannot constitute cause to excuse his procedural default. Because [petitioner] has failed to establish one element of the cause and prejudice exception, he cannot show the exception applies.

*Johnson v. Singletary*, 938 F.2d 1166, 1175 (11th Cir. 1991) (*en banc*) (emphasis

supplied) (quoting *Coleman*, 501 U.S. at 752 (in turn quoting *Murray v. Carrier*, 477

U.S. 478, 488 (1986)), and citing *Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982)).

Petitioner does not argue the only other basis for overcoming the procedural

default: the correction of a fundamental miscarriage of justice. *See Murray*, 477 U.S.

at 495-96. (See also the discussion in Part IV(C)(1)(b) *supra*.) Therefore, his eighth

claim ("H") is due to be denied.

**I**.  *Exclusion of Testimony Offered By Patricia Carter*

The first witness called by defense counsel in *the penalty phase* of petitioner's

trial was Ms. Patricia Carter, who was acquainted with the members of petitioner's

family. During direct examination, Ms. Carter gave, without objection by the state, the

testimony recited in the previous section — *i.e.*, Billy Ray Thomas said "he had killed her, Mrs. McLemore."[179]

At the conclusion of the *redirect* examination of Ms. Carter, however, petitioner's attorney turned to a subject not addressed on direct or cross-examination: *i.e.*, "Has Billy Ray ever bragged about attacking or murdering other women?"[180] Before she could answer, the prosecutor objected on the grounds of hearsay, and the trial court sustained.[181]  Petitioner's ninth claim addresses this ruling, and it has three constituent parts.  First, he claims that the trial judge committed error of constitutional proportions when he

> precluded Mrs. [Patricia] Carter from testifying whether Billy Ray Thomas had ever bragged to her about attacking or murdering other women.  (R. 1950).  The trial court's refusal to admit this highly relevant evidence during the sentencing phase of Mr. Thomas' trial violated Mr. Thomas' rights to due process of law.[182]

Second, petitioner claims that his attorneys' "failure to call Patricia Carter *during the guilt phase* constitutes ineffective assistance of counsel."[183]  Finally, petitioner claims

---

[179] *See supra* notes 175 & 176 and accompanying text.

[180] R. 1950.

[181] *Id*.  No further questions were asked of the witness, and no offer of proof was made.

[182] Doc. no. 1 (Petition) ¶ 172, at 38.

[183] *Id*. ¶ 173, at 38 (emphasis supplied).

173

that the "failure to appeal the exclusion of [Ms. Carter's] testimony also constitutes ineffective assistance of counsel."[184]

**1**.    *Trial court error*

Petitioner argued in his Rule 32 petition that it was error for the trial judge to preclude Ms. Carter from saying whether Billy Ray Thomas had "bragged about attacking or murdering other women." The Rule 32 trial court, however, neglected to address the issue in its final order.[185] Petitioner raised the claim again on collateral appeal, and respondent admitted the trial court had failed to rule upon the issue, but argued that the substantive component of this claim — the alleged error of the trial court in sustaining the prosecutor's hearsay objection — had been procedurally defaulted. The Alabama Court of Criminal Appeals agreed, and held that "[t]he underlying substantive issue is procedurally barred because it was presented to, and addressed by, the trial court, Rule 32.2(a)(2), and could have been, but was not, presented on appeal, Rule 32.2(a)(5)." *Thomas v. State*, 766 So. 2d at 961.

Respondent correctly contends that a default under adequate and independent state procedural rules prohibits this court from reaching the merits of this aspect of

---

[184] *Id.* ¶ 174, at 39.

[185] *See* Rule 32 C.R. Tab. 38, at 51.

petitioner's claim.[186]  Petitioner presents no meaningful reply to respondent's assertion

that the substantive component of this claim was procedurally defaulted,[187] and the

issue will not be discussed further.  (See the discussion in Part IV(C) of this opinion,

*supra*.)

> 2.  *Ineffective assistance of counsel for failing to present Ms. Carter's testimony during the guilt phase of trial*

Petitioner contends that his trial attorneys failed to investigate and discover

witness Patricia Carter prior to trial; and then, once she had been discovered, failed to

request permission to reopen the defense case-in-chief in order to present her testimony

during the guilt phase.[188]  The trial and Rule 32 hearing transcripts are unequivocally

clear, however, that

> despite diligent preparation and investigation, defense counsel were not aware of the identity of [Patricia Carter] *until after the jury returned its verdicts of guilty*.  They were not aware of even her existence until around 3:00 p.m. the day before the verdicts, and the only information that they had pertaining to the identity of this woman was learned around 8:00 p.m. the evening before the verdicts were returned.

*Thomas v. State*, 766 So. 2d at 887 (emphasis supplied).  "Thus, defense counsel could

not possibly have asked that the defense's case be reopened so that Carter could testify

---

[186] Doc. no. 17 (Respondent's Answer), at 76-77.

[187] *See* doc. no. 35 (Petitioner's Brief), at 80-82.

[188] *See* doc. no. 1 (Petition) ¶ 173, at 38-39; and doc. no. 35 (Petitioner's Brief), at 82-83.

175

in the guilt phase." *Id*. at 914. (For a full discussion of this aspect of petitioner's claim, see *id*. at 886-89, 914-15, 961-62.)

Petitioner has not presented *any* evidence, much less clear and convincing evidence, demonstrating that the state appellate court's factual finding is either not correct, or an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. §§ 2254(d)(2), (e)(1). Further, petitioner has not explained how the state court's decision is either contrary to, or an unreasonable application of, clearly established federal law. *Id*. § 2254(d)(1).

**3**.    *Failure to appeal the exclusion of Ms. Carter's testimony*

Finally, petitioner claims that his attorneys rendered ineffective assistance by failing to raise the trial judge's ruling, precluding Ms. Carter from testifying whether Billy Ray Thomas had "ever bragged about attacking or murdering other women," as error on direct appeal.

The Alabama Court of Criminal Appeals addressed this aspect of petitioner's claim on collateral review, and held that it also was without merit. *See Thomas v. State*, 766 So. 2d at 962 (citing *McElroy's Alabama Evidence* § 48.01(10)). The treatise cited by the state court provides that:

> An accused may not prove the character of another [person] for the
> purpose of showing that such other [person], and not the accused,

committed the crime being prosecuted.  This preclusion is based upon the general exclusionary rule of character.  Such proof is inadmissible whether it be in the form of reputation, *acts of violence against those other than the present victim*[,] or opinion of character.

I Charles W. Gamble, *McElroy's Alabama Evidence* § 48.01(10) (5th ed. 1996) (emphasis supplied and footnotes omitted).

Thus, this testimony was properly excluded by the trial court.  It follows that the performance of petitioner's appellate counsel was not deficient for failing to raise a meritless issue on appeal.  *See*, *e.g.*, *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001) (holding that a state habeas petitioner's "appellate counsel was not ineffective for failing to raise a nonmeritorious issue") (citation omitted); *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) (noting that "raising every single frivolous point on appeal is not a sign of effective counsel and indeed often has the effect of diluting the import of stronger points," and stating that "it is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance") (citations and internal quotation marks omitted).

Further, because petitioner was not entitled to relief on this issue, he cannot prove that he was prejudiced by his attorney's failure to appeal the trial judge's ruling.

Finally, petitioner has not shown that the resolution of this claim by the Alabama Court of Criminal Appeals was contrary to, or involved an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).

For all of these reasons, all aspects of Claim "I" are rejected.

**J**.    *Exclusion of Testimony Offered by Sandra Gibson*

The second witness called by defense counsel during the penalty phase of trial was petitioner's sixteen-year-old cousin and "girlfriend," Sandra Diane Gibson.[189] Counsel attempted to elicit testimony from her to the following effect:

> MR. MOFFATT:  Ms. Sandra Gibson related to me that Billy Ray Thomas bragged about enjoying sex with older women and that he liked older women and preferred older women over younger women.  I think he made that comment to her on more than one occasion and within a short time span before the death of Mrs. McLemore.[190]

The state prosecutor's hearsay objection[191] was sustained by the trial judge, who added an addition ground for rejecting it:  "I don't see the relevancy about what the defendant's brother told her about older women.  I sustain the objection."[192]

---

[189] *See* R. 1950-53.

[190] R. 1952 (offer of proof, out of the hearing of the jury).

[191] R. 1951-52 ("I'm going to object to what someone else told her.  The witness needs to come to be put on the stand.").

[192] R. 1952.

The petition filed in this court argues that this evidence "suggest[ed] that Billy committed the crime for which Mr. Thomas was convicted,"[193] that it was relevant to two statutory mitigating circumstances,[194] and that its exclusion violated Alabama Code § 13A-5-45(d) ("Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence. . . .").[195]

This court cannot grant habeas relief "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *see also Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a mere error of state law is not a denial of due process. If the contrary were true, then every erroneous decision by a state court on state law would come [to this Court] as a federal constitutional question.") (citations and internal quotation marks omitted); *Breedlove v. Moore*, 279 F.3d 952, 963 (11th Cir. 2002) ("A federal habeas court may not issue the writ on the basis of a state's interpretation of its own laws and [evidentiary] rules, absent extreme circumstances.") (citing *Pulley*, 465 U.S. at 42).

---

[193] Doc. no. 1 (Petition) ¶ 179.

[194] *Id.* ¶ 177 (quoting Alabama Code § 13A-5-51(4) and (5): *i.e.*, "The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor," and, "The defendant acted under extreme duress or under the substantial domination of another person," respectively).

[195] *Id.* ¶ 178.

179

Rather, "[h]abeas review of an evidentiary ruling of a trial judge is limited to ascertaining whether the error is of such a magnitude as to render the trial fundamentally unfair and thus violative of due process." *Leverett v. Spears*, 877 F.2d 921, 925 (11th Cir. 1989) (citing *DeBenedictis v. Wainwright*, 674 F.2d 841, 843 (11th Cir. 1982)).[196] "Fundamental fairness is violated when the evidence is 'material in the sense of a crucial, critical, highly significant factor.'" *Redman v. Dugger*, 866 F.2d 387, 390 (11th Cir. 1989) (quoting *Boykins v. Wainwright*, 737 F.2d 1539, 1544 (11th Cir. 1984)).

This court finds that the exclusion of testimony that "Billy Ray Thomas bragged about enjoying sex with older women," even if such comments were made "on more than one occasion and within a short time span before the death of Mrs. McLemore,"[197] does not rise to a level of prejudice that rendered petitioner's trial fundamentally unfair. The statements do not tend to demonstrate, as petitioner contends, "the possibility that another actor committed the offense for which death has been imposed,"[198] or that petitioner "was an accomplice in the capital offense committed by another person and

---

[196] *See* doc. no. 35 (Petitioner's Brief), at 85-86 ("[F]ederal habeas review of trial error based on state law is available where the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'") (quoting *Donnelly v. DeChristoforo*, 416 U.S 637, 643 (1974)).

[197] R. 1952 (defense counsel's offer of proof, out of the hearing of the jury).

[198] Doc. no. 35 (Petitioner's Brief), at 86.

his participation was relatively minor,"[199] or that petitioner "acted under extreme duress or substantial domination of another person."[200]   The state trial judge correctly discerned that this testimony was not relevant to any issue addressed in the penalty phase of trial.

Petitioner also asserts in one paragraph of his petition that "[t]rial counsel's failure to appeal [the exclusion of] this testimony also constitutes ineffective assistance of counsel."[201]   He did not address that contention in brief, however.   Further, respondent asserts this issue was raised in petitioner's *certiorari* brief on direct appeal. The Alabama Court of Criminal Appeals so ruled in its opinion on collateral review, saying:

> In regard to the proposed testimony of [Sandra] Gibson, the underlying issue — whether the trial court properly sustained an objection to her proposed testimony . . . — is precluded because it was presented to, and addressed by the trial court, Rule 32.2(a)(2), and because it was also presented on direct appeal to the Alabama Supreme Court (Brief on petition for certiorari review, pp. 49-50, 52) and indirectly addressed [by] that court, Rule 32.2(a)(4).  *See* 539 So.2d at 400.

> The issue whether trial counsel were ineffective for not raising the issue regarding Gibson's proposed testimony is without merit because the trial court did rule on the issue and Thomas received an adverse ruling (R. 1951-52).   The issue whether appellate counsel were ineffective for

---

[199] *Id*. at 85.

[200] *Id*.

[201] Doc. no. 1 (Petition) ¶ 181, at 40.

failing to present the issue on direct appeal is also without merit; as noted above, it was presented on appeal.

*Thomas v. State*, 766 So. 2d at 962-63.

Finally, petitioner has not demonstrated that the state courts' decisions were contrary to, or involved an unreasonable application of, clearly established federal law, nor has he shown that the state courts' decisions were based upon an unreasonable determination of the facts in light of the evidence before those courts. *See* 28 U.S.C. § 2254(d). For all of these reasons, petitioner's tenth claim ("J") is denied.

**K.** *Ineffectiveness of Trial Counsel for Failing to Investigate, Discover, and Present Expert Forensic Testimony*

Petitioner contends his trial attorneys failed to "adequately investigate and cross-examine the state's expert witnesses regarding blood and other evidence found at the crime scene," and "failed to call a single witness — expert or otherwise — in order to rebut the state's forensic evidence."[202] Petitioner presents nothing in his brief to support this claim. It therefore lacks specificity. The Alabama Court of Criminal Appeals so found on collateral review, saying:

> (e) "*Trial counsel failed to investigate, challenge, and adequately cross-examine critical prosecution witnesses, including but not limited to the State's forensic pathologist, Joseph Embry, the State's forensic microanalyst, John Kilbourne, the State's*

---

[202] Doc. no. 1 (Petition) ¶ 182.

> fingerprint expert, Carol Curlee, and the State's forensic
> serologist, Roger Morrison, whose testimony had to be challenged
> to protect Mr. Thomas's interests and rights.  Moreover, trial
> counsel failed to challenge the competence and relevance of the
> testimony offered by some of the State's witnesses, including but
> not limited to the decedent's daughter . . ., witnesses Kathy Guess
> Pylant and Addie Siniard, and Drs. Huggins and Hardin, members
> of the State's Lunacy Commission."  (Brief, pp. 15-16.)

Again, this statement is Thomas's entire argument in his brief to
this court, and again, Thomas was no more specific in his petition or
post-hearing brief.  (Rule 32 C.R. 522, 645-46.)  This claim lacks any
specificity whatsoever.  As noted *supra*, a review of a claim of ineffective
counsel is not triggered until the petitioner has identified specific acts or
omissions.  *Strickland. See*, *e.g.*, *Nelson v. Hargett*, 989 F.2d 847, 850
(5th Cir. 1993) (claims of failure to investigate must show with specificity
what information would have been obtained with investigation, and
whether, assuming the evidence is admissible, its admission would have
produced a different result).  We find it appropriate to concur with the
following findings by the Rule 32 court, without further analysis: "This
Court having heard all the testimony at the trial of this matter, and
reviewing the transcript of this trial . . . finds affirmatively that Thomas's
trial counsel effectively cross-examined each and every prosecution
witness and took all legal and ethical steps necessary to discredit said
testimony." (Rule 32 C.R. 745.)

*Thomas v. State*, 766 So. 2d at 892 (emphasis in original).

Petitioner has failed to allege his grounds for relief with sufficient detail and

clarity to demonstrate even *prima facie* evidence of a constitutional violation.  The

mere assertion of a ground for relief, without more factual detail, does not satisfy a

petitioner's burden of proof, or the requirements of 28 U.S.C. § 2254(e)(2) and Rule

2(c) of the *Rules Governing Section 2254 Cases in the United States District Courts*. This claim is due to be summarily denied.

**L.**    *Failure to Consider Mitigating Evidence at Sentencing*

Petitioner next claims that the trial judge committed constitutional error by failing to consider evidence of statutory and non-statutory mitigating circumstances at sentencing,[203] and that his attorneys failed to "properly appeal" this issue.[204]

**1.**    *Construction of petitioner's claim*

The principal difficulty in addressing this aspect of petitioner's twelfth claim lies in the parties' practice of using the terms "consider" and "existence" interchangeably throughout their pleadings.  The words are not synonymous; there are important legal distinctions between "consideration" of evidence offered as a basis for a sentence less than death, and "acceptance" of that evidence — a term here used in the sense of finding that the evidence proffered in mitigation of sentence *establishes*, or *proves* the "existence" of, the factual proposition for which it is offered.  Even when mitigating

---

[203] *See* doc. no. 1 (Petition), at 41-49.

[204] *Id*. ¶ 224, at 49 ("In addition, Mr. Thomas' trial attorneys failed to properly appeal the trial court's failure to find any statutory or non-statutory mitigating circumstances.  Appellate counsel did not brief the issue on appeal to the Alabama Court of Criminal Appeals.  Realizing this mistake, counsel then sought to assert the claim before the Alabama Supreme Court.  This was deficient performance under the first prong of *Strickland*.").

184

evidence is "accepted" by the sentencing authority, the "weight" it should be accorded is yet another variable in the sentencing calculus.

An examination of the history of the present claim, beginning with its first appearance in the petition for writ of *certiorari* filed on direct appeal in the Supreme Court of Alabama, reveals that petitioner has focused upon the trial court judge's alleged failure "to give proper *consideration* to the statutory and nonstatutory mitigating factors indisputably supported by the record as required by the Constitution of the United States and the Alabama Constitution."[205]   The brief filed by petitioner in support of his *certiorari* petition relies upon *Lockett v. Ohio*, 438 U.S. 586 (1978),[206] holding that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from **considering**, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Id*. at 604 (italics in original, boldface emphasis added) (footnotes omitted).   Notably, petitioner's *certiorari* pleadings did *not* rely upon an Eleventh Circuit decision that will be discussed below, *Magwood v. Smith*, 791 F.2d 1438 (11th Cir. 1986), even though the opinion in that case was certainly available on the date the petition and supporting

---

[205] Doc. no. 1 (Petition) ¶ 222 (emphasis supplied).

[206] *See* C.R. Tab 32, at 53.

185

brief were filed in the state's highest court.  The habeas petition filed in this court again relies upon *Lockett v. Ohio*, *supra*, but also cites *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), and *Magwood v. Smith*, *supra*.[207]

The Supreme Court's decisions in *Lockett* and *Eddings* mandate only that sentencing authorities not be precluded by law from *considering* a broad range of evidence offered by a defendant as a basis for a sentence less than death.[208]  Neither opinion says anything about "acceptance" of such evidence — in the sense of finding that the evidence offered in mitigation of sentence *establishes*, or *proves* the "existence" of, the factual proposition for which it is offered — or the "weight" such evidence should be accorded, even if "accepted."  The Eleventh Circuit's opinion in *Magwood v. Smith*, on the other hand, addresses that, as well as other, issues.

In *Magwood*, the Court reiterated the well-established principle that a federal habeas court cannot "re-evaluate the *weight* accorded to particular aggravating and mitigating factors.  This determination is left to state courts, provided the death-penalty statute and sentencing hearing meet relevant constitutional requirements."  791 F.2d

---

[207] See doc. no. 1 (Petition) ¶ 223 ("The trial court's failure to give this mitigating evidence its due violated basic Eighth Amendment rights as well as those guaranteed by the Fifth, Sixth, and Fourteenth Amendments.  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *see also Magwood v. Smith*, 791 F.2d 1438 (11th Cir. 1987).").

[208] *Eddings* reiterated the Court's holding in *Lockett*, *see* 455 U.S. at 110-12, and added this: "Just as the State may not by statute preclude the sentencer from **considering** any mitigating factor, neither may the sentencer refuse to **consider**, *as a matter of law*, any relevant mitigating evidence." *Id*. at 113-14 (italics in original, boldface emphasis added).

at 1449 (emphasis in original) (citing, *e.g.*, *Johnson v. Wainwright*, 778 F.2d 623, 631 (11th Cir. 1985) (stating that federal habeas courts "accept the state courts' decisions about the *weight* of mitigating evidence absent fundamental error") (emphasis supplied)).

In addition, however, the *Magwood* Court also held that this Circuit's cases prohibiting re-evaluation of the "weight" accorded particular aggravating and mitigating factors on habeas review "do not preclude federal review of the fact-finding that determines the *existence* of a particular aggravating or mitigating circumstance. This is a separate inquiry and one that can proceed within the parameters set forth in 28 U.S.C. § 2254(d)."  791 F.2d at 1449 (emphasis in original).  In support of that proposition, the *Magwood* Court said:

> We are aware of the court's statement in *Ford* [*v. Strickland*, 696 F.2d 804 (11th Cir. 1983) (*en banc*)] that "we have not found any habeas corpus decision in which this Court has reversed a death sentence due to the state court's incorrect decision as to the *existence or absence* of aggravating and mitigating circumstances."  696 F.2d at 819.  Although that statement establishes that this circuit has not yet found it necessary to reject a factual finding from a state court capital sentencing hearing, it in no way precludes such a result.  In fact, following this statement the *Ford* court went on to apply 28 U.S.C. § 2254(d) and uphold the factual findings of the Florida courts.  *Id*.
>
> A third case from this circuit supplies additional authority for federal review of factual findings relating to mitigating circumstances. In *Goode v. Wainwright*, 704 F.2d 593 (11th Cir.), *rev'd on other grounds*, 464 U.S. 78, 104 S. Ct. 378, 78 L. Ed. 2d 187 (1983) (per curiam), this

187

court noted the distinction between review of the *weight* given to a mitigating circumstance and review under § 2254(d) of factual findings as to the *existence* of that circumstance. 704 F.2d at 603 & n. 11.

Having established that *a federal habeas corpus court may review a state court factual finding concerning the existence of mitigating circumstances*, we now turn to the decision of the district court in this particular case. . . . .

*Magwood v. Smith*, 791 F.2d at 1449 (emphasis added).

As noted above, petitioner could have raised, but failed to assert, a *Magwood* claim on *certiorari* review in the Supreme Court of Alabama. Even so, because respondent does not claim procedural default, and also because petitioner *did allege* in his petition for writ of *certiorari* filed in the Alabama Supreme Court that "the trial court examined the relevant mitigating circumstances in a mechanical, cursory and rote manner,"[209] this court will construe the present claim as questioning whether the trial court properly considered the evidence offered by petitioner in mitigation of the sentence to be imposed, and whether the trial court's factual findings concerning the existence or non-existence of mitigating circumstances retain their § 2254(e)(1) presumption of correctness.

**2**.     *The trial court's findings*

---

[209] C.R. Tab 32, at 51 (citing R. 2037-40).

The sentencing order entered by the trial court in accordance with Alabama Code § 13A-5-47[210] contains the following findings concerning the existence or non-existence of mitigating circumstances:

> In compliance with the statutory requirement that the Trial Court enter specific findings concerning the existence or non-existence of each mitigating circumstance enumerated by statute, the Court finds that none of the following mitigating circumstances exist in this case:
>
> 1. That the Defendant has no significant history of prior criminal activity. The Defendant was shown by the preponderance of the evidence to have a significant history of criminal conduct. He was convicted in 1983 of burglary in the third degree, in 1983 of receiving stolen property in the second degree, in 1982 he was convicted of receiving stolen property in the second degree, in 1980 he was convicted of the possession of a forged instrument in the second degree.
>
> 2. That the capital offense was committed while the Defendant was under the influence of extreme or [sic] emotional disturbance. The Defendant was examined by two psychiatrists at the Taylor-Hardin Secure Medical Facility under the order of this Court. Each of these psychiatrists examined the Defendant and found no mental illness or defect and in each

---

[210] The relevant portion of this statute provides that:

> Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52. The trial court shall also enter written findings of facts summarizing the crime and the defendant's participation in it.

Ala. Code § 13A-5-47(d) (1975).

of their opinions the Defendant did not suffer from a mental disease or defect at the time of the offense.  The Defendant introduced testimony by psychologists which they contended to show mental disease or defect.

While the Court recognizes that this mitigating circumstance contemplates a disturbance of mind which might exist separate and apart from a mental disease or defect and that the Court is not bound by the testimony of expert witnesses, the Court finds from a consideration of all the evidence that the Defendant was not under the influence of extreme mental or emotional disturbance at the time the capital offense was committed.

3.  That the victim was a participa[nt] in the Defendant's conduct or consented to it.  There is no evidence to support this mitigating circumstance in this case.

4.  That the Defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor. There is no support for this mitigating circumstance under the evidence presented.

5.  The Defendant acted under extreme duress or under the substantial influence of another person.  There is no support for this mitigating circumstance under the evidence presented.

6.  That the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.  The Defendant entered a plea of not guilty by reason of mental disease or defect.  With regard to this defense, the Court instructed the jury that a person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, such person lacks substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.  By its verdict of guilty the jury found the evidence insufficient to support the plea of not guilty by reason of mental disease or defect and the jury's

finding is supported by the evidence. While the Court recognizes that the Court is not bound by the findings of the jury in this respect and that the Court recognizes that this mitigating circumstance contemplates impaired capacity which might exist separate and apart from a mental disease or defect, the Court finds from a consideration of the testimony of the expert witnesses who testified in this case that this mitigating circumstance does not exist.

7. Age of the Defendant at the time of the crime. The Defendant was twenty-four years of age at the time this capital offense was committed. The Court finds from the evidence that the Defendant's age was not a mitigating factor at the time of the crime. The Court having considered whether there are any mitigating circumstances not enumerated by statute which are shown by the evidence to exist in this case, the Court finds, therefore, that the evidence does not support any finding that there are any mitigating circumstances in this case not enumerated by statute.

## CONCLUSION

The Court having found that there are two aggravating circumstances in this case and that there are no mitigating circumstances in this case and having given consideration of the recommendation of the jury contained in its advisory verdict, it is the judgment of this Court that the aggravating circumstances outweigh mitigating circumstances shown by the evidence in this case. Accordingly it is ORDERED, ADJUDGED AND DECREED by the Court that the Defendant be punished by death.

*Thomas v. State,* 539 So. 2d at 398-99 (Appendix).

**a**.   *The trial court's consideration of statutory mitigating circumstances*

The foregoing portions of the trial court's sentencing order clearly reflect that the trial judge *considered* the evidence presented by petitioner as it bore upon the

191

mitigating circumstances enumerated in Alabama Code § 13A-5-51;[211] he just did not

*accept* that evidence.   However, *acceptance* "is not constitutionally required; the

Constitution only requires that the sentencer *consider* the factors." *Atkins v. Singletary*,

965 F.2d 952, 962 (11th Cir. 1992) (emphasis in original).

Therefore, to the extent petitioner contends that the trial court's findings

concerning the mitigating circumstances enumerated in Alabama Code § 13A-5-51 are

based upon incorrect findings of fact, he has not carried his § 2254(e)(1) burden of

demonstrating, with clear and convincing evidence, that the trial judge's findings are

not presumptively correct, or that they were "based on an unreasonable determination

---

[211] Ala. Code § 13A-5-51 provides that:  "Mitigating circumstances shall include, but not be limited to, the following:

"(1) The defendant has no significant history of prior criminal activity;

"(2) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance;

"(3) The victim was a participant in the defendant's conduct or consented to it;

"(4) The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor;

"(5) The defendant acted under extreme duress or under the substantial domination of another person;

"(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and

"(7) The age of the defendant at the time of the crime."

of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.

§ 2254(d)(2).

When it is shown, as in this case, that "a full hearing has been held in which the

defense counsel is given a fair opportunity to present mitigating evidence, [federal

habeas] review becomes highly deferential." *Atkins*, 965 F.2d at 962 (citing *Palmes v.

Wainwright*, 725 F.2d 1511, 1523 (11th Cir. 1984)).  The Eleventh Circuit's recent

decision in *Schwab v. Crosby*, 451 F.3d 1308 (11th Cir. 2006), made that quite clear

when holding that,

> while sentencing courts may not refuse to consider evidence offered in
> mitigation, they need not decide that the facts established by that evidence
> have mitigating force in the context of the case.  The Constitution requires
> that the sentencer be allowed to consider and give effect to evidence
> offered in mitigation, *but it does not dictate the effect that must be given
> once the evidence is considered*; *it does not require the sentencer to
> conclude that a particular fact is mitigating or to give it any particular
> weight*.

*Id*. at 1329 (emphasis supplied).  *See also Harich v. Wainwright*, 813 F.2d 1082, 1101

(11th Cir. 1987) (stating that the Supreme Court's decisions in *Skipper v. South

Carolina*, 476 U.S. 1 (1986), *Eddings v. Oklahoma*, *supra*, and *Lockett v. Ohio*, *supra*,

require *only* "that the defendant be allowed to *present* all relevant mitigating evidence

to the sentencing jury or court . . . .  These cases do not require that the sentencing body

*accept* the conclusion that the evidence constitutes a mitigating circumstance or that

the mitigating circumstances outweigh the aggravating circumstances."), *adopted in relevant part sub nom. Harich v. Dugger*, 844 F.2d 1464, 1468-69 (11th Cir. 1988) (*en banc*), *partially abrogated on other grounds by Davis v. Singletary*, 119 F.3d 1471, 1481-82 (11th Cir. 1997).

> **b**.   *The trial court's consideration of allegedly* non-statutory *mitigating circumstances*

Thus, this aspect of petitioner's twelfth claim ("L") comes down to his contention that the trial court failed to consider, and make written findings addressing, the five, allegedly *non-statutory*, mitigating circumstances enumerated in the habeas petition filed in this court:  *i.e.*,

> (1)   Mr. Thomas is mentally retarded, having an IQ estimated to [be] between 56 and 64.  Mr. Thomas has the intellectual capacity of a sixth grader.

> (2)   At the time of the crime, Mr. Thomas was under the influence of drugs and alcohol.  Mr. Thomas' mental infirmities were exacerbated by his intoxicated state.

> (3)   Mr. Thomas had a pitiable childhood.  Mr. Thomas was influenced heavily by an abusive and alcoholic father.  In later years, Mr. Thomas had no stable home life, as evidenced by his being shuffled from foster home to foster home.

> (4)   Just three weeks prior to the crime, Mr. Thomas' father passed away.  Mr. Thomas suffered tremendous grief and anxiety as a result of his father's death.

194

(5)   Mr. Thomas' brother, Billy Thomas, was involved in committing the offense for which Mr. Thomas was convicted.[212]

A close examination of the listed circumstances shows that only the third can be accurately described as "non-statutory."  In other words, the substance of the first, second, fourth, and fifth mitigating circumstances alleged by petitioner cannot be conceptually distinguished from — and each actually is encompassed by — one or more of the seven, *statutory* categories enumerated in Alabama Code § 13A-5-51.[213]

For example, the first mitigating factor listed — the contention that petitioner is "mentally retarded" — is encompassed by the sixth, *statutory*, mitigating circumstance ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired"), which was considered, but not accepted, by the trial judge.[214]

---

[212] Doc. no. 1 (Petition) ¶ 221.

[213] *See supra* note 211 for the text of this statute.

[214] It should be noted that, at trial and on direct appeal, petitioner alleged that he was "*borderline* mentally retarded" (emphasis supplied).  It was only during the post-conviction, Rule 32 proceedings that petitioner began to allege that he is "mentally retarded."  The Rule 32 trial court appointed mental health experts to examine petitioner, held an evidentiary hearing, and found that petitioner was *not* mentally retarded.  However, because this court has determined — as will be explained in the discussion of Claim "R" *infra* — that the post-conviction proceedings and the Rule 32 court's factual findings do not comport with standards elucidated in either *Atkins v. Virginia*, 536 U.S. 304 (2002), or the decision of the Supreme Court of Alabama in *Ex parte Perkins*, 851 So. 2d 453 (Ala. 2002), and also because a finding that petitioner *is* mentally retarded would render him ineligible for the death penalty under the new constitutional rule established by the *Atkins* decision, discussion of this matter in the context of mitigating circumstances is a moot point.

195

The second non-statutory mitigating factor asserted in this court — the contention that, at the time of the crime, petitioner was under the influence of drugs and alcohol, and that those substances exacerbated his mental infirmities — is encompassed by the second and sixth statutory circumstances (*i.e.*, "The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance," and, "The capacity of the defendant to appreciate the criminality of his conduct . . . was substantially impaired"), both of which were considered, but not accepted, by the trial judge.

The fourth, allegedly non-statutory, mitigating circumstance asserted by petitioner — the contention that the death of his father three weeks prior to the crime caused him to suffer "tremendous grief and anxiety" — is encompassed by the second statutory circumstance (*i.e.*, "The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance"), which was considered, but not accepted, by the trial judge.

The fifth, allegedly non-statutory, mitigating factor asserted in this court — the contention that petitioner's brother, Billy Ray Thomas, was involved in the commission of the capital offense — is encompassed by the fourth and fifth statutory circumstances (*i.e.*, "The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor," and, "The defendant acted . . . under

196

the substantial influence of another person"), both of which were considered, but not accepted, by the trial judge.

Thus, only the third circumstance asserted by petitioner — his "pitiable childhood" — is not clearly encompassed by one of the statutory categories addressed by the trial court. Even so, that circumstance was not presented to the Alabama Supreme Court on direct appeal. Respondent therefore asserts, and petitioner does not dispute, that the substantive claim that the trial judge committed constitutional error by not considering this factor is procedurally barred.[215] When this claim was presented for the first time in petitioner's post-conviction, Rule 32 petition,[216] the Rule 32 trial court found it to be procedurally barred.[217] The Rule 32 trial court judge (who also had presided at petitioner's trial and imposed the sentence at issue) alternatively found the claim to be without merit, asserting that he did consider the evidence for the existence of non-statutory mitigating circumstances, but found that no such factors had been established.[218] On collateral appeal, the Alabama Court of Criminal Appeals also found the claim to be procedurally barred by Alabama Rule of Criminal Procedure 32.2(a)(3), because

---

[215] *See* doc. no. 17 (Respondent's Answer), at 88-89.

[216] *See* Rule 32 C.R. Tab 38, at 53.

[217] *Id*. at 89 (citation omitted).

[218] *Id*.

it could have been, but was not, raised before the trial court.  It is also procedurally barred by Rule 32.2(a)(4), with one exception, because it was, in essence presented to, and implicitly addressed by, the Alabama Supreme Court.  (See Brief on petition for certiorari review, pp. 51-53, where Thomas alleged that the trial court failed to consider the following: Thomas's borderline mental retardation; his high degree of intoxication at the time of the crimes; the involvement of his brother Billy; his mental instability and indications of emotional disturbance; his brain damage from drug use; his lack of any history of violent behavior; his age; and his being easily influenced.)  The only one not specifically mentioned in the brief to the Supreme Court was the trial court's alleged failure to consider Thomas's pitiable childhood, including a violent and alcoholic father.  Our consideration of this subpart is procedurally barred by Rule 32.2(a)(5) because it could have been, but was not, raised on appeal.

*Thomas v. State*, 766 So. 2d at 963 (footnote omitted).

Petitioner has not shown that the state courts' decisions regarding the allegedly non-statutory, mitigating circumstances listed by him in paragraphs 1, 2, 4, and 5 above are either contrary to, or involved an unreasonable application of, clearly established federal law; nor has he argued that the decision was based upon an reasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).  Moreover, consideration of the non-statutory mitigating circumstance asserted in the third paragraph is procedurally barred.

Furthermore, the determination of whether mitigating circumstances have been established by the evidence presented is a product of the trial court's fact-finding skills, and such factual determinations are entitled to a presumption of correctness that may

198

not be disregarded, unless rebutted by clear and convincing proof to the contrary.  *See*

28 U.S.C. § 2254(e)(1).  After careful examination of the factual findings at issue, this

court finds no fundamental error in the trial court's decision to discount the alleged

involvement of Billy Ray Thomas in the offense of conviction, the alleged non-violent

nature of petitioner's previous crimes, and his intoxication at the time of the capital

offense.  It was also well within the trial court's discretion to credit the opinion of some

mental health experts over others concerning the subjects of petitioner's mental and

emotional disturbances, his ability to conform his conduct to the law, insanity, brain

damage, and schizophrenia.  *See*, *e.g.*, *Bottoson v. Moore*, 234 F.3d 526, 534 (11th Cir.

2000) (noting that conflicting expert testimony requiring the discounting of the

testimony of one expert constitutes a finding of fact subject to a § 2254(e)(1)

presumption of correctness).[219]  This disagreement among the mental health experts is

what distinguishes petitioner's case from *Magwood v. Smith*, *supra*.

In that case, Billy Joe Magwood shot and killed the Coffee County, Alabama

Sheriff shortly after his release from the Coffee County jail, in retaliation for perceived

injuries inflicted while Magwood served his sentence in that jail.  Magwood was

convicted and sentenced to death.  On federal habeas review, the district court found

---

[219] As will be explained *infra*, in the discussion of Claim "R," the Rule 32 trial court's consideration of petitioner's claim of mental retardation is another matter altogether.

that the state court had erroneously rejected Magwood's mitigating mental health

evidence.  When upholding the district court's decision, the Eleventh Circuit wrote:

> After reviewing the psychiatric evidence that was before the state court, we must conclude that the state court's rejection of the two mental condition mitigating factors is not fairly supported by the record and that, as such, Magwood was sentenced to death without proper attention to the capital sentencing standards required by the Constitution.   The three members of the court-appointed lunacy commission reported on August 16, 1979, that Magwood was presently insane and probably was insane on the date of Sheriff Grantham's murder.   As a result of this report, Magwood was committed to Searcy Hospital for an eight-month course of treatment that required the use of powerful antipsychotic drugs.  Dr. Rudder expanded upon the commission's findings in his deposition and repeated his conclusion that Magwood was insane on March 1, 1979.  Dr. McKeown, a court-appointed psychologist, concluded that Magwood was not insane on March 1, but that he suffered from paranoid schizphrenia on that date.  Dr. Cooper and Dr. Crook both believed that Magwood was not insane at the time of their June 6, 1979, examination, but neither physician expressed an opinion about Magwood's state of mind on the day of the crime.  Thus, four experts ascertained that Magwood suffered from some form of serious mental disorder on the date of Sheriff Grantham's murder and none testified that Magwood was free from mental illness on that date.

> We find this evidence is more than sufficient to overcome the presumption of correctness accorded the state court's findings by 28 U.S.C. § 2254(d) and *Sumner v. Mata*, 449 U.S. 539, 101 S. Ct. 764, 66 L.Ed.2d 722 (1981).   The record clearly demonstrates that Magwood killed Sheriff Grantham "under the influence of extreme mental or emotional disturbance," Ala.Code § 13-11- 7(2), and that on March 1, 1979, Magwood's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired," Ala.Code § 13-11-7(6).

*Magwood v. Smith*, 791 F.2d 1438, 1449-50 (11th Cir. 1986).  In other words, the *Magwood* trial court's factual findings were not entitled to a presumption of correctness because *all* mental health experts agreed that Magwood suffered from some type of mental illness on the date of the crime.

On the other hand, when expert testimony concerning mental health issues is in conflict, the Eleventh Circuit has not disturbed the presumption of correctness that attaches to a state court's factual findings.  *See*, *e.g.*, *Johnson v. Dugger*, 932 F.2d 1360, 1367-68 (11th Cir. 1991) (distinguishing *Magwood* because "the state introduced substantial testimony by two psychiatrists rebutting the defense's claim that Johnson suffered from PTSD") (quoting *Johnson v. Wainwright*, 778 F.2d 623, 631-32 (11th Cir. 1985));  *Goode v. Wainwright*, 704 F.2d 593, 603 n.11 (11th Cir.) (rejecting a habeas petitioner's challenge to the state trial court's failure to find that his mental deficiencies were mitigating factors because "[t]he evidence from the four psychiatrists was in conflict, and we cannot say that the judge's findings are not fairly supported by the record") (citations omitted), *rev'd on other grounds*, 464 U.S. 78 (1983).

Because the mental health evidence presented at the trial of the present case was in conflict, this court cannot say that the trial court's factual determination that no mitigating circumstances relevant to petitioner's mental health was established by the evidence is fundamentally erroneous.

201

Thus, this court ultimately reaches the same conclusion as the Eleventh Circuit

in *Atkins v. Singletary*, 965 F.2d 952 (11th Cir. 1992):

> [Petitioner's] argument that the trial judge erred by rejecting offered
> mitigating circumstances is without merit.  We have written before that,
> once we see that a full hearing has been held in which the defense counsel
> is given a fair opportunity to present mitigating evidence, our review
> becomes highly deferential.  *See*, *e.g.*, *Palmes v. Wainwright*, 725 F.2d
> 1511, 1523 (11th Cir. 1984).  Trial court's findings on mitigating factors
> are presumed to be correct, *see*, *e.g.*, *Magwood v. Smith*, 791 F.2d 1438,
> 1450 (11th Cir. 1986), and will be upheld if they are supported by the
> record. *See*, *e.g.*, 28 U.S.C. § 2254(d).  Here, the record supports the trial
> judge's findings on mitigating circumstances.
>
> Although [petitioner] argues that the trial judge did not *consider*
> non-statutory factors, it is more correct to say that the trial judge did not
> *accept* — that is, give much weight to — [petitioner's] nonstatutory
> mitigating factors.  Acceptance of nonstatutory mitigating factors is not
> constitutionally required; the Constitution only requires that the sentencer
> *consider* the factors.  *Blystone v. Pennsylvania*, 494 U.S. 299, 308, 110 S.
> Ct. 1078, 1084, 108 L. Ed. 2d 255 (1990).  Our review of the record and
> of the trial judge's order convinces us that the trial judge fully considered
> all the supposedly mitigating factors offered by [petitioner] but, in the
> light of the other evidence presented by the state, refused to accept most
> of those factors.

*Atkins*, 965 F.2d at 962 (emphasis in original).

Alternatively, and to the extent petitioner's claim can be construed as arguing

that the trial court concluded that the five, allegedly non-statutory, mitigating

circumstances asserted in this court were, in fact, not "mitigating," a similar argument

was made by another habeas petitioner, but rejected by the Eleventh Circuit, in *Schwab*

*v. Crosby*, 451 F.3d 1308 (11th Cir. 2006).

202

This claim also appears to attack the trial court's conclusions that some facts or circumstances were not mitigating. In that respect, it runs counter to a number of decisions recognizing that while sentencing courts may not refuse to consider evidence offered in mitigation, they need not decide that the facts established by that evidence have mitigating force in the context of the case. The Constitution requires that the sentencer be allowed to consider and give effect to evidence offered in mitigation, but it does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight.

*Id.* at 1329-30 (emphasis in original) (citations omitted).

For all of the reasons discussed above, this aspect of petitioner's twelfth claim ("L") is denied.

**3**.    *Counsel's failure to "properly appeal"*

Petitioner contends that the performance of his appellate attorneys was objectively deficient because they "failed to properly appeal" the trial court's determination that no statutory or non-statutory mitigating circumstances had been established by the evidence;[220] and, "[g]iven the overwhelming abundance of mitigating evidence, there is a reasonable probability that Mr. Thomas's conviction would have been reversed on appeal."[221]

Petitioner correctly asserts that his attorneys did not raise the trial court's failure to find any mitigating circumstances as error on the first step of direct appeal, to the

---

[220] Doc. no. 1 (Petition) ¶ 224.

[221] *Id.* ¶ 225 (citing *Hadley v. State*, 575 So. 2d 145 (Ala. Crim. App. 1990)).

Alabama Court of Criminal Appeals.  Nevertheless, as required by Alabama Code §

13A-5-53,[222] that Court scoured the record for the purpose of determining whether the

trial court's factual-findings concerning aggravating and mitigating circumstances were

supported by the evidence, and reached the following conclusions.

> This court is required by § 13A-5-53, Code of Alabama 1975, to review the propriety of the appellant's death sentence and to examine the record for any errors adversely affecting his conviction.  We have thoroughly reviewed this record and find no error adversely affecting this appellant's rights.  *See Beck v. State*, 396 So. 2d 645 (Ala. 1980); Rule 45A, A.R.A.P.

> The trial court found the existence of two aggravating circumstances in this case: (1) "The capital offense was committed while the defendant was engaged in the act of burglary in the first degree" (§ 13A-5-49(4)) and (2) "The capital offense was especially heinous, atrocious and cruel compared to other capital offenses." (§ 13A-5-49(8)).

> As stated by the trial court in the sentencing order (which is attached to this opinion as Appendix A), the first aggravating circumstance is established by the jury's verdict and is supported by the evidence in this case.  The second aggravating circumstance is clearly supported by the facts included in this record.  The appellant broke into the victim's home during the early morning hours and attacked this eighty-two year old victim while she slept in her bed.  The victim's body

---

[222] This statute requires the State's intermediate Court of Criminal Appeals to, among other things, review the case to determine "whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence, and whether death was the proper sentence in the case." Ala. Code § 13A-5-53(a).  The next subsection states that, when "determining whether death was the proper sentence in the case the Alabama Court of Criminal Appeals, subject to review by the Alabama Supreme Court, shall determine . . . [w]hether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; . . ." *Id.* § 13A-5-53(b)(2); *see also id.* § 13A-5-53(c) ("The Court of Criminal Appeals shall explicitly address each of the three questions specified in subsection (b) of this section in every case it reviews in which a sentence of death has been imposed.").

was mutilated especially in the area of her vagina and rectum. She died from suffocation as a result of an object being placed in her mouth. After the victim's death, her home was ransacked and then set on fire. These facts convince this court that this capital offense was especially heinous, atrocious and cruel. *See Grayson v. State*, 479 So. 2d 69 (Ala. Crim. App.1984), *aff'd*, *Ex parte Grayson*, 479 So. 2d 76 (Ala. 1985),*cert. denied*, 474 U.S. 865, 106 S. Ct. 189, 88 L. Ed. 2d 157 (1985); *Kennedy v. State*, 472 So. 2d 1092 (Ala. Crim. App. 1984), *aff'd*, *Ex parte Kennedy*, 472 So. 2d 1106 (Ala. 1985), *cert. denied*, 474 U.S. 975, 106 S. Ct. 340, 88 L. Ed. 2d 325 (1985).

The trial court did not find the existence of any statutory or non-statutory mitigating circumstances *and this finding is also supported by the record*.

We do not find evidence in the record that the appellant's sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor. *This court has also independently weighed the aggravating and mitigating circumstances* and we are convinced that death is the proper sentence in this case.

The judgment of the trial court is due to be, and is hereby, affirmed.

*Thomas v. State*, 539 So. 2d at 396-97 (emphasis added).

Petitioner's appellate attorneys did allege in the petition for writ of *certiorari* filed in the Supreme Court of Alabama that "[t]he trial court erred by examining the mitigating circumstances in a cursory manner during the sentencing phase of the proceedings."[223]

---

[223] C.R. Tab 32, at 12 ("Fifth Issue") (citing *Green v. Georgia*, 442 U.S. 93 (1979), and *Lockett v. Ohio*, *supra*). In their supporting brief, counsel specifically argued that the trial court:

(1)    failed to consider that petitioner's prior convictions were not crimes of violence;

The Alabama Supreme Court granted *certiorari* review, but affirmed the judgment of the Alabama Court of Criminal Appeals, saying:

> Pursuant to Rule 39(c), A. R. App. P., we granted the defendant's petition to review the judgment of the Court of Criminal Appeals affirming his conviction and sentence of death. *Thomas v. State*, 539 So. 2d 375 (Ala. Crim. App. 1988). After carefully and thoroughly considering the record of trial, the Court of Criminal Appeals' opinion, and the briefs and arguments of the parties, we find no basis for reversal of the judgment of the Court of Criminal Appeals. AFFIRMED.

*Ex Parte Thomas*, 539 So. 2d 399, 400 (Ala. 1988) (*per curiam*).

On collateral review, petitioner presented the following claim, both as a substantive claim of trial court error, and, as the basis for his contention that his

---

(2)    accorded too much weight to the state's psychiatrists, and discounted the testimony of petitioner's independent psychiatric experts when considering whether the crime was committed under the influence of an extreme or emotional disturbance;

(3)    did not consider other indications of emotional disturbance, such as the death of petitioner's father just three weeks prior to the crime of conviction;

(4)    did not consider whether petitioner acted under the duress, control, or participation of his brother;

(5)    did not consider that petitioner was borderline mentally retarded, emotionally distressed over the death of his father, and easily influenced by others;

(6)    relied too heavily on the fact that the jury did not accept petitioner's plea of not guilty by reason of mental disease or defect and, consequently, ignored evidence that he did not have the capacity to appreciate the wrongfulness of his acts; and

(7)    failed to consider petitioner's age (24 on the date of the offense) as a mitigating factor, even though it was shown that he was "emotionally disturbed, brain damaged from the use of drugs, borderline retarded, highly intoxicated at the time of the crimes, and ha[d] no prior history of violent behavior."

C.R. Tab 32, at 51-53.

attorneys rendered constitutional ineffective assistance by failing to present the claim

to the trial court and on the first step of direct appeal:

> AA. The trial court failed to consider as nonstatutory mitigating evidence, the following:  (1) that Thomas is mentally retarded; (2) that Thomas was under the influence of drugs and alcohol at the time of the offenses; (3) that Thomas had a pitiable childhood, including a violent and alcoholic father; and (4) that Thomas's brother, Billy, had had some involvement in the offenses and the trial court had knowledge of that involvement.

*Thomas v. State*, 766 So. 2d 860, 963 (Ala. Crim. App. 1998) (italicized emphasis

deleted and footnote omitted).  The Alabama Court of Criminal Appeals found that the

substantive component of this claim was procedurally barred, and that petitioner had

failed to establish he was prejudiced by appellate counsel's failure to present the issue

on the first step of direct appeal.

> The underlying issue . . . is procedurally barred by Rule 32.2(a)(3) because it could have been, but was not, raised before the trial court.  It is also procedurally barred by Rule 32.2(a)(4), with one exception, because it was, in essence presented to, and implicitly addressed by, the Alabama Supreme Court.  (*See* Brief on petition for certiorari review, pp. 51-53, where Thomas alleged that the trial court failed to consider the following:  Thomas's borderline mental retardation; his high degree of intoxication at the time of the crimes; the involvement of his brother Billy; his mental instability and indications of emotional disturbance; his brain damage from drug use;  his lack of any history of violent behavior; his age; and his being easily influenced.)  The only one not specifically mentioned in the brief to the Supreme Court was the trial court's alleged failure to consider Thomas's pitiable childhood, including a violent and alcoholic father.  Our consideration of this subpart is procedurally barred by Rule 32.2(a)(5) because it could have been, but was not, raised on appeal.

In regard to the question whether trial counsel were ineffective in failing to present the underlying substantive issue before the trial court, Thomas fails to sustain the *Strickland* burden of establishing prejudice. The Alabama Supreme Court rejected the substantive issue on the merits (with the one noted exception) on the petition for the writ of certiorari. By finding the issue to be without merit, it implicitly found that either the issue had no legal or factual merit or that the error, if any, was harmless. In regard to whether Thomas was prejudiced by the trial court's alleged failure to consider his pitiable childhood, including the influence of his violent and alcoholic father, Thomas has failed to establish that the trial court in fact failed to consider this particular evidence. *See Ex parte Slaton*, 680 So. 2d 909, 924 (Ala.1996) (in regard to the appellant's argument that the trial court's failure to list in its sentencing order all the nonstatutory items he offered in mitigation, including his family background, was indicative of the court's failure to consider all nonstatutory mitigation, the Alabama Supreme Court proclaimed, "There is no requirement that a trial court list in its sentencing order all nonstatutory mitigation offered."), *cert. denied*, 519 U.S. 1079, 117 S. Ct. 742, 136 L. Ed. 2d 680 (1997).  In fact, the judge who presided over the Rule 32 proceedings was the same judge who sentenced Thomas, and he made the specific finding in his order denying Thomas's petition that "the nonstatutory mitigating evidence offered by Thomas was in fact considered."  (C.R. 733.)  Moreover, "[t]rial judges are presumed to follow their own instructions, and they are presumed to know the law and to follow it in making their decisions."  *Ex parte Slaton*, 680 So. 2d at 924.  The trial court instructed the trial jury:

> "Now, a mitigating circumstance does not have to be included in the list that I have read to you in order for you to consider that as a mitigating circumstance. In other words, the mitigating circumstances which you may consider are those enumerated by statute or any that you find exists from the evidence. It may include any aspect of a Defendant's character or his record or any circumstances of the offense that the Defendant has offered as a basis for a sentence of life imprisonment without parole instead of death."

(R. 2005.)

208

Based on the foregoing, we likewise conclude that appellate counsel were not ineffective for failing to argue on appeal that the trial court had failed to consider, as nonstatutory mitigating evidence, Thomas's pitiable childhood.

*Thomas v. State*, 766 So. 2d at 963-64 (footnotes omitted).[224]

Petitioner has failed to show that the state courts' adjudication of his claim of ineffective assistance of counsel resulted in a decision that was either contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). He also has not shown that the state courts' decisions were based on an unreasonable determination of the facts in light of the evidence presented in the state court. *Id*. § 2254(d)(2).[225]

---

[224] Petitioner makes two assertions concerning the reliance of the Alabama Court of Criminal Appeals upon the Alabama Supreme Court's brief, one-paragraph, *per curiam* opinion. First, he argues that it simply affirmed his "conviction," but "never addressed" the merits of his claim that the trial court failed to consider "uncontroverted" evidence of statutory and non-statutory mitigating circumstances when sentencing him to death. Doc. no. 1 (Petition), at 49 n.18. Based upon that contention, petitioner then argues that the Court of Criminal Appeals was simply "wrong" when "asserting" in its opinion on collateral review that "the Alabama Supreme Court somehow 'implicitly addressed'" his claim that the trial court judge "examined the relevant mitigating circumstances in a mechanical, cursory and rote manner." C.R. Tab 32, at 51 (citing R. 2037-40).

Based upon the language of the Alabama Supreme Court's opinion, however — *i.e.*, "After carefully and thoroughly considering . . . the briefs and arguments of the parties" — this court must accept that the state's highest court *did consider* the issues presented in petitioner's *certiorari* brief, but found "no basis for reversal of the judgment of the Court of Criminal Appeals." *Ex Parte Thomas*, 539 So. 2d at 400.

[225] Although the substantive claim concerning petitioner's pitiable childhood and alcoholic father as a mitigating circumstance is procedurally defaulted, other evidence offered at trial has some bearing on the performance and prejudice prongs of *Strickland*. Specifically, while it is true that petitioner did have an extremely difficult childhood with his biological family and a violent, alcoholic father, the evidence also showed that petitioner was removed from his childhood home at the age of 12, placed in foster homes with reasonable success, and monitored extensively by the Department of Human Resources. Therefore, petitioner cannot show manifest error in the trial

Therefore, this final aspect of petitioner's twelfth claim ("L") also is denied.

**M**.   *Denial of Competency Hearing*

Petitioner contends, for the first time in this petition for writ of habeas corpus, that the state court proceeding that has consistently been referred to as "a competency hearing" in all prior stages of this case was, in fact, an *Ake* hearing;[226] and, therefore, that he "never had a competency hearing."[227]   These contentions were not raised in the trial court, on direct appeal, in petitioner's Rule 32 petition, or on collateral appeal from the trial court's denial of his Rule 32 petition.   Not surprisingly, therefore, respondent contends that this aspect of petitioner's thirteenth claim is procedurally

---

court's refusal to find these circumstances were mitigating, and certainly cannot show the trial court failed to consider these circumstances.   Even if this court were to assume that the state trial judge was incorrect by failing to find petitioner's pitiable childhood to be a mitigating circumstance, there is no indication whatsoever that the weight of that circumstance, had it been properly found, would have convinced the trial judge to determine that the aggravating circumstances did not outweigh it.   Thus, even if counsel were objectively deficient for failing to raise this issue on *certiorari* review, petitioner cannot show a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different, *i.e.* the trial court would have sentenced him to life without parole, rather than death.

[226] *See* doc. no. 1 (Petition) ¶ 229 (alleging that "defense counsel moved to obtain funding to retain a psychiatrist under the newly decided *Ake v. Oklahoma*, 470 U.S. 68 (1985) opinion" on Nov. 18, 1985), and ¶230 (asserting that the trial court "conducted a hearing on the *Ake* motion" on Nov. 22, 1985).

[227] *Id*. at 50 (heading); *see also id*. ¶¶ 226-37; doc. no. 35 (Petitioner's Brief), at 63-70.

defaulted,[228] although the issue actually is one of petitioner's failure to "exhaust" state remedies.  *See* 28 U.S.C. § 2254(b)(1)(A).[229]

The "exhaustion-of-state-remedies doctrine," now codified in the federal habeas statute, *see id*. §§ 2254(b) and (c), requires a state prisoner to present the state courts with the substance of a federal habeas corpus claim, in order to allow those courts a fair opportunity to apply controlling legal principles to the facts bearing upon the petitioner's constitutional claim.  *See*, *e.g.*, *Picard v. Connor*, 404 U.S. 270, 275-78 (1971).  Petitioner's failure to raise the present claim until now means that he "deprived the state courts of 'the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding.'"  *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (quoting *Picard*, 404 U.S. at 276).

Although unexhausted, the substantive component of this claim is, nonetheless, "procedurally defaulted, even absent a state court determination to that effect, [because]

---

[228] *See* doc. no. 17 (Respondent's Answer), at 94-95.  Petitioner did not address this defense in his reply brief.

[229] 28 U.S.C. § 2254(b)(1)(A) provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State; . . ." As the Eleventh Circuit observed in *McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005), the state's failure to raise the explicit issue of "exhaustion does not constitute a waiver under AEDPA, which mandates that '[a] State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.'"  *Id*. at 1304 (quoting 28 U.S.C. § 2254(b)(3)).  *See also Dill v. Holt*, 371 F.3d 1301, 1302 n.1 (11th Cir. 2004) (stating that AEDPA requires a court to address exhaustion when it is not expressly waived by the state).

it is clear from state law that any future attempts at exhaustion would be futile." *Bailey*, 172 F.3d at 1305 (citing *Snowden v. Singletary*, 135 F.3d 732, 737(11th Cir. 1998)); *see also* 28 U.S.C. § 2254(b)(1)(B)(ii).[230]  If petitioner attempted to raise this claim in a second Rule 32 petition in the state system, it would be rejected on numerous grounds, including that it is:  (1) an impermissible successive petition, filed outside the statute of limitations applicable to postconviction petitions; and (2) a claim that petitioner was required to, but did not, raise at trial, on appeal, or during collateral proceedings.  *See* Ala. R. Crim. P. 32.2(a)(3), (a)(5), (b), (c), and (d).

For these reasons, this court treats the substantive component of this claim as procedurally defaulted, because it would be barred under independent and adequate state procedural rules.  *See*, *e.g.*, *McNair v. Campbell*, 416 F.3d 1291, 1305 (11th Cir. 2005) ("It is well established that when a petitioner has failed to exhaust his claim by failing to fairly present it to the state courts and the state court remedy is no longer available, the failure also constitutes a procedural bar.") (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).[231]

---

[230] 28 U.S.C. § 2254(b)(1)(B)(ii) provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . circumstances exist that render such process ineffective to protect the rights of the applicant."

[231] The Eleventh Circuit emphasized that its holding in *McNair*, which raised an issue of first impression in this Circuit, applied

> *only* to a procedural bar *that arises out of a failure to exhaust state remedies*. Such

1.    *Ineffectiveness of counsel for failing to request a competency hearing*

Petitioner also claims that "trial counsel [were] ineffective for failing to request a competency hearing."[232]   This claim, like the underlying substantive contention, is raised for the first time in the present petition.   Accordingly, respondent contends that it also is procedurally defaulted.[233]   Petitioner does not speak to this defense in his reply brief.   Thus, for the same reasons addressed in the preceding section, this court finds the contention to be procedurally defaulted.   Alabama law is clear that a successive petition "shall be denied unless the petitioner shows both that good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice."   Ala. R. Crim. P. 32.2(b).   Petitioner has shown no cause why his ineffective assistance of counsel claim, and its substantive counterpart, could not have been raised in his Rule 32 petition.   Further, if brought at

---

a procedural bar is to be distinguished from one that arises, not because of a failure to exhaust, but rather because the state court will not hear the claim due to a state procedural bar.   For example, most states require contemporaneous objections and often decline to entertain a claim because of a failure to object.   Such a claim may well be fully exhausted, but nevertheless procedurally barred in federal court because of the State's invocation of its bar for failure to object.   In such a case, the procedural bar in federal court has nothing to do with exhaustion, and therefore § 2254(b)(3) would not apply.

*McNair v. Campbell*, 416 F.3d at 1306 (emphasis in original) (footnote omitted).

[232] Doc. no. 1 (Petition) ¶ 238; *see also id.* ¶¶ 239-41.

[233] *See* doc. no. 17 (Respondent's Answer), at 96-97.

213

the present time in state court, the two-year statute of limitations (dated from the issuance of the mandate in the direct appeal of petitioner's conviction) would bar these unexhausted claims.  *See* Ala. R. Crim. P. 32.2(c)(1).[234]

**N.**    *Ineffective Assistance of Counsel for Failing to Investigate and Present Evidence of Organic Brain Damage*

Petitioner's fourteenth claim — that trial counsel were ineffective for failing to investigate and present evidence to the jury that petitioner "was not only mentally retarded[,] but suffered from organic brain damage and [an] impulse control disorder . . . at the time of the crimes"[235] — was raised in his Rule 32 petition, but rejected by both the state trial and appellate courts.  On collateral appeal, the Court of Criminal Appeals engaged in an exhaustive review of the testimony presented on the subjects addressed by this claim, both during trial and at the Rule 32 hearing, *see Thomas v. State*, 766 So. 2d 860, 904-14 (Ala. Crim. App. 1998), and concluded that petitioner had

---

[234] Undoubtedly, out of an abundance of caution, respondent addresses the possibility that petitioner may have been contending that "his attorneys were ineffective *at the competency hearing* or failed to object to the adequacy of the competency hearing." *Id*. at 97.  If the present claim can be so construed, it was *exhaustively* addressed by the Alabama Court of Criminal Appeals on collateral review, and rejected. *See Thomas v. State*, 766 So. 2d at 879-86.  Petitioner has not alleged, and has not shown, that the state appellate court's denial of this claim resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law, nor has he shown that the state court's decision was based upon an unreasonable determination of the facts in light of the evidence presented.  *See* 28 U.S.C. § 2254(d).

[235] Doc. no. 1 (Petition) ¶ 262; *see generally id*. ¶¶ 242-62.

214

failed to establish the prejudice prong of *Strickland* because of (1) the credibility problems presented by Thomas's two Rule 32 experts; (2) Thomas's failure, even with his "handpicked" experts, to establish any effect of organic brain syndrome that would have excused the crimes; (3) the fact that any further evidence of Thomas's impulsiveness and organic brain syndrome would have been cumulative of the evidence introduced at trial; and (4) the state's evidence that Thomas was not suffering from a mental disease or defect at the time of the crimes was strong.

*Id.* at 914.

For organic brain damage — sometimes referred to in the record as "organic mental illness," "organic brain syndrome," or "organic brain disorder" — to have constituted a feasible mental state defense, petitioner had to show that the disorder caused him to be legally insane at the time of the offense. Neither of the two expert witnesses who testified on his behalf at the Rule 32 hearing provided any practical testimony regarding what effect, if any, petitioner's alleged organic brain condition had upon him at the time of the crime.

While the two clinical psychologists who testified for the defense at trial (Dr. Charles Brown and Dr. James Crowder) may not have precisely pronounced a specific diagnosis of organic brain damage (regardless of whether it was drug-induced, hereditary, or the result of traumatic injury), or schizophrenia, or an impulse control disorder, or some combination of the above, the state appellate court concluded that those witnesses did provide plain-spoken explanations of: each mental defect, and its etiology and effects; preliminary psychological test results; and petitioner's history,

state-of-mind, and treatment more than nine months before the murder.   These

witnesses also compared that evidence to petitioner's life circumstances and alcohol

and drug consumption for several weeks before the night of the murder.   That

comparison demonstrated — more powerfully than the testimony of the experts who

testified for the defense at the Rule 32 hearing — that petitioner was either

schizophrenic, or suffering from some organic brain anomaly, at the time of the

offense.

>    We find additional reason to hold that Thomas failed to establish
> fundamental unfairness or unreliability from defense counsel's alleged
> failure to further investigate Thomas's alleged organic brain damage and
> impulse control disorder and to put that evidence before the jury:  the jury
> actually heard more testimony of the effects on organic brain syndrome
> than was presented at the Rule 32 hearing, and the jury also heard
> testimony that Thomas was impulsive.   The record contains repeated
> discussion of organic brain syndrome and numerous references to
> Thomas's being impulsive.

*Thomas v. State*, 766 So. 2d 908.   In short, the state appellate court concluded that

petitioner's trial experts supplied adequate ammunition against the opinions of the

State's experts.

In the face of battling experts, however, it must not be forgotten that petitioner

himself testified at trial.   The jury therefore had before it petitioner's rendition of

events, which included his testimony that — even though he had no memory of

harming Mrs. McClemore — he *did remember* walking into her home, reading the

Bible to her (allegedly because he believed her to be dead), and leaving her home.  All of these events occurred within close temporal proximity of one another.  In short, the jury determined petitioner's mental blackout defense was not credible.  The lack of credibility regarding petitioner's story was also supported by the manner in which the crime took place, and other non-expert evidence presented at trial.

Ultimately, however, it must be remembered that the factual conclusions of the state appellate court are presumed to be correct, and petitioner has not rebutted that presumption with clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1). Moreover, petitioner has failed to demonstrate that the state courts' adjudication of this claim resulted in a decision that was based on an unreasonable determination of the facts, in light of the evidence presented in the state court proceedings, both at trial and the Rule 32 evidentiary hearing.  *See* 28 U.S.C. § 2254(d)(2).  Finally, petitioner has not shown that the state courts' adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).  Therefore, this claim is due to be denied.

**O**.   *Incompetent Mental Health Expert*

Petitioner next claims that Dr. James Crowder, the clinical psychologist retained by defense counsel to evaluate him in preparation for trial, failed to perform in a

minimally competent manner, as required by *Ake v. Oklahoma*, 470 U.S. 68 (1985).[236]

He alleges that "Dr. Crowder's own diagnosis that there was a possibility that Mr.

Thomas suffered from organic brain damage should have led him to perform additional

testing,"[237] and that "Dr Crowder's failure to follow up on his diagnosis denied Mr.

Thomas access to critical mitigating evidence."[238]

---

[236] *See* doc. no. 1 (Petition) ¶¶ 263-65.

[237] Doc. no. 35 (Petitioner's Brief), at 96.

[238] *Id.*; *see also* doc. no. 1 (Petition) ¶ 265 (same).  Petitioner also complains that Crowder was incompetent because he should "have been able to assist the defense in highlighting the 'remarkable lack of consistency' in the evaluations by the State's experts, Drs. Huggins and Hardin." *Id.* (citing Rule 32 R. 63).  However, petitioner provides no explanation as to what Dr. Crowder should, or should not, have done in order to undermine the testimony of the State's experts.  It is petitioner's responsibility to provide the factual basis for this contention, and he has failed to do so.  Additionally, the Alabama Court of Criminal Appeals addressed this contention and rejected it, saying:

> We specifically reject Thomas's argument that Dr. Crowder would have "been able to assist the defense in highlighting the gross deficiencies and flaws in the evaluations conducted by State's experts, Drs. Huggins and Hardin."  (Rule 32 C.R. 557.)  Defense counsel conducted exemplary cross-examination of the state experts. In fact, during cross-examination of Dr. Hardin about the results of a Minnesota Multiphasic Personality Inventory of petitioner, Dr. Hardin admitted that counsel had "outfoxed" him and that "[t]here's a possibility that there was an invalid test and ... not a deliberate fake bad."  (R. 1808.)

*Thomas v. State*, 766 So. 2d at 914.  Petitioner has not shown that the state court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor that the decision was an unreasonable determination of the facts, in light of the evidence presented in state court.  See 28 U.S.C. § 2254(d)(1), (2).

Respondent contends this claim is procedurally defaulted because petitioner failed to raise it at trial or on direct appeal.[239]  The claim, nevertheless, was asserted in petitioner's Rule 32 petition and addressed on collateral appeal by the Alabama Court of Criminal Appeals, which adjudicated it on the merits.  Thus, it is subject to review by this court under 28 U.S.C. § 2254(d).

Even so, petitioner does not make clear whether he contends the state appellate court's adjudication of the claim resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law, or whether the decision was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  In fact, petitioner's entire argument consists of a reference to the Supreme Court's opinion in *Ake*, along with an assertion that "[t]his case is analogous to" the decision of the Florida Supreme Court in *State v. Sireci*, 536 So. 2d 231, 232-33 (Fla. 1988).[240]

---

[239] *See* doc. no. 17 (Respondent's Answer), at 101-02; *see also* doc. no. 73 (Respondent's Brief) at 12 & n.3 (contending that claim "O" was procedurally defaulted "because it was not raised at trial or on appeal").

[240] See doc. no. 35 (Petitioner's Brief), at 96, where petitioner argues that:

In *Sireci*, the defendant claimed that his two court-appointed psychiatrists failed to conduct competent and adequate evaluations of his sanity because they failed to discover that he suffered from organic brain damage.  [536 So. 2d] at 232.  As pointed out by the *Sireci* court, although a subsequent finding of organic brain damage does not necessarily warrant a new sentencing hearing, when an examination has ignored clear indications of either mental retardation or organic brain damage, a new sentencing hearing is mandated.  *Id.*  In *Sireci* [*sic*] [As in *Sireci*], there were known circumstances that should have led the experts to perform additional testing

219

Petitioner's claim therefore fails, because he simply complains that Dr. Crowder did not perform in a minimally competent manner, and cites *Ake v. Oklahoma* as a basis for relief. The Eleventh Circuit has clearly stated that *Ake* applies to "ruling[s] in which the trial court denies [a defendant] due process by violating his right to competent psychiatric assistance." *Clisby v. Jones*, 960 F.2d 925, 934 (11th Cir. 1992). *Ake* provides no support for "an allegation of expert incompetence akin to an ineffectiveness of counsel claim under the Sixth Amendment." *Id.* Accordingly, Claim "O" is due to be denied.

**P**.   *Ineffective Assistance of Counsel During the Penalty and Sentencing Phases*

This claim has two parts. Petitioner first alleges that trial counsel rendered ineffective assistance during the penalty phase by failing to call any members of his family to testify on his behalf.[241]

> Even though Mr. Thomas's mother and sister testified during the guilt phase, they did not focus their testimony on mitigation. As shown

---

to determine whether Mr. Thomas suffered from organic brain damage. Here, Dr. Crowder's own diagnois that there was a possibility that Mr. Thomas suffered from organic brain damage should have led him to perform additional testing. (R. 1632) Yet, despite his findings, no further investigation or examination was recommended or performed. The *Sireci* court held that the failure to order additional testing based on the known circumstances "deprived the defendant of due process by denying him the opportunity through an appropriate psychiatric examination to develop factors in mitigation of the imposition of the death penalty." *Id.* at 233. *Cf. Mason v. State*, 489 So. 2d 734, 736-37 (Fla. 1986) (remand for evidentiary hearing on competency where great risk existed that determinations of competency neglected history indicative of organic brain damage).

[241] *See* doc. no. 1 (Petition) ¶ 267.

in the Rule 32 hearing, each of these witnesses could have described to the jury, in excruciating detail Mr. Thomas' tragic and afflicted life, and his prolonged history of mental retardation. They could have instilled genuine emotion on the jury by providing them with a sensitive and humane portrayal of Mr. Thomas' good character. Indeed, they could have cried, added a human touch, and begged the jury to spare Mr. Thomas' life. This type of testimony, which was not admissible nor appropriate during the guilt phase, could have persuaded the jury to sentence Mr. Thomas to life in prison without parole.[242]

On collateral appeal, the Alabama Court of Criminal Appeals exhaustively discussed the evidence of petitioner's background that was presented during the guilt-innocence and penalty phases of trial, and compared that evidence to the evidence presented during the post-conviction, Rule 32 hearing. *See Thomas v. State*, 766 So. 2d at 966-74. After carefully reviewing the factual findings of that court — findings which, under § 2254(e)(1), are presumed to be correct — this court concludes that petitioner has not rebutted that presumption. The testimony presented during the guilt-innocence and penalty phases of trial painted a detailed and vivid picture of petitioner's tragic life. In contrast, as the state appellate court observed, the evidence adduced during the Rule 32 hearing would have added very little color or texture to that portrait.

Considering all the evidence introduced in the guilt and penalty phases of Thomas's trial, we fail to see how the evidence that Thomas argues should have been elicited at the penalty phase would have had any impact. It certainly would not have changed the outcome, and it did not render the sentencing fundamentally unfair or unreliable. The proposed evidence would either have been cumulative to the evidence produced at

---

[242] *Id.* ¶ 268.

trial or would have been so contradicted by other evidence as to have been rendered useless.  For example, Thomas claims that evidence should have been elicited that he had created no disciplinary problems.  Not only was there overwhelming evidence to the contrary, but having a family member testify as to that would not only have cast doubt on the credibility of the person testifying, but could have also cast doubt on the testimony of favorable witnesses such as Mrs. Bynum [*i.e.*, Carol Bynum, the social worker who had managed petitioner's foster-care placements for many years].

In regard to Thomas's allegation that trial counsel was ineffective in failing to call any family member to testify, we point out that two family members and members of two foster families testified at the guilt-phase proceeding and a member of yet another foster home testified at the penalty-phase proceeding.  We disagree with Thomas that the jury was left with the impression, from the absence of family testimony at the penalty phase of the trial, that family members had nothing positive to say about him and that they did not care about him.  No implication — explicit or implicit — was made to the jury that family members did not testify because they had rejected Thomas.  *Compare Harris v. Dugger*, 874 F.2d at 763.  The prosecutor did not make any comment emphasizing the absence of family members as witnesses.  *Compare Cave v. Singletary*, 971 F.2d 1513, 1519 (11th Cir.1992).  Furthermore, in argument in the penalty-phase proceeding, defense counsel stated:

> "I think we all and others [who] did know [Mrs. McLemore] suffer a loss [as] a result of her death, but in considering whether or not this person should be put to death, there's another family. The families that themselves are victims.  They had nothing to do with the crime that was committed in this case.  That's the family of Kenny Thomas. His mother and sisters."

———————

> "In some other place [while Thomas is being executed, if so sentenced], a loving mother, an old woman who has carried life on her shoulders, will wail in sorrow and grief.  Sisters will cry and gnash their teeth and ask why did it have to happen.  Brothers will bite their lips and attempt to muffle their anguish and their sorrow,

> but it will be there.  Kenneth Glenn Thomas, the little baby [who] was born on the cold rainy day down at the old red brick hospital who had the open innocent blue eyes and the innocent heart will be dead."

(R. 1937-38, 1988-89.)

Based on the foregoing, we reject Thomas's claims of ineffective trial counsel in the penalty phase.

*Thomas v. State*, 766 So. 2d at 973-74.

This court has reviewed the trial record and the testimony elicited from petitioner's relatives during the Rule 32 evidentiary hearing.  Contrary to petitioner's assertion, the testimony given by his mother and two sisters at the Rule 32 hearing is brief, limited in scope, and lacks emotionally-compelling content,[243] especially when compared to the voluminous amount of trial testimony designed to humanize and illustrate petitioner's life, mental problems, and personality.  Petitioner has not demonstrated a reasonable probability that the jury would have recommended, or that the trial judge would have sentenced him to, life without parole based on the testimony presented at the Rule 32 hearing.

In the second part of this claim, petitioner asserts that trial counsel also were ineffective for failing to call any mental health experts to testify during the penalty

---

[243] *See* Rule 32 R. at 82-106.

phase of trial.[244]  Of course, such experts did testify during the guilt-innocence phase, but petitioner argues that their testimony was far more "limited and constrained" than it would have been in the "unencumbered" penalty phase, when evidentiary rules are more lenient.[245]  Finally, petitioner alleges his counsel should have asked the jury to recommend consecutive sentences of life without parole.[246]

These aspects of petitioner's sixteenth claim ("P") are without merit.  His conclusory assertions that mental health experts "could have testified to hearsay evidence surrounding [his] background and family life,"[247] or could have presented "a narrative rendition of [his] mental health,"[248] with no identifying content, completely lack a factual basis, and they certainly do not satisfy the stringent pleading requirements for a habeas petition.  *See* Rule 2(c)(2), *Rules Governing Section 2254 Cases in the United States District Courts*.  It also is extremely unlikely that any expert would have been allowed to engage in a narrative disquisition without objection from the prosecution.  Moreover, petitioner had the opportunity to present hearsay evidence, and to illustrate the beneficial effects of expert narrative testimony, at the Rule 32

---

[244] *See* doc. no. 1 (Petition) ¶¶ 270-74.

[245] *Id.* ¶ 271.

[246] *Id.* ¶ 273.

[247] *Id.* ¶ 271.

[248] *Id.* ¶ 272.

hearing, but failed to do so.  Petitioner also has failed to demonstrate a reasonable probability that the jury would have recommended consecutive sentences of life without parole, even if that option had been presented to them.  Ultimately, however, when a habeas petitioner's counsel is alleged to have rendered deficient performance during the sentencing phase of a capital trial,

> the relevant question for determining prejudice is whether the entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally, raised a reasonable probability that the result of the sentencing proceeding would have been different if competent counsel had presented and explained the significance of all of the available evidence.

*Fortenberry v. Haley*, 297 F.3d 1213, 1229 (11th Cir. 2002) (citing *Williams v. Taylor*, 529 U.S. 362, 399 (2000)).  Petitioner has made no such demonstration.

The Alabama Court of Criminal Appeals conducted a thorough examination of these claims, and petitioner has failed to show that its findings are either not entitled to a § 2254(e)(1) presumption of correctness, or were an unreasonable determination of the facts in light of the evidence before that court.  *See* 28 U.S.C. § 2254(d)(2).  Petitioner also has failed to demonstrate that the state appellate court's adjudication of this claim was either contrary to, or an unreasonable application of, clearly established federal law.  *Id*. § 2254(d)(1).  Consequently, the claim is due to be denied.

**Q**.    *Erroneous Admission of Oral Statements*

225

Petitioner alleges the trial court committed error of constitutional proportions when finding that: he had the mental capacity to understand a recitation of his *Miranda* rights and warnings when questioned by police on the morning of (and during the day following) the offense; those rights were properly explained to him; and that he knowingly and intelligently waived his rights.[249]  He also alleges that his appellate counsel were ineffective for failing to cite these issues as error on direct appeal.

Respondent contends this claim is procedurally defaulted, because petitioner failed to raise it on direct appeal as required by Alabama Rule of Criminal Procedure 32.2(a)(5).[250]  These same claims were asserted in petitioner's Rule 32 petition, however, and they were addressed on the merits during the subsequent collateral appeal.  *See Thomas v. State*, 766 So. 2d at 923-25.  Those portions of the state appellate court's opinion addressing these issues read as follows:

> Q.  *The trial court allegedly erroneously admitted into evidence Thomas's oral statements to the police in violation of Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).
>
> Thomas argues that *Miranda* was violated because, he says, the prosecution allegedly relied on his statement that he knew what his *Miranda* rights were and did not elicit testimony as to whether Thomas was properly advised of each of the *Miranda* rights, as to whether Thomas had the mental capacity to understood those rights, and as to whether he knowingly and intelligently waived those rights.

---

[249] *See* doc. no. 1 (Petition) ¶¶ 275-62.

[250] See doc. no. 17 (Respondent's Answer) at 105-106.

Chief Richard Faulk testified before the jury that, at the first interview, he read to Thomas the following from a standard waiver of rights form:

> "I've been advised that I must understand my rights before I answer any questions.  I have the right to remain silent.  Anything I say will be used against me in court.  I have the right to talk to a lawyer for advice before I answer any questions and to have him with me during questioning.  I have the same right to the advice and presence of a lawyer even if I cannot afford one.  The police cannot furnish me with a lawyer, but one will be appointed for me, if I wish, by the Court.  If I wish to answer questions now, without a lawyer, I also have a right to stop answering questions at any time until I talk to a lawyer.  Waiver: the above having been read to me or by me, I understand what my rights are.  I am willing to answer questions and make a statement.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me, and no pressure of any kind has been used against me."

(R. 1381-82.) Chief Faulk also testified that Thomas signed the waiver, that he appeared to understand his rights, and that he did not appear to be intoxicated at that time.  In regard to their second meeting, Chief Faulk testified that he again informed Thomas of each of his rights, that they went over the waiver again, and that although Thomas signed that waiver, Thomas stated that he wanted to postpone any conversation until the following morning.  In regard to the third meeting, which took place at Thomas's request 30 hours after he was jailed (on the morning of December 16), Faulk testified that when he started to read Thomas his rights from the rights and waiver form, Thomas interrupted and said that it was not necessary to repeat his rights because he knew the form; that he then gave Thomas the form to read himself; that Thomas looked at the form as if he were reading it; and that Thomas signed the waiver.  In the hearing on Thomas's motion to suppress, Faulk further testified that, on this third interview, Thomas appeared to understand his rights.

In addition to Faulk's testimony, several witnesses testified in the suppression hearing in regard to Thomas's mental capacity to understand

his rights and to knowingly waive them.  The only testimony favorable to Thomas was to the effect that on an IQ test administered in 1968, Thomas scored 56; that an adult scoring within the IQ range of 52 to 68 has an intellectual level comparable to that of an average eight- to eleven-year-old child; that Thomas was considered mildly or educably mentally retarded; and that he had been in special education classes while he was attending school.  However, the evidence at the suppression hearing further shows that Thomas can read and write, that he graduated from high school (with a special diploma), and that his IQ had improved since the administration of the 1968 test.

The underlying substantive issue of the admissibility of Thomas's two statements is presented in Issue XVII. (Brief, pp. 65-67.)  The circuit court correctly ruled that this issue is precluded because it was addressed at trial, Rule 32.2(a)(2).  (Rule 32 C.R. 727.)  In his motion to suppress, defense counsel asserted that Thomas had not intelligently and knowingly waived his right to counsel.  (C.R. 185-86.)  Moreover, the trial court addressed this precise issue by ruling that the constitutional safeguards of *Miranda* had been followed.  The trial court also made specific factual findings supporting its conclusion that Thomas had knowingly and intelligently waived his rights and made a statement.  *See* R. 1373-74, quoted in Part I, *supra*.

The issue whether trial counsel were ineffective for failing to present the underlying substantive issue is without merit.  As noted above, the trial court addressed the issue.

We further find that the issue whether appellate counsel were ineffective in failing to raise the underlying substantive issue, as asserted in Issue IV, is without merit because the underlying substantive issue is without merit.  The situation as portrayed by Thomas in his brief is inaccurate: in satisfying the requirements of *Miranda*, the prosecution did not rely solely on the blanket statement that Thomas knew his *Miranda* rights.  Rather the prosecution met its burden of "spell[ing] out with clarity and precision the specific *Miranda* warnings the police gave the defendant."  *Ex parte Johnson*, 620 So. 2d 709, 711 (Ala. 1993) (where, unlike the circumstances before us, the prosecution relied solely on the officer's general, conclusory testimony that he had informed the defendant

of his *Miranda* rights), *cert. denied*, 510 U.S. 905, 114 S. Ct. 285, 126 L. Ed. 2d 235 (1993).

> "[O]nce *Miranda* warnings have been given and a waiver made, a failure to repeat the warnings before a subsequent interrogation will not automatically preclude the admission of an inculpatory response. Whether the *Miranda* warnings must be repeated depends on the facts of each individual case, with the lapse of time and the events which occur between interrogation being relevant factors to consider."

*Hollander v. State*, 418 So. 2d 970, 972 (Ala. Cr. App. 1982) (citations omitted; *quoted in Nabors v. State*, 649 So. 2d 1327 (Ala. Cr. App. 1994)). Under the circumstances presented here, it was reasonable for the police officer to rely on Thomas's assertion that he did not need to have the *Miranda* warnings repeated. We find that a third review of Thomas's *Miranda* rights was unnecessary. In addition, we find that evidence before the trial court sufficiently supports its finding that Thomas had the mental capacity to understand his rights and that he knowingly and intelligently waived those rights.

*Thomas v. State*, 766 So. 2d at 923-25.

The findings of fact made by the Rule 32 trial court and intermediate state appellate court on collateral review are entitled to a presumption of correctness, and petitioner has offered no evidence, much less clear and convincing evidence, to overcome that presumption. *See* 28 U.S.C. § 2254(e)(1). The appellate court also engaged in a detailed discussion of *Miranda* and its application to the facts in petitioner's case. Petitioner has not demonstrated that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law, nor an

unreasonable determination of the facts in light of the evidence before the state court. *Id.* § 2254(d).  The substantive component of this claim, therefore, is due to be denied.

### 1.   *Ineffective assistance of counsel*

After reciting his substantive *Miranda* claim, petitioner's discrete claim concerning the alleged ineffective assistance of counsel is contained in one sentence: "Trial counsel was also ineffective for failing to appeal the *Miranda* issue."[251]

Since "habeas corpus review exists only to review errors of constitutional dimension," a habeas petition must meet "heightened pleading requirements." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (citations omitted).  The mere assertion of a ground for relief, without more factual detail, does not satisfy either petitioner's burden of proof under 28 U.S.C. § 2254(e)(2), or the requirements of Rule 2(c) of the *Rules Governing Section 2254 Cases in the United States District Courts* (requiring a petitioner to specify all grounds for relief available to him, state the facts supporting each ground, and state the relief requested).

Additionally, while the substantive claim was not raised by counsel on direct appeal, it is clear from those portions of the opinion of the Alabama Court of Criminal Appeals quoted above that petitioner's claims of ineffective assistance of trial and appellate counsel were addressed and rejected on their merits during *collateral* review.

---

[251] Doc. no. 1, ¶ 280.

230

The Alabama Supreme Court affirmed the decision of the intermediate appellate court addressing, and denying, the merits of the substantive claim. *See Ex parte Thomas*, 766 So. 2d 975 (Ala. 2000). In effect, therefore, petitioner received the appellate review he complains appellate counsel failed to obtain on direct appeal. Accordingly, petitioner cannot establish that he was prejudiced by the allegedly deficient performance of his counsel. This claim is due to be denied.

**R.**   *Petitioner is Mentally Retarded, and His Execution Will Constitute Cruel and Unusual Punishment*

Petitioner's eighteenth claim alleges that he is mentally retarded, and his execution will constitute cruel and unusual punishment in violation of the Eighth Amendment,[252] as made applicable to the states through the Due Process Clause of the Fourteenth Amendment.

**1**.   *Procedural history of this claim*

The trial strategy of petitioner's attorneys "was not to win an acquittal but to save the defendant's life." *Ex parte Thomas*, 766 So. 2d 975, 976 (Ala. 2000). To that end, defense counsel marshaled evidence "to build a case on the issue of mental competency and a defense of not guilty by reason of mental disease or defect." *Thomas v. State*, 766 So. 2d 860, 877 (Ala. Crim. App. 1998). The evidence tended to show

---

[252] *See* doc. no. 1 (Petition) ¶¶ 281-87; *see also* doc. no. 35 (Petitioner's Brief), at 11-17; and doc. no. 74 (Petitioner's Supplemental Brief), at 2-22.

that petitioner was a paranoid schizophrenic who suffered from brain damage that was either "drug induced" or the result of "organic" anomalies,[253] and, mental retardation.[254]

Even so, the issue of petitioner's alleged mental retardation was not clearly elaborated in its present framework, as a violation of the Eighth and Fourteenth Amendments, until the filing of his Rule 32 petition.   Respondent consequently has argued, both in the state courts below and in this court, that the claim was procedurally defaulted.[255]   The Rule 32 court so held, finding the claim to be barred by Alabama Rules of Criminal Procedure 32.2(a)(3) and (a)(5), because it could have been, but was not, raised at trial or on direct appeal.   That court alternatively (and inconsistently) found that the claim *had been* raised and fully litigated at trial and on direct appeal and, thus, post-conviction relief was precluded by Alabama Rules of Criminal Procedure 32.2(a)(2) and (a)(4).[256]   As yet another alternative, the Rule 32 court also held that

---

[253] *See Thomas v. State*, 766 So. 2d at 880 (summarizing the guilt phase testimony of two clinical psychologists employed by the Alabama Department of Corrections, Dr. Raymond Lee and Dr. Charles Brown, and describing petitioner's brain damage as "drug induced"); *id*. at 904 (describing petitioner's condition as "organic brain damage" or "organic mental illness").

[254] *See id*. at, *e.g*., 880, 884, 904-14 & nn.15-16, and 963.

[255] *See, e.g*., doc. no. 17 (Respondent's Answer), at 110-11; doc. no. 73 (Respondent's Brief), at 10 (listing the claim asserted in this court as "R" among the procedurally defaulted claims).

[256] These two groupings of state procedural rules logically would appear to be mutually exclusive:  *i.e*., the claim either was raised at trial and/or direct appeal, or it was not asserted at one (or both) of those earlier stages.

"Thomas is not in fact mentally retarded."[257]   Those portions of the Rule 32 court's

opinion addressing this claim reads as follows:

## O. Thomas' Claim of Mental Retardation

The Court finds this claim to be procedurally barred pursuant to those grounds set forth in sections 1 & 2 of this Order.[258]

Alternatively, the Court finds this claim to be without merit in that this claim has been *fully* litigated at both the trial level and in this collateral proceeding.  At the trial of this matter, Thomas introduced evidence of his childhood, his school performances, his past history of contact with members of the Department of Pension and Securities (now Department of Human Resources) his evaluations at Taylor Hardin Secure Medical Facility, as well as privately retained mental health practitioners.

The jury at the trial of this case rejected Thomas' claim of not guilty by reason of mental disease or defect.  This Court specifically found, at the sentencing, that Thomas was not suffering from any mental disease or defect.  While there has been testimony at Thomas' Rule 32 hearing as to his having some form of mental deficiency, that testimony, from Thomas' own experts was that he was "borderline" or "mildly" retarded.

While Thomas' handpicked experts testified that he fell within the mild range of mental retardation, that testimony was contradicted by the testimony of the State's expert, Dr. Joe W. Dixon[, who] is an extremely experienced forensic psychologist, who has had extensive experience dealing with criminal defendants.  In contrast, neither of Thomas' mental state experts has experienced [sic] in the criminal field that even

---

[257] Rule 32 C.R. Tab 42 ("Opinion and Findings of Fact of the Trial Court"), at 736.

[258] The pertinent sections of the Rule 32 court's opinion referenced in this back-cite actually were numbered with Roman Numerals.  Section I discussed Rules 32.2(a)(3) and (a)(5), precluding relief on any claim that could have been, but was not, raised at trial or on direct appeal, respectively. *See id*, at 720-21.  Section II discussed Rules 32.2(a)(2) and (a)(4), precluding post-conviction relief on any claim that had been raised and addressed at trial or on direct appeal, respectively.  *Id*. at 721.

approached that of Dr. Dixon.  Further, the methodology employed by Thomas' experts was questionable, while Dr. Dixon used well-recognized evaluation instruments and techniques.  Moreover, the bias of Thomas' experts in his favor, and against capital punishment, was evident from this Court's observations of their courtroom demeanor.  For these reasons, this Court credits the testimony of Dr. Dixon, and does not credit the testimony of Thomas' experts.  The evidence establishes, and this Court so finds, that Thomas is not in fact mentally retarded.

Therefore, Thomas' claim is rejected as being meritless.[259]

The Alabama Court of Criminal Appeals affirmed only one aspect of the Rule 32 court's decision — holding that petitioner's Eighth Amendment claim was procedurally barred because it could have been, but was not, raised at trial or on direct appeal.  In addition, the intermediate state appellate court affirmed on the basis of a different ground, not addressed in the Rule 32 court's opinion, and held as a matter of federal constitutional law that the claim was "without merit."  *See Thomas v. State*, 766 So. 2d at 966 (citing, *e.g.*, *Penry v. Lynaugh*, 492 U.S. 302 (1989)).  The Supreme Court's opinion in *Penry* then provided the governing rule of decision, and it held that the execution of mentally retarded individuals did not *categorically* violate the Eighth Amendment's prohibition against cruel and unusual punishments, *provided* jurors had been instructed that they could consider, and give mitigating effect to, evidence of a defendant's mental retardation.  *See* 492 U.S. at 328 (O'Connor, J., majority

---

[259] Rule 32 C.R. Tab 42 ("Opinion and Findings of Fact of the Trial Court"), at 734-36 (emphasis in original).

opinion).[260]   The *Penry* judgment was based, at least in part, on Justice O'Connor's observation that there *then was* "insufficient evidence" of "a national consensus against execution of the mentally retarded." *Id*. at 340 (O'Connor, J., Part IV-C of opinion).[261]

During the thirteen years following the *Penry* decision, however, just such a consensus evolved.   Eighteen states enacted legislation expressly providing that a sentence of death could not be carried out upon mentally retarded persons.  *See Atkins v. Virginia*, 536 U.S. 304, 313-17 (2002).   That number did not count the statutory prohibitions on the execution of mentally retarded persons that had been enacted by Georgia, Maryland, and the United States Congress prior to the *Penry* decision, nor the fourteen states that had rejected capital punishment altogether.   *Id*. at 313-16.   The weight of that evolving national consensus,[262] together with "the consistency of the

---

[260] Justices Brennan, Marshall, Blackmun, and Stevens joined Justice O'Connor in this part ("III") of the opinion in *Penry*.

[261] Justice O'Connor spoke only for herself in this part ("IV-C") of the *Penry* opinion. Justices Brennan, Marshall, Stevens and Blackmun would have concluded that execution of mentally retarded persons violated the Eighth Amendment.  *See* 492 U.S. at 343–50.   At the time Justice O'Connor wrote, only Congress and two states (Georgia and Maryland) had enacted legislation proscribing the execution of mentally retarded defendants.  *See Atkins v. Virginia*, 536 U.S. 304, 313-15 (1988).

[262] *Id*. at 307 ("[I]n the 13 years since we decided *Penry v. Lynaugh*, the American public, legislators, scholars, and judges have deliberated over the question whether the death penalty should ever be imposed on a mentally retarded criminal.   The consensus reflected in those deliberations informs our answer to the question presented by this case:  whether such executions are 'cruel and unusual punishments' prohibited by the Eighth Amendment to the Federal Constitution.") (citation omitted).

direction of change,"[263] persuaded the Court to abrogate its opinion in *Penry*, and to

hold that execution of mentally retarded persons categorically violated the Eighth

Amendment.

> Our independent evaluation of the issue reveals no reason to disagree with the judgment of the legislatures that have recently addressed the matter and concluded that death is not a suitable punishment for a mentally retarded criminal. We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our evolving standards of decency, we therefore conclude that such punishment is excessive and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender.

*Atkins v. Virginia*, 536 U.S. at 321 (citation and internal quotation marks omitted).

**2**.     *The issue of procedural default*

The *Atkins* decision announced "a new substantive rule of constitutional law,

made retroactive to cases on collateral review." *In re Holladay*, 331 F.3d 1169, 1172

(11th Cir. 2003); *see also Penry v. Lynaugh*, 492 U.S. at 330 (stating that, "if we held,

as a substantive matter, that the Eighth Amendment prohibits the execution of mentally

---

[263] *See id.* at 315-16 ("It is not so much the number of these States that is significant, but the consistency of the direction of change. Given the well-known fact that anticrime legislation is far more popular than legislation providing protections for persons guilty of violent crime, the large number of States prohibiting the execution of mentally retarded persons (and the complete absence of States passing legislation reinstating the power to conduct such executions) provides powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal. The evidence carries even greater force when it is noted that the legislatures that have addressed the issue have voted overwhelmingly in favor of the prohibition.") (footnotes omitted).

retarded persons . . . regardless of the procedures followed, such a rule would fall under the first exception to the general rule of non-retroactivity [discussed in *Teague v. Lane*, 489 U.S. 288, 301 (1989),] and would be applicable to defendants on collateral review") (O'Connor, J., unanimous opinion); *In re Hill*, 437 F.3d 1080, 1082 (11th Cir. 2006) (holding that the new rule of constitutional law announced in *Atkins* "meets the requirement of 28 U.S.C. § 2244(b)(2)(A)" and, therefore, is retroactive to cases on collateral review); *In re Hicks*, 375 F.3d 1237, 1239 (11th Cir. 2004) (same).

As a matter of federal constitutional law, therefore, it cannot be said that this claim was "defaulted" under state procedural rules. *See Morrow v. State*, 928 So. 2d 315, 323, 324 (Ala. Crim. App. 2004) (suggesting procedures for addressing an *Atkins* claim "*regardless of when the issue is raised*") (emphasis supplied). *See also*, *e.g.*, *Tarver v. State*, 940 So. 2d 312, 317 (Ala. Crim. App. 2004) (retroactively applying *Atkins* rule to a claim not presented in the defendant's Rule 32 petition); *Clemons v. State*, No. CR-01-1355, 2003 WL 22047260 (Ala. Crim. App. Aug. 29, 2003) (concluding that *Atkins* applied retroactively to a claim that had been raised for the first time on appeal from the denial of a Rule 32 petition). Therefore, those aspects of the Rule 32 and state appellate courts' opinions to the contrary are accorded no deference.

**3**.     *Section 2254(d) review of the state appellate court's alternative holding*

That portion of the opinion of the Alabama Court of Criminal Appeals rejecting petitioner's Eighth Amendment mental retardation claim in reliance upon the Supreme Court's holding in *Penry v. Lynaugh* is — by virtue of a subsequent Supreme Court decision, abrogating *Penry*, and creating a new, substantive rule of constitutional law retroactively applicable to cases on collateral review — contrary to clearly established Federal law, as determined by the Supreme Court of the United States in *Atkins v. Virginia*. *See* 28 U.S.C. § 2254(d)(1).

**4**.    *Section 2254(d) review of the Rule 32 trial court's factual finding*

Petitioner argues that the Rule 32 trial court's factual determination that he is not mentally retarded "should be given no deference,"[264] because neither that court nor Dr. Joe Wheeler Dixon — the clinical psychologist whose testimony provided the sole basis for the Rule 32 court's conclusion — applied appropriate tests for determining mental retardation.  For the following reasons, this court agrees.

**a**.    *Standards for determining mental retardation suggested by the Supreme Court's opinion in* Atkins v. Virginia

The Supreme Court did not dictate a national standard for determining mental retardation in *Atkins*.  Instead, the Court said that:

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded.  . . .  Not all people who claim to be mentally retarded will

---

[264] Doc. no. 74 (Petitioner's Supplemental Brief), at 17.

> be so impaired as to fall within the range of mentally retarded offenders
> about whom there is a national consensus.  As was our approach in *Ford
> v. Wainwright*, 477 U.S. 399 (1986), with regard to insanity, "we leave to
> the State[s] the task of developing appropriate ways to enforce the
> constitutional restriction upon [their] execution of sentences." *Id*., at 405.

*Atkins v. Virginia*, 536 U.S. at 317 (footnote omitted).  The omitted footnote observed

that, even though the statutory definitions of mental retardation adopted by Congress

and the twenty states that prohibited the execution of such persons were not identical,

all of them "generally conform[ed] to the clinical definitions" promulgated by the

American Association on Mental Retardation and the American Psychiatric

Association.  *Id*. at 317 n.22.  The Court sketched the parameters of those definitions

as follows:

> The American Association on Mental Retardation (AAMR) defines
> mental retardation as follows:  "*Mental retardation* refers to substantial
> limitations in present functioning.  It is characterized by significantly
> subaverage intellectual functioning, existing concurrently with related
> limitations in two or more of the following applicable adaptive skill areas:
> communication, self-care, home living, social skills, community use,
> self-direction, health and safety, functional academics, leisure, and work.
> Mental retardation manifests before age 18."  Mental Retardation:
> Definition, Classification, and Systems of Supports 5 (9th ed. 1992).

> The American Psychiatric Association's definition is similar: "The
> essential feature of Mental Retardation is significantly subaverage general
> intellectual functioning (Criterion A) that is accompanied by significant
> limitations in adaptive functioning in at least two of the following skill
> areas: communication, self-care, home living, social/interpersonal skills,
> use of community resources, self-direction, functional academic skills,
> work, leisure, health, and safety (Criterion B).  The onset must occur
> before age 18 years (Criterion C).  Mental Retardation has many different

etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. *Id.,* at 42-43.

*Atkins v. Virginia,* 536 U.S. at 309 n.3 (emphasis in original).

When attempting to assess whether an individual's "intellectual functioning" is "significantly subaverage" — a diagnostic criterion central to both definitions of mental retardation quoted above — the *Atkins* Court pointed to the Wechsler Adult Intelligence Scales test (WAIS-III) as being

> *the standard instrument in the United States for assessing intellectual functioning.* AAMR, Mental Retardation, *supra.* The WAIS-III is scored by adding together the number of points earned on different subtests, and using a mathematical formula to convert this raw score into a scaled score. The test measures an intelligence range from 45 to 155. The mean score of the test is 100, which means that a person receiving a score of 100 is considered to have an average level of cognitive functioning. A. Kaufman & E. Lichtenberger, Essentials of WAISIII Assessment 60 (1999). It is estimated that between 1 and 3 percent of the population has *an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.* 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds. 7th ed.2000).

*Atkins v. Virginia,* 536 U.S. at 309 n.5 (emphasis supplied).

Thus, the Supreme Court clearly pointed the states in the direction of clinical definitions of mental retardation that have three constituent parts: *i.e.*, significantly substandard intellectual functioning as measured by such normative standards as the

Wechsler Adult Intelligence Scales test, "the standard instrument in the United States for assessing intellectual functioning"; accompanied by significant limitations in adaptive skills in such areas as communication, self-care, and self-direction; and, both deficiencies must be manifest before the age of eighteen years. *Id*. at 309 n.3 & n.5.

> **b**.     *The Alabama standard for determining mental retardation*

Following *Atkins*, the Alabama Supreme Court urged the state legislature "to expeditiously develop procedures for determining whether a capital defendant is mentally retarded and thus ineligible for execution." *Ex parte Perkins*, 851 So. 2d 453, 455 n.1 (Ala. 2002).[265]   In the breach, however, the *Perkins* Court applied a broad definition of mental retardation gleaned from legislation enacted by eighteen states that prohibited the execution of mentally retarded individuals. *See id*. at 456 n.3.   The consensus definition thus arrived-at and applied in *Perkins* contained the same constituent parts emphasized by the Supreme Court in *Atkins*:   that is, "a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior.   Additionally, these problems must have manifested themselves during the

---

[265] *But see Ex parte Perkins*, 851 So. 2d at 457 (Johnstone, J., specially concurring) ("I do not necessarily join in that part of footnote 1 urging the Alabama legislature 'to expeditiously develop procedures for determining whether a capital defendant is mentally retarded and thus ineligible for execution.'   I neither encourage nor discourage such legislation. *This Court is capable of rightly resolving these issues if and when they are presented*, what the statutory scheme may be at the time.") (emphasis supplied).

developmental period (i.e., before the defendant reached age 18)." *Ex parte Perkins*,

851 So. 2d at 456.[266]

The Alabama Court of Criminal Appeals subsequently recognized that the

definition promulgated in *Ex parte Perkins* was consistent with the definition of the

term "mentally retarded person" adopted by the Alabama Legislature when enacting

the State's "Retarded Defendant Act": *i.e.*, "A person with significant subaverage

general intellectual functioning resulting in or associated with concurrent impairments

in adaptive behavior and manifested during the developmental period, as measured by

appropriate standardized testing instruments." *Morrow v. State*, 928 So. 2d 315, 322

(Ala. Crim. App. 2004) (quoting Ala. Code § 15-24-2(3) (1975) (1995 Replacement

Vol.));[267] *see also Stallworth v. State*, 868 So. 2d 1128, 1182 (Ala. Crim. App. 2003)

---

[266] The only, possibly-significant, deviation between this Alabama standard and that discussed by the Supreme Court in *Atkins* lies in the cutoff IQ score for determining subaverage intellectual functioning: the Alabama Supreme Court placed the bar at 70, rather than the 70 to 75 score that the *Atkins* Court stated was "*typically considered* the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Atkins v. Virginia*, 536 U.S. at 309 n.5 (emphasis supplied).

[267] As the *Morrow* Court observed, Alabama's "Retarded Defendant Act," codified at Ala. Code § 15-24-1 *et seq.*,

> consists of seven short sections and basically authorizes the defendant or the State to file an affidavit with the trial court establishing that the defendant "is a person who has been identified as mentally retarded and [who] has received or is presently receiving services through the Department of Mental Health and Mental Retardation, a program certified by the Department of Mental Health and Mental Retardation, or the Department of Education." § 15-24-3, Ala.Code 1975. The affidavit may then be used by the parties and the court "in connection with the decisions relative to bail hearings, determination of place of detention, and ultimate disposition of such case." § 15-24-4, Ala.Code 1975.

(noting that "[t]his definition is consistent with the majority of those states that have legislation prohibiting the execution of a mentally retarded defendant but that do not establish a specific IQ score as a barrier").

      **c**.   *The evaluation of petitioner's claim by the Rule 32 court*

This court now must determine whether the Rule 32 court utilized a diagnostic definition of mental retardation that is consistent with present-day jurisprudence. Moreover, because the Rule 32 court relied *exclusively* upon the testimony of Dr. Joe Wheeler Dixon as the basis for its conclusion that "Thomas is not in fact mentally retarded,"[268] a close examination of Dr. Dixon's testimony also is necessary.

Discussion must begin with the stated basis for the Rule 32 court's conclusion that petitioner's mental retardation claim had been rejected by both the jury and trial court:

> The jury at the trial of this case rejected Thomas' claim of not guilty by reason of mental disease or defect. This Court specifically found, at the sentencing, that Thomas was not suffering from any mental disease or defect. While there has been testimony at Thomas' Rule 32 hearing as to his having some form of mental deficiency, that testimony, from Thomas' own experts was that he was "borderline" or "mildly" retarded.[269]

---

*Morrow v. State*, 928 So. 2d 315, 317 n.2 (Ala. Crim. App. 2004).

[268] Rule 32 C.R. Tab 42 ("Opinion and Findings of Fact of the Trial Court"), at 736.

[269] Rule 32 C.R. Tab 42, at 735.

Petitioner correctly asserts that, in reaching this conclusion, the Rule 32 court "confused the issues" by equating the standards for determining the sufficiency of an affirmative defense of not guilty by reason of mental disease or defect with those for proof of mental retardation.[270]

Petitioner also is correct when contending that Dr. Joe Wheeler Dixon, the expert exclusively relied upon by the Rule 32 court, also confused the issues by evaluating petitioner

> primarily for a mental state defense and whether Mr. Thomas was schizophrenic, suffered from organic brain syndrome, and other mental disorders. Dr. Dixon also evaluated Mr. Thomas to see if his mental functioning was limited enough, with a purported target IQ in the low sixties, to enable Mr. Thomas to successfully claim that he was not guilty by reason of mental disease or defect. That mental disease or defect had to be profound enough so that[,] at the time of the crime, Mr. Thomas could not comprehend the criminality of his misconduct nor conform his conduct to the law. Dr. Dixon's understanding of the purpose of his evaluation of Mr. Thomas's mental retardation was tainted given the status of the law in Alabama in 1992.[271]

Indeed, Dr. Dixon admitted at the outset of his direct examination before the Rule 32 court that the issues he had prepared himself to address did not include the question of petitioner's alleged mental retardation, but his "competency":

---

[270] Doc. no. 74 (Petitioner's Supplemental Brief), at 13 ("The Rule 32 trial court confused the issues in this matter. At the time of trial, it was an affirmative defense to claim that as a result of mental disease or defect, a defendant lacked substantial capacity either to appreciate the criminality of the act and/or he was unable to conform his alleged misconduct to the requirements of the law.").

[271] *Id.* at 16.

Q.      Dr. Dixon, let me ask you just briefly, if your would, describe how you went about performing the evaluation that you've done in connection with this case.

A.      Well, the first thing we do as part of our training as forensic examiners is we evaluate the individual cold,[272] that is, without consultation or without reviewing any records, and we know what the forensic issues are or are likely to be before the court, *and in a Rule 32 hearing such as this*, *such issues would generally stem around*, was he *competent* at the time of the trial, was he *competent* to waive his *Miranda* [rights], what was his mental state in all probability at the time of the offense, and is he currently *competent* to participate in the Rule 32 hearing.  So that pretty well sets the structure for the outline.[273]

In contrast, as the Supreme Court clearly explained in *Atkins v. Virginia*, the assessment of an Eighth Amendment claim of mental retardation goes to the question of a defendant's "culpability" — *not* his "competency":

Mentally retarded persons frequently know the difference between right and wrong *and are competent to stand trial*.  Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others.  There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.  *Their deficiencies do not warrant an exemption from criminal sanctions*, *but they do diminish their personal culpability*.

---

[272] Dr. Dixon's "cold" evaluation consisted of a three hour interview with petitioner at the Atmore State Penitentiary in July 1992.  (Rule 32 R. Vol. 1, p. 109).

[273] Rule 32 R., Vol. 1 at 109-110 (emphasis and alteration added).

245

*Atkins v. Virginia*, 536 U.S. at 318 (emphasis supplied) (footnotes omitted).  In other words, a defendant is not required to prove that he is unable to appreciate the criminality of his conduct, or to conform his behavior to the requirements of the law, in order to be excluded from capital punishment under the Eighth and Fourteenth Amendments.  Rather, under the *Atkins* holding, a mentally retarded individual is *categorically* excluded from *execution* because the imposition of such a sanction upon such persons would be inconsistent with either justification that the Supreme Court has recognized as a basis for the death penalty:  *i.e.* retribution and deterrence of capital crimes by prospective offenders.  *See id.* at 318-21.

Moreover, Dr. Dixon did not base his opinion that petitioner functioned in the "borderline" range of intelligence[274] upon the petitioner's performance on the Wechsler Adult Intelligence Scales – Third Revision, which then was "the standard instrument in the United States for assessing intellectual functioning." *Atkins*, 536 U.S. at 309 n.5. Instead, he administered only a *short form* of that test in preparation for the Rule 32 hearing:  a shortcut that yielded a highly questionable score of 78.[275]  The full form of a Wechsler Adult Intelligence Scales test instrument has eleven sub-tests, but Dr. Dixon administered only three of those to petitioner, and he based his IQ measurements

---

[274] *See* Rule 32 R., Vol. 1 at 113.

[275] *Id.* at 120-21.  In contrast, a complete Wechsler Adult Intelligence Scales test instrument was administered to petitioner at the Taylor Hardin Secure Medical Facility in 1985, and it yielded a full scale score of 71.  *Id.* at 117, 121.

upon the results of only two of the three sub-tests.[276]  As Dixon admitted, a short form test normally is used only for "screening purposes," and IQ scores produced by that shortcut run at least "five or six points higher than [a person's] true IQ."[277]

Dr. Dixon purportedly chose this methodology to rule out mental retardation, even though he admitted that mental retardation is "usually assessed with intelligence tests and a formal normed measure of adaptive functioning, and by . . . diagnostic criteria" similar to those explained by the two expert witnesses who had testified on behalf of petitioner earlier in the hearing.[278]

With regard to petitioner's adaptive functioning, Dixon testified on cross-examination that his opinion was developed from petitioner's "description for me of [what his] life was like before he was incarcerated so there was an *informal assessment* of his adaptive level, what he could do and could not do in society independently."[279] Again, Dixon chose this "informal" methodology, even though he knew that mental retardation is "usually assessed with intelligence tests and a *formal normed measure of adaptive functioning*, and by criteria, diagnostic criteria which you went through

---

[276] *Id.*

[277] Rule 32 R., Vol. 1, at 127.

[278] *Id.* at 113-14.

[279] *Id.* at 119 (emphasis and alteration added).

247

with the [psychologists who had testified on behalf of petitioner] this morning."[280]

Dixon also chose this lax methodology in spite of the fact that, "[a]s the doctor [*i.e.*,

one of petitioner's expert witnesses] pointed out earlier this morning, it seems to have

great merit as to where the IQ score falls in the courts, but among clinicians it has less

merit in that we talk more about what their adaptive functions are, how well they

independently function without supervision, and what their cognitive capacities are."[281]

> **d**.   *Conclusions regarding the Rule 32 court's finding*

For all of the reasons discussed in the immediately preceding section, the Rule

32 court's conclusion that "Dr. Dixon used well-recognized evaluation instrument and

techniques"[282] was not fairly supported by the evidence.  It also was prejudicially

erroneous for the Rule 32 court to equate petitioner's Eighth Amendment claim with

the evidence presented at trial in support of his plea of "not guilty by reason of mental

disease or defect."  That evidence was proffered, understood, and considered at trial in

the context of the legal standards governing proof of *a mental state affirmative defense*.

Within that analytical framework, petitioner's claim of mental retardation was rejected,

but with an understanding that the claim could be legally significant only if petitioner

adduced clear and convincing evidence demonstrating that he lacked either the capacity

---

[280] *Id.* at 113-14 (emphasis supplied).

[281] Rule 32 R., Vol. 1, at 114.

[282] Rule 32 C.R. Tab 42 ("Opinion and Findings of Fact of the Trial Court"), at 735-36.

to appreciate the criminality of his conduct, or the ability to conform his conduct to the requirements of the law, as a result of a severe mental disease or defect. *See* Ala. Code § 13A-3-1 (1975); *see also*, *e.g.*, *Shorts v. State*, 412 So. 2d 830, 832-33 (Ala. Crim. App. 1981).

In light of the Rule 32 court's references to petitioner's mental state defense, and that court's solitary reliance upon the evaluation conducted by Dr. Dixon — who focused upon such irrelevant questions as "was [petitioner] *competent* at the time of the trial, was he *competent* to waive his *Miranda* [rights], what was his mental state in all probability at the time of the offense, and is he currently *competent* to participate in the Rule 32 hearing"[283] — that court's conclusion was not based upon standards approved by either *Atkins* or *Ex parte Perkins*.  To that extent, therefore, the Rule 32 court's adjudication of this claim resulted in a decision that was contrary to, and an unreasonable application of, clearly established federal law, as determined by the Supreme Court in *Atkins v. Virginia*, a decision that is retroactively applicable to the present claim.  *See* 28 U.S.C. § 2254(d)(1).  The decision also was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See id*. § 2254(d)(2).

---

[283] Rule 32 R. Vol. 1, at 109-110 (Dixon testimony) (emphasis and alteration added).

249

For all of these reasons, therefore, the state court's conclusion that petitioner is not mentally retarded is entitled to no deference.

**5**.    *The sufficiency of the evidence before this court*

The next question that must be addressed is whether the factual support for petitioner's claim of mental retardation is sufficient to state a *prima facie* claim in this court.  Respondent generally denies the claim, and encourages this court to dismiss it on the ground that the facts tendered in support of petitioner's arguments do not meet even the broadest definition of mental retardation.[284]   At most, respondent simply denies that petitioner is mentally retarded as defined by *Atkins* or Alabama law, and argues that he has failed to state a colorable claim.

This court has carefully reviewed the testimony of all mental health professionals who examined petitioner, particularly the three psychologists called during collateral proceedings in state court.  This court also examined the testimony of those family members and other persons (such as foster parents and social workers) who were called to the stand during trial and postconviction proceedings, as well as records from the state's Department of Human Resources and Taylor Hardin Secure Medical Facility, for evidence pertaining to petitioner's mental retardation claim.   That review establishes that petitioner has more than adequately stated a colorable Eighth

---

[284] *See* doc. no. 47 (Respondent's Supplemental Brief), at 6-23.

Amendment claim, and that he did so years before such a claim was even available to him as a matter of law, and, without the benefit of the guidance provided by the *Atkins* opinion.

Even so, it is not possible to definitively determine from the record, as it now stands, whether petitioner is mentally retarded within the context of those diagnostic criteria elucidated in *Atkins* and *Ex Parte Perkins*.  The opinions stated by Dr. Joe Wheeler Dixon, and the shortcut methodology he employed to reach his conclusions, are neither helpful nor relevant to the task facing this, or any other, court.  And, even though this court found the testimony of those forensic psychologists who testified on behalf of petitioner during the Rule 32 hearing to be far more explicit and grounded in generally accepted methodologies, neither witness administered standardized tests to determine petitioner's intelligence or adaptive functioning.  In short, the present record simply is not sufficient to determine whether petitioner is, or is not, mentally retarded. Further proceedings are necessary to determine the issue in accordance with binding authorities.

Petitioner asked this court to either "exercise its discretion to expand the record through additional discovery [and] conduct an evidentiary hearing on the matter, or remand this case to the State for further proceedings."[285]  In choosing which path to

---

[285] Doc. no. 74 (Petitioner's Supplemental Brief), at 22 (footnote omitted and alterations added).

follow, this court must be mindful of the dictate of the *Atkins* Court: *i.e.*, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences."  536 U.S. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)) (alterations in original).  While a habeas petitioner would be entitled to a federal evidentiary hearing if a state's procedures for determining mental retardation are "not adequate to afford a full and fair hearing," *Ford*, 477 U.S. at 418, the Alabama Court of Criminal Appeals has provided guidance to the state trial courts on the procedures for determining whether a capital defendant is mentally retarded.  *See Morrow v. State*, 928 So. 2d 315, 322-25 (Ala. Crim. App. 2004).  In this instance, the Alabama courts have not had an opportunity to conduct an evidentiary hearing in accordance with the procedures specified in *Morrow*, nor to focus upon the diagnostic criteria outlined in *Atkins*, *Ex parte Perkins*, or even Alabama Code § 15-24-2(3) (the state's "Retarded Defendant Act").  In these unique circumstances, therefore, "justice and comity would be best served by giving the [Alabama] courts the opportunity to re-examine" petitioner's Eighth Amendment claim in the light of *Atkins* and its Alabama progeny, *Ex parte Perkins*.  *Eldridge v. Crouse*, 400 F.2d 94, 94 (10th Cir. 1968).  *Cf. Waters v. Beto*, 392 F.2d 74, 76 (5th Cir. 1968) (applying principles of comity, and remanding a case to the state court to conduct an

252

evidentiary hearing and make findings of fact).  In short, this is a matter for the state to decide in the first instance, *but only by application of the proper standards*.

For the foregoing reasons, petitioner's claim is due to be remanded to the state trial court, with instructions to determine whether petitioner is mentally retarded according to standards established by binding authorities.  In order for such a determination to satisfy the constitutional standards of due process of law, the state trial court shall take all steps necessary to assure that an evidentiary hearing is held in such a manner that a fair, complete, and full fact-finding process is had with regard to petitioner's mental retardation claim under the Eighth and Fourteenth Amendments.  At a minimum, such assurance requires that the state court:  appoint a competent attorney, who is conversant with both the applicable diagnostic criteria and professional jargon, to represent petitioner; and, ensure that funds are made available to petitioner for the purpose of retaining a competent and qualified forensic psychologist and forensic neuropsychologist to examine and formulate an opinion as to whether petitioner is mentally retarded.[286]  The state court also is instructed to issue

---

[286] The evidence in this case suggests that petitioner suffers from "organic brain damage," a condition that (if the suggestion is proven to be true) may be in addition to, *or* the cause of, *or* a factor exacerbating petitioner's alleged mental retardation.  Consequently, a forensic *neuro-psychologist* is specified *in addition to* a forensic *psychologist*, because the latter mental health professionals often lack the expertise to distinguish neurological defects from the cognitive and functional disabilities of mental retardation.

specific and detailed findings of fact and conclusions of law in connection with the claim.

**S**.    *Erroneous Admission of Pocketknife*

Petitioner's nineteenth claim addresses a pocketknife containing blood, hair, and fiber evidence that was recovered at the scene of the crime, from the front seat of his automobile.[287]  His substantive claim has three, interrelated parts:  (*i*) "police failed to follow proper police procedures [for] safekeeping" the knife, "thus possibly contaminating the knife with foreign material and failing to preserve potentially exculpatory evidence";[288]  (*ii*) the "blatant disregard [of police officers] for proper procedures in the face of visible material evidence constituted bad faith under" *Arizona v. Youngblood*, 488 U.S. 51 (1988);[289] and (*iii*) petitioner consequently was prejudiced by the trial court's admission of the knife, and, forensic testimony concerning the hair and fiber evidence found on its blade.[290]  In addition to these substantive contentions,

---

[287] *See* doc. no. 1 (Petition) at 63 ("Mr. Thomas's rights to a fair trial and due process of law guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of Alabama were violated by the failure of the police to follow proper procedures to preserve potentially exculpatory evidence and his attorneys' failure to appeal the admission of certain evidence.  *Arizona v. Youngblood*, 488 U.S. 51 (1988).").

[288] *Id*. ¶ 289.

[289] *Id*. ¶ 302.

[290] *Id*. ¶ 298 ("Mr. Thomas was prejudiced by the admission of the knife.  The State relied on trace evidence (fibers and hair) to suggest the knife had been used during the crime.  Had the knife been properly excluded, this trace evidence would not have been admissible.  Even more shocking is the fact that this tainted knife contained four out of only six hair fragments recovered

petitioner claims that his appellate attorneys rendered ineffective assistance by failing to raise the admission of the knife, and the forensic evidence resulting from analysis of the blood, hair fragments, and trace fibers recovered from its blade, as trial error on direct appeal.[291]

**1**.    *Admission of the pocketknife*

Petitioner presented his substantive contention that the pocketknife, and the forensic evidence derived from it, were erroneously admitted in his Rule 32 petition,[292] but the trial court neglected to address the claim in its final opinion.  Even so, the Alabama Court of Criminal Appeals addressed the contention on collateral appeal, and determined that it was procedurally barred.

> R.  *The trial court erred, as a matter of law, in allowing into evidence the pocketknife recovered from Thomas's car on the grounds that the police failed to follow proper procedures, thereby possibly contaminating the knife with foreign material and failing to preserve potentially exculpatory evidence.*
>
> Thomas asserts that the officers handled a pocketknife found in his car after they had been in the victim's home, thereby possibly contaminating the knife with foreign material, including inculpatory evidence, from the victim's home.  He also asserts that, by handling the knife as they did, they failed to preserve any fingerprints that may have been on it.

---

from the crime scene.").  *See also id.* ¶¶ 290-99.

[291] *See id.* ¶¶ 300-03.

[292] *See* Rule 32 C.R. Tab. 38, at 28.

Forensic examination of the knife revealed the following: fiber on the knife consistent with the green fiber of the victim's nightgown; other fiber consistent with the fiber of the victim's pink blanket; two hairs consistent with the victim's head hair; and one pubic hair consistent with the victim's.

Officer Mitchell testified that he seized the knife from the driver's seat of Thomas's vehicle after the officers had finally gotten Thomas, who was unruly and combative, out of the car and patted down; that he touched the blade when he partially opened the knife; that he noted that the blade was bloody and that a couple of small hairs were stuck by the blood to one side of the blade; and that he gave the knife to Officer Dempsey while he and other officers were scuffling with Thomas to get him across the street and into a patrol car. Officer Dempsey testified that, when he was given the knife, he placed it in his left breast pocket; that he did not do anything to change the condition of the knife; and that it was in the same condition when he received it as it was when he subsequently gave it to Sergeant Clark. Sergeant Clark testified that, when Officer Dempsey gave him the knife at city hall, Dempsey had already partially opened it to show him the hair caught on the tip of the blade; that he noted that a hair was hanging from the broken tip of the blade; that he closed the blade and placed the knife in a plastic bag; that he did not alter the knife in any way while it was in his possession; and that he turned the knife over to Kilbourne, the forensic scientist, at the crime scene. After this testimony, defense counsel moved to exclude the knife from evidence on the ground that the condition of the knife had not been properly preserved though the chain of custody in accordance with police procedure and could thus have been contaminated, and the trial court denied the motion. (R. 1034-38.)

The underlying substantive issue, as asserted in Issue XVIII (Brief, pp. 67-69), regarding possible contamination [of the pocketknife], is precluded by Rule 32.2(a)(2), because it was raised and addressed at trial. In regard to the possibility of failure to preserve potentially exculpatory evidence, the underlying substantive issue is barred because it could have been, but was not, presented at trial. Rule 32.2(a)(3). The underlying issue, as to both grounds, is also procedurally barred by Rule 32.2(a)(5), because it could have been raised or addressed on appeal.

256

*Thomas v. State*, 766 So. 2d at 925-26 (emphasis in original).

Respondent asserts that this court is precluded from reviewing the merits of petitioner's substantive claims.[293] Petitioner does not rebut that contention.[294] Further, the last state court to review these claims clearly and expressly stated that its disposition of the claim rested on state procedural bars, and the state grounds cited are both independent of the federal question, and adequate to support the judgment. Accordingly, the substantive components of petitioner's Claim "S" have been procedurally defaulted. *See*, *e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).

_____**2**.    *Ineffective assistance of counsel*

The Alabama Court of Criminal Appeals also addressed petitioner's ineffective assistance of counsel contentions on collateral review, and entered the following findings of fact and conclusions of law.

> The issue whether appellate counsel were ineffective for failing to raise the underlying substantive issue of contamination on appeal, as argued in Issue IV, is also without merit. Thomas has failed to meet his burden of proof: there is no showing on the record that the evidence was contaminated or that conditions of safeguarding the knife were so lax that it could have been contaminated. We can find no evidence in the record to support Thomas's conclusion that Officer Mitchell entered the victim's house before he seized the knife from Thomas's car and gave it to Officer Dempsey or that Officer Dempsey entered the house before he transferred the knife to Sergeant Clark. While Thomas argues to the contrary — that

---

[293] *See* doc. no. 17 (Respondent's Answer), at 111-13.

[294] *See* doc. no.35 (Petitioner's Brief), at 99-101.

Officers Mitchell and Dempsey had gone into the victim's house and examined the crime scene before they handled the knife — he offers no citations to the record to support this bare assertion. He also failed to present any evidence on this point at the Rule 32 hearing. Moreover, the forensic scientist testified at trial that he did not recall any police officer on the scene who was wearing a uniform with green acetate fibers or pink polyester fibers (like those found on the knife blade). (R. 1209.) The possibility that the knife was contaminated by fibers and hairs picked up by the two officers — who were not shown to have been in the residence before handling the knife — is based on sheer speculation.

The law pertaining to chain of custody is stated in *Ex parte Holton*, 590 So. 2d 918, 919-20 (Ala. 1991), as follows:

> "Proof of [an] unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. [*Ex parte Williams*, 548 So. 2d 518, 520 (Ala. 1989).] In order to establish a proper chain, the State must show to a 'reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.' *McCray v. State*, 548 So. 2d 573, 576 (Ala. Cr. App. 1988). Because the proponent of the item has the burden of showing this reasonable probability, we require that the proof be shown on the record with regard to the various elements discussed below.

> "The chain of custody is composed of 'links.' A 'link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: '(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction or retention; and (3[the] safeguarding and handling of the item between receipt and disposition.' Imwinkelreid, *The Identification of Original, Real Evidence*, 61 Mil. L. Rev. 145, 159 (1973).

"If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a 'missing' link, and the item is inadmissible.  If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the 'link,' as to one or more criteria or as to one or more links, the result is a 'weak' link.  When the link is 'weak,' a question of credibility and weight is presented, not one of admissibility."

We are of the opinion that the evidence, albeit circumstantial, established the three criteria and, thus, the evidence was admissible, and its weight and credibility were left to the jury.  In fact, defense counsel did a good job placing the issue of weight and credibility before the jury:  he thoroughly cross-examined witnesses on the procedure used by the police to preserve the evidentiary integrity of the knife.  *See*, *e.g.*, R. 1172-73.

"'The evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain.'  *Slaughter v. State*, 411 So. 2d 819, 822 (Ala. Cr. App. 1981)(emphasis supplied)."

*Ex parte Williams*, 548 So. 2d 518, 520 (Ala. 1989) (quoting *Ex parte Williams*, 505 So. 2d 1254, 1255 (Ala. 1987)).

As a final note, we point out that the other trace evidence, which remains beyond question, clearly buttresses the integrity of evidence on the knife.  For example, an examination of the jeans which Thomas was wearing when he was arrested revealed fibers consistent with the victim's nightgown and also a hair similar to the victim's.  An examination of Thomas's shoes revealed fibers similar to those of the carpet in the victim's bedroom.

The issue whether trial and appellate counsel were ineffective for failing to move to exclude the knife on the ground that the officers failed to preserve potentially exculpatory evidence has not been proven.

"'[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' [*Arizona v.*] *Youngblood*, 488 U.S. [51,] 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 . . . [(1988)]. 'The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.' *Youngblood*, 488 U.S. at 57, 109 S. Ct. 333 (footnote). . . ."

*Ex parte Gingo*, 605 So. 2d 1237, 1240-41 (Ala. 1992), *cert. denied*, 506 U.S. 1049, 113 S. Ct. 967, 122 L. Ed. 2d 123 (1993). Thomas's general claim that the officers acted in bad faith is unsupported by any argument or even one citation of authority. The knife was seized in a potentially dangerous confrontation in which the officers were trying to arrest and pat down a combative, hostile, intoxicated person covered in blood. The knife was then transferred from one officer to another while the officers were trying to subdue Thomas and place him in a patrol car. We are unwilling to find that the officers acted in bad faith by not stopping the intense struggle long enough to slip the knife into a plastic bag. Moreover, at the time the knife was seized, the knife had no apparent exculpatory value.

*Thomas v. State*, 766 So. 2d at 926-28 (footnotes omitted) (alterations in original).

Petitioner has not produced any evidence, much less clear and convincing evidence, to rebut the presumption of correctness that attaches to the factual findings of the Alabama Court of Criminal Appeals. *See* 28 U.S.C. § 2254(e)(1). He also has not shown that Court's adjudication of the claim was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *Id*. § 2254(d)(2). As a consequence, and as the state appellate court found, petitioner is unable to satisfy either the performance or prejudice prongs of the

*Strickland* standard for establishing his claim of ineffective assistance of counsel.  He also has failed to carry his burden of persuading this court that the state court's adjudication of these claims was contrary to, or involved an unreasonable application of, the Supreme Court's opinions in *Arizona v. Youngblood* and *Strickland v. Washington*.  *Id*. § 2254(d)(1).  Accordingly, all aspects of Claim "S" are due to be denied.

**T**.   *Unconstitutionally Vague Statutory Aggravating Circumstance*

Petitioner's twentieth claim — the contention that the aggravating circumstance defined by Alabama Code § 13A-5-49(8) ("The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses") is unconstitutionally vague as applied[295] — was procedurally defaulted.  The claim could have been, but was not, raised at trial and on direct appeal.  When it was asserted for the first time in the Rule 32 petition, the state court found it to be procedurally defaulted pursuant to Alabama Rules of Criminal Procedure 32(a)(3) and (5).[296]  The Alabama Court of Criminal Appeals reached the same conclusion on collateral appeal.  *See Thomas v. State*, 766

---

[295] *See* doc. no. 1 (Petition), at 67 (Claim "T") ("Mr. Thomas's death sentence was imposed in violation of his rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the Constitution of Alabama because the statutory aggravating circumstances enumerated in Section 13A-5-49(8), Code of Alabama (Supp. 1988), is unconstitutionally vague as applied.  *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980).")); *see also id.* ¶¶ 304-11.

[296] *See* Rule 32 petition, Rule 32 C.R. Tab. 38, at 44.

So. 2d at 949 (holding the present claim to be precluded by the same state procedural rules, "because it could have been, but was not, raised at trial or on appeal"). Respondent therefore argues that this court is precluded from reviewing the merits of the claim.[297]  Petitioner does not rebut that contention.[298]  This court finds that the last state court to review the claim clearly and expressly stated that its disposition rested on state procedural bars that are independent of the federal question and adequate to support the judgment.  Accordingly, the claim is denied.  (See the discussion in Part IV(C) of this opinion, *supra*.)

**U**.  *Failure to Instruct on Manslaughter as a Lesser Included Offense*

The last claim asserted in the original habeas petition is that the trial judge's failure to instruct the jury on the elements of manslaughter as a lesser included offense of the charge of capital murder deprived petitioner of due process of law and a fair trial.[299]  Petitioner also contends that his attorneys were ineffective for not requesting

---

[297] *See* doc. no. 17 (Respondent's Answer), at 115-16.

[298] *See* doc. no. 35 (Petitioner's Brief), at 92-94.

[299] *See* doc. no. 1 (Petition), at 69 (Claim "U") ("The trial court's failure to instruct the jury on the lesser included offense of manslaughter and his trial counsel's failure to properly preserve and appeal this issue deprived Mr. Thomas his rights to due process of law and a fair trial in violation of his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of Alabama.  *Beck v. Alabama*, 447 U.S. 625 (1980); *Strickland v. Washington*, 466 U.S. 668 (1984)."); *see also id*. ¶¶ 312-13, 318-20.

a manslaughter instruction,[300] and "for failing to properly appeal this issue"[301] — *i.e.*, petitioner's counsel did not cite the failure to instruct on manslaughter as trial error on direct appeal to the Alabama Court of Criminal Appeals; instead, the issue was raised for the first time in the petition for *certiorari* filed in the Alabama Supreme Court.[302]

### 1. *Resolution of the substantive claim*

In view of the uncontroverted evidence of intoxication presented at trial, Alabama case law indicates that petitioner was entitled to an instruction on manslaughter as a lesser-included offense, even in the absence of a specific request by defense counsel.  *See*, *e.g.*, *Crosslin v. State*, 446 So. 2d 675, 681-82 (Ala. Crim. App. 1983).  The Alabama Supreme Court acknowledged that the *Crosslin* opinion provided "compelling authority that the defendant-petitioner was entitled to an instruction on the lesser included offense of manslaughter."  *Ex parte Thomas*, 766 So. 2d 975, 977 (Ala. 2000).

As a general rule, however, the failure of a state trial judge to instruct on a lesser included offense, even when such an omission is incorrect under state law, does not

---

[300] *Id.* ¶ 314.

[301] *Id.* ¶ 315 ("Trial counsel was also ineffective for failing to properly appeal this issue.  Trial counsel failed to raise the issue in the direct appeal to the Alabama Court of Criminal Appeals.  Realizing his egregious mistake, trial counsel raised the issue before the Alabama Supreme Court on direct appeal.").

[302] *See* C.R. Tab 32, at 12, 54-56.  The issue was reiterated in the petition for rehearing filed in the same Court.  *See* C.R. Tab. 34, at 12, 61-64.

present a federal constitutional question that can be reviewed in a federal habeas proceeding. *See*, *e.g.*, *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a mere error of state law is not a denial of due process. If the contrary were true, then every erroneous decision by a state court on state law would come [to this Court] as a federal constitutional question."); *Grech v. Wainwright*, 492 F.2d 747, 748 (5th Cir. 1974) (holding that a state trial judge's failure to instruct the jury on lesser included offenses "does not present a federal constitutional question") (citing *Alligood v. Wainwright*, 440 F.2d 642, 643 (5th Cir. 1971); *Higgins v. Wainwright*, 424 F.2d 177 (5th Cir. 1970); *Flagler v. Wainwright*, 423 F.2d 1359 (5th Cir. 1970)).

Rather, a state conviction will be set aside only if the state court's adjudication of a state law issue "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," not state law. *See* 28 U.S.C. § 2254(d)(1). *See also*, *e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations of state-law questions."); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law.").

Petitioner attempts to meet this standard by relying upon the Supreme Court's decision in *Beck v. Alabama*, 447 U.S. 625 (1980). That case addressed Alabama's previous capital punishment regimen, under which the trial judge was

264

specifically prohibited from giving the jury the option of convicting the defendant of a lesser included offense.  Instead, the jury [was] given the choice of either convicting the defendant of the capital crime, in which case it [was] required to impose the death penalty, or acquitting him, thus allowing him to escape all penalties for his alleged participation in the crime.  If the defendant [was] convicted and the death penalty imposed, the trial judge [was then required to] hold a hearing with respect to aggravating and mitigating circumstances; after hearing the evidence, the judge [was permitted to] refuse to impose the death penalty, sentencing the defendant to life imprisonment without possibility of parole.

*Beck v. Alabama*, 447 U.S. at 628-29 (footnotes omitted).  The defendant in *Beck* and an accomplice had been charged with the capital offense of an intentional killing in the course of a robbery.  The evidence adduced at trial would have entitled the defendant to an instruction on "felony murder" as a lesser-included offense, in the absence of the statutory prohibition noted above.

Because of the statutory prohibition, [however,] the court did not instruct the jury as to the lesser included offense of felony murder.  Instead, the jury was told that if petitioner was acquitted of the capital crime of intentional killing in the course of a robbery, he "must be discharged" and "he can never be tried for anything that he ever did to Roy Malone [the victim]."  Record 743.  The jury subsequently convicted petitioner and imposed the death penalty; after holding a hearing with respect to aggravating and mitigating factors, the trial court refused to overturn that penalty.

*Id*. at 630.  Beck appealed, eventually reaching the United States Supreme Court, where he argued that

the prohibition on giving lesser included offense instructions in capital cases violates both the Eighth Amendment as made applicable to the States by the Fourteenth Amendment and the Due Process Clause of the

265

> Fourteenth Amendment by substantially increasing the risk of error in the factfinding process. Petitioner argues that, in a case in which the evidence clearly establishes the defendant's guilt of a serious noncapital crime such as felony murder, forcing the jury to choose between conviction on the capital offense and acquittal creates a danger that it will resolve any doubts in favor of conviction. . . .

*Id*. at 632 (footnote omitted).[303]

The Supreme Court agreed, and held that Alabama's statutory prohibition on giving lesser-included offense instructions in capital cases was unconstitutional because it substantially increased the risk of prejudicial error in the factfinding process. *See Beck*, 447 U.S. at 637 ("[W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense — but leaves some doubt with respect to an element that would justify conviction of a capital offense — the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.").

*Beck* has not been extended by the Supreme Court, however. In fact, the Court has taken pains to explain that *Beck's* holding does not stretch beyond the peculiar facts it addressed. *See id*. at 635 ("Alabama's failure to afford capital defendants the

---

[303] The Supreme Court granted *certiorari* to decide the following question:

> "May a sentence of death constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict?"

*Beck v. Alabama*, 447 U.S. at 627 (quoting *Beck v. Alabama*, 444 U.S. 897 (1979) (memorandum)).

protection provided by lesser included offense instructions is *unique in American criminal law*.") (emphasis supplied) (footnote omitted).  For example, in *Schad v. Arizona*, 501 U.S. 624 (1991), the Court rejected an argument that due process required a jury in a capital case to be instructed on *every* lesser included offense supported by the evidence:

> Petitioner's second contention is that under *Beck v. Alabama*, 447 U.S. 625 (1980), he was entitled to a jury instruction on the offense of robbery, which he characterizes as a lesser included offense of robbery murder.  *Beck* held unconstitutional an Alabama statute that prohibited lesser included offense instructions in capital cases.  Unlike the jury in *Beck*, the jury here was given the option of finding petitioner guilty of a lesser included noncapital offense, second-degree murder.  While petitioner cannot, therefore, succeed under the strict holding of *Beck*, he contends that the due process principles underlying *Beck* require that the jury in a capital case be instructed on *every lesser included offense supported by the evidence*, and that robbery was such an offense in this case.

> Petitioner misapprehends the conceptual underpinnings of *Beck*.  Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction *if the only alternative was to set the defendant free with no punishment at all*.  We explained:

>> "'[O]n the one hand, the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason — its belief that the defendant is guilty of some serious crime and should be punished.  On the other hand, the apparently mandatory nature of the death penalty may encourage it to acquit for an equally impermissible reason — that, whatever his crime, the defendant does not deserve death . . .

. [T]hese two extraneous factors . . . introduce a level of uncertainty and unreliability into the factfinding process that cannot be altered in a capital case."  [*Beck*, 447 U.S. at 642-43] (footnote omitted).

We repeatedly stressed *the all-or-nothing nature of the decision* with which the jury was presented.  See *id.*, at 629, 630. 632, 634, 637, 642-43, and n.19.  As we later explained in *Spaziano v. Florida*, 468 U.S. 447, 455 (1984), "[t]he absence of a lesser included offense increases the risk that the jury will convict . . . simply to avoid setting the defendant free . . . .  The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into *an all-or-nothing choice between capital murder and innocence*." See also, *Hopper v. Evans*, 456 U.S. 605, 609 (1982).  The central concern of *Beck* is simply not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offence of conviction (capital murder) and innocence.

*Schad v. Arizona*, 501 U.S. at 645-47 (emphasis added).[304]

The facts and pertinent statutory provisions of this case bear no similarity to those addressed in *Beck*.  The jurors who sat in judgment of petitioner's fate were *not* "essentially told," as he alleges, that they must either "convict him of capital murder or set him free."[305]  Instead, his jury was instructed on seven lesser-included-offenses, one of which was the crime of murder under Alabama Code § 13A-6-2, as

---

[304] The foregoing excerpts from the *Schad* opinion not only explain the scope of *Beck's* holding, but also address every Supreme Court decision cited in petitioner's brief, with the exception of *Hopkins v. Reeves*. 524 U.S. 88 (1998).  Even so, *Hopkins* affords petitioner no precedential assistance.  The issue in *Hopkins* was whether a Nebraska trial court in a capital case was required by *Beck* to give requested jury instructions on offenses that historically had not been considered by the courts of that state to be lesser included offenses.  That is not the issue here.

[305] Doc. no. 1 (Petition) ¶ 313.

distinguished from capital murder under § 13A-5-40(a)(2).[306]  Therefore, if the jurors had been convinced that petitioner had committed a grave, violent homicide, but not convinced that he was guilty of capital murder, they were presented the "third option" of convicting him of the lesser-included, non-capital offense of murder.   In other words, petitioner's jury was *not* "faced with an all-or-nothing choice between the offence of conviction (capital murder) and innocence."  *Schad*, 501 U.S. at 647.

For these reasons, petitioner has failed to show that the Alabama Supreme Court's conclusion that the failure of the trial judge to instruct petitioner's jury on the lesser included offense of manslaughter was not prejudicial error requiring reversal of the conviction, *see Ex parte Thomas*, 766 So. 2d at 979-80 (concluding that "even a *preserved-error review* of this particular issue would not have availed the defendant-petitioner a reversal") (emphasis in original), was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  *See also*, *e.g.*, *Ring v. Arizona*, 536 U.S. 584, 603 (2002) (stating that a state supreme court's "construction of the State's own law is authoritative") (citing *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975)).

---

[306] The other lesser-included offenses charged were burglary in the first and second degrees; attempted burglary in the first and second degrees; and criminal trespass in the first and third degrees. *See* R. Tab 14, at 1890, 1896-1903.

**2**.    *Resolution of the ineffective assistance of counsel claim*

When petitioner's Rule 32 claims reached the Alabama Supreme Court on collateral appeal, that Court confined its discussion and holding to

> *petitioner's most arguable issue*: that his trial counsel was ineffective for his failure to request a jury instruction on the lesser included offense of manslaughter (predicated on evidence of intoxication at the time of the acts) and his failure to object to the failure by the trial court to instruct the jury on the lesser included offense of manslaughter.

*Ex parte Thomas*, 766 So. 2d at 976 (emphasis supplied).

The Alabama Supreme Court said that the strength of petitioner's argument that the trial court committed prejudicial error by failing to instruct the jury on the lesser included offense of manslaughter lay in the same facts and principles discussed by the Court of Criminal Appeals in its underlying opinion on collateral appeal:  *i.e*., the evidence of petitioner's intoxication at the time of the offense was "substantial" and "unchallenged"  *Thomas v. State*, 766 So. 2d 860, 951 (Ala. Crim. App. 1998); *see also Ex parte Thomas*, 766 So. 2d 975, 976-77 (Ala. 2000) ("The evidence that the defendant was voluntarily intoxicated at the time he killed the victim is . . . super-abundant.").  As a consequence, "compelling authority," including the *Crosslin* case cited by the Court of Criminal Appeals, clearly indicated that petitioner "was entitled to an instruction on the lesser included offense of manslaughter."  *Id*. at 977; *see also Thomas v. State*, 766 So. 2d at 952 & n.27.  The Alabama Supreme Court accordingly

270

concluded that defense counsel had rendered deficient performance by not requesting such an instruction, by not objecting to the trial judge's failure to so instruct, and by neglecting to raise the omission as trial error on the first step of direct appeal, to the Alabama Court of Criminal Appeals — thereby relegating "defendant-petitioner to the plain-error rule, which increased the burden on the defendant-petitioner to prove prejudice." *Ex parte Thomas*, 766 So. 2d at 979 (citations omitted).

> Trial defense counsel's failure to request an instruction submitting manslaughter and failure to preserve error in this regard cannot be considered a strategic decision. He requested and obtained an instruction on voluntary intoxication to the effect that voluntary intoxication could negate an element of specific intent. The logical sequel would have been an instruction on manslaughter as a lesser included offense. Such an instruction, predicated on voluntary intoxication, would have been entirely consistent with the defense of mental incompetence and the strategy of simply saving the defendant's life rather than seeking total exoneration.

*Id*. at 977.

On the other hand, the Alabama Supreme Court held that the weakness of petitioner's argument lay in his inability to satisfy the prejudice prong of the *Strickland* standard — an issue that the Court characterized as turning upon the *merits question* of whether petitioner "would have obtained a reversal and new trial" on direct appeal, "if his trial defense counsel *had* preserved the error for review." *Id*. at 979 (emphasis in original). For the following reasons, the Alabama Supreme Court concluded that

even a *preserved-error review* of this particular issue would not have availed the defendant-petitioner a reversal and therefore the failure by trial defense counsel to preserve the error did not prejudice the defendant-petitioner. In other words, the result would have been the same in either event because, under the particular facts and circumstances of this case, had trial defense counsel preserved the error, the appellate courts would have recognized the error but would not have found prejudice that required reversal.

Conducting even a preserved-error review, an appellate court in Alabama will not reverse an error unless it has substantially prejudiced the party seeking the review. *Ex parte Yelder*, 575 So. 2d 137 (Ala. 1991); *Espey v. State*, 270 Ala. 669, 120 So. 2d 904 (1960); Rule 45, Ala. R. App. P. As we have explained, the trial court submitted to the jury not only the capital murder burglary-murder charged in the indictment but also the lesser included offense of noncapital murder as well as other lesser included offenses. The jury verdict that the defendant is guilty of the capital murder burglary-murder bespeaks that the jury was convinced beyond a reasonable doubt of the existence of each and every essential element of capital murder *burglary*-murder, including, particularly significantly, not only the essential element of intent to kill in the murder aspect of the capital murder charge but also the essential element of intent to commit theft, which, in turn, included the essential element of intent to deprive the victim of the property to be stolen from her, in the burglary aspect of the capital murder charge. Section 13A-5-40(a)(4) (defining burglary-murder capital murder), § 13A-7-5 (defining burglary in the first degree), and § 13A-8-2 (defining theft of property), Ala.Code 1975. Intent to commit theft, entailing, as it does, intent to deprive the owner of her property, is a mental state more elaborate and complex and thus more subject to disruption or obliteration by voluntary intoxication than is the mental state of intent to kill. Had the jury in this case harbored a reasonable doubt to the effect that voluntary intoxication had disrupted or obliterated this defendant's ability to form or to harbor specific intent, the jury first would have applied this doubt to the comparatively elaborate and complex element of intent essential to the burglary aspect of the burglary-murder capital murder charge and accordingly would not have found the burglary and therefore would not have found the burglary-murder but, instead, would have found the defendant guilty of

272

only the lesser included offense of noncapital murder.  Even with the refuge of an option to convict for manslaughter, the jurors, who manifestly were convinced beyond a reasonable doubt that the defendant had formed and harbored the more elaborate and complex specific intent to commit a theft within this victim's dwelling, could not and would not have rationally and reasonably concluded that intoxication had disrupted or obliterated the formation or existence of intent to kill in the same brain at the same time and thus could not and would not have rationally and reasonably doubted that the defendant had formed and harbored the relatively simple intent to kill.  Therefore, had the trial court submitted the lesser included offense of manslaughter to this jury for its consideration, the likelihood is nil that the jury would have chosen to convict the defendant of manslaughter rather than murder or capital murder.

Finally, the absence of an instruction on the lesser included offense of manslaughter did not deprive the defendant of an opportunity for a compromise verdict.  Had the jury been inclined to compromise, the jury would obviously have chosen the option they already had to convict the defendant of the lesser included offense of noncapital murder.

Because the giving of a jury instruction on the lesser included offense of manslaughter would not have changed the verdict of the jury, the absence of such an instruction did not prejudice the defendant.  Thus, even if defense trial counsel had preserved the error of the failure of the trial court to instruct the jury on the lesser included offense of manslaughter, the defendant would not have obtained a reversal on appeal.  Accordingly, the failure of defense trial counsel to preserve the error did not prejudice the defendant, and the defendant has not met the prejudice prong of the test for ineffective assistance of counsel as required for relief under *Strickland v. Washington*, *supra*.

*Ex parte Thomas*, 766 So. 2d at 979-80 (emphasis in original).

To the extent that the Alabama Supreme Court's conclusion that petitioner cannot satisfy the prejudice prong of the *Strickland* standard is grounded in determinations of fact questions — *e.g.*, whether the jury "harbored a reasonable doubt

273

to the effect that voluntary intoxication had disrupted or obliterated this defendant's ability to form or to harbor a specific intent," *id*. at 980 — such factual determinations must be "presumed to be correct," even if, at first blush, they seem speculative, and petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Petitioner has not shouldered that burden.

This court also cannot say that such determinations of factual questions by Alabama's highest court "resulted in a decision that was based on an *unreasonable determination of the facts in light of the evidence presented in the State court proceeding*." 28 U.S.C. § 2254(d)(2) (emphasis supplied). For this court to hold otherwise on the basis of the present record would require it to engage in speculation and conjecture equal to, if not greater than, that of the six Justices who joined in the state supreme court's opinion on collateral review.

In summary, petitioner has not shown under § 2254(d)(1) that the Alabama Supreme Court's adjudication of either the substantive component of this claim, or the derivative issue of the effectiveness of counsel, "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," nor has he shown under § 2254(d)(2) that the state supreme court's decision "was based on an unreasonable

274

determination of the facts in light of the evidence presented in the State court proceeding." *See*, *e.g.*, *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001) ("State court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)."). Therefore, all aspects of this claim are denied.

"**II**"    *The Applicability of the Supreme Court's Holding in* Ring v. Arizona

Petitioner's final claim was not asserted at trial, on direct appeal, during collateral proceedings in state court, or in his original habeas petition. Instead, it was raised for the first time in section "II" of his supplemental brief,[307] filed long after the petition for writ of habeas corpus. The claim pivots upon the Supreme Court's holding in *Ring v. Arizona*, 536 U. S. 584, 589 (2002), *overruling Walton v. Arizona*, 497 U.S. 639 (1990).

The *Ring* case was the second occasion on which the Supreme Court addressed the State of Arizona's sentencing scheme for capital cases, under which trial judges made all findings of fact relevant to a convicted defendant's death-eligibility, without the advice or participation of juries. *See Ring*, 536 U.S. at 588 ("In Arizona, following

---

[307] *See* doc. no. 74 (Petitioner's Supplemental Brief), at 22-25. The title of this section states: "II. The Alabama statute under which Mr. Thomas was sentenced to death requires the judge — without the aid of the jury — to make the findings necessary for imposition of a death sentence in violation of the Sixth Amendment to the United States Constitution. *Ring v. Arizona*, 122 S. Ct. 2228 (2002)." *Id*. at 22.

a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty."). The Court first addressed that sentencing scheme in 1990, in *Walton v. Arizona*, *supra*, and on that occasion held it to be "compatible with the Sixth Amendment because the additional facts found by the judge qualified as sentencing considerations, not as 'element[s] of the offense of capital murder.'" *Ring*, 536 U.S. at 588 (quoting *Walton*, 497 U.S. at 649) (alteration in original).

Ten years later, however, the Court handed down its opinion in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), holding that: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id*. at 490.[308]

---

[308] The Supreme Court's opinion in *Jones v. United States*, 526 U.S. 227 (1999), construing the federal carjacking statute (18 U.S.C. § 2119), which authorized increased maximum sentences when the commission of that offense resulted in "serious bodily injury" or "death," foreshadowed the *Apprendi* holding. In *Jones*, the Court observed that its "prior cases suggest[ed]," but did not "establish," that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than [a] prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id*. at 243 n.6. *Apprendi* converted that *dicta* to a holding. *See Ring*, 536 U.S. at 588-89 (construing *Apprendi* as holding that "the Sixth Amendment does not permit a defendant to be 'expose[d] . . . to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone'") (quoting *Apprendi*, 530 U.S. at 483) (emphasis and alterations in original).

When the *Ring* case reached the Supreme Court, therefore, and the Court applied the rationale of its decision in *Apprendi* to a death sentence imposed under the Arizona sentencing scheme, the Court concluded that

> *Apprendi's* reasoning is irreconcilable with *Walton's* holding in this regard, and today we overrule *Walton* in relevant part.    Capital defendants, no less than noncapital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.

*Ring*, 536 U.S. at 589; *see also id*. at 602 ("If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact — no matter how the State labels it — must be found by a jury beyond a reasonable doubt.") (citing *Apprendi*, 530 U.S. at 482-83); *id*. at 609 ("Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury.") (quoting *Apprendi*, 530 U.S. at 494 n.19).

Petitioner's supplemental brief argues that the Court's holding in *Ring* "requires *jury* fact-finding on critical sentencing issues [and], therefore, invalidates the Alabama sentencing structure which allows *judges*, without the aid of the jury, to make the factual findings required for the imposition of the death penalty."[309]

---

[309] Doc. no. 74 (Petitioner's Supplemental Brief), at 22 (emphasis in original).

277

Laying aside the the inaccuracy of petitioner's assertion that, under Alabama's

capital sentencing scheme, trial court judges determine sentence "without the aid of the

jury,"[310] it need only to be noted that the Supreme Court specifically determined in

---

[310] Alabama's capital sentencing regimen, unlike the Arizona scheme addressed in *Ring*, is not one in which the ultimate sentencing decision in capital cases is committed entirely to judges. Instead, Alabama maintains a "hybrid" system, under which the jury renders an advisory verdict, but the judge makes the ultimate sentencing decision. Such statutory schemes have been referred to as "guided discretion" systems, and Florida's "guided discretion" statute — a statutory scheme which, like Alabama's similar regimen, authorizes a trial judge to override a jury's advisory sentence recommendation — was sustained in *Proffitt v. Florida*, 428 U.S. 242 (1976).

The death-sentenced inmate in *Proffitt* did not challenge directly Florida's judicial override provision because, in his case — like the present one — the advisory jury had recommended death. *Id*. at 246. The Court nevertheless remarked that a judge-sentencing scheme might better ensure equal treatment across capital cases. *See id*. at 252 (opinion of Stewart, Powell, and Stevens, JJ).

Eight years later, however, in *Spaziano v. Florida*, 468 U.S. 447 (1984), the Court confronted the question lift open in *Proffitt* — *i.e.*, whether the exercise of a judicial override in a case in which the jury recommended a sentence of life violates the Constitution — and concluded that the Eighth Amendment did not prohibit states from empowering judges to make the final decision about the appropriateness of the death penalty, and to override a contrary recommendation by the jury. *See id*. at 463-65.

The Supreme Court's decision in *Ring* does not unsettle its holdings in *Proffitt* and *Spaziano*. Instead, as the majority opinion noted,

Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. *See Apprendi v. New Jersey*, 530 U.S. 466, 490-491, n.16 (2000) (noting "the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation" (citation omitted)). Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. *See Proffitt v. Florida*, 428 U.S. 242, 252 (1976) (plurality opinion) ("[I]t has never [been] suggested that jury sentencing is constitutionally required."). He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. *See Clemons v. Mississippi*, 494 U.S. 738, 745 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. *See Apprendi*, 530 U.S., at 477, n.3 (Fourteenth

*Schriro v. Summerlin*, 542 U.S. 348 (2004), that its holding in *Ring v. Arizona* does not apply retroactively to cases, such as this one, in which the conviction and sentence were final on direct appeal before the *Ring* opinion was announced.  *See id.* at 358 ("*Ring* announced a new *procedural rule* that does not apply retroactively to cases already final on direct review.") (emphasis supplied).  Accordingly, this claim is due to be denied.

## VI.  CONCLUSION

All claims in the petition for writ of habeas corpus filed by Kenneth Glenn Thomas are due to be denied on the grounds set out in this opinion, with the sole exception of Claim "R," which will be remanded to the state court for a determination of petitioner's Eighth and Fourteenth Amendment claim in accordance with the decisions of the United States Supreme Court in *Atkins v. Virginia*, 536 U.S. 304 (2002), and the Supreme Court of Alabama in *Ex parte Perkins*, 851 So. 2d 453 (Ala. 2002).  A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 6th day of March, 2007.

---

Amendment "has not . . . been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury'").

*Ring v. Arizona*, 536 U.S. 584, 597 n.4 (2002) (Ginsburg, J. majority opinion).

United States District Judge

# APPENDIX

### The Alabama Court of Criminal Appeals' Disposition on Collateral Appeal of The Specific Acts of Alleged Prosecutorial Misconduct Now Comprising Claim "F" of Petitioner's 28 U.S.C. § 2254 Habeas Petition

| **Alleged Misconduct**<br>Paragraph Numbers Correspond to § 2254<br>Habeas Petition (doc. no. 1) | **Disposition**<br>*Thomas v. State*, 766 So. 2d 860<br>(Ala. Crim. App. 1998) |
|---|---|
| 117.  The prosecutor told the jury [during opening statement] that the significance of the indictment was that a grand jury had already considered the evidence in the case and had decided that there was a "likelihood" that the defendant had committed the crime.  (R. 697-99).  The prosecutor emphasized, "and those eighteen citizens on the Grand Jury, after hearing the evidence, returned an indictment against this man right here (Indicating), this Defendant."  (R. 697-98).  Rather than simply reading the indictment to the jurors, the prosecutor remarked that the likelihood that Mr. Thomas committed the crime "was important to the Grand Jury" and "it's important to us."  (R. 699).<br><br>118.  These improper comments instructed the jury that they should consider the indictment as <u>evidence</u> of Mr. Thomas' guilty which violated his right to a fair trial by attacking the presumption of innocence before any evidence had been presented. | Petitioner did not raise these claims at trial or on direct appeal.  Consequently, they were held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 893-902 (discussing Rule 32 claim "II.(i)" corresponding to paragraphs 117 and 118 of the petition filed in this case).  *See also id.* at 929 (discussing Rule 32 claim "60.(a)" and "60.(b)"). |
| 119.  The prosecutor also made repeated inflammatory and highly prejudicial statements, declaring several times, for example, that the victim had been "slaughtered."  (R. 762, R. 770). | See 766 So. 2d at 902-03, and, 929 (discussing the Rule 32 claim corresponding to paragraph 119). |
| 120.  The prosecutor was allowed without objection to introduce irrelevant testimony of Marvolene Thomas, the daughter of the decedent, ostensibly for the purpose of having Ms. Thomas identify jewelry, watches, and other items that were found in a pillowcase at the scene.  (R. 1438-1431).  The prosecutor asked Ms. Thomas whether her mother appeared to be in good health the last time Mrs. Thomas saw her alive, to which Ms. Thomas responded "She was in good health.  She Looked real good."  (R. 1431).  This testimony was elicited solely for the purpose of parading an emotional display of the victim's family members before the jury.  This type of evidence is inadmissible at the guilty/innocence phase of the trial. | Petitioner did not raise this claim at trial or on direct appeal.  Consequently, it was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 929 (discussing Rule 32 claim "61.(a)"). |

| | |
|---|---|
| 121. The prosecutor improperly impeached witnesses during cross-examination with statements allegedly made to other witnesses without ever "completing the impeachment" by calling these witnesses to the witness stand. (R. 1732, 1743). This questioning was tantamount to the prosecutor testifying.  For example, during his cross-examination of Mr. Thomas at trial, the prosecutor asked Mr. Thomas whether, after he'd been returned to the jail from the state hospital, he'd told fellow prisoners Harold L. Schut and Dewayne Pugh that he'd "really faked all those doctor down there at Taylor-Hardin." (R. 1732). Mr. Thomas denied making such statements, and the prosecutor did not call either Mr. Schut or Mr. Pugh as a witness o testify to the fact that such statements were made. | Petitioner did not raise this claim at trial or on direct appeal.  Further, the state appeals court held that petitioner "fail[ed] to support his allegation with evidence." 766 So. 2d at 932 (discussing Rule 32 claim "61.(g)"); *see also* Ala. R. Crim. P. 32.3 (providing in pertinent part that "[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief"). |
| 122.  At the guilt/innocence phase of petitioner's trial, the court improperly admitted into evidence irrelevant, inflammatory and highly prejudicial photographs of the decedent's wounds. (R. 865-76; R. 941-44; R. 948-49; R. 1068-70).  The introduction into evidence of photographs of the victim's wounds at the guilt/innocence phase of the trial was not probative of any relevant fact and was inflammatory and highly prejudicial. Many of the photographs were cumulative duplicates and close-ups which exacerbated the prejudicial effect of the photographs.  Even after cumulative photographs of the victim taken at the scene had been admitted into evidence, the trial court improperly admitted grossly inflammatory photographs, including one depicting the anus and buttocks of the victim, that were taken during the autopsy. (R. 941-44; R. 948-49). <br><br> 123.  In addition, the trial court improperly allowed the prosecutor to project color slide photographs of the bloodstained evidence and the ransacked rooms of the decedent's house during the examination of tone of the State's witness, even though the prosecutor made no showing that the projection of these slides was necessary for this witness to testify.  (R. 1096-1128). <br><br> 124.  The trial court also allowed the prosecutor to parade before the jury, and introduce into evidence, highly inflammatory and prejudicial tangible evidence such as the bloody nightgown and underwear of the victim. (R. 1137-1151).  The introduction of this gruesome and highly inflammatory physical evidence, which had not material evidentiary value, served only to further arouse the passions of the jury. | Petitioner's attorneys objected at trial to *some* (but *not* all) of the exhibits forming the basis of these claims. However, *none* of the substantive components of these claims were asserted as trial error on direct appeal.. Consequently, the claims were held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(2), (3), and (5).  *See* 766 So. 2d at 922-23 (discussing Rule 32 claim "P"). |

| | |
|---|---|
| 125.  The prosecutor inflamed the jury against Mr. Thomas by repeatedly calling him "this street punk" (R. 1829 – three times), "this criminal" (R. 1828), "this thug" (R. 1831, 1834), "a murderer" (R. 1844), and a "manipulator" (R. 1851).  At one point, the prosecutor blatantly misled the jury about Mr. Thomas' previous criminal record by telling them that he was "a street punk who has been excused by this community and society for everything that he ever did wrong before."  (R. 1828).  These direct personal attacks against Mr. Thomas constituted reversible error because Mr. Thomas never placed his good character in issue. | Petitioner did not object to the substantive components of this claim at trial, or raise them as error on direct appeal.   Consequently, the claim was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 933-34 (discussing Rule 32 claim "63.(b)"); *see also id*. at 936 (discussing Rule 32 claim "63.(e)"). |
| 126.  The unwarranted attacks against Mr. Thomas were intensified by the prosecutor's declaration that the case was about "murder and meanness" and "murder and mayhem."  (R. 1828).   The prosecutor improperly compared the case to others by calling the offense "one of the most atrocious crimes in the history of this county" and "one of the most saddest [sic] slaughters in its history." (R. 1828). | Petitioner did not raise this claim at trial or on direct appeal.   Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 934-36 (discussing Rule 32 claim "63.(c)"). |
| 127.  The prosecutor then referred to the personal characteristics and life history of the victim in an improper effort to project the trial as a contest between the victim and the victim's family against Mr. Thomas.  (R. 1828).  The prosecutor stated:<br><br>"As a teenager, [the victim] say the doughboys go off to Europe during World War I.  As a young mother, she kept a family together and raised them during the great depression and then, as a fairly young adult, she saw two million persons go off again to Europe, many of them not returning, to fight in World War II.  She lived through tornadoes and droughts and bad times.  She lived through killer tornadoes in the 1930s that killed 200 people in the southeast and the killer tornadoes of 1974 that claimed the lives of 6 or 7 people here in this county." | Petitioner did not raise this claim at trial or on direct appeal.   Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 934-36 (discussing Rule 32 claims "62" and "63.(a)"). |
| 128.  The prosecutor also improperly made negative comments about the defense's case and evidence.  The prosecutor undermined Mr. Thomas' defense when he stated that the defense's case was "unprovable and unsubstantiated." (R. 1857).  This derogatory statement improperly suggested that the jury shift the burden of proof to the defense. | Petitioner did not raise this claim at trial or on direct appeal.   Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 938-39 (discussing Rule 32 claim "63.(h)"). |

| | |
|---|---|
| 129.  The prosecutor distorted and mischaracterized Mr. Thomas' testimony by telling the jury that he claimed to be "one of the biggest potheads in the world" (R. 1831); that he had brag[ged] about his prior drug use" (R. 1856); and that "his face [lit] up, and he almost got gleeful as he described that." (R. 1856). | Petitioner did not raise this claim at trial or on direct appeal.  Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 936-38 (discussing Rule 32 claim "63.(f)"). |
| 130.  The prosecutor improperly invited the jury to speculate, based on testimony by the State's criminologist, that soot patterns in the victim's sink suggested that there had been water in it, that Mr. Thomas had "used [the sink] to wash himself, his hands, his genitals, and he used it to wash away the life's blood of Flossie McLemore." (R. 1845).    The uncontroverted evidence, however, demonstrated that Mr. Thomas's hands and body were covered with his own blood and that there were no fingerprints left in the sink. | Petitioner did not raise this claim at trial or on direct appeal.  Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 943 (discussing Rule 32 claim "63.(p)"). |
| 131.  The prosecutor ignored undisputed testimony by two of the state's witnesses that the front door was unlocked. (Don Pressnell R. 925); (Larry Gooch R. 837).  Instead, he told the jury that Officer Harlan tried to "force" the front door open but it was "locked."  (R. 1840).  Harlan never testified about the front door. | Petitioner did not raise this claim at trial, on direct appeal, or in the Rule 32 petition he filed in state court.  Consequently, the underlying substantive issue is procedurally barred.  *See, e.g., Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim unless he first properly raised the issue in the state court system."). |
| 132. The prosecutor wrongly impugned Mr. Thomas' character with evidence not admitted in the record when he remarked that Mr. Thomas had been "committing felonies" at a party earlier in the evening.  (R. 1836-37).  Arguing facts to the jury not admitted into evidence was improper and constitutes reversible error. | Petitioner did not raise this claim at trial or on direct appeal.  Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 941 (discussing Rule 32 claim "63.(*l*)"). |
| 133.  The prosecutor falsely and improperly impugned [two] defense witnesses by stating that they were "either cousins or best friends or were drunk and intoxicated and have at least admitted prejudice for this Defendant because they are either related or friends." (R. 1838).  He wrongly suggested that defense witnesses were beholden to Mr. Thomas because "[h]e is the one that brings the dope and whiskey to the parties."  (R. 1838).<br><br>134.  The prosecutor also blatantly maligned the defense witness Charles Brown, M. D. By referring to him as "Little Charlie Brown."  (R. 1854). | Petitioner did not raise these claims at trial or on direct appeal.  Consequently, the underlying substantive issues were held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 941-42 (discussing Rule 32 claim "63.(n)").  (The Court of Criminal Appeals did find that "the prosecutor's sole reference to Dr. Brown was inappropriate," but concluded that "it was not prejudicial."  *Id*. at 942.) |

| | |
|---|---|
| 135.   The prosecutor impermissibly bolstered the [testimony of two of the] State's witnesses [Pressnell and Corum, both of whom placed petitioner in the vicinity of the crime-scene at the estimated time of commission] by characterizing their testimony as "critical and believable" (R. 1838), and stating that they "had very logical explanations for what they saw . . . ." (R. 1836-37). | Petitioner did not raise these claims at trial or on direct appeal.  Consequently, the underlying substantive issues were held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 942-43 (discussing Rule 32 claim "63.(*o*)"). |
| 136.   The prosecutor impermissibly injected his personal opinions about Mr. Thomas' testimony.  He remarked to the jury that Mr. Thomas had told them 'the most incredible story' (R. 1838-39); that his testimony was "a statement of lies tied together with other lies with one big hole right in the middle" (R. 1851); and that "he lied about it" (R. 1857). | Petitioner did not raise this claim at trial or on direct appeal.  Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 938 (discussing Rule 32 claim "63.(g)"). |
| 137.   The prosecutor also improperly expressed his personal opinion about the defense's evidence of Mr. Thomas' mental state, telling the jury that "there is no real evidence presented by the defense that at the time of this crime . . . this man was suffering from a mental disease or defect" (R. 1853); and there was only "speculation and guess work and projection" on the part of defense experts about mental disease or defect (R. 1853). | Petitioner did not raise this claim at trial or on direct appeal.  Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 941 (discussing Rule 32 claim "63.(k)"). |
| 138.   The prosecutor's repeated mischaracterization of Mr. Thomas' character coupled with his derogatory comments that Mr. Thomas was "liar," demonstrate a repeated pattern of misconduct. | Petitioner did not raise this claim at trial, on direct appeal, or in the Rule 32 petition he filed in state court.  Consequently, the underlying substantive issue is procedurally barred.  *See, e.g., Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim unless he first properly raised the issue in the state court system."). |
| 139.   The prosecutor impermissibly vouched for the State's expert witness, Dr. Clifford Hardin, by expressing his personal opinion to the jury that, "[i]n my judgment, the most probative witness to insanity alone was Dr. Hardin."  (R. 1855).   "[W]hat I thought was most important is that [Dr. Hardin] said . . . that he was more or less convinced of this man's sanity about as strong as it ever has been of anyone" (R. 1856); and that "Dr. Hardin, I believe, sunk whatever defense of insanity there was." (R. 1856). | Petitioner did not raise this claim at trial or on direct appeal.  Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 939-41 (discussing Rule 32 claim "63.(j)"). |

| | |
|---|---|
| 140.   The prosecutor also minimized the jury's concern as to whether a death sentence was an appropriate sentence by improperly expressing his personal opinion that "the only time during this investigation [Mr. Thomas] came close to admitting the truth" was when he stated in his tape-recorded statement, taken shortly after his arrest, that he "just want[ed] to die." (R. 1851). This remark not only suggested to the jury that Mr. Thomas had confessed to the crimes – when in fact he never confessed, but it also intimated that a death sentence would be acceptable to Mr. Thomas. | Petitioner did not raise this claim at trial or on direct appeal. Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5). *See* 766 So. 2d at 943-44 (discussing Rule 32 claim "63.(q)"). |
| 141. The prosecutor further sabotaged the defense's case by making hyperbolic and exaggerated statements about the evidence. He told the jury that they had seen "the most despicable and inhumane photographs that I think a jury has ever seen" (R. 1830); that the victim had been "cut, slashed, and maybe a better word was tortured" (R. 1830); and that "the sickening grotesque evidence [was] overwhelming" that the victim had been sexually abused. (R. 1851). | Petitioner did not raise this claim at trial or on direct appeal. Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5). *See* 766 So. 2d at 939 (discussing Rule 32 claim "63.(i)"). |
| 142.   The prosecutor wrongly asked the jury to ignore mitigating evidence. He improperly characterized mitigating evidence as aggravating evidence, and grossly mischaracterized Mr. Thomas' sad and pitiable upbringing, which in large part consisted of being neglected by his family and shuttled from one foster home to another, by telling the jury that Mr. Thomas was "a street punk who took the very best that this community has to offer and spit in the community's face."  (R. 1829).<br><br>143.   The prosecutor derisively remarked that Mr. Thomas "had the advantage of having psychologists and counselors as he grew up to help him with whatever problems that he had, but all the social workers, the preachers, the foster parents, the teachers, and the psychologists together couldn't keep this kid from being what he was and what he is:  evil, mean and violent." (R. 1829). Once again, these personal onslaughts against Mr. Thomas[,] coupled with the erroneous comments that no mitigating evidence existed[,] constituted reversible error and violated Mr. Thomas's right to a fair trial. | Petitioner did not raise either of these claims at trial or on direct appeal.   Consequently, the underlying substantive issues were held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5). *See* 766 So. 2d at 936 (discussing Rule 32 claim "63.(d)" corresponding to the content of paragraphs 142 and 143). |

| | |
|---|---|
| 144.   The prosecutor's closing rebuttal was also replete with improprieties. He wrongly told the jury that somebody had "to take responsibility" for the crime, thereby framing the jury's task as a choice among disparate parties as to who would bear the blame, and appealing to the jury's prejudices by implying that if the jury did not convict Mr. Thomas no one would be held responsible:<br><br>    Who is going to take the responsibility for the death of Mrs. Flossie McLemore? Me? For being a dumb D.A. or a weak D.A.? Bobby Smith? For not being the best investigator in the world? Police? For not having a car on every street corner on December the 14th of 1984? The defense would have you put the responsibility for her death and for that killing on everybody but the one man in this whole wide world that could have prevented that death and prevented that tragedy. The one man who can only be held responsible for it today.<br><br>(R. 1879). Equally damaging, he told the jury that it was "setting the standard for what conduct is going to be in this community," (R. 1885) and imploring the jury to convict Mr. Thomas so as not to "[ send] out a very bad message" to "other thugs and murderers." (R. 1885). | Petitioner did not raise this claim at trial or on direct appeal.  Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5). *See* 766 So. 2d at 944 (discussing Rule 32 claim "64.(a)" – asking "Who is going to take the responsibility for the death of Mrs. Flossie McLemore?"); *see also id*. at 946-47 (discussing Rule 32 claim "64.(e)" – the assertion that the jury was "setting the standard for what conduct is going to be in this community"). |
| 145.  The prosecutor improperly injected his personal background and beliefs into the argument in an attempt to get the jury to sympathize and identify with the State:<br><br>    I'm not the head of some Gestapo or a bunch of Nazis trying to Kill somebody. I'm Jimmy Fry who on a cold November morning in 1950 was born two blocks from here at Powers Hospital. I'm here to see that the law and order is maintained, and that hopefully, beyond all else, justice is done so that the people of this county can go to sleep at night and be in bed and be safe and secure in their homes.<br><br>(R. 1879-80). | Petitioner did not raise this claim at trial or on direct appeal.  Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 944-45 (discussing Rule 32 claim "64.(b)"). |

287

| | |
|---|---|
| 146.   The prosecutor improperly invoked the murdered victim's presence in the courtroom in an attempt to appeal to vengeance for the victims' family and to portray the case as a contest between the "rights of the Defendant" and the "victim's rights":<br><br>You've heard the explanation of the rights of the Defendant in this case. . . .  You know somebody else had rights, too.  There should have been a third chair over here this week between Bobby and I.  If we had that chair it would be empty.  This is the chair for Mrs. Flossie McLemore.  She had rights, too.<br><br>(R. 1884). | Petitioner did not raise this claim at trial or on direct appeal.  Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 945-46 (discussing Rule 32 claim "64.(c)"). |
| 147.   The prosecutor misstated the evidence and the charges made against Mr. Thomas when he told the jury the victim "was broken into and raped and robbed" and that "every home in this county was raped and robbed." (R. 1884).  These improper references to the crime of rape were intended to inflame the passions and fears of the jury and were highly prejudicial. | Petitioner did not raise this claim at trial or on direct appeal.  Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5).  *See* 766 So. 2d at 946 (discussing Rule 32 claim "64.(d)"). |
| 149.   The prosecutor during sentencing suggested to the jury that it should sentence Mr. Thomas death because it "may consider that if this man is sentenced to life without parole there's always the possibility of escape." (R. 1983).<br><br>150.   This "parole" statement was calculated to arouse the pre-existing concern of the jurors about prison escapes, which had been widely publicized in the local news media before Mr. Thomas' trial.  In fact, a local radio station had recently aired a "contest" where participants tried to guess the correct date and time of the next prison escape. | Petitioner objected to the prosecutor's "possibility of escape" argument at trial, and the trial court sustained and gave a curative instruction to the jury.  *See* 766 So. 2d at 956, 958 ("[T]he trial court's swift, appropriate actions were curative.").   The issue was not raised on direct appeal, however.  Consequently, the Alabama Court of Criminal Appeals held that it was procedurally barred by Ala. R. Crim. P. 32.2(a)(2) and (5).  *See* 766 So. 2d at 956-58 (discussing Rule 32 claim "79.(d)"). |
| 151.   The prosecutor's remarks to a key defense witness' testimony were improper by asking the witness if she was "sure [she'd] never been treated for any kind of mental disease or defect?" and then commenting, when the witness answered affirmatively, "I guess we'll have to take your word for it." (R. 1949). | Petitioner did not raise this claim at trial or on direct appeal.  Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5). *See* 766 So. 2d at 954 (discussing Rule 32 claim "Y.78.(a)"). |
| 152.   The prosecutor inflamed the passions of the jury against Mr. Thomas with grossly inflammatory characterizations of the offense as a "savage slaughter" (R. 1980); "almost animalistic" (R. 1980); "like some kind of Nazi war crime" (R. 1980); and "very similar to a crime being committed against a child."  (R. 1981). | Petitioner did not raise this claim at trial or on direct appeal.  Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5). *See* 766 So. 2d at 954-55 (discussing Rule 32 claim "Y.79.(a)"). |

| | |
|---|---|
| 153. The prosecutor also wrongly expressed his personal opinion about the evidence, including assertions that the offense "[went] beyond all human dignity," (R. 1980), that "[i]t [went] to the point of offending all of human sensibility," (R. 1980), and that "I don't know what he could have done to her that would have been more degrading and more inhumane than the things that he did and the things that you all have convicted him of doing." (R. (1981). | Petitioner did not raise this claim at trial or on direct appeal. Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5). *See* 766 So. 2d at 955-56 (discussing Rule 32 claim "Y.79.(b)"). |
| 154. The prosecutor improperly characterized the jury's decision between a death sentence and a sentence of life without parole as a choice between "do[ing] justice" and "sav[ing] this man's life": I want you to do what you think is right. I want you to do justice. What they want is, I guess, to save this man's life, I want justice. (R. 1984-1985). | Petitioner did not raise this claim at trial or on direct appeal. Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5). *See* 766 So. 2d at 958-59 (discussing Rule 32 claim "Y.79.(e)"). |
| 155. Coupled with this flagrant statement, the prosecutor impermissibly attempted to deflect responsibility from the jury for its sentencing decision by telling it that "I'm not asking you to kill anybody or take anybody's life. I'm asking you to enforce the law of the State of Alabama." (R. 1984-85). | Petitioner did not raise this claim at trial or on direct appeal. Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5). *See* 766 So. 2d at 960 (discussing Rule 32 claim "Y.79.(g)"). |
| 156. The prosecutor flagrantly appealed to the prejudice and sympathy of the jury by emphasizing the age and vulnerability of the victim, comparing her to "a child," (R. 1981 – twice), who "was an innocent prey of this defendant." (R. 1981). | Petitioner did not raise this claim at trial or on direct appeal. Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5). *See* 766 So. 2d at 956 (discussing Rule 32 claim "Y.79.(c)"). |
| 157. The prosecutor wrongly suggested to the jury that it make its decision as to sentence by simply taking "the photograph of this man shot through the bars at the jail with the blood on his face" and comparing it with "one of the photographs of Mrs. McLemore laying there in the floor in a pool of blood with her body mutilated and abused beyond what we all would consider inhumane." (R. 1984-85). This closing comment tapped into the jury's exposure to extensive media before trial, including pictures of Mr. Thomas. Unquestionably, Mr. Thomas suffered extreme prejudice from this image. | Petitioner did not raise this claim at trial or on direct appeal. Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5). *See* 766 So. 2d at 959-60 (discussing Rule 32 claim "Y.79.(f)"). |
| 158. The combined effect of all of the prosecutor's improper arguments and comments during the guilt/innocence and penalty phases of the trial violated Mr. Thomas' rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the Alabama Constitutions. | Petitioner did not raise this claim at trial or on direct appeal. Consequently, the underlying substantive issue was held to be procedurally barred by Ala. R. Crim. P. 32.2(a)(3) and (5). *See* 766 So. 2d at 947 (discussing Rule 32 claim "65."). |