# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **KENNETH GLENN THOMAS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-01-S-0772-NE** |
| | ) | |
| | ) | |
| **RICHARD ALLEN, Commissioner** | ) | |
| **of the Alabama Department of** | ) | |
| **Corrections,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Petitioner, Kenneth Glenn Thomas, is an inmate in the custody of the Alabama Department of Corrections.  He was sentenced to death by the Circuit Court of Limestone County, Alabama, for the intentional murder of Mrs. Flossie McLemore during the course of a burglary.  *See* Ala. Code § 13A-5-40(a)(4) (1975).  Following exhaustion of his direct appeal rights and post-conviction remedies in the state court system,[1] Thomas filed a petition in this court, seeking relief in the nature of *habeas corpus*.  *See* 28 U.S.C. § 2254.  All but one of his claims for relief were dismissed in

---

[1] *See Thomas v. State*, 539 So. 2d 375 (Ala. Crim. App. 1988), *aff'd sub nom Ex parte Thomas*, 539 So. 2d 399 (Ala. 1988) (*per curiam*), *cert. denied sub nom Thomas v. Alabama*, 491 U.S. 910 (1989).  *See also Thomas v. State,* 766 So. 2d 860 (Ala. Crim. App. 1998), *aff'd sub nom Ex parte Thomas*, 766 So. 2d 975 (Ala. 2000).

1

an order and memorandum opinion entered on March 6, 2007;[2] the sole claim that survived the motion for summary judgment filed by the respondent Commissioner of the Alabama Department of Corrections was Thomas's contention that he is mentally retarded.[3]  If Thomas is retarded, then the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002) — holding under the Eighth Amendment that "death is not a suitable punishment for a mentally retarded criminal," *id*. at 321 — will require his death sentence to be vacated.[4]

This court originally ordered that Thomas's *Atkins* contention be remanded to the state court system, with instructions to reevaluate his claim in accordance with

---

[2] *See* doc. nos. 86 (memorandum opinion) and 87 (accompanying order).

[3] *See* doc. no. 86 at 231-49 (holding pursuant to 28 U.S.C. §§ 2254(d)(1) and (d)(2) that the state courts' post-conviction conclusion that Thomas was not mentally retarded was contrary to, and an unreasonable application of, clearly established federal law as determined by the United States Supreme Court in *Atkins v. Virginia*, 536 U.S. 304 (2002), as well as an unreasonable determination of the facts in light of the evidence presented in the state-court, post-conviction proceedings).

[4] The *Atkins* majority affirmed that "mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes," but also recognized that the disabilities of such persons "in areas of reasoning, judgment, and control of their impulses" diminished their ability to "act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Atkins*, 536 U.S. at 306-07 (Stevens, J., majority opinion).  In other words, the mental deficiencies of retarded persons "do not warrant an *exemption* from criminal sanctions, but they do diminish their personal *culpability*." *Id*. at 318 (emphasis supplied); *see also id*. at 321 ("We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty.  Construing and applying the Eighth Amendment in the light of our evolving standards of decency, we therefore conclude that such punishment is excessive and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender.") (citation and internal quotation marks omitted).

standards established by binding authorities.[5]  Upon joint motion of the parties,

however, this court was persuaded to withdraw that remedy in favor of an order

amending the judgment to reflect that the claim would be litigated on the merits in

this court.[6]  An evidentiary hearing commenced on May 19, 2008, and concluded on

May 20, 2008.[7]  Thereafter, the parties filed post-hearing briefs.[8]

Respondent's brief concedes that the evidence presented during the May

hearing establishes that "Thomas's IQ now falls in the mild mental retardation

range,"[9] but goes on to argue that *Atkins* provides him no relief because he failed to

prove that "he suffered from significantly sub-average general intellectual functioning

or substantial deficits in adaptive behavior in the developmental period."[10]

---

[5] *See* doc. no. 86 (Mar. 6, 2007 memorandum opinion) at 250-54, and doc. no. 87 (accompanying order).

[6] *See* doc. no. 91.  In preparation for an evidentiary hearing, a scheduling order was entered to govern discovery, mental health examinations, and the exchange of witness and exhibits lists between the parties.

[7] ***Nota bene***:  The evidentiary hearing resulted in a two volume transcript that has been filed as document numbers 124 and 125.  For purposes of this opinion, the transcript will be cited as follows:  "**[Witness], Tr. Vol. I at [page #]**" or "**[Witness], Tr. Vol. II at [page #]**."

[8] *See* doc. nos. 126 (respondent's brief), 127 (petitioner's brief), 128 (respondent's reply brief), and 129 (petitioner's response to respondent's reply brief).

[9] Doc. no. 126 (respondent's brief) at 1.

[10] *Id*. at 26 ("Thomas failed to prove by a preponderance of the evidence the third prong of the mental retardation definition — that he suffered from significantly sub-average general intellectual functioning or that he exhibited significant or substantial deficits in adaptive behavior during the developmental period.  While Thomas's IQ now falls in the mild mental retardation range, a mild mental retardation diagnosis would be inappropriate because he did not meet the diagnostic criteria during his developmental period.  This Court should, therefore, find that this claim in the habeas petition is without merit and should deny relief on it").

Respondent thus reduced his argument against a finding of mental retardation to this question:  *Has petitioner proven*, *by a preponderance of the evidence*,[11] *that he met the criteria for mental retardation prior to the age of eighteen years* (the so-called "developmental period")?  The remainder of this opinion addresses that question, as well as other issues.[12]

## Table of Contents

**I.  The Legal Criteria Defining Mental Retardation** ............................................... 6

**II.  Diagnostic Criteria Defining Mental Retardation** ........................................ 10

    **A.  Assessment of Intellectual Functioning** ..................................................... 10

        **1.**  *Standardized assessment instruments* .............................................. 10-11

            **a.**  *The Wechsler Adult Intelligence Scales* ......................................... 12

            **b.**  *The Stanford-Binet Intelligence Scales* ........................................... 16

---

[11] The habeas petitioner bears the burden of persuading the court, by a preponderance of the evidence, that he meets the diagnostic criteria specified in the Alabama Supreme Court opinions discussed in Part I of this opinion *infra*.  *See, e.g.*, *Holladay v. Campbell*, 463 F. Supp. 2d 1324, 1341 n.21 (N.D. Ala. 2006).  *See also Morrow v. State*, 928 So. 2d 315, 322-23 (Ala. Crim. App. 2004) (holding that a preponderance of the evidence standard applies when considering *Atkins* claims under Alabama Rule of Criminal Procedure 32).

[12] An additional query, framed by the recent decision of the Supreme Court of Alabama in *Smith v. State*, No. 1060427, 2007 WL 1519869 (Ala. May 25, 2007), must also be answered:  *Has petitioner proven that he met the criteria for mental retardation on the date of the offense for which he was sentenced to death?  See id.* at *8.  The statement from respondent's brief quoted in note 10 *supra* clearly appears to concede this issue.  Indeed, respondent has not mentioned this issue.  Even so, and as discussed in Part I *infra*, the Eleventh Circuit recently held that Alabama's definition of mental retardation in the context of cases based on *Atkins* includes an implicit understanding that the offender must prove that he suffered from substantial deficits in intellectual and adaptive functioning on the date of the offense.  *See Holladay v. Allen*, 555 F.3d 1346, 1353 (11th Cir. 2009) (citing *Smith v. State*, No. 1060427, 2007 WL 1519869 (Ala. May 25, 2007)).  Consequently, this court also will address that question.

**2**.   *Measurement errors and cut scores* ................................................ 18-19

    **a**.   *The effect of "standard errors of measurement" on "true" IQ scores* ............ 20

    **b**.   *The stipulated* SEM *and its effect upon determination of petitioner's IQ* ....... 24

**3**.   *The "Flynn Effect," IQ gains over time, and cut scores* ........................... 31

**4**.   *Conclusions* ....................................................................... 39-40

**B.**   **Assessment of Adaptive Behavior** ............................................. 42

    **1.**   *Standardized assessment instruments* ...................................... 45

    **2.**   *The importance of clinical judgment* ...................................... 48

    **3.**   *The assessment instrument used in this case* ........................... 50

**III**.   **Expert Witnesses and "Best Practices"** ....................................... 53

  **A.**   **Petitioner's Experts** ........................................................... 53

    **1.**   *Dr. Karen Salekin* ........................................................... 53

    **2.**   *Dr. Daniel Marson* ......................................................... 55-56

  **B.**   **Respondent's Expert** ........................................................ 58

  **C.**   **"Best Practices"** .............................................................. 59-60

**IV**.   **Assessments of Petitioner's Intellectual Functioning** ....................... 67

  **A.**   **Intelligence Assessments Performed Prior to Age Eighteen** .................. 68

    **1.**   *October 4, 1968 — age nine years and seven months* ........................... 68

    **2.**   *October 12, 1972 — age thirteen years and seven months* ................... 69

    **3.**   *June 23, 1973 — age fourteen years and two months* ........................... 70

    **4.**   *March 18, 1975 — age sixteen* ............................................... 73

    **5.**   *Findings* ....................................................................... 75

**B.   The Intelligence Assessment Performed on April 11, 1977** ...................................... 75

**C.   Intelligence Assessments Performed Near the Date of the Offense** ......................... 83

    **1.** *March 21, 1985 — age twenty-six years* ................................................. 83

    **2.** *January 24, 1986 — age twenty-six years and ten months* ................................... 84

    **3.** *Findings* .......................................................................... 85

**D.   Intelligence Assessment Performed in Preparation for Hearing** ............................ 85

**V.   Assessments of Petitioner's Adaptive Behavior** .................................................. 89

    **A.   Petitioner's Deficiencies Prior to Age Eighteen** ........................................ 89

        **1.** *The home environment — birth to age 12* ............................................ 90

        **2.** *Adolescence and foster care — ages 12 through 18* ............................................ 93

        **3.** *Schooling* .......................................................................... 97

        **4.** *Assessments by third-party informants* ................................................. 99

        **5.** *Findings* .......................................................................... 104

    **B.   Petitioner's Deficiencies at the Time of the Offense** ............................... 106

    **C.   Petitioner's Present Adaptive Functioning Abilities** ............................... 122

**VI. Conclusions** .......................................................................... 125

_____

# I.  THE LEGAL CRITERIA DEFINING MENTAL RETARDATION

The Supreme Court's decision in *Atkins v. Virginia* did not dictate a national

standard for determining whether a criminal defendant is mentally retarded and, for

that reason, not subject to the ultimate sanction of the law.  Instead, the Court left to

the states "the task of developing appropriate ways to enforce the constitutional restriction" upon the execution of mentally retarded convicts. *Atkins*, 536 U.S. at 317 (citation, internal quotation marks, and footnote omitted).

The Court's reticence to propound hard and fast rules undoubtedly was grounded in the fact that the statutory definitions of mental retardation adopted by Congress and those states that then prohibited the execution of mentally retarded persons were not identical.  Even so, the Court observed that all of the existing statutes generally conformed to diagnostic criteria promulgated by the American Association on Mental Retardation and the American Psychiatric Association.

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows:  "*Mental retardation* refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas:  communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  Mental retardation manifests before age 18."  Mental Retardation:  Definition, Classification, and Systems of Supports 5 (9th ed. 1992).

> The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas:  communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).  Mental

7

> Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. *Id.*, at 42-43.

*Atkins*, 536 U.S. at 309 n.3 (emphasis in original). The *Atkins* opinion thus pointed the states in the direction of clinical definitions that have three constituent parts: that is, in order to be diagnosed as "mentally retarded," the person under evaluation must exhibit (*i*) before the age of eighteen years (*ii*) significantly sub-average intellectual functioning, accompanied by (*iii*) significant limitations in adaptive functioning.

Similarly, the Alabama Supreme Court subsequently held that a defendant seeking the benefit of *Atkins* "must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)." *Ex parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002).[13]

---

[13] The Alabama Supreme Court has said that the definition of mental retardation for purposes of capital cases should be developed by the State Legislature. *See Ex parte Perkins*, 851 So. 2d at 455 n.1 ("As the judicial branch of government, this Court can only interpret the law. We urge the Legislature to expeditiously develop procedures for determining whether a capital defendant is mentally retarded and thus ineligible for execution."); *see also Smith v. State*, No. 1060427, 2007 WL 1519869, at *8 (Ala. May 25, 2007) (same).

However, neither of the preceding opinions addressed the "Retarded Defendant Act," enacted by the Alabama Legislature in 1985. *See* Act No. 85-652, 1985 Acts of Alabama. That legislation defines the term "retarded defendant" in the same rubric as the *Atkins* Court: "A person with significant subaverage general intellectual functioning resulting in or associated with concurrent

The Alabama Supreme Court layered a gloss on the *Perkins* definition in *Smith v. State*, No. 1060427, 2007 WL 1519869 (Ala. May 25, 2007), holding that a defendant must exhibit significantly subaverage intellectual functioning abilities and significant deficits in adaptive behavior during *three periods* of his life:  before the age of eighteen; on the date of the capital offense; and currently.

> All three factors must be met in order for a person to be classified as mentally retarded for purposes of an *Atkins* claim.  *Implicit in the definition is that the subaverage intellectual functioning and the deficits in adaptive behavior must be present at the time the crime was committed as well as having manifested themselves before age 18*.  This conclusion finds support in examining the facts we found relevant in *Ex parte Perkins* and *Ex parte Smith* and finds further support in the *Atkins* decision itself, in which the United States Supreme Court noted:  "The American Association on Mental Retardation (AAMR) defines mental retardation as follows:  '*Mental retardation* refers to substantial limitations in *present* functioning.'"  536 U.S. at 308 n.3, 122 S. Ct. 2242 (second emphasis added).  Therefore, in order for an offender to be considered mentally retarded in the *Atkins* context, the offender must *currently exhibit* subaverage intellectual functioning, *currently exhibit* deficits in adaptive behavior, *and* these problems must have manifested themselves before the age of 18.

---

impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments."  Ala. Code § 15-24-2(3) (1975) (1995 Replacement Vol.).

It also should be observed that the Alabama Supreme Court's specification of "an IQ of 70 or below" as the line dividing mentally retarded individuals from the remainder of the population is *not found* in:  (*a*) the Alabama Retarded Defendant Act; (*b*) the *Atkins* decision (observing that "an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition," 536 U.S. at 309 n.5); or (*c*) as discussed *infra*, any of the professional diagnostic criteria.

9

*Smith*, 2007 WL 1519869, at *8 (emphasis supplied).  *See also Holladay v. Allen*, 555

F.3d 1346, 1353 (11th Cir. 2009) (same).

## II.  DIAGNOSTIC CRITERIA DEFINING
## MENTAL RETARDATION

### A.   Assessment of Intellectual Functioning

"The assessment of intellectual functioning is essential to making a diagnosis

of mental retardation, as virtually all definitions of mental retardation make reference

to significantly subaverage intellectual functioning as one of the diagnostic criteria."

Ruth Luckasson *et al.*, *Mental Retardation*:  *Definition, Classification, and Systems*

*of Supports* 51 (Washington, D.C.:  American Association on Mental Retardation

10th ed. 2002) (hereafter, "AAMR, *Mental Retardation*").[14]

> [I]ntelligence is not merely book learning, a narrow academic skill, or
> test-taking smarts.  Rather, it reflects a broader and deeper capacity for
> comprehending our surroundings — catching on, making sense of
> things, or figuring out what to do.  Thus the concept of intelligence
> represents an attempt to clarify, organize, and explain the fact that
> individuals differ in their ability to understand complex ideas, to adapt
> effectively to their environments, to learn from experience, to engage in
> various forms of reasoning, to overcome obstacles by thinking and
> communicating.

*Id*. at 40 (citation omitted).

### 1.   Standardized assessment instruments

---

[14] A copy of this treatise was introduced into evidence as Petitioner's Ex. 27.

"Although far from perfect, intellectual functioning is still best represented by IQ scores when obtained from appropriate assessment instruments."  AAMR, *Mental Retardation* at 14.  The "Wechsler Adult Intelligence Scales – Third Edition" (WAIS-III) and the "Stanford-Binet Intelligence Scales – Fifth Edition" (SB5) are the two most widely used IQ tests, *id*. at 59, and they were utilized by the parties' expert witnesses to assess petitioner's current intellectual functioning.   Both are "standardized" assessment instruments, meaning that:  (*a*) during the design phase, each was administered to a large, representative sample of the population for which the test was intended to provide reliable, normative data;[15] (*b*) the reliability and validity of each test has been established over time by cumulative empirical applications and analysis;[16] and (*c*) each test must be administered, scored, and

---

[15] *See* Raymond J. Corsini, *The Dictionary of Psychology* 940 (New York, N.Y.:  Brunner-Routledge 2002) (defining "standardized measuring device" and "standardized test").

[16] Attorneys and courts have a tendency to refer to the concepts of "reliability" and "validity" interchangeably, but the terms have distinct meanings in scientific and other technical disciplines. *See*, *e.g.*, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 n.9 (1993). "Reliability" is a term that refers to the *consistency* or *stability* of a test device, procedure, or methodology. "When repeated measurements of the same thing give identical or very similar results, the measurement instrument is said to be reliable." W. Paul Vogt, *Dictionary of Statistics & Methodology* 245 (Thousand Oaks, Calif.:  Sage Publications 2d ed. 1999).  Thus, "[a] perfectly reliable test would give exactly the same score time after time."  Corsini, *supra* note 15 at 826.
    The fact that a measurement device yields the same result on repeated trials does not mean that the scores are "valid," however, as the following example illustrates:

> For example, if you got on your bathroom scale and it read 145 pounds, you got off and then on again and it read 139, and you repeated the process and it read 148, your scale would not be very *reliable*.  If, however, in a series of weighings you got the same answer (say, 145), your scale would be *reliable* — even if it were not *accurate* (*valid*) [because] you really weighed 120 pounds.

11

interpreted by trained examiners in strict accordance with instructions issued by the test developers.[17]

a.    *The Wechsler Adult Intelligence Scales*

The first IQ assessment instrument to be named the "Wechsler Adult Intelligence Scales" (WAIS) was published in 1955 as a revision of the "Wechsler-Bellevue Intelligence Scales" developed in 1939 by Dr. David Wechsler, a clinical psychologist, during his association with Bellevue Psychiatric Hospital in New York City.[18] The theoretical basis for the device was Dr. Wechsler's belief that intelligence is a multifaceted construct that enables an individual to comprehend and deal effectively with the environment in which he or she lives and works.[19] After dividing

Vogt, *supra* at 245 (emphasis and alteration supplied).  The preceding example assists in understanding that (*a*) the scientific concepts of "reliability" and "validity" are inextricably related, (*b*) that "validity" is a term used "to describe a measurement instrument or test that *accurately measures what it is supposed to measure*," and (*c*) that while "validity" requires "reliability," the reverse is not true, because the "reliability" (consistency) of a test device, procedure, or methodology does not necessarily mean that it is "valid" (*i.e.*, that it *accurately measures* what it is supposed to measure).  *Id.* at 301.

[17] *See, e.g.*, David Wechsler, *WAIS-III Administration and Scoring Manual* (San Antonio, Tex.:  The Psychological Corp. 1997); Gale H. Roid, *Stanford-Binet Intelligence Scales*, *Fifth Edition*, *Examiner's Manual* (Itasca, Ill.: Riverside Publishing 2003).

[18] This initial assessment instrument was devised for use with adults and older children.  It consisted of six verbal and five performance subtests that yielded separate verbal and performance intelligence quotients as well as an overall IQ.  *See* R. J. Corsini, *The Dictionary of Psychology* at 1066.  The test instrument was revised and renamed the "Wechsler Adult Intelligence Scales" (WAIS) in 1955.

[19] *See* David Wechsler, *The Measurement of Adult Intelligence* 229 (Baltimore: Williams & Wilkins 1939) (defining intelligence as "[t]he global capacity of a person to act purposefully, to think rationally, and to deal effectively with his/her environment").  *See also* David Wechsler, *WAIS-III Administration and Scoring Manual* iii (San Antonio: The Psychological Corp. 1997) ("Believing

intelligence into two major types of skill sets, verbal and performance, Wechsler used the statistical technique of factor analysis to determine specific skills within those two major domains.[20]

The most recent iteration of this assessment instrument, the so-called "Wechsler Adult Intelligence Scales – Third Edition" (WAIS-III), is a 1997 revision of the "Wechsler Adult Intelligence Scales – Revised Edition" (WAIS-R) published in 1981.[21]  It is an individually administered test designed to assess the intelligence of individuals ranging in age from 16 years to 89 years.

---

that intelligence is something more than what is measured by standardized tests, [Wechsler] spent a large part of his life trying to assess additional components of intellectual functioning, including an individual's genetic makeup, socio-educational experiences, ambition, determination, and personality style.").

[20] The term "factor analysis" describes a complex field of analytical techniques that is impossible to define briefly, but it has been generally described as:

> Any of several methods of analysis that enable researchers to reduce a large number of variables to a smaller number of variables, or factors, or latent variables; a factor is a set of variables, such as items on a survey, that can be conceptually and statistically related or grouped together.  Factor analysis is done by finding patterns among the variations in the values of several variables; a cluster of highly inter-correlated variables is a factor.  . . .

W. Paul Vogt, *Dictionary of Statistics & Methodology* 107-08 (Thousand Oaks, Calif.:  Sage Publications 2d ed. 1999).

[21] The second, revised version of Dr. David Wechsler's original assessment instrument, the "Wechsler Adult Intelligence Scales – Revised" (WAIS-R), was standardized in 1981 on a sample of 1,880 U.S. subjects, ranging in age from 16 to 74 years.  The sample was highly stratified, and broken down into nine different age groups.  Equal numbers of men and women subjects were included, and the relative numbers of white and non-white subjects reflected the most recent census figures.  The sample was further broken-down into four geographic regions and six occupational categories, and there also was an attempt to balance urban and rural subjects.  The WAIS-R was considered to have impressive reliability and validity.

The WAIS-III was standardized on 2,450 adults from the United States.  Thirteen separate standardization groups were created by age classification.  Within each group, the number of males and females was roughly equal (except for the 65 to 89 age group, which contained more females), and there was Census-based stratification for race or ethnicity (White, African American, Hispanic), education, and geographic region based on Census reports.

AAMR, *Mental Retardation* at 61.  As shown in the following table, fourteen subtests are equally divided between seven Verbal Scale subtests and seven Performance Scale subtests.  The number preceding each subtest indicates the standardized order of administration:  *i.e.*, the "Picture Completion" subtest (on the Performance Scale) is administered first; the "Vocabulary" subtest (Verbal Scale) is given next, and so on in alternating order to assist an examiner in maintaining the test-subject's interest.

| WAIS-III SUBTESTS (Grouped According to Verbal and Performance Scales) | |
| --- | --- |
| **Verbal Scale** | **Performance Scale** |
| **2. Vocabulary** A series of orally and visually presented words that the examinee orally defines.[22] | **1. Picture Completion** A set of color pictures of common objects and settings, each of which is missing an important part that the examinee must identify.[23] |

---

[22] Before starting this subtest — which, as discussed in the text preceding this table, actually is the *second* subtest administered — the examiner is directed to say:  "Now we are going to do something different.  In this next section, I want you to tell me the meanings of some words.  Now listen carefully and tell me what each word I say means."  The examinee then is asked to define 33 words.  Examples include "winter," "bed," "ship," "penny," "breakfast," "repair," "assemble," "yesterday," and 0 to 2 points are scored for each response.  D. Wechsler, *WAIS-III Administration and Scoring Manual* 68-92 (San Antonio:  The Psychological Corp. 1997).

[23] Before starting this subtest, the examiner is directed to say:  "I am going to show you some pictures in which there is some important part missing.  Look at each picture and tell me what is missing."  (Examples include a picture of a table missing one leg, or a picture of a person's face

| WAIS-III SUBTESTS (Grouped According to Verbal and Performance Scales) | |
| --- | --- |
| **4. Similarities**<br>A series of orally presented pairs of words for which the examinee explains the similarity of the common objects or concepts they represent. | **3. Digit Symbol – Coding**<br>A series of numbers, each of which is paired with its own corresponding hieroglyphic-like symbol. Using a key, the examinee writes the symbol corresponding to its number. |
| **6. Arithmetic**<br>A series of arithmetic problems that the examinee solves mentally and responds to orally. | **5. Block Design**<br>A set of modeled or printed two-dimensional geometric patterns that the examinee replicates using two-color cubes. |
| **8. Digit Span**<br>A series of orally presented number sequences that the examinee repeats verbatim for Digits Forward and in reverse for Digits Backward. | **7. Matrix Reasoning**<br>A series of incomplete gridded patterns that the examinee completes by pointing to or saying the number of the correct response from five possible choices. |
| **9. Information**<br>A series or orally presented questions that tap the examinee's knowledge of common events, objects, places, and people. | **10. Picture Arrangement**<br>A set of pictures presented in a mixed-up order that the examinee rearranges into a logical story sequence. |
| **11. Comprehension**<br>A series of orally presented questions that require the examinee to understand and articulate social rules and concepts or solutions to everyday problems. | **12. Symbol Search**<br>A series of paired groups, each pair consisting of a target group and a search group.  The examinee indicates, by marking the appropriate box, whether either target symbol appears in the search group. |
| **13. Letter-Number Sequencing**<br>A series of orally presented sequences of letters and numbers that the examinee simultaneously tracks and orally repeats, with numbers in ascending order and the letters in alphabetical order. | **14. Object Assembly**<br>A set of puzzles of common objects, each presented in a standardized configuration, that the examinee assembles to form a meaningful whole. |

Source:  D. Wechsler, *WAIS-III Administration and Scoring Manual* (San Antonio:  The Psychological Corp. 1997)**.**

As the Supreme Court observed, the WAIS-III is scored by adding together the

number of points earned by a test subject on these different subtests, and then

---

missing the nose.)  One point is scored for each correct response within the time limit (20 seconds or less for each picture).  *Id*. at 64-67.

using a mathematical formula to convert this raw score into a scaled score. The test measures an intelligence range from 45 to 155. The mean score of the test is 100, [24] which means that a person receiving a score of 100 is considered to have an average level of cognitive functioning. It is estimated that between 1 and 3 percent of the population has *an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.*

*Atkins*, 536 U.S. at 309 n.5 (emphasis supplied, citations omitted).

### b. *The Stanford-Binet Intelligence Scales*

The Stanford-Binet battery of intelligence assessment instruments is far older than the Wechsler series. The original test was devised by psychologist Alfred Binet, who was charged by the French government with developing a method of identifying intellectually-deficient school-age children for placement in special education programs. Research conducted by Binet and physician Theophilus Simon between 1905 and 1908 at a school for mentally-retarded boys led to the development of the Binet-Simon test, which employed questions of increasing difficulty to measure such attributes as attention, memory, and verbal skills. In 1916, Lewis Terman, a psychologist at Stanford University in California, released the "Stanford Revision of

---

24 The "mean" ( *M* ) is the most often used measure of central tendency, and it is obtained by adding all of the values in a set of data, and then dividing that sum by the number of values in the dataset (*i.e.*, it is the "average" score). *See, e.g.*, W. P. Vogt, *Dictionary of Statistics & Methodology* at 172.

the Binet-Simon Scale."[25]  That test has been revised several times since its inception, and currently is in its fifth edition — a version that is generally referred to as either the "Stanford-Binet 5" or "SB5."

The SB5 consists of a battery of tests that assess a person's intelligence across four areas of intellectual functioning:  verbal reasoning; quantitative reasoning; abstract and visual reasoning; and short-term memory.  These areas are covered by fifteen subtests, including vocabulary, comprehension, verbal absurdities, pattern analysis, matrices, paper folding and cutting, copying, quantitative, number series, equation building, memory for sentences, memory for digits, memory for objects, and bead memory.  All test subjects take an initial vocabulary test that, together with the subject's age, determines the number and level of sub-tests to be administered.  Total testing time is 45 to 90 minutes, depending upon the subject's age and the number of subtests administered.  Raw scores are based on the number of items answered, and are converted into a "standard score" corresponding to the test subject's age group, similar to an IQ measure.[26]

---

[25] *See generally* Ramond E. Fancher, *The Intelligence Men:  Makers of the IQ Controversy* (New York:  W.W. Norton & Co. 1985).

[26] *See*, *e.g.*, R.J. Corsini, *The Dictionary of Psychology* 940 (explaining that "[a] set of scores may be standardized by taking each score, subtracting the mean, then dividing the difference by the standard deviation.  The resultant score, known as a standard, standardized, or z score, gives the number of standard deviations the original score was above or below the mean.  The entire set of standard scores has a mean of 0 and a standard deviation of 1.  In a normal distribution, over 99% of the cases lie between z = − 3.00 and z = + 3.00.").

According to the website of the SB5's publisher, Riverside Publishing Company, "[n]ormative data for the SB5 were gathered from 4,800 individuals between the ages of 2 and 85+ years.  The normative sample closely matches the 2000 U.S. Census.  Bias reviews were conducted on all items for the following variables: gender, ethnicity, culture, religion, region, and socioeconomic status."[27]

The SB5 has a mean IQ score of 100,[28] and a standard deviation of 16:  the "standard deviation" indicates how far a particular individual's score falls above or below the mean score for the test subject's age group.[29]  For example, if an eight-year-old child achieved a score of 116 on the SB5, the child's score would be one standard deviation above the mean performance score of all eight-year-olds in the representative sample.

**2**.    *Measurement errors and cut scores*

*A key task for the . . . analyst applying a scientific method to conduct a particular analysis, is to identify as many sources of error as possible, to control or to eliminate as many as possible, and to estimate the*

---

[27] *See* http://www.riverpub.com/products/sb5/details.html (alterations added) (last visited March 24, 2009).

[28] *See supra* note 24.

[29] *See*, *e.g.*, Corsini, *supra* note 26 (defining the term *standard deviation* ("SD"), in part, as "[a] measure of the spread or deviations of scores about the mean of a distribution.  In a normal distribution, about two-thirds of the cases fall within the limits of one SD above and below the mean. It is the square root of the variance.").

*magnitude of remaining errors so that the conclusions drawn from the study are valid.*[30]

A critical question that must be addressed is: "*How much confidence can this court place in the IQ scores produced by the tests administered to petitioner?*" Even though most of the intelligence tests that will be discussed later in this opinion are generally considered to be reliable assessment instruments that produce valid IQ scores,[31] there still exists an inherent potential for "measurement error." Measurement errors can be either random or systematic. "Random errors" are caused by any factors that randomly affect measurement of test variables. Examples include factors peculiar to the individual test-subject (*e.g.*, fatigue, poor health), the testing situation (*e.g.*, environmental distractions inhibiting concentration), the manner in which the test was administered (*e.g.*, the examiner's failure to adequately explain each segment of the test, or to strictly follow the test developer's instructions), the examiner's lack of training, or a multitude of other, unpredictable variables that artificially inflate or deflate a test subject's performance. The important attribute of random errors is that they do not have consistent effects across the entire population of persons to whom the test instrument is administered.

---

[30] National Research Council, *Strengthening Forensic Science in the United States*: *A Path Forward*, Chap. 4, at 5 (Washington: The National Academies Press 2009) (Prepublication Copy) (emphasis supplied).

[31] *See supra* note 16 (discussing concepts of "reliability" *versus* "validity").

"Systematic errors," on the other hand, are test-specific sources of error that are caused by any factors that *systematically* affect IQ measurements across the entire population of test subjects. Systematic errors also can be generated by many variables, but usually they can be traced to inadequacies in the assessment instrument itself. Unlike random errors, systematic errors tend to have consistently positive or negative effects upon the performance scores generated by each individual to whom the test is administered. To use a pedestrian example, suppose "you recorded the temperature every day in your backyard. If your thermometer was incorrectly calibrated, so that it was always 4 degrees too high, the faulty thermometer would produce a systematic error (an upward bias) in your measurement."[32] One such systematic inaccuracy in the intelligence assessment instruments administered to petitioner over the course of his life will be discussed in Part II(A)(3) *infra*, addressing the so-called "Flynn effect."

      **a**.    *The effect of "standard errors of measurement" on "true" IQ scores*

A "true" IQ score is the hypothetical score a test subject would obtain if no measurement error influenced his or her performance during the administration of an

---

[32] W. P. Vogt, *Dictionary of Statistics & Methodology* at 287. Measurement errors also can result from a phenomenon psychologists call "practice effects" — "Influences on the outcomes of a study that occur when subjects are tested more than once." *Id*. at 219. If a test is re-administered to a subject in less than six months to a year, the second administration usually results in inflated IQ scores.

intelligence assessment instrument.  No clinician, much less this court, can state a test subject's "true" score with *absolute* certainty, because error *always* is present in any testing situation.  For well-designed test instruments, however, the random errors of individual test subjects are randomly distributed.  Accordingly, the more scores that are grouped together, the more likely it is that an individual test subject's errors will be cancelled out by the results obtained by administration of the assessment instrument to a very large sample of the population during the "normative research and survey process"[33] leading to the development of a "standardized test."[34]  That is the reason reputable IQ assessment instruments like the Wechsler and Stanford-Binet batteries were standardized ("normed") on large, representative samples of the general population.[35]

During the design process of developing normative standards, measurement errors are taken into account through use of a mathematical concept that statisticians

---

[33] *See, e.g.*, R. J. Corsini, *The Dictionary of Psychology* at 650 (defining the term *normative research/survey* as:  "Research to obtain data on particular groups and particular topics leading to information such as average performance, such as administering scholastic achievement tests to large samples of same-age children and reporting the mean and standard deviation so that in the future individuals or groups can be compared with these norms.").

[34] *See supra* notes 15–17 and accompanying text.  *See also, e.g.*, R. J. Corsini, *The Dictionary of Psychology* at 940 (defining the term *standardized test* as:  "An examination whose validity and reliability have been established by thorough cumulative empirical applications and analysis and which has clearly defined characteristics and instructions for administration and scoring.").

[35] As noted in Part I(A)(1)(a) *supra*, the WAIS-III was standardized on 2,450 adults.  Further, as observed in Part I(A)(1)(b) *supra*, normative data for the SB5 were gathered from 4,800 individuals between the ages of 2 and 85+ years.

and psychologists refer to as the "Standard Error of Measurement" (*SEM*).  The *SEM* is an index of the variability of test scores produced by persons forming the normative sample.  The *SEM* makes it possible to determine the reliability of a particular intelligence assessment instrument, and the level of confidence that can be placed in the scores produced by an administration of the test to an individual test subject.

Every intelligence test has a *SEM*, which is used to calculate a range of scores lying along a continuum (think of a yardstick), and evenly arranged on each side of the IQ score obtained during an individual administration of the test.  The test subject's "true" IQ most likely lies within that range above and below his or her actual test score.

For example, Kenneth Glenn Thomas was nearly 49 years of age on the date WAIS-III and SB5 IQ assessment instruments were administered to him by the parties' expert witnesses.[36]  The *SEM* for a full-scale IQ score produced by the administration of a WAIS-III test to a person between the ages of 45 to 54 years is 2.23 points.[37]  The *SEM* for the full-scale IQ score produced by the administration of an SB5 assessment instrument to a person between the ages of 40 and 49 years is 2.12

---

[36] *See* doc. no. 110-2 (Report of Karen Salekin, Ph.D.) at 1 ("Age:  48 years, 8 months").

[37] *See* AAMR, *Mental Retardation*, Chap. 4, Appendix 4.1, at 70.

22

points.[38]  Taking those factors into account in connection with the IQ scores obtained

from petitioner, this court can be confident that Thomas's true "intellectual

functioning ability" fell within a band of scores bordered on the high-end by *adding*

*two SEMs* to the full-scale IQ score obtained by administration of each of the

foregoing test instruments, and bordered on the low-end by *subtracting two SEMs*

from his full-scale IQ score:  in other words, and in the case of the WAIS-III, by

*adding* 4.46 points (2 x 2.23 *SEMs* = 4.46) to — and also *subtracting* 4.46 points

from — the full-scale IQ score produced by administration of that IQ assessment

instrument.  The same process applies to the administration of an SB5 assessment

instrument, except that the number of points added to and subtracted from petitioner's

obtained full-scale IQ score would be 4.24 (2 x 2.12 *SEMs* = 4.24 points).  The 2002

AAMR manual explains this process as follows:

> The assessment of intellectual functioning through the primary
> reliance on intelligence tests is fraught with the potential for misuse if
> consideration is not given to possible errors in measurement.  An
> obtained standard IQ score must always be considered in terms of the
> accuracy of its measurement.  Because all measurement, and particularly
> psychological measurement, has some potential for error, obtained
> scores may actually represent a range of several points.  *This variation*
> *around a hypothetical* "true score" *may be hypothesized to be due to*
> *variations in test performance*, *examiner's behavior*, *or other*
> *undetermined factors*.  Variance in scores may or may not represent
> changes in the individual's actual or true level of functioning.  Errors of

---

[38] *See* Gale H. Roid, *Stanford-Binet Intelligence Scales*, *Fifth Edition*, *Technical Manual*
Table 3.2, at 66 (Itasca, Ill.:  Riverside Publishing Co. 2003).

measurement as well as true changes in outcome must be considered in the interpretations of test results. *This process is facilitated by considering the concept of standard error of measurement (SEM), which has been estimated to be three to five points for well-standardized measures of general intellectual functioning.* This means that if an individual is retested with the same instrument, the second obtained score would be within one *SEM* (i.e., ± 3 to 4 IQ points) of the first estimates about two thirds of the time. *Thus an IQ standard score is best seen as bounded by a range that would be approximately three to four points above and below the obtained score. . . . Therefore, an IQ of 70 is most accurately understood not as a precise score, but as a range of confidence* with parameters of at least one *SEM* (i.e., scores of about 66 to 74; 66% probability), *or parameters of two SEMs* (i.e., scores of 62 to 78; **95% probability**). *This is a critical consideration that must be part of any decision concerning a diagnosis of mental retardation*.

AAMR, *Mental Retardation* at 57-59 (all emphasis added, citation omitted).

> **b**.   *The stipulated* SEM *and its effect upon determination of petitioner's IQ*

The attorneys for both parties and their expert witnesses stipulated that a standard error of measurement in the neighborhood of approximately ± 5 points is proper for full-scale IQ test scores produced by the intelligence assessment instruments discussed in this opinion.[39]   The American Psychiatric Association

_____

[39] *See* doc. no. 127 (petitioner's brief) at 20 ("All the testifying experts agree that the standard error of measurement is approximately five points."), and doc. no. 126 (respondent's brief) at 18 ("[A]s Dr. McClaren testified, the standard error of measurement is plus or minus five."). *See also* Salekin, Tr. Vol. I at 21 ("So the plus or minus five is really looking at the average IQ or . . . [standard error of measurement] for all tests."); Marson, Tr. Vol. II at 79-80 (testifying that Thomas's raw WAIS score of 74 at age 16 was within the five point standard error of measure); and McClaren, Tr. Vol. II at 176 ("Plus and minus five is an approximate two times the standard error of measurement, which is a statistical term. And you can get a confidence interval. . . . If you have

agrees:  the most recent edition of its *Diagnostic and Statistical Manual of Mental Disorders* notes that "there is a measurement error of approximately 5 points in assessing IQ."  APA, *Diagnostic and Statistical Manual of Mental Disorders*, *Fourth Edition*, *Text Revision* 41-42 (2000) (emphasis added) (hereafter "DSM-IV-TR").[40]

The parties disagree, however, as to how the "band of confidence" produced by the process of adding *and* subtracting that value from petitioner's obtained, full-scale IQ scores should be interpreted.  Petitioner argues, in combination with the "Flynn effect" discussed in the following section, that his IQ scores should be adjusted downward, because a "compelling showing of lifelong deficits in adaptive behavior . . . yields scores that are perfectly consistent across [his] life."[41]  Petitioner points to several cases as support for this position, but none are particularly illustrative, much less precedential.[42]

Respondent, on the other hand, argues that this court should refuse to adjust petitioner's IQ scores downward using the standard error of measurement.

---

to be right 95 times out of a hundred, it's going to be bigger.  And when it gets to 95 percent, it's plus or minus five points.").

[40] A copy of this treatise was introduced into evidence as Petitioner's Ex. 29.

[41] *See* doc. no. 127 (petitioner's brief) at 20 (citing Salekin, Tr. Vol. 1 at 220-21, and Petitioner's Ex. 2 (Salekin Report) at Table 2).

[42] *See* doc. no. 127 (petitioner's brief) at 21 (citing *United States v. Parker*, 65 M.J. 626, 629-30 (Navy-Marine Corps Ct. Crim. App. 2007); *Moore v. Dretke*, No. Civ. A. 603CV224, 2005 WL 1606437, at *5 (E.D. Tex. July 1, 2005); *State v. Burke*, No. 04AP-1234, 2005 WL 3557641, at *14 (Ohio Ct. App. Dec. 30 2005); *Pruitt v. State*, 834 N.E. 2d 90, 105-06 (Ind. 2005); *State v. Jimenez*, 908 A.2d 181, 184 n.3 (N.J. 2006)).

Respondent also contends that he has been unable to find any authority to support a downward adjustment of petitioner's full-scale IQ scores, "depending on . . . assessment of Thomas's adaptive functioning."[43]   Respondent asserts that, even though petitioner "argued during the evidentiary hearing [that] the range for mildly mentally retarded is from 70-75 . . .  under Alabama law, the cut-off for mild mental retardation is 70 or below."[44]

The resolution of these conflicting positions lies in a careful examination of the diagnostic criteria contained in the authoritative treatises published by the AAMR and APA,[45] and referenced in decisions of the Supreme Courts of the United States and the State of Alabama.

---

[43] Doc. no. 126 (respondent's brief) at 15-16.

[44] *Id.* at 16 n.5.  However, as observed in note 13 *supra*, the Alabama Supreme Court's specification of "an IQ of 70 or below" as the line dividing mentally retarded individuals from the remainder of the population is *not found* in:  (*a*) the Alabama Retarded Defendant Act, Ala. Code § 15-24-2(3); (*b*) the *Atkins* decision (observing that "an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition," 536 U.S. at 309 n.5); or (*c*) AAMR and APA diagnostic criteria.

[45] All persons who testified as expert witnesses during the evidentiary hearing held in this court agreed that both treatises referenced in *Atkins* — the AAMR's manual on *Mental Retardation*, and the APA's DSM-IV-TR — are authoritative, learned treatises containing diagnostic criteria generally accepted by professionals in the fields of psychology and psychiatry.  While respondent's witness, Dr. Harry McClaren, expressed a preference for the DSM-IV-TR for diagnostic purposes, he admitted that the AAMR's manual on *Mental Retardation* also is authoritative, and added:  "I think it is one of the books that goes into both the history of mental retardation and how it has been understood at different times and how they think or thought in 2002 the best way to go about conceptualizing it."  McClaren, Tr. Vol. II at 220-21, 226.

It is clear that neither of the professional organizations dedicated to the diagnosis and treatment of mental deficiencies advocates a fixed, finite IQ "cut score" as an impregnable barrier, separating persons who are mentally retarded from those who are not. The AAMR explicitly states that "*a fixed cutoff for diagnosing an individual as having mental retardation was not intended, and cannot be justified psychometrically*." *Mental Retardation* at 58 (emphasis supplied). That manual also states — not just once, but at least eight times — that the clinical standard for "significantly subaverage" intellectual functioning "is approximately two standard deviations below the mean, *considering the standard error of measurement for the specific assessment instruments used* and the instruments' strengths and limitations." *Id*. at 13 (emphasis supplied); *see also id*. at 14, Table 1.2 ("Intelligence") (same); 17 (same); 23, Table 2.1 ("IQ Cutoff") (same); 27 (same); 37 (same); 58 (same); 198 (same).

> *In effect, this expands the operational definition of mental retardation to 75, and that score of 75 may still contain measurement error*. Any trained examiner is aware that all tests contain measurement error; many present scores as confidence bands rather than finite scores. Incorporating measurement error in the definition of mental retardation serves to remind test administrators (who should understand the concept) that an achieved Wechsler IQ score of 65 means that one can be about 95% confident that the true score is somewhere between 59 and 71.

*Id*. at 59 (emphasis supplied).

In like manner, the American Psychiatric Association recognizes that measurement error must be taken into account when interpreting a full-scale IQ score obtained by assessment with any of the standardized, individually administered, intelligence assessment instruments discussed in this opinion.

> Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately two standard deviations below the mean). It should be noted that there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument (e.g., a Wechsler IQ of 70 is considered to represent a range of 65–75). Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning. . . .

APA, DSM-IV-TR at 41-42.

The Fourth Circuit endorsed these generally-accepted clinical standards when instructing a district court to consider whether a state statute defining mental retardation permitted measurement error to be taken into account when determining whether a capital murder habeas petitioner's raw IQ score of 72 was "'two standard deviations below the mean' as set forth under that statute." *Walker v. True*, 399 F.3d 315, 323 (4th Cir. 2005). *See also In re: Bowling*, 422 F.3d 434, 442 (6th Cir. 2005) (observing that "there appears to be considerable evidence that irrebuttable IQ ceilings are inconsistent with current generally-accepted clinical definitions of mental

28

retardation and that any IQ thresholds that are used should take into account factors, such as a test's margin of error, that impact the accuracy of a particular test score") (Moore, J., concurring in part and dissenting in part) (footnote omitted).

In addition, many state courts have recognized that standard errors of measurement must be taken into account when interpreting IQ scores. *See*, *e.g.*, *State v. Burke*, 2005 Ohio 7020, 2005 WL 3557641, at *13 (Ohio App. 10th Dist. Dec. 30, 2005) ("In accord with the AAMR's standard, measurement error must be considered in determining an individual's IQ score."); *In re Hawthorne*, 105 P.3d 552, 557-58 (Cal. 2005) (observing that IQ test scores are not precise due to measurement error, and holding that mental retardation should not be determined according to a fixed IQ cut score, but upon an assessment of the defendant's overall capacity based on a consideration of all relevant evidence); *State v. Williams*, 831 So. 2d 835, 853 & n.26 (La. 2002) (observing that any IQ test must account for standard margins of error).[46] The California Supreme Court explained the point this way:

> With respect to the intellectual prong of [California's mental retardation statute], respondent Attorney General urges the court to adopt an IQ of 70 as the upper limit for making a prima facie showing. We decline to do so for several reasons: First, unlike some states, *the California Legislature has chosen not to include a numerical IQ score*

---

[46] *But see Bowling v. Commonwealth*, 163 S.W.3d 361, 375-76 (Ky. 2005) (holding that the Kentucky State Legislature "chose a bright-line cutoff ceiling of an IQ of 70, a generally recognized level at which persons are considered mentally retarded," and the court would not "rewrite this unambiguous statute" to include correction for the test instrument's standard error of measurement).

*as part of the definition of mentally retarded.*[47] . . . Moreover, statutes referencing a numerical IQ generally provide that a defendant is presumptively mentally retarded at or below that level, rather than — as respondent impliedly argues — that a defendant is presumptively not mentally retarded above it.  Second, *a fixed cutoff is inconsistent with established clinical definitions* and fails to recognize that significantly subaverage intellectual functioning may be established by means other than IQ testing.  Experts also agree that an IQ score below 70 may be anomalous as to an individual's intellectual functioning and not indicative of mental impairment.    Finally, *IQ test scores are insufficiently precise to utilize a fixed cutoff in this context.*

*In re Hawthorne*, 105 P.3d at 557 (emphasis added, citations and footnote omitted).

*See also State v. Lott*, 779 N.E.2d 1011, 1014 (Ohio 2002) ("While IQ tests are one of the many factors that need to be considered, they alone are not sufficient to make a final determination on this issue.  We hold that there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70.").

One academician who surveyed state statutory developments following the *Atkins* decision has observed that

> many states have incorporated a specific IQ cutoff score in their definitions of mental retardation, most often using an IQ of seventy as the cutoff for this component of the mental retardation definition.  However, most of these definitions do not acknowledge that each assessment instrument has a standard measurement error, usually between three and five points, and that the standard measurement error is not the same for all instruments.  Recognizing the impact of the standard measurement error, in the previous AAMR definitions and the current APA definition, the IQ cutoff for mental retardation has been

---

[47] As discussed in note 13 *supra*, the "Retarded Defendant Act" enacted by the Alabama Legislature in 1985 also does not include a numerical IQ cut score.  *See* Ala. Code § 15-24-2(3).

quantified between seventy and seventy-five, as noted by the Court in *Atkins*. To avoid mistaken reliance on and potential misuse of a particular IQ score, especially if it does not include consideration of standard measurement error, the AAMR stated its current IQ cutoff in terms of being at least two standard deviations below the mean of the specific instruments used, considering their particular standard measurement error, strengths, and limitations. The current APA definitional material also refers to the IQ cutoff as being approximately two standard deviations below the mean, with reference to measurement error of approximately five points. *Thus, any state's use of a fixed IQ cutoff score, without reference to standard measurement error and other factors concerning the specific instrument used, risks an inaccurate assessment of the intellectual functioning component of the mental retardation definition.*

Peggy M. Tobolowsky, *Atkins Aftermath*: *Identifying Mentally Retarded Offenders and Excluding Them From Execution*, 30 J. Legis. 77, 95-96 (2003) (emphasis added, footnote omitted); *see also id*. at 139 ("[S]tates that use a rigid IQ cutoff score of seventy for the intellectual functioning component may be excluding some individuals otherwise falling within the accepted clinical definition.").

**3**.    *The "Flynn effect," IQ gains over time, and cut scores*

The discussion in the preceding sections bears upon the following truism: "*An IQ score is only as valid as the test the person takes, and the test is only as valid as the standardization sample on which it is normed*." James R. Flynn, *What is Intelligence?* 111 (Cambridge Univ. Press 2007) (emphasis supplied).

The "Flynn effect" is the name given in recognition of the central role played by Professor James R. Flynn in discovering and, in a series of fifteen or more publications between 1984 and today, documenting the fact that IQ scores have been increasing from one generation to the next in all fourteen nations for which IQ data is available.[48]  Flynn recently explained the phenomenon this way:

> For the Wechsler (WISC [49] and WAIS) and the Stanford-Binet IQ tests, the best rule of thumb is that Full Scale IQ gains have been proceeding at a rate of 0.30 points per year ever since 1947.  This rate is based on comparisons of all of the Wechsler and Stanford-Binet tests used in recent years (see Box 11).  It means that for every year that passes between when an IQ test was normed, that is, when its standardization sample was tested, obsolescence has inflated their IQs by 0.30 points.  For example, if you took the WISC (normed in 1947-1948) in 1977-1978, you would get an unearned bonus of 9 IQ points (30 years x 0.30).  Even though you might be dead average, you would be scored at 109 thanks to obsolete norms thirty years out of date.  After all, IQ gains over time mean that as we go back into the past, representative samples of Americans perform worse and worse.  In this case, you are not being compared to your peers, the 14-year-olds of the late 1970s, but to a much lower-scoring group, the 14-year-olds of the late 1940s.  Your score of 109 against the old norms makes you appear

---

[48] Professor Flynn's first publication addressing the phenomenon bearing his name was a 1984 article entitled "The Mean IQ of Americans, Massive Gains 1932 to 1978," published in 95 Psychology Bulletin 29 (1984).  *See also*, *e.g.*, James R. Flynn, *Massive IQ Gains in 14 Nations: What IQ Tests Really Measure*, 101 Psych. Bull. 171 (1987).  Flynn definitively set out the 0.30 point per year gain in a 1999 publication entitled "Searching for Justice:  The Discovery of IQ Gains Over Time," 54 American Psychologist, 5 (1999). *See generally* Flynn, *What is Intelligence?* 199-200 (listing publications); AAIDD, *User's Guide* at 60.

[49] WISC is an acronym for the "Wechsler Intelligence Scale for Children":  an intelligence assessment instrument that was normed — *i.e.*, its standardization sample was tested — in 1947-48.  A revised edition (the WISC-R) was normed in 1974; a third edition (the WISC-III) in 1991; and the most recent iteration (the WISC-IV) in 2003.

above average, but you are actually no better than average and deserve
an IQ of 100.

Flynn, *supra* at 112.[50]  In other words, as an intelligence test ages — or moves farther

from the date on which it was standardized ("normed") — the mean score of the

population as a whole on that assessment instrument increases, thereby artificially

inflating the IQ scores of individual test subjects.  Stated somewhat differently, IQ

scores have been increasing over time for reasons that are totally unrelated to the

actual, "true" intelligence of test subjects.

Even though the parties' attorneys and expert witnesses uniformly agreed that

the Flynn effect is an empirically proven statistical fact,[51] they disagreed on the extent

to which an individual test subject's IQ score should be adjusted to take that

_____

[50] *See also*, *e.g.*, Kanaya *et al.*, *The Flynn Effect and U.S. Policies*:  *The Impact of Rising IQ Scores on American Society via Mental Retardation Diagnoses*, Oct. 2003 American Psychologist:

> Ever since the introduction of standardized IQ tests in the early 20th century, there has been a systematic and pervasive rise in IQ scores all over the world, including the United States.  Known as the *Flynn effect* . . . [it] causes IQ test norms to become obsolete over time.  In other words, as time passes and IQ test norms get older, people perform better and better on the test, raising the mean IQ by several points within a matter of years.  Once a test is renormed, which typically happens every 15-20 years, the mean is reset to 100, making the test harder and "hiding" the previous gains in IQ scores.

*Id*. at 778 (citations omitted).

[51] *See* doc. no. 127 (petitioner's brief) at 21-25; doc. no. 126 (respondent's brief) at 14; Salekin, Tr. Vol. I at 153 ("it's undisputed"); Marson, Tr. Vol. II at 81-82 (testifying that the Flynn effect is "a statistically proven phenomenon with respect to the fact that IQ scores rise over time within a population from the date [a standardized IQ] test is normed to the date the test is administered"); Marson, Tr. Vol. II at 80-81 ("it's really unequivocal that the effect exists"); and McClaren, Tr. Vol. II at 172, 174-75 ("it is, without a doubt, a phenomenon that is occurring").

phenomenon into account.  For example, petitioner's psychological expert, Dr. Karen Salekin, testified that she always applies Dr. Flynn's recommendation to reduce a full-scale IQ score by 0.30 points for each year elapsed beyond the date on which the test instrument was standardized ("normed").[52]

On the other hand, respondent's expert, Dr. Harry McClaren, testified that the Flynn effect was something he would "take into consideration.  But to slavishly say that this is definitely going to be right or a better estimate of this person's true IQ, I don't think that . . . the profession [has come to a national consensus on] that point."[53] Dr. McClaren's opinion about the lack of professional acceptance of the validity of the Flynn effect is refuted by the AAMR's 2002 manual, which explicitly states that, "as others have shown (**e.g., Flynn, 1987**), it is critically important to use standardized tests with the most updated norms."  *Mental Retardation* at 56 (emphasis supplied); *see also id.* at 59 (noting "variances in scores between successive revisions of intelligence measures").

A manual published in 2007 under the present name of the organization formerly known as the "American Association on Mental Retardation" (AAMR) — *i.e.*, the "American Association on Intellectual and Developmental Disabilities"

---

[52] *See* Salekin, Tr. Vol. I. at 153.  Petitioner's neuropsychological expert, Dr. Marson, testified that he also believed the Flynn effect should be applied in Thomas's case.  *See* Marson, Tr. Vol. II at 79.

[53] McClaren, Tr. Vol. II at 172-75.

(AAIDD) — is even more explicit.  It recommends that clinicians take into account *both* the Flynn effect *and* the standard error of measurement when performing retrospective diagnoses in less than optimal circumstances (*e.g.*, the legal and physical constraints of a maximum-security prison environment).  Specifically, the *User's Guide: Mental Retardation Definition, Classification and Systems of Supports – 10th Edition* ("*User's Guide*") directs diagnosticians to:

> Recognize the "Flynn Effect."  In his study of IQ tests across populations, Flynn (1984, 1987, 1989) discovered that IQ scores have been increasing from one generation to the next in all 14 nations for which IQ data existed. This increase in IQ scores over time has been dubbed the Flynn Effect.  Flynn reported a greater increase in the Wechsler Performance IQ, which is more heavily loaded on fluid abilities than on the Wechsler Verbal IQs.  On average, the Full-Scale IQ increases by approximately 0.33 points for every year elapsed since the test was normed (Flynn, 1999).  The main recommendation resulting from this work is that all intellectual assessments must use a reliable and appropriate individually administered intelligence test.  In cases of tests with multiple versions, the most most recent version with the most current norms should be used at all times.  In cases where a test with aging norms is used, a correction for the age of the norms is warranted. For example, if the Wechsler Adult Intelligence Scale (WAIS-III, 1997) was used to assess an individual's IQ in July 2005, the population mean on the WAIS-III was set at 100 when it was originally normed in 1995 (published in 1997).  However, based on Flynn's data, the population mean on the Full-Scale IQ raises roughly 0.33 points per year; thus, the population mean on the WAIS-III Full-Scale IQ corrected for the Flynn Effect would be 103 in 2005 (9 years X 0.33 = 2.9).  Hence, using the "at least two standard deviations below the mean" (Luckasson et al., 2002), the approximate Full-Scale IQ cutoff would be approximately 73 (*plus or minus the standard error of measurement* ).  Thus the clinician needs to use the most current version of an individually administered

> test of intelligence and take into consideration the Flynn Effect *as well*
> *as the standard error of measurement* when estimating an individual's
> true IQ score.

AAIDD, *User's Guide* at 20-21 (emphasis supplied).

Respondent retorts that, with the exception of the AAMR/AAIDD, no other national organization or federal agency has officially endorsed the Flynn effect.[54] That may be so, but it does not justify ignoring the phenomenon in the face of its unchallenged existence.[55] The steady rise in IQ scores from year to year is a statistically proven fact. Dr. McClaren admitted that he had no knowledge of any study arguing that IQ scores in the general population of the United States have *not* increased at the average rate of 0.30 points each year after a test instrument was standardized.[56] Further, and even though "there is not a consensus among professionals as to why these gains are occurring or what these gains actually mean

---

[54] *See* doc. no. 126 (respondent's brief) at 14-15.

[55] Professor Flynn aptly observed that "Prosecution experts sometimes claim that psychologists are still evaluating the significance of the Flynn effect. That is true. But it does not mean that we should wait for some distant day before applying our knowledge of the rate of IQ gains to adjust the IQ scores of defendants in current cases." James R. Flynn, *Tethering the Elephant*: *Capital Cases*, *IQ*, *and the Flynn Effect*, 12 Psychology, Public Policy, and Law 170, 173 (2006); *see also id.* at 186 ("I also wish to call attention to another argument put forward by prosecutors, namely, that the Flynn effect is a 'group phenomenon' and cannot be applied to individuals. As the reader now knows, this is just a senseless mantra. When the group making the IQ gains is composed of Americans, those gains render test norms obsolete and inflate the IQ of every individual being scored under obsolete norms.").

[56] *See* McClaren, Tr. Vol. II at 230-33.

36

(e.g., are we really getting smarter?), *all are in agreement that the gains occur*."[57]

"Since 1998, when the American Psychological Association issued *The Rising Curve*: *Long-Term Gains in IQ and Related Measures* (Neisser, 1998), no scholar published in a first-line journal has ignored the relevant data on IQ gains over time."[58]  It also is undisputed that Professor Flynn's recommendation — *i.e.*, "deduct 0.30 IQ points per year (3 points per decade) to cover the period between the year the test was normed and the year in which the subject took the test"[59] — is a generally accepted adjustment.

Outside the psychological and psychiatric communities, at least one Circuit Court of Appeals has held that the Flynn effect is relevant to the interpretation of IQ scores in capital cases.  In *Walker v. True*, 399 F.3d 315 (4th Cir. 2005), the habeas petitioner, who was raising a mental retardation claim under *Atkins*, argued that the district court committed reversible error by failing to adjust his IQ scores to take into account both the Flynn effect and the test instrument's standard error of measurement.

---

[57] Kanaya *et al.*, *The Flynn Effect and U.S. Policies*:  *The Impact of Rising IQ Scores on American Society via Mental Retardation Diagnoses*, Oct. 2003 American Psychologist at 778 (emphasis supplied).

[58] Flynn, *supra* note 55 at 173.  Dr. McClaren also acknowledged that "One reference, Sadler, who wrote a book about the assessment of intelligence, especially in children, talks about Flynn in the 90s.  Talking about 3 points a decade."  McClaren, Tr. Vol. II at 172-73.  This refutes respondent's suggestion that a reduction for the Flynn effect is simply a "political" effort to render death row inmates ineligible for the death penalty.  *See* doc. no. 126 (respondent's brief) at 14 n.4, and Tr. Vol. I at 157-58.

[59] Flynn, *supra* note 55 at 173.

The Fourth Circuit agreed, vacated the district court's opinion dismissing the habeas

petition, and remanded the case for consideration of "relevant evidence":

> The district court, without much explanation, did not consider the Flynn Effect or the measurement error, stating that such evidence "does not provide a legal basis for ignoring Walker's WAIS test scores." J.A. 266. But, as the Virginia statute makes clear, the relevant question is whether Walker scored two standard deviations below the mean, a question which is directly addressed by Walker's expert opinion as to the Flynn Effect. *Thus*, not only did *the district court* resolve a factual dispute against Walker — contrary to the claims in his petition and where the facts remained materially disputed — it also *refused to consider relevant evidence, namely the Flynn Effect evidence*. Therefore, on remand the district court should consider the persuasiveness of Walker's Flynn Effect evidence. And if the district court does credit that evidence, it should then consider whether the Virginia statute permits consideration of measurement error in order to determine whether Walker's purported score of 72 is "two standard deviations below the mean" as set forth under that statute.

*Walker*, 399 F.3d at 322-23 (emphasis added). *See also Walton v. Johnson*, 440 F.3d

160 (4th Cir. 2006) (*en banc*);[60] *In re Hicks*, 375 F.3d 1237, 1242 (11th Cir. 2004)

---

[60] The Fourth Circuit panel decision reversed the district court saying: "On remand, the district court should determine . . . the persuasiveness of Walton's Flynn Effect evidence as to the second test; if the court finds the Flynn Effect evidence persuasive, it should then determine whether the Virginia statute permits consideration of measurement error in order to determine whether Walton's purported score of 74 is two standard deviations below the mean," 407 F.3d at 296-97 (internal quotation marks and citation omitted), but the *en banc* court withdrew the panel decision and affirmed the district court's dismissal of the habeas petition because, even taking the Flynn effect into account, the petitioner still did not state a cognizable mental retardation claim under Virginia law.

Walton also alleges that he received an IQ score of 77 when his trial expert tested him a few months after he turned 18. Walton contends, however, that this score of 77 should be reduced to a score of 74 because of the "Flynn Effect." Accepting these allegations in Walton's habeas petition as true, Walton still does not state a claim that

(Birch, J., dissenting from the denial of a stay of execution because the IQ scores generated by a 1985 administration of the Wechsler Adult Intelligence Scale to the habeas petitioner were "likely to have been artificially inflated by what has been labeled 'The Flynn effect' ").[61]

State appellate courts have reached the same conclusion. The Ohio Court of Appeals, for example, has held that "a trial court must consider evidence presented on the Flynn effect, but, consistent with its prerogative to determine the persuasiveness of the evidence, the trial court is not bound to, but may, conclude the Flynn effect is a factor in a defendant's IQ score." *State v. Burke*, 2005 Ohio 7020, 2005 WL 3557641, at *13 (Ohio App. 10th Dist. Dec. 30, 2005).

### 4. *Conclusions*

*Adherence to scientific principles is important for concrete reasons: they enable the reliable inference of knowledge from uncertain information. . . .*[62]

---

he is mentally retarded because Virginia law requires that intellectual functioning be commensurate with a score of 70 or less before age 18.

*Walton*, 440 F.3d at 177-78 (footnotes omitted).

[61] *See also Bowling v. Commonwealth*, 163 S.W.3d 361, 384 (Ky. 2005) ("Appellant's IQ scores show that he could not meet the 'significantly subaverage intellectual functioning' criterion of the statutory definition of 'mental retardation' even if the General Assembly had provided for application of a five-point margin of error and a three-point 'Flynn effect.' Thus, we need not address whether he meets the 'substantial deficits in adaptive behavior' criterion of the definition."); *People v. Superior Court*, 129 Cal. App. 4th 434, 28 Cal. Rptr. 529, 541-42 (5th Ct. App. 2005) ("Even considering the Flynn effect and the possibility of some measurement error, an IQ of 92 could not be lowered to 75."), *reversed on other grounds*, 40 Cal.4th 999, 155 P.3d 259 (Cal. 2007).

[62] National Research Council, *Strengthening Forensic Science*, *supra* note 30 at 1.

George Bernard Shaw famously said that England and America are two countries separated by a common language.  In an analogous manner, the discussion in the previous Parts of this opinion demonstrates that attorneys, judges, psychologists, and psychiatrists share a common language, but our specialized vocabularies often separate one professional group from the other.  Legal and mental health professionals

> differ in the acceptance of methods of analysis.  In science in general and in statistics in particular, a method is evaluated according to well-established criteria.   In the courts, theoretical justifications of a statistical method may be treated as if they are less important than the general acceptance of the method by statisticians and other scientists.

*The Evolving Role of Statistical Assessment as Evidence in the Courts* 145 (Stephen E. Fienberg ed., 1989).  For such reasons, when assessing the role that full-scale IQ scores play in determining mental retardation, courts must be careful to distinguish between the language (*rules*) of law and the language (*diagnostic criteria*) of psychologists and psychiatrists.  Stated differently, it is important for courts to guard against resolving the *factual question* of mental retardation *as a matter of law*.

> In finding the facts of a particular case, courts and juries untrained in science are sometimes called upon to resolve contested scientific issues, but such factual findings do not establish generally applicable rules of law.  . . .  [A]n appellate court cannot convert a disputed factual assertion into a rule of law simply by labeling it a "legal standard"  . . .

*People v. Superior Court*, 155 P.3d 259, at 267 (Cal. 2007).

40

Contrary to respondent's argument that there is no diagnostic or legal basis by which this court may properly adjust petitioner's raw IQ scores in answering the question of whether he suffers from significantly subaverage intellectual functioning,[63] the adjustments to raw IQ scores mandated by the "standard error of measurement" and the "Flynn effect" are well-supported by the accumulation of empirical data over many years. Both methodologies have been subjected to rigorous

---

[63] *See* doc. no. 126 (respondent's brief) at 16-17:

Thomas's reliance on the Flynn effect and a downward adjustment of the standard error of measurement is improper and not supported by the psychological community. *While the Flynn effect is a recognized phenomenom* [sic], the psychological community has not determined what to make of it or how to factor it in a determination of intellectual functioning. In fact, the proposal that IQ scores must be downwardly adjusted for the Flynn effect is not addressed by the DSM-IV-TR. In addition, the American Psychological Association has not endorsed the Flynn effect. (Vol. I, part 1, pp. 152-153). The manuals for administration of the WAIS-III and the Stanford-Binet V do not allow for a correction of an IQ score by using the Flynn effect. (Vol. I, part 1, pp. 153-154). The Social Security Administration and the Adult Department of Vocational Rehabilitation Services do not provide for correction of IQ scores using the Flynn effect. (Vol. I, part 1, p.154). In fact, one of Thomas's experts, Dr. Karen Salekin, agreed that there is not a national consensus as to what to do with the Flynn effect. The only group that recognizes the Flynn effect is the American Association on Intellectual and Developmental Disabilities (AAIDD) which is an advocacy group for persons with mental retardation. (Vol I, part 1, p. 155). Because there is no scientific data to support the imposition of the Flynn effect, Thomas's reliance on the Flynn effect should be rejected by this Court.

This Court should also refuse to accept Thomas's argument that all of his IQ scores should be adjusted downward using the standard error of measurement. The standard error of measurement is a statistical measure that allows psychologists to know the amount of error that could be present in any test. The DSM-IV-TR states that the standard error of measurement for IQ scores is basically plus or minus five points. . . .

*Id*. (emphasis supplied, footnote and transcript citations omitted).

peer review and, while some psychologists may still ponder the precise cause(s) of the Flynn effect, no reputable member of the relevant professional communities denies that IQ scores have been increasing at the average rate of 0.30 points a year since the 1930s. General acceptance of both methodologies has come "as results and theories continue to hold, even under the scrutiny of peers, in an environment that encourages healthy skepticism."[64]

Therefore, this court has taken both factors into account when evaluating the extent of petitioner's intellectual functioning abilities. Stated differently, even though the legal cut-off score for a finding of "significantly subaverage intellectual functioning" is stated in opinions of the Alabama Supreme Court as "an IQ of 70 or below," a court should not look at a raw IQ score as a *precise* measurement of intellectual functioning. A court must also consider the Flynn effect and the standard error of measurement in determining whether a petitioner's IQ score falls within a *range* containing scores that are less than 70.

**B.    Assessment of Adaptive Behavior**

Under *Atkins* and its progeny, a finding of "mental retardation" can only be made upon the basis of a conclusion that the petitioner's significantly sub-average

---

[64] National Research Council, *Strengthening Forensic Science*, *supra* note 30 at 4-2.

intellectual functioning is accompanied by substantial limitations in adaptive behavior. *See Atkins*, 536 U.S. at 309 n.3; *Ex parte Perkins*, 851 So. 2d at 456.

The term "adaptive behavior" is defined by the AAMR as "the collection of *conceptual*, *social*, and *practical skills* that have been learned by people in order to function in their everyday lives." *Mental Retardation* at 41 (emphasis supplied). "Conceptual skills" include language, reading and writing, money concepts, and self-direction; in other words, a determination whether the test subject possesses a basic level of literacy and numeracy (so he can shop and make change), and remembers to do things on time. "Social skills" include interpersonal relationships, personal responsibility, self-esteem, gullibility and naiveté, following rules, obeying laws, and avoiding victimization. "Practical skills" include daily activities such as eating, personal hygiene, dressing, meal preparation, housekeeping, transportation, taking medication, money management, and telephone use, as well as occupational

skills and maintaining a safe environment.[65]  Dr. Salekin explained the concept as

follows:

> [A]daptive behaviors are everyday skills, such as walking, talking, grooming, cooking, cleaning, and participating in school or work.  These abilities are learned over time in the context of one's home and community, and they represent skills that are necessary to function within that context.  It is important to emphasize that adaptive behaviors develop over the course of time and with experience, and thus individuals are evaluated against their same age peers.  *To measure adaptive skills, adaptive behavior scales have been developed and normed on individuals with and without intellectual disabilities.  These scales require that an informant, typically a parent, teacher, or other individual who is very familiar with the individual's daily level of functioning, rate the person of interest on a variety of skills*.  For instance, the informant may rate the extent to which the individual follows directions or balances a checkbook along a continuum ranging from "Never Does or Can't Do" to "Always Does or Can Do Without Assistance."

---

[65] *See* AAMR, *Mental Retardation*, Chap. 5, Table 5.2, at 82.  The three broad domains of adaptive behavior specified in the Tenth (2002) AAMR manual — *conceptual*, *social*, *and practical skills* — represent a shift from, and are less differentiated than, the ten skill areas that were listed in the Ninth (1992) edition of the manual referenced in the *Atkins* opinion: *i.e.*, (i) communication, (ii) self-care, (iii) home living, (iv) social skills, (v) community use, (vi) self-direction, (vii) health and safety, (viii) functional academics, (ix) leisure and (x) work.  *See id*. at 73; *see also Atkins*, 536 U.S. at 309 n.3.  The 2002 manual explains this shift in diagnostic criteria as follows:

> A number of professionals involved in the diagnosis of mental retardation expressed concern that the 10 skill areas in the 1992 AAMR definition were not found on any single standardized measure of adaptive behavior at that time.  The requirement that significant limitations be present in at least 2 of the 10 skill areas was particularly problematic when the 10 areas were not known to be internally consistent or independent.  The lack of measurement tools and the fact that the 10 areas had not emerged for factor-analytical work on adaptive behior led the current AAMR Terminology and Classification Committee to reconsider and change this component of the definition criteria.

AAMR, *Mental Retardation* at 81 (citation omitted).

* * * *

There exist many misconceptions about how to conceptualize adaptive behavior for diagnostic purposes. First, some believe that adaptive behavior is measured by estimates of abilities or potential, but it is the individual's actual performance that is important. Second, adaptive behavior is typical behavior that reflects an individual's ability to function on a day-to-day basis. It is not measured by isolated successes or failures. Third, adaptive behavior is performance in one's community, not in restricted settings, such as prison or therapeutic treatment programs. Fourth, the definition of mental retardation does not require that a cause of impairment be identified; diagnosis is determined by the presence of significant deficits in intellectual functioning and concomitant deficits in adaptive behavior that are evident before the age of 18 years.

Doc. no. 110-2 (Report of Karen Salekin, Ph.D.), at 15, 16 (emphasis supplied).

**1**.   *Standardized assessment instruments*

In the Tenth (2002) edition of the AAMR's manual, diagnosticians are, for the first time, instructed that

significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population, including people with disabilities and people without disabilities. On these standardized measures, significant limitations in adaptive behavior are operationally defined as performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills.

*Mental Retardation* at 76.[66]

There are many scales for measuring adaptive behavior, but it is important to recognize that "no one instrument can measure all of the relevant domains of adaptive behavior." *Id.* at 84 (citation and internal quotation marks omitted). *See also*, *e.g.*, doc. no. 110-2 (Report of Karen Salekin, Ph.D.) at 16 ("There exist numerous scales of adaptive behavior that can be used for the purposes of diagnosis, classification, and planning for supports; [but] *no single measure is best for all three*.") (alteration and emphasis added).

---

[66] The authors of the 2002 AAMR manual explain their emphasis upon the use of standardized test instruments, normed on the general population (including people with mental disabilities as well as people who are not mentally retarded) as an effort to achieve "a balanced consideration" of intelligence and adaptive behavior skills in the diagnosis of mental retardation.

> In spite of the fact that previous definitions have indicated that intelligence and adaptive behavior should have equal weight in diagnosis, in practice IQ has typically dominated and thus has been overemphasized both in terms of professional decision making and diagnosis and research. This dominance of measured IQ has been unfortunate because the earliest conceptions of mental retardation were based upon a profile of individuals who were unable to adapt to the demands of everyday life.

> Intelligence test measurement preceded the development of standard measures of adaptive behavior, which may partially explain the shift from the original concept of mental retardation to one that has been more focused on limited intellectual capabilities, as measured by IQ tests. Moreover, adaptive behavior assessment has sometimes been viewed as a mechanism for declassification that occurs when a person who is otherwise considered to have mental retardation (based on IQ) is subsequently determined not to have mental retardation on the basis of adaptive behavior; that is, adaptive behavior has been used as protection against false positives. This imbalance between intelligence and adaptive behavior does not represent the current conceptualization of mental retardation.

AAMR, *Mental Retardation* at 80 (citations omitted).

For that reason, review of school records, medical histories, public records, employment records, and personal observations of the test subject in face-to-face interviews, as well as consideration of other, collateral sources of information — such as interviews of "third-party informants" (*e.g.*, family members, friends, school teachers, and other persons who know the subject well) — are all used by clinicians to complement, but not replace, standardized assessment measures.  *See* AAMR, *Mental Retardation* at 84.

> Those who use most current adaptive behavior scales to gather information about typical behavior rely primarily on the recording of information obtained from a third person who is familiar with the individual being assessed.  Thus assessment typically takes the form of an interview process, with the respondent being a parent, teacher, or direct service provider [e.g., prison guards] rather than from direct observation of adaptive behavior or from self-report of typical behavior. It is critical that the interviewer and informant or rater fully understand the meaning of each question and response category in order to provide valid and reliable information to the clinician.  It is also essential that people interviewed about someone's adaptive behavior be well-acquainted with the typical behavior of the person over an extended period of time, preferably in multiple settings.  In some cases it may be necessary to obtain information from more than one informant.  The consequences of scores to the rater, informant, or individual being rated should also be taken into consideration, as well as the positive or negative nature of the relationship between the rater or informant and the person being assessed.  Observations made outside the context of community environments typical of the individual's age peers and culture warrant severely reduced weight.

*Id*. at 85 (citations omitted).

**2**.     *The importance of clinical judgment*

As a result of the fact that no currently available assessment instrument can measure all domains of adaptive behavior, the importance of "clinical judgment" increases. *See id*. at 84. Clinical judgment is particularly important in cases such as this one, where the passage of many years limits the use and valid interpretation of standardized test instruments administered to third-party informants. *Id*. at 94 ("Clinical judgment is often required when . . . difficulties arise in selecting informants and validating informant observations [or] . . . direct observation of the individual's actual performance has been limited and additional direct observation is necessary.").[67]

Respondent's expert, Dr. Harry McClaren, acknowledged the importance of clinical judgment.  When he was asked if the fact that no currently-available assessment instrument completely measures all domains of adaptive behavior means that the question of whether a person is significantly limited in adaptive behavioral skills "essentially comes down to [a clinician's] professional judgment," Dr. McClaren answered:   "absolutely correct," "[t]hat's right."[68]   However, Dr. McClaren's unequivocal embrace of the importance of clinical judgment in the

---

[67] The constraints of a maximum-security prison environment also limit the diagnostician's ability to assess the subject's adaptive skills consistently with the AAMR definition.

[68] Tr. Vol. II at 212-13.

assessment of a test subject's adaptive skills only begs a question: *What do psychologists mean when they use the term "clinical judgment"?*  The AAIDD's *User's Guide* answers that query as follows:

> Clinical Judgment is a special type of judgment that emerges directly from extensive data and is rooted in a high level of clinical expertise and experience.  Its three characteristics are that it is (a) systematic (i.e., organized, sequential, logical), (b) formal (i.e., explicit and reasoned), and (c) transparent (i.e., apparent and communicated clearly).  The result of competent clinical judgment is that its use enhances the precision, accuracy, and integrity of the clinician's decisions and recommendations. It is important to point out that clinical judgment is not (a) a justification for abbreviated evaluations, (b) a vehicle for stereotypes or prejudices, (c) a substitute for insufficiently explained questions, (d) an excuse for incomplete or missing data, or (e) a way to solve political problems.

AAIDD, *User's Guide* at 23.[69]  Moreover, "it is crucial that clinicians conduct a thorough social history and align data and data collection to the critical question(s) at hand."  *Id*.

**3**.     *The assessment instrument used in this case*

Petitioner's expert, Dr. Karen Salekin, administered the Scales of Independent Behavior–Revised (SIB-R) test instrument to third-party informants for the purpose of probing their memories of petitioner's adaptive skills prior to age eighteen.  She also administered the SIB-R to prison guards for the purpose of exploring their observations of petitioner's behavior, both currently and during the entire time he has been incarcerated.[70]

---

[69] The Tenth (2002) edition of the AAMR manual defines the concept slightly differently, but consistently with the definition quoted in text:

> *Clinical judgment* is a special type of judgment rooted in a high level of clinical expertise and experience; it emerges directly from extensive data.  It is based on the clinician's explicit training, direct experience with people who have mental retardation, and familiarity with the person and the person's environments.  Thus clinicians who have not gathered extensive relevant assessment data should not claim clinical judgment.  Clinical judgment should *not* be thought of as a justification for abbreviated evaluations, a vehicle for stereotypes or prejudices, a substitute for insufficiently explored questions, an excuse for incomplete or missing data, or a way to solve political problems.  Rather, it should be viewed as a tool of clinicians with training and expertise in mental retardation and ongoing experiences with — and observations of — people with mental retardation and their families.

AAMR, *Mental Retardation* at 95 (emphasis in original).

[70] The AAMR manual describes this assessment tool as follows:

> The Scales of Independent Behavior–Revised (SIB-R) is a component of the Woodcock-Johnson Psycho-Educational Battery and has three forms: the Full-Scale,

50

According to respondent's expert, the SIB-R test instrument is designed for administration to third-party informants, to assess their knowledge of the subject's *current* adaptive skills — *not* twenty- to thirty-year-old memories of the subject's past behavior.[71]  Respondent's expert also asserts that the SIB-R is not normed for inmates who have been incarcerated in a highly-restrictive, death-row environment for long periods of time.[72]

_____

the Short Form, and the Early Development Form.  A Problem Behavior Scale is included in each form.  The SIB-R provides a wide array of scores for diagnosis and planning supports.  For diagnosis, scores on Social Interaction and Community Skills, Personal Living Skills, and Community Living Skills are consistent with the social, practical, and conceptual domains in the current definition.  A fourth SIB score, Motor Skills, can contribute information about the Health dimension in the conceptual model of individual functioning in Figure 1.1.

The SIB manual addresses many of the issues that make the interpretation of adaptive behavior scores especially challenging in the diagnosis of mental retardation, including physical disability, use of adaptive equipment, alternative communication methods, tasks no longer age-appropriate, partial performance of multi-part tasks, and lack of opportunity due to environment or safety and cognitive ability to understand social expectations for performing behaviors.  Guidelines regarding these special conditions suggest that individuals should be rated according to what they actually do (or would do if age-appropriate) rather than giving "credit" for lack of opportunity, overprotective environments, adaptive equipment, or physical disability or denying credit if tasks are performed well with the assistance of adaptive equipment and/or medication.  The Checklist of Adaptive Living Skills (CALS) is part of the same assessment battery.  It is a criterion-referenced measure of adaptive living skills that is useful for program planning but would not be appropriate for diagnostic purposes.

AAMR, *Mental Retardation* at 89-90 (citations omitted).

[71] McClaren, Tr. Vol. II at 211-12.

[72] *Id.* at 211.  Dr. McClaren later testified that, even though he also administered a standardized adaptive behavior assessment instrument, he did so with this "caveat":  such tests are designed

Dr. Salekin candidly confessed that the SIB-R was not created to be utilized in the manner she employed it.  Nevertheless, she chose to make use of it in an effort to discern some sense of the petitioner's adaptive skills, and also because the 2002 AAMR definition requires administration of a standardized assessment instrument for diagnostic purposes.[73]

In short, any conclusions regarding the limitations of petitioner's adaptive-behavioral skills prior to the age of eighteen, during adulthood, or as a result of his twenty-year stint on death row ultimately hinge upon the strength and credibility of each expert's clinical judgment, as applied to the other sources of information she or he explored.  As has been observed, however, clinical judgments can "represent both the best and worst of assessment data.  Judgments made by conscientious, capable, and objective individuals can be an invaluable aid in the assessment process.

---

to be given at the time — near or about the time that a person who knows the subject in a number of contexts over time is doing it without having to put their mind back perhaps ten years, eight years in time.

 While it would be nice to give these adaptive measures to people on death row, the environment is just not usually conducive to conduct the standardized adaptive behavior [assessment].

McClaren, Tr. Vol. II at 160-61.

[73] Salekin, Tr. Vol. I at 210.  *See also* AAMR, *Mental Retardation* at 91 ("For diagnosis, significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population, which includes people with disabilities and people without disabilities.").

Inaccurate, biased, subjective judgment can be misleading at best and harmful at worst."[74]

### III. EXPERT WITNESSES AND "BEST PRACTICES"

**A.   Petitioner's Experts**

**1.   *Dr. Karen Salekin***

Dr. Salekin is a clinical and forensic psychologist.  She earned a Bachelor of Science degree with double majors in Psychology and Kinesiology[75] from Simon Fraser University in Burnaby, British Columbia, during 1991, and a Master of Science degree and a Doctorate in Psychology from the University of North Texas in 1994 and 1997, respectively.  Between 1995 and 1998, Dr. Salekin completed pre- and post-doctoral clinical training at a Federal penal facility and two University medical centers.  She has maintained a private practice in clinical and forensic psychology in Tuscaloosa, Alabama, since 2001, but in 2003 she also was appointed an Assistant Professor of Psychology at the University of Alabama.  She has various publications in print.[76]  Dr. Salekin estimated that she has performed hundreds of

---

[74] *Id.* at 94 (quoting J. Salvia & J.E. Ysseldyke, *Assessment* (Boston:  Houghton Mifflin 5th ed. 1991)).

[75] Kinesiology is the study of muscles and muscular movement in relation to the principles of mechanics and anatomy.  *See* Raymond J. Corsini, *The Dictionary of Psychology* at 525.

[76] *See* Petitioner's Ex. 1 (Salekin's *curriculum vitae*) at 5-8.  Dr. Salekin was asked whether a chapter she had contributed to a book — *Capital Mitigation From a Developmental Perspective: The Importance of Risk Factors, Protective Factors, and the Construct of Resilience* in Expert Psychological Testimony for the Courts (M. Costanzo, D. Krauss & K. Pezdek eds.) — was intended

forensic assessments throughout her career, and she has conducted eleven *Atkins* evaluations in Alabama death penalty cases — a number that includes petitioner, Kenneth Thomas.[77]  All of those evaluations were conducted at the request of defense counsel.[78]  Even so, Dr. Salekin has concluded that only three of those eleven subjects were mentally retarded.[79]  That fact indicates that Dr. Salekin is not a trained parrot, and enhances her credibility.

---

"to provide capital defense attorneys with information to help them in representing capital defendants.]"  Tr. Vol. I at 140.  She answered "no," saying:

> The point of the chapter is actually not for attorneys.  It's for psychologists conducting mitigation evaluations . . . , to understand the person from a developmental perspective so that they're addressing all issues.

> Whether there's mitigation present or not, the role of the psychologist is to do a full evaluation of the development trajectory.  So it's actually not geared for attorneys.

Salekin, Tr. Vol. I at 140-41.

[77] *See* Salekin, Tr. Vol. I at 7-8, 138.  This number includes the present evaluation.

[78] *Id.*  Dr. Salekin testified for the Santa Clara County, California District Attorney's office during April of 2007 "as an expert in the assessment of mental retardation."  Salekin, Tr. Vol. I at 8, and Petitioner's Ex. 5 at 7.  In January 2008, she spoke at a defense attorneys' seminar entitled "Loosening the death belt: tightening the defense one life at a time."  Tr. Vol. I at 141.  Her presentation was entitled "[W]hat your expert needs and what you need from your expert."  *Id.*  Salekin denied having testified that she is "against the death penalty":

> What I have said in the past is I'm not a firm person for the death penalty; that I don't believe in its deterrent value.  But at the same time, I'm not going to be the kind of person who pickets against the death penalty or anything else.  So it's not that I'm against the death penalty, per se.  I just don't think it works as punishment.

*Id.* at 142.

[79] *Id.* at 8.

When conducting a forensic evaluation, Dr. Salekin follows recommendations contained in a treatise discussing the legal and clinical contexts of forensic assessments, including "best practice" guidelines for participating effectively and ethically in civil and criminal proceedings:  *i.e.*, Gary B. Melton, John Petrila, Norman G. Poythress & Christopher Slobogin, *Psychological Evaluations for the Courts:  A Handbook for Mental Health Professionals and Lawyers* (New York:  The Guilford Press 3d ed. 2007).[80]  One section of that treatise discusses the information that should be addressed in a written report of evaluation.   For example, diagnosticians are encouraged to document, among other things:  the reasons for conducting the mental assessment; the names of all contacts; the date, time, place, and length of interviews; what each informant said; and, the collateral sources and records that were reviewed.[81]

**2.**    *Dr. Daniel Marson*

---

[80] During the hearing, Dr. Salekin was asked by petitioner's counsel whether her profession had promulgated standards for conducting *Atkins* evaluations on death-row inmates.  She answered that, "in terms of our profession, there's no hard and fast rule written down anywhere that says your have to do it this way, you have to do it that way," but she went on to describe a treatise that she believed to contain useful guidance on the information that should be contained in written reports of evaluation.  While on the stand, Dr. Salekin identified the book as "the Handbook of Forensic Evaluations for Mental Health Professionals," and stated that it was authored "by a group of individuals, Gary Melton, Norm Poythress — anyway, there's four individuals who have done three revisions of the book."  Tr. Vol. I at 136-37.  The full, correct title of the treatise is as stated in text, and copies of the third edition may be obtained at www.amazon.com; the second (1997) edition is available through www.alibris.com.

[81] *See* Salekin, Tr. Vol. I at 136-37.

55

Dr. Marson has been a professor of neurology at the University of Alabama in Birmingham since 1990. He earned a Liberal Arts degree from Carlton College in Northfield, Minnesota during 1976. From 1977-78, he studied law at the University of Edinburgh in Scotland, and he earned a Juris Doctor degree from the University of Chicago School of Law in 1981. Dr. Marson pursued further graduate training in clinical psychology at Northwestern University Medical School in Chicago, and he obtained a Ph.D. in Clinical Psychology (with a specialization in geriatric issues) from that school in 1990.[82]

As the term "neuropsychology" suggests, it is a field of study that combines neurology and psychology. It is concerned primarily with clinical and scientific aspects of the relationship between brain structure and human behavior. Neuropsychologists search for possible organic causes of mental disorders, including retardation.[83] Dr. Marson explained his discipline this way:

> Well, to begin with, a good neuropsychologist is, first and foremost, a clinical psychologist. So I received that training at Northwestern.
>
> While I was there I took classes in brain science within the medical school. And then as part of my Ph.D., I took a specialty internship in neuropsychology at Westside V.A. [Hospital] in Chicago.

---

[82] *See* Petitioner's Ex. 17 (Dr. Marson's *curriculum vitae*) and Marson, Tr. Vol. II at 27-29.

[83] *See* R. J. Corsini, *The Dictionary of Psychology* at 640.

. . . .

Neuropsychology is a subspecialty of clinical psychology [that] focuses on disorders of higher cortical functioning or disorders of brain function.  And so we're psychologists who focus on brain behavior relationships.  . . .  [W]e use clinical interviews and specialized psychological tests to evaluate for brain dysfunction across a range of disorders.[84]

With specific reference to the diagnosis of mental retardation, Dr. Marson said

that neuropsychology allows a clinician to

conduct an evaluation [focusing upon] a wide range of specific or discreet cognitive functions, like memory, attention, perceptual abilities, problem solving.

And that can help the parties in a case, the Court understand how these specific deficits translate into specific kinds of problems in adaptive functioning.  . . .  A neuropsychologist can look at sort of the component cognitive abilities and relate them to specific deficits in everyday functioning.[85]

Marson testified that, since 2000, he had "been involved in about ten forensic

cases in which mental retardation was potentially an issue," and all but one involved

the death penalty.[86]  Marson found mental retardation in the non-death-penalty case,

and in only two of the nine death penalty cases.[87]  Again, that statistic enhances Dr.

Marson's credibility.

---

[84] Marson, Tr. Vol. II at 28-29.

[85] *Id.* at 29-30.

[86] *Id.* at 30-31.

[87] *Id.* at 31.

57

**B**.     **Respondent's Expert**

Dr. Harry A. McClaren is a licensed clinical psychologist specializing in criminal forensic psychology.  He earned a Bachelor of Science degree in Psychology from the University of Virginia in 1973, a Master's degree in Clinical Psychology from Mississippi State University in 1974, and a Ph.D. in Clinical Psychology from Virginia Polytechnic Institute in 1981.  He is licensed to practice psychology in Alabama and Florida, and he is a member of the American Psychological Association, as well as the American College of Forensic Examiners.[88]

Dr. McClaren has maintained a private practice in Clinical and Forensic Psychology since 1996.  He also has served as a staff psychologist at three institutions, including as Chief of Psychology at Alabama's Taylor Hardin Secure Medical Facility in Tuscaloosa from November 1983 to May of 1985.[89]  In that role, McClaren "worked with Norm Poythress to develop . . . forensic examiner training for the State of Alabama."[90]  When asked by the court if he considered the *Handbook for Mental Health Professionals and Lawyers* referenced by Dr. Salekin to be an authoritative and learned treatise,[91] Dr. McClaren responded that he owned a copy of

---

[88] McClaren, Tr. Vol. II at 145-46.  *See also* Respondent's Ex. 1 (Dr. McClaren's *curriculum vitae*).

[89] *See* Respondent's Ex. 1 at 2.

[90] McClaren, Tr. Vol. II at 146.

[91] *See supra* note 80 and accompanying text.

the book, and that he was "[a]wful proud of it," because one of the four co-authors, Norman G. Poythress, "is a very fine psychologist.  Knows a lot about the psychology and law."[92]

> It is a book that talks about different kinds of forensic psychology, about applying psychology to the nexus of mental health and the law. *And it gives suggestions by people that are well known about how to go about doing evaluations*, *writing reports*.  And it's the kind of thing that is not like a guideline, but it's a way to help people think about what they're doing.[93]

Dr. McClaren has been trained to conduct clinical forensic interviews and intelligence testing.[94]  He has testified "[h]undreds of times" at the request of trial judges, defense attorneys, district attorneys, and private counsel.[95] He estimated that ten to fifteen of his cases have involved *Atkins* evaluations, and all were done "at the request of some division of the State of Florida or the State of Alabama."[96]  In those few instances in which Dr. McClaren found people to be retarded, the find had been "stipulated to" by the State.[97]

## C.   "Best Practices"

---

[92] McClaren, Tr. Vol. II at 222.

[93] *Id*. at 222-23 (emphasis supplied).

[94] *Id.* at 147-48.

[95] *Id*. at 147.

[96] McClaren, Tr. Vol. II at 218.

[97] *Id.* at 219.

*Atkins v. Virginia* has required mental health professionals to hone diagnostic techniques originally designed for salutary purposes — *e.g.*, supporting and promoting the education and welfare of persons afflicted with mental retardation — to the forensic evaluation of persons charged with or convicted of the most heinous offenses known to the law.  Forensic assessments in such cases are more difficult than the ordinary case, at least in part because clinicians are asked to perform a retrospective diagnosis under less than optimal circumstances.

The AAIDD's 2007 *User's Guide* was "developed to assist . . . in understanding the 2002 [AAMR diagnostic] System fully and applying best practices based on that understanding."  *User's Guide* at 2.  "Best practices in [diagnosing] mental retardation are based on professional ethics, professional standards, research-based knowledge, and clinical judgment."  *Id*. at 1.  The pertinent portions of the guidelines for clinicians performing "retrospective diagnoses" read as follows:

> **Considerations**.  A retrospective diagnosis . . . may be required when clinicians are involved in determining . . . sentencing eligibility questions such as those related to the recent Atkins (2002) case.  As with all assessments for diagnosis, such situations require clinicians to act consistent with best practices — that is, to act consistent with professional ethics, professional standards, research-based knowledge, and clinical judgment.
>
> [I]n reference to people in the criminal justice system, some criminal defendants fall at the upper end of the MR/ID [Mental Retardation / Intellectual Disability] severity continuum (i.e., people with mental

60

retardation who have a higher IQ) and frequently present with a mixed competence profile. They typically have a history of academic failure and marginal social and vocational skills. Their previous and current situations frequently allowed formal assessment to be avoided or led to assessment that was less than optimal:

**Guidelines**. The following guidelines for clinicians are important in retrospective diagnoses. . . .

1. Conduct a thorough social history that includes: (a) the investigation and organization of all relevant information about the person's life including status, trajectory, development, functioning, relationships, and family; and (b) the exploration of possible reasons for absence of data or differences in data including poorly trained examiners, selection of inappropriate assessment instruments, improper interpretation of test scores, or lack of sensitivity or awareness of the impact of changing norms and practice effects (see Guidelines 4 & 5, below).

2. Conduct a thorough review of school records. Ideally, school records are available across the elementary-, middle-, and high-school years. Locate all those that are available and arrange them chronologically, numbering the pages. One also needs to make a summary table that lists placement on a year-by-year basis including any changes in the school or school system as well as special education or alternative placements. Citing page numbers from the school records is one way to provide documentation for each piece of relevant information identified. The thorough review should include:

(a)    mapping out the grades earned across the school years, looking for consistency of low grades in the core academic areas such as reading, math, English, and science (only in the upper grades)

(b)    indicating any grade levels failed or repeated

(c)    summarizing teacher, social and behavior ratings

61

(d)     identifying relevant teacher comments to student or parents and requests for, as well as actual, parent-teacher conferences

(e)     identifying when periodic achievement assessment happened (instruments and results) and, if necessary, learn more about the psychometrics of instrument used and how to interpret the scores

(f)     identifying results of hearing and vision and any other school-wide screening

(g)     searching for failure or patterns that normally would trigger parent-teacher conferences, prereferral meetings, or referrals for special education consideration

(h)     identifying the outcome of any eligibility assessment(s) and whether an individualized education plan was developed; if special education was provided, note the diagnosis (typically a developmental disability label is used until age 8), the years given, the type of placement (resource room, self-contained, separate school), and other supports

(i)     noting any services that might be viewed as substitutes to special education, which could indicate difficulties in cognitive adaptive behavior (e.g., remedial reading, Chapter I services)

(j)     looking for other evidence of difficulties in cognitive adaptive skills besides grades and test performance (e.g., student often late to class or confused about schedule, difficulty following classroom directions, poor record of handling homework, failing driver's education, etc.)

(k)     looking for difficulties in practical adaptive skills (e.g., poor grooming, unable to use money correctly, getting lost in school or on school grounds, unable to tell time, etc.)

(*l*)    looking for evidence of difficulties in social adaptive skills (e.g. follows others, lack of self-direction, few friends, gullible, does not understand social humor, etc.)

In addition to the above, having contact with the teacher is also valuable, if possible, as a means of clarifying questions in the records and getting specific comments on the student or explanations about gaps in the records.  Getting peer comments from school years is another valuable source of anecdotal information.

3. In reference to the assessment of adaptive behavior:  (a) use multiple informants and multiple contexts; (b) recognize that limitations in present functioning must be considered within the context of community environments typical of the individual's peers and culture; (c) be aware that many important social behavioral skills, such as gullibility and naivete, are not measured on current adaptive behavior scales; (d) use an adaptive behavior scale that assesses behaviors that are currently viewed as developmentally and socially relevant; (e) understand that adaptive behavior and problem behavior are different constructs and not opposite poles of a continuum; and (f) realize that adaptive behavior refers to typical and actual functioning and not to capacity or maximum functioning.

4. Recognize the "Flynn Effect."  [*The text of this paragraph was quoted previously*, in Part II(A)(3) *supra*.]

5. Recognize the impact of practice effect.  Practice effect refers to gains in IQ scores on tests of intelligence that result from a person being retested on the same test. . . .  For example, . . . [t]he WAIS-III manual reports an average increase of 5 points on the Full-Scale IQ between administrations with intervals of 2 to 12 weeks. Thus clinicians need to be sensitive to these practice effects and best practices in intellectual assessment recommendations against administering the same intelligence test to someone within the same year.  Practice effects can apply as well to normal achievement tests and state tests to measure school and district performance.

6. Recognize that self-ratings have a high risk of error in determining "significant limitations in adaptive behavior."  However, consistent with the need for multiple informants or respondents, self-ratings can be used under the following cautions:  (a) people with MR/ID are more likely to attempt to look more competent and "normal" than they actually are — which is sometimes interpreted as "faking"; (b) people with MR/ID typically have a strong acquiescence bias or inclination to say yes or agree with authority figures; and (c) MR/ID is a social status that is closely tied to how a person is perceived by peers, family members, and others in the community.

7. Conduct a longitudinal approach of adaptive behavior that involves multiple raters, very specific observations across community environments (especially in regard to social competence), school records, and ratings by peers in the development process.  This longitudinal evaluation needs to be sensitive to the subtle issue of "the stigma of the label" and the concern that families and schools have about the label of "mental retardation" and over-representation of specific racial or ethnic groups within particular communities and/or schools.

8. Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior or about having MR/ID.  Greenspan and Switzky (in press) discuss two reasons for this guideline.  First, there is not enough available information; second, there is a lack of normative information.

AAIDD, *User's Guide* at 17-20 (citations omitted, bracketed alterations added).

None of the experts who testified in this case explicitly referenced the foregoing portions of the *User's Guide*, but the reports tendered by petitioner's experts, Dr. Karen Salekin and Dr. Daniel Marson, substantially adhere to the guidelines for conducting retrospective diagnoses.

In contrast, the report submitted by respondent's expert, Dr. McClaren, is most notable for what it does *not* contain.[98]  For example, Dr. McClaren did not evaluate petitioner's adaptive behavior before the age of 18,[99] and he did not summarize interviews conducted with third-party informants for the purpose of obtaining some insight into petitioner's adaptive skills during the developmental period.[100]  Indeed, Dr. McClaren did not even identify the individuals to whom he spoke, and he devoted no attention to a discussion of diagnostic criteria.[101]

Dr. McClaren acknowledged the absence of this information, but asserted that he did not include it in his reports "as a matter of practice."  He declared that, in his opinion, it was important to state his conclusions regarding petitioner's pre-age-eighteen adaptive functioning only "if that is what the bottom line turned upon."[102]  That opinion is contradicted by the APA's *Diagnostic and Statistical Manual*, which notes that, when a ± 5 point standard error of measurement is taken into account, "it is possible to diagnose Mental Retardation in individuals with IQs *between 70 and*

---

[98] *Compare* doc. no. 110-2 (Salekin), Petitioner's Ex. 2 (same), doc. no. 111-2 (Marson), and Petitioner's Ex. 18 (same), *with* doc. no. 112 (McClaren), and Defendant's Ex. 1 (same).

[99] In Dr. Salekin's opinion, "[t]he information provided in [Dr. McClaren's] report doesn't allow for that kind of [adaptive behavior] analysis.  There's no indication of the findings that would go against adaptive functioning deficits prior to [or after] the age of 18."  Salekin, Tr. Vol. I at 130.

[100] *Id.* at 129; *see also* Marson, Tr. Vol. II at 84-86.

[101] *See* Salekin, Tr. Vol. I at 129-30; *see also* Marson, Tr. Vol. II at 84-86.

[102] McClaren, Tr. Vol. II at 246-47.

*75 who exhibit significant deficits in adaptive behavior.* Conversely, Mental Retardation would not be diagnosed in an individual with an IQ *lower than 70 if there are no significant deficits or impairments in adaptive functioning.*" DSM-IV-TR at 41-42 (emphasis supplied).

Dr. McClaren attempted to defend the paucity of substantive information included in his abbreviated report by answering "Yes" to the following, leading question posed by respondent's counsel: "[T]hat report . . . doesn't include all of the work that you did in order to make your evaluation of Mr. Thomas; it's just a summary, isn't that correct?"[103]  When asked by petitioner's counsel if it was his "custom and practice . . . to include all . . . important conclusions and the supporting information in your report?," Dr. McClaren answered: "I think it's important to explain what the conclusion is based on. And I guess you could have a debate about broad-brush reports that may be three to six pages, seven pages long or fine-brush reports that may be 17, 20 pages long. And most of my reports are in the three-to-six-page range."[104]

Regardless of Dr. McClaren's rationalizations, this court finds that his approach to forensic report writing leaves a great deal to be desired, especially in

---

[103] *Id*. at 199.

[104] *Id*. at 245-46.

cases such as this one, where important societal and legal policies collide. Dr. McClaren's report stands in stark contrast to the careful analysis and well-documented statements contained in the reports of petitioner's witnesses. For such reasons, it is less persuasive.

Even so, Dr. McClaren reviewed the same historical records as Drs. Salekin and Marson; he conducted interviews (albeit, it is not clear how many, with whom, the length of each, and the questions that were asked); and he administered testing instruments. Thus, while the deficiencies of Dr. McClaren's written report are painfully obvious, this court still must examine and consider his testimony at the evidentiary hearing to determine whether the paucity of substantive information contained in his written report simply reflects poor reporting practices, or whether it is indicative of an abbreviated, cursory evaluation.

## IV. ASSESSMENTS OF PETITIONER'S INTELLECTUAL FUNCTIONING

As discussed in Part I *supra*, this court must determine whether petitioner's intellectual functioning ability was significantly subaverage during three periods of his life: (1) before he reached the age of eighteen; (2) on the date the offense of conviction was committed; and (3) currently. *See Smith v. State*, No. 1060427, 2007 WL 1519869, at *8 (Ala. May 25, 2007).

## A.    Intelligence Assessments Conducted Prior to Age Eighteen

Intelligence tests were administered to petitioner at least seven times before his conviction for the capital murder that eventually brought him into this court.  Four of those were conducted before March 7, 1977, the date upon which he attained the age of eighteen years.

### 1.    *October 4, 1968 — age nine years and seven months*

The first evaluation occurred on October 4, 1968, when Thomas was nine years and seven months of age.  A psychologist on the staff of the North Central Alabama Mental Health Center in Decatur, Alabama, David Loiry, Ph. D., administered a short form version of the Wechsler Intelligence Scales for Children (WISC).  The WISC was normed in 1949, and consisted of a series of twelve tests for minors between the ages of five and sixteen years.  Verbal, performance, and full-scale intelligence quotients could be derived from computation of the subtest scales.  According to Dr. Loiry's report, Thomas's estimated full-scale IQ score of 56 placed him

> near the middle of the range of moderate mental deficiency according to the classification system used by the American Psychiatric Association. There is little variability in the sub-tests used to estimate his IQ and it is felt that this represents a valid estimate of his present intellectual functioning.

> Kenneth was recommended for placement in [a] Special Class for the Educable Mentally Retarded.[105]

Neither the standard error of measurement nor the Flynn effect can be taken into account, because the former is not known for this particular test, and no empirical studies of the latter phenomenon have been conducted using the short form of the WISC test instrument.[106]  Even without such adjustments, however, Thomas's full-scale IQ score of 56 clearly indicated significant limitations in his intellectual functioning at a young age.

**2.**    *October 12, 1972 — age thirteen years and seven months*

The second evaluation occurred on October 12, 1972, when Thomas was thirteen years and seven months of age.[107]  He was tested by the Athens, Alabama, School System with the California Test of Mental Maturity – Short Form (CTMM-SF).  The scales of that test measured various aspects of intellectual functioning, such as memory and logical reasoning, at five different levels of difficulty.  The test was

---

[105] *See* Petitioner's Ex. 3 (letter dated November 4, 1968, from Dr. Loiry to Thomas's grade school).

[106] According to Dr. Salekin, the short form WISC normally is utilized only for screening purposes, to determine whether further evaluation is needed, and not as a diagnostic tool.  *See* Salekin, Tr. Vol. I at 115-16.  Even so, the results are included here for two reasons: they give some idea of petitioner's Full-Scale IQ when assessment of his intellectual functioning began; and, more importantly, the report contains the basis for the opinion of an objective, professional diagnostician.

[107] *See* Petitioner's Ex. 18 (Marson report) at 6.  Only the scoring page of the test instrument was preserved in Thomas's school records.  *See* Petitioner's Ex. 21 at 14.

administered to groups of students, as opposed to individual test subjects.[108]  Thomas

received a composite IQ score of 68.  Again, even without taking into account either

the standard error of measurement or the Flynn effect, Thomas's composite IQ score

of 68 indicated significantly subaverage intellectual functioning abilities.[109]

**3.**     *June 23, 1973 — age fourteen years and two months*

The third intelligence assessment occurred on June 23, 1973, when Thomas

was fourteen years and two months of age.  He was re-evaluated by David Loiry,

Ph.D., at the request of Dr. Frank M Cauthen, M.D.  Dr. Loiry administered four tests:

the  full  Wechsler  Intelligence  Scales  for  Children  (WISC);[110]  the  Wide  Range

---

[108] *See* R. J. Corsini, *The Dictionary of Psychology* at 137.

[109] According to Dr. Daniel Marson, however, the CTMM should not be considered a diagnostic testing instrument, because so little is known about the version used with Thomas.

> We know it was developed in 1949.  We were not able to get a copy of the version that was administered . . . to Mr. Thomas.   . . .
>
> We know it has high correlations with the Stanford-Binet.  We know it's administered in a group setting as opposed to an individualized setting.  And we believe it has been used in the past as a way to . . . screen people who might need further evaluation on an individualized basis.
>
> And there are articles written about it, but we did not find anything current to indicate [that] it is still in active use.
>
> And we referenced it to be complete.  But we're not familiar with the test itself or . . . how it measures intelligence.

Marson, Tr. Vol II at 121.

[110] *See* Petitioner's Ex. 4 (letter dated June 23, 1973, from Dr. Loiry to Frank Cauthen, M.D., in which Loiry related his administration of the WISC and its results).  The long form of the WISC is an appropriate diagnostic testing instrument for mental retardation.  The remaining tests — each

Achievement Test (WRAT);[111] the Bender Visual-Motor Gestalt Test (BVMGT);[112]

a Figure Drawing test;[113] and a Rorschach test.[114]

Thomas's performance on the WISC test instrument yielded a verbal IQ score

of 69, a performance IQ score of 67, and a full-scale IQ score of 64 — clearly within

the range of mental retardation. The WRAT was administered for the purpose of

assessing Thomas's level of academic achievement, and it revealed that he functioned

at only a 3.7 grade level in spelling, a 3.9 grade level in reading, and a 2.9 grade level

---

of which is defined in the following footnotes — are either academic achievement tests or neuropsychological assessment instruments. *See* Salekin, Tr. Vol. I at 211-12.

[111] The Wide Range Achievement Test (WRAT) is "[a]n individual achievement test used primarily for remedial and vocational as well as general educational purposes, measuring the participant's level of skill in reading, spelling, and arithmetic computation, with an adjustable range from ages 5 to 75 years of age." R. J. Corsini, *The Dictionary of Psychology* at 1071.

[112] The Bender Visual-Motor Gestalt Test (BVMGT) is "[a] projective personality test in which the participant copies nine geometric figures, such as a circle tangent to a diamond and a row of dots. Interpretation of these configurations, and the participant's spontaneous comments, purportedly help examiners in assessing perceptual ability and personality characteristics, and in diagnosing functional and organic disorders." *Id.* at 105.

[113] A figure-drawing test is "[a]n examination in which the participant draws a human figure. [It is] used as a measure of intellectual development or as a projective technique. *See id.* at 376 (describing the "GOODENOUGH DRAW-A-MAN TEST, HOUSE-TREE-PERSON TEST, LEVY DRAW-AND-TELL-A-STORY TECHNIQUE, MACHOVER DRAW-A-PERSON TEST, ROSENBERG DRAW-A-PERSON TECHNIQUE") (all cap emphasis in original).

[114] A Rorschach Test is "[a] projective technique in which the participant is presented with ten unstructured inkblots, 5 achromatic (black and white) and 5 chromatic (in colors), in sequence and asked 'What might this be?' or 'What do you see?' The examiner classifies the responses according to such factors as color (C), movement (M), detail (D), whole (W), popular or common (P), animal (A), form (F), human (H), original, (O), small detail (d). The purpose of giving such a test is to interpret the participant's personality structure in terms of such factors as emotionality, cognitive style, creativity, bizarreness, and various defensive patterns. Interpretations are based on objective and subjective determinants. Psychologists' views differ as to the psychometric quality of the Rorschach (its reliability and validity), some asserting it has little or none." *Id.* at 852.

in arithmetic.  Based upon these results, Dr. Loiry concluded:  "*There appears to be little doubt about his mental retardation*."[115]

Without question, a full-scale IQ score of 64 on the WISC meets the intellectual functioning prong of a diagnosis of mental retardation.  That score points even more strongly in favor of Dr. Loiry's conclusion of mental retardation when the Flynn effect is taken into account.  The WISC was standardized ("normed") in 1949, but administered to Thomas 24 years later.  Multiplying 24 by the Flynn factor of minus 0.30 points for each year elapsed after the date of standardization yields a correction of 7.2 points that must be deducted from Thomas's full-scale IQ performance score, resulting in an adjusted IQ score of 57 (*i.e.*, 64 − 7.2 = 56.8, rounded-up to 57).

Not only is a score of 57 well below the cutoff for a diagnosis of mental retardation, it still is subject to adjustment by a ± 5 point standard error of measurement, resulting in a conclusion that can be stated with a 95% degree of

---

[115] Petitioner's Ex. 4 (emphasis supplied).

confidence,[116] that Thomas's "true" full-scale IQ score then lay within a band ranging from 52 on the low end to 62 on the high end.

Even if the Flynn effect is not taken into account, and the full-scale IQ performance score of 64 is adjusted only by the ± 5 point standard error of measurement, the high end of the resulting band (59 to 69) still is below the cutoff for mental retardation specified by the Alabama Supreme Court in *Ex parte Perkins*, 851 So. 2d at 456.

In short, regardless of how the full-scale IQ performance score produced by this test administration is sliced or diced, the numbers *always* lead to only one conclusion: Thomas's intellectual functioning was significantly below average at the age of fourteen years.

### 4.   *March 18, 1975 — age sixteen*

The final intelligence assessment conducted prior to Thomas's eighteenth birthday occurred on March 18, 1975, eleven days after his sixteenth birthday.  He was tested on the Wechsler Adult Intelligence Scales (WAIS) by Jim Lenz, a

---

[116] See the discussion in Part II(A)(2)(a) of this opinion *supra*, quoting the Tenth (2002) edition of the AAMR's manual as stating that "an IQ of 70 is most accurately understood not as a precise score, but as *a range of confidence with parameters of . . . two SEMSs* (i.e. scores of 62 to 78; **95% probability**).  *This is a critical consideration that must be part of any decision concerning the diagnosis of mental retardation*."  *Mental Retardation* at 59 (all emphasis added, citation omitted).

73

psychometrist for the Limestone County School System,[117] for the purpose of determining whether Thomas should remain in the "special education" curriculum.[118] Thomas marked the highest, raw performance scores to that point in his life:  verbal IQ 75,  performance IQ 75, and full-scale IQ 74.[119]  Lenz concluded, nevertheless, that Thomas was "functioning in the educable range of mental retardation," and recommended that he remain in special education.[120]

Thomas's raw, full-scale IQ score of 74 does not bar the conclusion that he suffered from significantly subaverage intellectual functioning prior to the age of eighteen.[121]  Adjustment for the Flynn effect alone reveals a diagnostically sound IQ score of less than 70.  The Wechsler Adult Intelligence Scales were standardized ("normed") in 1955, and Jim Lenz administered the assessment instrument to petitioner 20 years later.  Multiplying 20 by the Flynn standard of minus 0.30 points for each year elapsed after the test was normed yields a correction of 6 points that

---

[117] A psychometrist, also known as a "psychometrician," is a specialist in the science of mental tests and in the evaluation of test results.  "Psychometric examinations" are a series of psychological tests administered to determine an individual's intelligence, manual skills, personality characteristics, interests, and other mental factors.  *See* R. J. Corsini, *The Dictionary of Psychology* 785.

[118] *See* Petitioner's Ex. 4 and Ex. 6.  *See also* David Seibert (Thomas's special education teacher at West Limestone High School), Tr. Vol. I at 286.

[119] *See* Petitioner's Ex. 6.

[120] *Id*.

[121] Respondent's expert, Dr. McClaren, acknowledged that Mr. Lenz had the benefit of viewing Thomas when forming his conclusion that he was mentally retarded.  *See* McClaren, Tr. Vol. II at 236.

must be deducted from Thomas's raw performance score, resulting in an adjusted full-scale IQ of 68. Not only is that score below the cutoff for a diagnosis of mental retardation, but the score still is subject to adjustment by ± 5 points for measurement error, resulting in Thomas's hypothetical, "true" IQ score lying within a 63 to 73 band of confidence.[122] Accordingly, this court concludes that petitioner did not present with a true IQ score that was greater than 70 based upon the results of the intelligence examination administered to him on March 18, 1975.

### 5.   *Findings*

Based on the foregoing evidence, this court finds that petitioner has demonstrated, by a preponderance of the evidence, that he suffered from significantly subaverage intellectual functioning prior to the age of eighteen years: *i.e.*, during the so-called "developmental period."

### B.   **The Intelligence Assessment Performed on April 11, 1977**

The first assessment of Thomas's intellectual functioning following the end of the developmental period was performed on April 11, 1977, just one month after his eighteenth birthday. A Wechsler Adult Intelligence Scales (WAIS) test instrument was administered by Joyce Raley, a counselor at the West Limestone School. The

---

[122] *See* Salekin, Tr. Vol. I at 118-19, for testimony confirming this court's calculations, and, conclusion that a WAIS full-scale IQ score of 74 is not outside the range of a diagnosis of mild mental retardation when adjustments for the standard error of measurement and Flynn effect are taken into account.

record is not clear on the questions of why Ms. Raley, as opposed to Jim Lenz, administered the test, or the purpose for which it was given.[123]   In any event, Thomas's raw test scores on that occasion were the highest he has ever recorded: verbal IQ 78, performance IQ 79, and full-scale IQ 77.[124]

As noted in the previous section, however, the WAIS assessment instrument was standardized ("normed") in 1955, and Ms. Raley's administration of the test occurred 22 years later.  Multiplying 22 by the Flynn corrective factor of minus 0.30 points for each year elapsed after the test was normed yields a correction of 6.6 points that must be deducted from Thomas's raw score, resulting in an adjusted full-scale IQ of 70.4, which rounds down to 70.[125]   Even that is not an absolute score, because a further correction of $\pm$ 5 points for the standard error of measurement must then be applied to the adjusted IQ score.  In doing so, this court can be 95% confident[126] that Thomas's "true" IQ on the date of Ms. Raley's assessment fell within a band extending from 65 (65.4) on the low end to 75 (75.4) on the upper extreme.

---

[123] Dr. McClaren opined that, since the test was administered when Thomas was about to "graduate" (*i.e.*, age out of the public school system), "it was given in anticipation of further care for him as he moved into independent living or attempts to make him independent." McClaren, Tr. Vol. I at 241.

[124] *See* Petitioner's Ex. 7.

[125] *See* Salekin, Tr. Vol. I at 121.

[126] *See supra* note 116.

This court cannot conclude its discussion of these test results, however, without addressing Dr. McClaren's belief that Thomas's raw, full-scale IQ score of 77 on the WAIS administered by Joyce Raley, a counselor, as opposed to the School System's psychometrist, not only should be considered as an accurate measurement of his intellectual functioning abilities *prior to* age eighteen,[127] but also should be considered as proof that Thomas was not then, and is not now, mentally retarded. These contentions are deserving of at least some attention because it appears that there is a certain amount of arbitrariness in the selection of eighteen years as the end of the so-called "developmental period,"[128] and also because of Dr. McClaren's opinion that Thomas's performance on this exam is *the* defining fact upon which his intellectual functioning ability during the developmental period should be determined.

---

[127] Dr. McClaren testified that, in his opinion, "it is highly likely that 30 days earlier before he was 18 that he would have scored in a like manner."  McClaren, Tr. Vol. II at 181.

[128] The Tenth (2002) edition of AAMR's manual reports that the earliest diagnostic criteria "placed an emphasis on *incurability*" — that is, "[i]ndividuals with mental retardation were viewed as being predetermined by their limitations and consistently prevented from participating in everyday, typical environments because of their low IQs."  *Mental Retardation* at 20 (emphasis in original).  It was only with the Fifth (1959) edition of AAMR's manual that an age bracket was specified, and it was described as from "Birth through approximately 16 years."  *Id.*, Table 2.1, at 21.  Over the succeeding years, the definition of "the development period" shifted from that rubric, to the "Upper age limit of 18 years" in the Seventh (1973) edition, to the present definition of the "Period of time between conception and the 18th birthday" specified in the Eighth (1983), Ninth (1992), and Tenth (2002) editions of the AAMR manual.  *Id.* at 21-23.

Dr. McClaren made no effort to determine how many points, in his clinical judgment, should be deducted from Thomas's IQ score for either measurement error or the Flynn effect. When asked to explain why he felt so strongly about the validity of Thomas's raw, full-scale IQ score of 77, McClaren replied:

> That appears to be the high point, and it happens at 18 years, one month. So I think it is highly likely that 30 days earlier before he was 18 that he would have scored in a like manner.
>
> However, *you do have the Flynn factor*, *which* if you gave every break and decided he should get the maximum discount, so to speak, from the Flynn effect, it *could reduce it about seven points*.
>
> So — *but that's not how IQ tests were interpreted in those days nor now when I see reports*. It's with a score. And I often hear the psychologists say, well, probably the best in this confidence interval is the score you got. And — *but you know that things like the age of the test*, *the atmosphere of the testing situation*, *the environment in which the person is living all matters*. And when you report IQ scores, you report the score that you got and usually a confidence interval.[129]

Several points in the foregoing portion of Dr. McClaren's testimony require close scrutiny.

First — and addressing Dr. McClaren's statement that "that's not how IQ tests were interpreted *in those days*" — he is undeniably correct, but not for the reason he implies. Rather, that is a correct statement only because — as noted in Part II(A)(3) of this opinion *supra* — the statistical phenomenon bearing Dr. Flynn's name was not

---

[129] McClaren, Tr. Vol. II at 181-82 (emphasis supplied).

discovered until the middle of the following decade,[130] and clinicians did not begin to take it into account as a standard interpretative procedure until the 1990s, as the number of studies validating the accuracy of Flynn's observations nudged his statistical data across the line dividing debatable propositions from empirically-proven, generally-accepted facts.

Second, Dr. McClaren's assertion that he had not recently reviewed IQ reports interpreted in that manner — *i.e.*, "nor now when I see reports" — conflicts with his acknowledgment that "*things like the age of the test*, the atmosphere of the testing situation, the environment in which the person is living *all matter*[]."

Third, if Thomas's raw performance score was reduced by "seven points," as Dr. McClaren conceded it could be, the resultant full-scale IQ score of 70 would indicate mental retardation.

Finally, Dr. McClaren simply ignored the generally-accepted practice of all competent professionals in the fields of statistics, test theory, and psychology of being concerned with how measurement errors affect the interpretation of an individual's performance on a particular test.  (See the discussion in Part II(A)(2) *supra*.)

---

[130] *See supra* note 48, recording that Professor Flynn's first publication addressing the phenomenon bearing his name was an article entitled "The Mean IQ of Americans, Massive Gains 1932 to 1978," published in 95 Psychology Bulletin 29 (1984).

In sum, Dr. McClaren glossed over the Flynn effect, ignored the standard error of measurement (which the parties' *stipulated* as being ± 5 points), and rationalized his conclusion that Thomas did not meet the intellectual functioning prong of the clinical definition of mental retardation prior to the age of eighteen because the "trajectory" of Thomas's IQ scores was "going up" during the developmental period,[131] and reached a peak one month after his eighteenth birthday.[132]

This court does not find Dr. McClaren's testimony persuasive, and concludes that the raw, full-scale IQ score discussed here was an aberration. The flaw in Dr. McClaren's "trajectory" hypothesis was highlighted during further questioning by respondent's counsel:

> Q  So do you have an opinion as to whether or not he meets the diagnostic criteria for mentally [sic] under the DSM-IV-TR?
>
> A  [McClaren]  In my opinion, he does not meet the criteria for mental retardation.

---

[131] McClaren, Tr. Vol. II at 198 ("I believe he was in the borderline range towards the end of the time that he was pre-18. that's based on the 77 WAIS IQ that happened at 18 years, one month. *And the trajectory of the scores going up* and fairly steeply.") (emphasis supplied). *See also* doc. no. 126 (respondent's brief) at 13 ("Clearly, Thomas's intellectual functioning consistently rose during his developmental period to a level where he was functioning in the borderline range of intellectual functioning.").

[132] Additional testimony in support of this contention was that, in McClaren's judgment, at age eighteen, Thomas "was at the peak of his game as far as adaption to his environment, being in a supportive situation with his Ridgeway family that had the farm and apparently gave him some moral instruction as well as taking care of his needs, giving him a safe place to be. That's where it seems like his peak was if you look at the numbers." McClaren, Tr. Vol. II at 171.

Q  So what would be his correct diagnosis as far as his intellectual ability is concerned?

A  Borderline intellectual functioning.  I believe that he probably does have some cerebral impairment.  Whether that is related to his intellectual deficits or something distinct or some mixture is very hard to know.

*But after 18 and the tests got renormed*, [and] he again, *begins to drop off, as you would predict, using a Flynn effect*.[133]

The last sentence in the foregoing quotation encapsulates the contradictions inherent in Dr. McClaren's testimony.  He is there referring to the 1981 standardization ("renorming") of the first revised version of the Wechsler Adult Intelligence Scales, the so-called "WAIS-R."  (As will be discussed in the following section (Part IV(C)(1) of this opinion), the WAIS-R assessment instrument was administered to Thomas approximately eight years later, on March 21, 1985, and his raw, full-scale IQ score on that occasion was *71*.)  In other words, Dr. McClaren was *tacitly conceding* that the only way to reconcile (*a*) Thomas's raw, full-scale IQ score of 77 obtained at the age of eighteen years and one month with (*b*) his raw, full-scale IQ score of 71 obtained eight years later was by taking into account the "renorming" of the WAIS-R and, *thereby*, *the Flynn effect*.  Stated differently — and considering the fact that during the eight years elapsed between April 11, 1977 (when Ms. Raley

---

[133] *Id.* at 198-99 (emphasis supplied).

administered a 22-year-old WAIS assessment instrument) and March 21, 1985 (when, as discussed in the following Part of this opinion, a psychologist administered a four-year-old WAIS-R test), Thomas's raw, full-scale IQ performance score dropped 6 points, from 77 to 71 — *neither* those raw scores *nor* their "trajectory" can be rationally explained in the absence of taking into account *both* the Flynn effect *and* the standard error of measurement.  If that is done, then we can be 95% confident[134] that Thomas's "true" IQ on the date he was tested by Ms. Joyce Raley was, in round numbers, 70 (70.4):  *i.e.*, virtually the same as when he was tested eight years later.

Another factor that causes the court to view Thomas's performance on the April 11, 1977 test as an aberration is the fact that the record is silent on the question of what training or experience Ms. Raley had in the procedures for administering and scoring intellectual assessment instruments like the WAIS.  The importance of that question is underscored by the facts summarized in the tables attached to the written report of Dr. Karen Salekin as Appendix A:  *that is*, there is a consistency in the full-scale IQ scores recorded by Thomas both before and after Ms. Raley's April 11, 1977 administration of the WAIS that causes his raw score on that date to stand out as not only the highest IQ score registered in Thomas's lifetime, but also the *only* unadjusted, full-scale score above 74.

---

[134] *See supra* note 116.

For all of these reasons, as well as those addressed in the following section, this court accepts Dr. Salekin's well-supported, well-reasoned, and inherently-consistent analysis, and finds that the results of the April 11, 1977 IQ test are an aberration and should not be taken into account when determining Thomas's intellectual functioning abilities during any of the relevant times: *i.e.*, the developmental period, on the date of the offense, or currently.

**C**.   **Intelligence Assessments Performed Near the Date of the Offense**

**1**.   *March 21, 1985 — age twenty-six years*

The offense for which Thomas was convicted and sentenced to death occurred during the late-night or early-morning hours of December 15, 1984.[135]  Three months later, and prior to trial, he was evaluated by a "Dr. K. Hall" at the State of Alabama's Taylor Hardin Secure Medical Facility in Tuscaloosa.  Thomas then was twenty-six years of age.  Dr. Hall administered the Wechsler Adult Intelligence Scales – Revised (WAIS-R), and Thomas's raw scores were verbal IQ 70, performance IQ 74, and full-scale IQ 71.  Dr. Hall concluded that he was "functioning within the borderline range of intellect."[136]  The WAIS-R was standardized ("normed") in 1981, and Dr. Hall's administration of it occurred four years later.[137]  Multiplying 4 by the Flynn factor of

---

[135] *See*, *e.g.*, doc. no. 86 (memorandum opinion) at 7.

[136] Petitioner's Ex. 8.

[137] *See* Petitioner's Ex 2 (Report of Karen Salekin, Ph.D.), Appendix A, Table 1.

minus 0.30 points for each year elapsed after the date of standardization yields a correction of 1.2 points that must be deducted from Thomas's full-scale IQ score, resulting in an adjusted score of 69.8, rounded-up to 70.[138]  Consideration of the ± 5 point standard error of measurement results in the conclusion, stated with a 95% degree of confidence,[139] that Thomas's "true" full-scale IQ score lay within a band extending from 65 on the low end, to 75 at the upper extreme.[140]

**2**.    *January 24, 1986 — age twenty-six years and ten months*

Thomas was evaluated once more prior to trial by a Ph.D. psychologist named James Crowder.  The evaluation occurred on January 24, 1986, in the Limestone County Jail.  Thomas then was twenty-six years and ten months of age.  Dr. Crowder administered another WAIS-R assessment instrument, and Thomas's raw scores were verbal IQ 65, performance IQ 69, and full-scale IQ 65.  Even without taking the Flynn

---

[138] *See* Salekin, Tr. Vol. I at 121.

[139] *See supra* note 116.

[140] See the discussion in Part II(A)(2)(b) of this opinion *supra*, where the American Psychiatric Association's 2000 edition of its *Diagnostic and Statistical Manual of Mental Disorders* is quoted as stating, in the part discussing the standard error of measurement, that:

> It should be noted that there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument (e.g., a Wechsler IQ of 70 is considered to represent a range of 65-75).  Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior.  Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning.

*DSM-IV-TR* at 41-42.

effect or standard error of measurement into account, these scores clearly fell within the range of mental retardation.[141]

**3**.   *Findings*

In consideration of the evidence gleaned from the results of the March 21, 1985 and January 24, 1986 assessments, this court concludes that petitioner suffered from significantly subaverage intellectual functioning on the date of the offense. *See Smith v. State*, 2007 WL 1519869, at *8 (noting that "subaverage intellectual functioning . . . must be present at the time the crime was committed").

**D**.   **Intelligence Assessments Performed in Preparation for Hearing**

Dr. McClaren administered a WAIS-III intelligence assessment instrument to Thomas on September 6, 2007, and he obtained a verbal IQ score of 66, performance IQ score of 72, and a full-scale IQ score of 65.[142] Those results clearly support a finding of mental retardation, but the adjusted scores unquestionably do so.  The WAIS-III assessment instrument was standardized ("normed") in 1997, but it was

---

[141] Applying the Flynn effect, however, and a ± 5 point standard error of measurement to Thomas's raw scores, results in a full-scale IQ score of 64, and a confidence bandwidth of 59 to 69: *i.e.*, nearly five years elapsed between the date on which the WAIS-R was normed (1981) and the date on which it was administered to Thomas in the Limestone County Jail (1986).  Multiplying 5 by the Flynn correction factor of minus 0.30 points for each year elapsed between the date on which the test was normed and the date it was administered yields 1.5 points that must be deducted from Thomas's raw, full-scale IQ score (65 − 1.5 = 63.5, rounded-up to 64); and, applying a ± 5 point *SEM* to that figure produces a bandwidth of confidence running from a low of 59 to a high of 69.

[142] *See* doc. no. 112 (report of Harry A. McClaren, Ph.D.) at 7.

administered to Thomas by Dr. McClaren some ten years later. Multiplying 10 by the Flynn factor of minus 0.30 points for each year elapsed after the date of standardization yields a correction of 3.0 points that must be deducted from Thomas's raw, full-scale-IQ performance score, resulting in an adjusted IQ of 62 (65-3 = 62). Not only is that score well below the cutoff for a diagnosis of mental retardation, it still is subject to adjustment by a ± 5 point standard error of measurement, resulting in a conclusion that can be stated with a 95% degree of confidence that Thomas's "true" full-scale IQ then lay within a band ranging from 57 to 67.

This court's confidence that Thomas currently suffers from significantly subaverage intellectual functioning abilities is bolstered by at least four additional facts. First, Dr. McClaren also administered a so-called "Test of Memory Malingering,"[143] and its results "did not suggest malingering" by Thomas during

_____

[143] The Test of Memory Malingering was developed by T.N. Tombaugh of Carleton University, based upon research in neuropsychology and cognitive psychology. It is a fifty item visual recognition test specifically designed to assist psychologist and psychiatrists in discriminating between malingered and true memory impairments. *See* http://www3.parinc.com/products.

Four experiments were undertaken to validate the Test of Memory Malingering (TOMM). In the first 3 experiments, the TOMM was administered to 475 community-dwelling individuals and 161 neurologically impaired patients (traumatic brain injury, aphasia, cognitive impairment, and dementia). Both clinical participants and community-dwelling adults achieved exceptionally high scores. A criterion score of 45 (90% correct) on the 2nd trial correctly certified 95% of all non-demented patients (91% of all patients) as not malingering. In a 4th experiment, the criterion score readily distinguished individuals who deliberately faked memory impairments from those who did not. The results from all 4 experiments show that the TOMM is relatively insensitive to genuine memory impairment and holds

administration of the WAIS-III:[144]  that is, deliberate feigning of mental retardation in order to avoid the death penalty.[145]   Second, Dr. Salekin administered an SB5 intelligence assessment instrument to Thomas on November 11, 2007,[146] and it produced a full-scale IQ of 62 — identical to Thomas's full-scale IQ score on the WAIS-III, when adjusted for the Flynn effect.  Third, the "correlation coefficient" for the full-scale IQ scores produced by the WAIS-III and SB5 assessment instruments

---

considerable promise for detecting exaggerated or deliberately faked memory impairment in clinical situations.

http://www.cat.isist.fr/?aModele=afficheN&cpsidt=2805961.    *See generally* Google (Test of Memory Malingering).

[144] Doc. no. 112 (report of Harry A. McClaren, Ph.D.) at 7.

[145] *See* R. J. Corsini, *The Dictionary of Psychology* at 565 (defining the term *malingering* as: "Deliberate feigning of an illness or disability for financial gain or to escape responsibility, as in faking mental illness as a defense in a trial, faking physical illness to win compensation, or faking a defect to avoid military service.  Such a person is called a malingerer.").

[146] Dr. Salekin chose the SB5 to eliminate concern regarding the potential impact of so-called "practice effects," due to Dr. McClaren's earlier administration of a WAIS-III intelligence assessment instrument.  *See* doc. no. 110-2 (Report of Karen Salekin, Ph.D.) at 13-14, and 33; *see also supra* note 32.

is + 0.82:[147] *i.e.*, very close to a perfect correlation coefficient of + 1.0.[148]  Finally,

respondent and Dr. McClaren concede this point.[149]

Accordingly, the third requirement of *Smith*, as that case construes *Atkins* and

*Ex parte Perkins*, has been satisfied:  petitioner has demonstrated, by a preponderance

of the evidence, that he "currently" exhibits significantly subaverage intellectual

---

[147] *See* Gail H. Roid, *The Stanford Binet Intelligence Scales, Fifth Edition, Technical Manual* 88 (Itasca, Ill.:  Riverside Publishing 2003).

[148] "Correlation coefficients" are numbers that range from – 1.0 to + 1.0, and that are used to show the degree to which two quantitative variables are related.  If there were a perfect positive correlation between the IQ scores produced by the WAIS-III and SB5, the correlation coefficient would be + 1.0.  If there were a perfect negative (inverse) correlation between the IQ scores produced by the two assessment instruments, that would be denoted by the negative number – 1.0, meaning that whenever one IQ score was high, the other would be low, and vice versa.  A correlation coefficient of 0 means that there is no relationship between the variables.  Thus, the coefficient of + 0.82 reported in text indicates that the full-scale IQ scores produced by the two assessment instruments used in this case are very close to the same, but not perfect correlatives.  *See, e.g.*, R. J. Corsini, *The Dictionary of Psychology* at 177 (defining "coefficient of correlation"); W. P. Vogt, *Dictionary of Statistics & Methodology* at 58 (defining "Correlation" and "Correlation Coefficient").

When Dr. Salekin was asked how she would "characterize the closeness" between Thomas's full-scale IQ score of 62 on the SB5 administered by her, and his score of 65 on the WAIS-III administered by Dr. Harry McClaren, she testified that the scores were "very close," and that both she and Dr. McClaren obtained "valid scores."  Salekin, Tr. Vol. I at 40.

[149] *See* doc no. 126 (respondent's brief) at 26 ("Thomas's IQ now falls in the mild mental retardation range."); McClaren, Tr. Vol. II at 180 (admitting that Thomas's SB5 full-scale IQ score of 62 "probably" was the most accurate reflection of his present intellectual functioning).  Dr. McClaren administered a WAIS-III assessment instrument and a "Test of Memory and Malingering" on either Sept. 6 or Nov. 16, 2007 (his written report is not clear on that issue).  The results unquestionably were consistent with a finding of significantly subaverage intellectual functioning:  *i.e.*, verbal IQ 66, performance IQ 72, and full-scale IQ of 65.  As Dr. McClaren conceded, "[t]here is a 95% chance that [Thomas's] true IQ is between 62 and 70 at this point," because "[h]is test of Memory Malingering did not suggest malingering."  Doc. no. 112 (report of Harry A. McClaren, Ph.D.) at 7.

functioning.  *See Smith v. State*, 2007 WL 1519869, at *8; *see also Holladay v. Allen*, 555 F.3d at 1353.

## V.  ASSESSMENTS OF PETITIONER'S ADAPTIVE BEHAVIOR

### A.  Petitioner's Deficiencies Prior to Age Eighteen

No standardized, adaptive-behavior, assessment instruments were administered to Thomas prior to his eighteenth birthday.  While consideration of a person's limitations in adaptive skills became a component of the definition of mental retardation in 1959, "the notion that you had to test for it" did not become a diagnostic requirement until 2002, when the tenth edition of AAMR's *Mental Retardation* manual was published.[150]  Before then, psychologists relied primarily upon clinical judgment and the observations of third-party informants to assess a person's adaptive skills.  As Dr. Salekin put it, "we could talk to the school, we could talk to mom, we could talk to a bunch of people, [but we would] not hand over one of these [standardized tests], and be comfortable with giving a diagnosis that way."[151]

In order to gather information about Thomas's adaptive skills during the period prior to his eighteenth birthday, therefore, the parties were relegated to a review of records maintained by public schools and social workers employed by the Alabama

---

[150] Salekin, Tr. Vol. I at 209-10.  The American Psychiatric Association still does not require the use of standardized, adaptive-behavior, assessment-instruments.

[151] *Id.*

89

Department of Pensions and Security ("DPS"),[152] as well as the recollections of persons who were acquainted with petitioner during his youth.[153]  Petitioner's attorneys argue that an objective assessment of such information establishes that Thomas's adaptive behavioral skills during the developmental period were substantially below average in the areas of "functional academics, work, social and interpersonal skills, home living, and self-direction."[154]   Those assertions are evaluated below.

**1.**   *The home environment — birth to age 12*

DPS records establish that Kenneth Glenn Thomas was the third of nine children born into the marriage between William Thomas and Annie Ratcliff Thomas. The family was so socially and economically deprived that "even the poor people

---

[152] Since 1986, this agency has been known as the Alabama Department of Human Resources ("DHR").  For a short history of DHR and its predecessors — *i.e.*, the Alabama Department of Child Welfare (created in 1919), the Department of Public Welfare (created in 1933), and the Alabama Department of Pensions and Security (created in 1955) — and the missions of each agency, see: http://www.encyclopediaofalabama.org/face/Alabama Department of Human Resources.

[153] *See Mental Retardation* at 85 ("It is . . . essential that people interviewed about someone's adaptive behavior be well-acquainted with the typical behavior of the person over an extended period of time, preferably in multiple settings.").

[154] Doc. no. 127 (petitioner's brief) at 6.  The terms quoted in text comport with five of the ten skill areas outlined in the DSM-IV-TR.  The terms also share a conceptual linkage with the three skill sets identified in AAMR's 2002 definition:  "Adaptive behavior is the collection of conceptual, social and practical skills that have been learned by people in order to function in their everyday lives."  *Mental Retardation* at 73.

called them dirt poor."[155]   Dr. Salekin summarized the dysfunctional and abusive

environment into which Thomas was born as follows:

> With regard to his home of origin, records obtained from the Department
> of Pensions and Securities (DPS) are replete with information indicating
> that the parents of Mr. Thomas were repeatedly deemed to be unfit and
> that when in the home he was exposed to alcoholism (father), criminal
> activity (father), domestic violence (father toward mother), and there
> was evidence that Mr. Thomas Sr. had been molesting one or more of
> his daughters.  Furthermore, there is information in the DPS records that
> suggests that on numerous occasions the Thomas family was without
> adequate food, clothing, and shelter (e.g., the home was unkempt and
> was too small for the amount of people residing there), and that Mrs.
> Thomas did not access appropriate medical services for the care and
> treatment of her children.  In a notation dated 01/23/1963 (initials of
> writer IBM), the family was described as "destitute" and Mrs. Thomas
> was noted to have been wearing unseasonably thin and worn out
> clothing, and was described as "very cold and pitiful looking."

> Review of available documents provides ample information
> regarding DPS's desire to reunify the family and the multitude of
> problems that prevented this from occurring.  Throughout the records
> there are references made to the illegal, corrupt, violent, and
> unpredictable behavior of Mr. Thomas Sr., and the ineffective and
> dependent nature of Mrs. Thomas.  During discussions with Ms. Carole
> Russell it became clear that the primary problem for the family lay in the
> relationship between the parents and the inability for Mrs. Thomas to
> extricate herself from this damaging union.  According to Ms. Russell,
> it was common place for Mrs. Thomas to state that she would leave her
> husband permanently, but after a short period of separation (often times
> when he would be incarcerated or would otherwise abandon the family)
> she would return to the union.  Over the course of the family's
> involvement with DPS, Mrs. Thomas was informed multiple times that,
> should she make the decision to end the relationship with her husband,

---

[155] Salekin, Tr. Vol. I at 68.

[she] and her children [could] be reunited.  Mrs. Thomas was well aware of this fact, but routinely returned to their dysfunctional and violent relationship.

According to multiple informants (as well as information provided in court documents), Mr. Thomas was heavily influenced by his father who taught Mr. Thomas how to steal and to engage in other illegal activities.  During Mr. Thomas's testimony at trial, he stated that his dad would take him to bars when he was young, and that he witnessed him committing theft, arson, and assault.  These accounts were corroborated by record review and interviews with numerous collateral sources (e.g., Connie Allen, Carole Russell, and Wayne Ridgeway).  It is important to note that all nine of the children were at one point removed from the care of their natural parents, and in three of the nine cases the parental rights were terminated and the children adopted outside of the family.

According to records located in the DPS file, the Thomas family's first contact with DPS occurred in 1957 at the time that Mr. Thomas's father was first sentenced to prison (one year sentence).  At this time Mrs. Thomas applied for assistance and did so again in 1963 when her husband was again incarcerated.  In 1969 the family began to receive Social Security benefits due to Mr. Thomas Sr. becoming disabled secondary to a gunshot wound.  In late 1971, Mr. Thomas was convicted of arson after having purposefully set fire to his family's home and as a result, served two years in prison.  Following his release Mr. Thomas Sr. once again behaved irresponsibly as evidenced by excessive drinking, "impulsive acts", and he spent the majority of the family money on paying fines and court costs.

Doc. no. 110-2 (Report of Karen Salekin, Ph.D.) at 19-20 (footnote omitted).

Petitioner's father, William Thomas, emphatically was a negative influence on

his son's life.  Thomas did not recognize that fact, however.  Instead, he perceived a

"special relationship," as Dr. Marson recorded:

His father apparently took a special interest in Mr. Thomas, and referred to his son as his "pet." Mr. Thomas said he looked up to his father. Mr. Thomas reportedly often accompanied his father to the neighborhood bar where his father drank heavily, and also witnessed his father commit many criminal acts. For example, Mr. Thomas recalled an early childhood memory of watching his father break into a house, steal the contents of the home, and then set the house on fire. When Mr. Thomas got older, his father reportedly taught him how to strip cars and rob houses. Of note, when Mr. Thomas was 12 years old, he was arrested for starting a fire at the Capshaw Baptist Church in Athens. On February 22, 1974, at age 14, Mr. Thomas was reported arrested for stealing $5 from one of his teachers.

Ms. [Connie] Allen said that her brother learned everything bad from their father. According to Ms. Allen, Mr. Thomas was eager to please his father and did almost anything his father asked him. Ms. Allen stated that she did not think that Mr. Thomas ever learned to distinguish between right and wrong because his father used to tell him it was okay to do bad things.

Doc. no. 111-2 (Report of Dr. Daniel Marson & Dr. Kristen Triebel), at 4-5.

**2**.    *Adolescence and foster care — ages 12 through 18*

Thomas resided with his family from birth until the age of twelve, when he was removed from the home and placed in DPS protective custody as a result of an arson. DPS records indicate that Thomas entered the Capshaw Baptist Church on a dare from two "older friends" and set fire to a bulletin board and door.[156] He was arrested the following morning, after riding back to the church on his bicycle, and asking

---

[156] *See* Petitioner's Ex. 22 at 180 (recording that Thomas told DPS social workers "that some older boys dared him to set fire and said they would shoot him with a pellet rifle if he did not do it. Kenneth has never been in trouble before and was very much afraid of going to court and wanted a second chance.").

feigned questions about what had happened.  Although the exact path of subsequent proceedings is not clear, it appears that Thomas was diverted from the juvenile court system into DPS-supervised foster care.  He spent most of the following six years in three foster homes.

Thomas first resided for approximately one year (1971-72) with Mrs. Edith Austin and her family in Athens, Alabama, after which he returned to his family home for a short time, to live with his mother.  Thomas reportedly was not happy living with his mother, however, because his father was in prison, and it was "not the same without him."

Thomas then was placed in a second foster home, with Mr. and Mrs. Thomas Stevenson, for approximately a year and a half between the ages of thirteen and fourteen (1972 to 1974).

After repeatedly running away from the Stevensons' home, Thomas was moved to a third foster placement, in the home of Mr. and Mrs. Wayne Ridgeway, who owned and operated a farm near Goodsprings, Alabama.  Thomas described that placement as "the happiest home I knew."  No pleasure goes unpunished, however, and sadly, in September of 1977, Thomas was told that he no longer was eligible for foster-care or other DPS protective services as a result of becoming "an adult" on

March 7, 1977 — his eighteenth birthday.  Having no other options or resources,

Thomas returned home to live with his mother.

Dr. Salekin summarized the circumstances of Thomas's three foster-home

placements in her written report as follows:

> Mr. Thomas resided in foster care from the age of 12 years until he aged out of the system at 18 years of age.  His first placement was with the Austin family (~08/23/1971) which lasted for a period of eight months after which time Mr. Thomas was removed from this placement and placed back in the family home.  According to records, the change in placement was due to DPS's observation that the placement was not longer of benefit to Mr. Thomas, but was instead hindering positive growth and development.  In a progress note it was stated that DPS believed that, if possible, it would be much better for him to reside at home.  After approximately one year, Mr. Thomas was again placed in foster care, but this time secondary to his mother being unable to manage and control his behavior.

> On August 11, 1972, Mr. Thomas moved into the Stevenson Boarding home for a period of two years with termination of this placement occurring secondary to Mr. Thomas's refusal to return to the home.  This request was reportedly due to his growing dissatisfaction with the rules of the home, the reported alienation from his birth family, and the purported negative influence of a male foster child on Mr. Thomas.  Mr. Thomas's third and final placement was at the Ridgeway home (start date appears to be August, 1974).  According to Ms. Carole Russell, Mr. Thomas was placed at this home because she believed that he would be able to function well in this environment.  She further explained that there were few expectations at the home and that Mr. Thomas would be able to carry out the simple tasks required of him.  Ms. Russell indicated that the other children that were placed at the home were special needs children of low cognitive ability, a statement supported by Mr. Mitchell Rose, grandson of Ms. Ridgeway, and Mr. David Seibert, special education teacher.

According to Mr. Thomas, he was happiest when living at the Ridgeway home and he particularly enjoyed the outside chores that he and all of the children were required to do.  He noted that during his time with the Ridgeways he did not get into trouble at school, did not use illegal drugs, played community baseball, and frequently attended church (these statements are supported by information available via record review and multiple collateral contacts).  It is important to note that near the end of his residency at the Ridgeway home there were discussions between the Ridgeway family and DPS about continuing Mr. Thomas in foster care and assisting with his continued [vocational] education.  It appears that at the time Mr. Thomas was about to "age out" of the system, DPS had either not made a firm commitment to providing further education or had not developed an appropriate transition plan.   This lack of foresight and threatened abrupt discontinuation of services angered Mr. Wayne Ridgeway (as noted in DPS records and during personal communications with this examiner).  It is noted that during discussion with Ms. Carole Russell he "became very upset, stating that he could not see how we could throw a child who could not take care of himself into the street."  The Ridgeways were clear that they could not keep Mr. Thomas unless the DPS payments continued.

In response to the above described situation, DPS looked into the vocational program that was offered by "the Junior College" (name unknown to this evaluator) at the time.  Upon evaluation it was determined that "due to the fact that Kenneth is mildly mentally retarded, there was some concern as to whether or not he would be able to perform in the regular trade school program."  Apparently there was a relatively large amount of knowledge that would have been transmitted via text books and this was deemed to be unsuitable for the abilities of Mr. Thomas.  Instead, DPS chose to look into the possibility of a good fit between Mr. Thomas's abilities and the vocational program offered by "VPS" (exact name of the program unknown to this examiner).  Although meetings with a VPS counselor were established, Mr. Thomas chose not to follow through with this recommendation.  He reported that he no longer wanted to attend school, and he wanted to "be on his own." Mr. Thomas's contact with DPS was terminated on 09/19/1977.

Doc. no. 110-2 (Report of Karen Salekin, Ph.D.) at 20-21 (footnote omitted).

**3.**   *Schooling*

Thomas failed the first grade.  During his second enrollment in that primary grade (1968), he was placed in the special education program.[157]  Except for a brief (and mistaken) placement in a regular classroom setting during a portion of his fifth grade year,[158] Thomas remained in special education classes for the remainder of his time in public schools.  His grades within that curriculum were observed by Dr. Salekin to be good to excellent, and there was no indication that he was a behavioral problem in the classroom.  Even so, Dr. Salekin's written report stresses that "it is important to note" that Thomas's academic successes arose "solely in relation to his

---

[157] Dr. Salekin testified that it was her recollection that Dr. Loiry recommended that Thomas be placed in special education.  Salekin, Tr. Vol. I at 210-11.  Respondent's expert did not dispute Dr. Salekin's conclusion that Dr. Loiry was deeply involved in Thomas's life, and "he knew him very well and knew his functioning in multiple contexts."  *Id.* at 211.

[158] *See* doc. no. 110-2 (Report of Karen Salekin, Ph.D.) at 22 ("Based on a notation in DPS records (dated 04/27/72), it appears that at some point Mr. Thomas was placed in regular programming (at least for part of his fifth grade year) and when this mistake was identified, he was immediately placed back in special education.").  Salekin testified that she thought school records indicated a teacher had requested the placement, because Thomas was doing so well in special education.  Salekin, Tr. Vol. I at 74.  DPS social worker Carole Russell testified that it was never recommended that Thomas be placed in a regular classroom setting, but that Thomas had "approached [DPS workers] and said that everyone thought he could maintain himself in maybe a regular classroom."  Russell, Tr. Vol I at 305.  Russell did not recall her response to Thomas, but remembered that he was residing in the Stevenson home at that time, that "he started developing nervous tics.  And he was always a nervous child.  And we had him retested again.  And recommendations were made that he remain in his current [special education] program."  *Id.*

placement in special education and these grades in no way reflect a comparison to functioning in mainstream programming."[159]

> According to [David] Seibert, Mr. Thomas's special education teacher [from the 9th through the 12th grades], graduating from the 12th grade in special education means little more than you attended the program. Mr. Seibert stated that he remembers Mr. Thomas as meeting criteria for mental retardation and estimated his IQ to "be in the low 70's" . . . "maybe a little less." He further noted that [Thomas] was able to function well in special education classes, but "would not have functioned in a regular classroom. He would be a discipline problem because he wouldn't be able to follow along." Mr. Thomas was noted to have been well behaved and able to handle the simple tasks required of the students (e.g., going to the library, riding the bus, reading at rudimentary level and completing simple math problems). Mr. Seibert recalled that he was always respectful and that he had no problems controlling him in the classroom environment.

Doc. no. 110-2 (Report of Karen Salekin, Ph.D.) at 22.

Dr. Salekin testified that special education was "very different from regular programming," and she quoted David Seibert's description of the curriculum as

> a learning environment that assists people with very fundamental skills. Basic reading skills are within the spectrum, basic math skills, communication skills. But it's not comparable to the regular programming.

> And in fact, he mentioned to me that there was no way that Kenny would have survived in the regular programming; that he didn't have the mental capacities to do so; he didn't have the social skills to do so; that he was less mature.

---

[159] Doc. no. 110-2 (Report of Karen Salekin, Ph.D.) at 22.

So his functioning in the educational realm really strongly supports a finding of mild mental retardation.

And I think this is important, too. When I went to speak with Mr. Seibert and introduced myself and I asked an open-ended question such as: Tell me about Kenny, the quote I got from him was, he was definitely mentally retarded.

And we went and talked about this further. And he estimated his IQ — for him, he was thinking in the kind of high 60s, low 70s. And he described Kenny and his abilities and said he was not different from the group of kids in special ed. He fit in there very, very well. He had no behavioral problems with him at all.

So it was kind of — from David Seibert's perspective, his description to me of Kenny really suggested that special education was the right placement for him. And his success shouldn't be considered an anomaly; in fact, it should be expected. That was in that realm.

Salekin, Tr. Vol. I at 70-72.

**4**.    *Assessments by third-party informants*

Three persons who had extensive contact with Thomas prior to age eighteen testified at the hearing. The first was Carole Russell, a retired social worker who was employed by the Limestone County Department of Pensions and Security for nearly thirty years, from 1969 through 1998. She worked in "child protective services" and was assigned to Thomas's case in September 1971, when he was twelve years old.[160]

---

[160] Russell, Tr. Vol. I at 289-92.

Ms. Russell was responsible for Thomas's care until he turned eighteen, and was no longer eligible for DPS child protective services.[161]

Wayne Ridgeway, Jr., the son of petitioner's last foster parents, Wayne Senior and Annie Ridgeway, also testified.[162]  Mr. Ridgeway has lived on and farmed the Ridgeway land all of his life, and stated that a total of 46 children had lived in the family home during the years his mother and father served as DPS foster parents.[163] The junior Ridgeway was in his late 20s or early 30s when Thomas arrived,[164] and he saw the boy every day.[165]

David Seibert was Thomas's special education teacher during the tenth, eleventh, and twelfth grades at West Limestone County High School in the late

---

[161] *Id.*, Tr. Vol. II at 13-14.  The frequency of Ms. Russell's contacts with Thomas varied over time:  at the beginning, she saw him "at least several times a month"; but toward the end of DPS protective services, Russell's contacts dropped to once or twice a month.  Russell, Tr. Vol. I at 292. The location of her contacts also varied:  sometimes Russell met Thomas in his foster home; sometimes at her DPS office; and sometimes she transported him to-and-from visitation with his biological family, or parties for children in DPS foster-care.  *Id.*

[162] Ridgeway, Tr. Vol. I at 222-26.

[163] *Id.* at 226.  Ridgeway lived near his parents' home, and "the [foster] kids stayed at [his] house about as much as they stayed at [his parents'] house."  *Id.* at 254.

[164] *Id.* at 231.

[165] *Id.*

1970s.[166]   He spent the entire school day with Thomas, except for short periods

devoted to P.E., vocational training ("AG"), or driver's education.[167]

The testimony from these witnesses uniformly revealed gross deficits in

adaptive skills.  For example, Thomas was described as being:  less mature than

persons his own age[168] — *e.g.*, he not only behaved like, but also looked like someone

several years younger than his chronological age;[169] gullible, and easily influenced

by others to engage in disruptive, age-inappropriate behavior;[170] incapable of

---

[166] Seibert, Tr. Vol. I at 266.  Seibert began teaching special education — also known as the "Educable Mentally Retarded (EMR) class" — at West Limestone in 1970.  Students were placed in that curriculum only after being tested by a psychometrist employed by the County School System and determined to meet the criteria for mental retardation.  *Id*. at 265.

[167] *Id.* at 266-67.

[168] Wayne Ridgeway testified that Thomas "never had girlfriends.  And he didn't go out at night and do other things other boys did."  Ridgeway, Tr. Vol. I at 248.  *See also* doc. no. 111-2 (Report of Dr. Daniel Marson and Dr. Kristen Triebel) at 4 ("During childhood and adolescence, and in early adulthood, Mr. Thomas did not appear to have normal social skills.  He reportedly never formed any meaningful or lasting relationships with any of his peers.  Specifically, Mr. Thomas stated that he never had any close friends either as a child or as an adolescent.  He reported occasionally talking to a few of his classmates, but he denied being close to any of them. . . . Mr. Thomas said other kids made fun of him after he started receiving special education services.  He reported that other students called him names such as 'dumb' and 'mentally retarded.' "); *see also id*. at 12 ("Mr. Thomas' social and interpersonal skills showed developmental arrest and impairment.  As a child, his teachers and social worker described him as hyperactive and impulsive.  As an adolescent, Mr. Thomas continued to experience problems fitting in with his peers.").

[169] Ms. Russell testified that Thomas not only lacked the maturity of other children his same age (he then was 12), but he also "looked like a child of being around seven, eight.  Maybe nine.  He was very short in stature.  His mannerisms and everything were childlike.  He had failed numerous grades in school.  He was very far behind socially as well as educationally."  Russell Tr. Vol. I. at 299-300.

[170] During Thomas's second placement with the Stevenson family, there were other foster children with normal intelligence in the home.  Many of them had a history of juvenile delinquency and they often enticed Thomas into disruptive behavior, such as running away from the home, "talking back" to the foster mother, and refusing to complete his assigned tasks.  *See* Russell, Tr.

functioning in mainstream classes;[171] and, incapable of remembering or following even simple instructions,[172] thereby limiting his employment opportunities to labor positions that did not require much skill, planning, or forethought.

Many of these deficits were observed in an undated note found in petitioner's DPS files, assessing his participation in a counseling program during his second foster-home placement. The assessment, therefore, was most likely made in or about 1972.[173] It was written by James Waller, Coordinator of the Children and Youth Services program at the North Central Alabama Mental Health Center, and provides contemporaneous corroboration of petitioner's absence of age-appropriate adaptive skills prior to age eighteen:

> Ken Thomas was a participant in an eight week adolescent group meeting which began on September 12 and ended on November 7. I do not feel that the group was of any important consequence for Kenneth. *Kenneth does not have the social skills which are necessary for participation in a discussion group. He was unable to listen or relate to the various problems discussed by other group members. When he did enter into the discussion it was at inappropriate times and with*

---

Vol. I at 301-02.

[171] David Seibert testified that Thomas was an "average" student in his special education (Educable Mentally Retarded) class, but was incapable of functioning in a "normal classroom" or of following a "normal curriculum" because other students would "have made fun of him if he couldn't read. Because I'm sure he couldn't read well and comprehend. And it would have been a discipline problem if they started making fun of him." Seibert, Tr. Vol. I at 270-71, 281-82.

[172] Wayne Ridgeway testified that Thomas had to be re-taught simple farm tasks each day: "you pretty much had to go over the same thing every day to get the job done." Ridgeway, Tr. Vol. I at 240. David Seibert testified that Thomas required a "lot of repetition." Seibert, Tr. Vol I. at 274.

[173] *See* Petitioner's Ex. 22 at 134-35.

*inappropriate topics*.  Kenneth was extremely active physically and the one hour of time necessary for discussion was difficult for him to attend to.  In addition, *Kenneth had difficulty understanding behavioral work assignments for home and was unable to follow through with the simple part of the assignment which involved bringing a piece of paper back to the meeting.  . . .*[174]

Dr. Daniel Marson testified that, based upon his review of (*i*) information gathered from clinical interviews with petitioner and his sister, Connie Allen, (*ii*) available records, and (*iii*) the results of Dr. Salekin's administration of the SIB-R to persons who knew Thomas prior to his eighteenth birthday, he concluded that Thomas possessed limited adaptive functioning skills during adolescence and early adulthood.

> He reportedly never lived independently, but lived with his parents, then foster parents, then his mother, and transiently as a young adult in the home of acquaintances in Alabama and Texas.  He has never leased an apartment in his name, or owned a home.  Similarly, he has never managed a checkbook or bank account independently.  Mr. Thomas reported opening a checking account when he was 18 years-old, but said he never learned how to use his account.  He did not know how to fill out checks, so he said he asked other people (sometimes strangers) to fill out his checks for him, and then he would sign the checks.  Although Mr. Thomas was able to obtain his driver's license, he said it took him three times to pass the driving examination.  In the home setting, Ms. Allen said Mr. Thomas was able to do very simple household chores, such as folding clothes.  However, per Mr. Wayne Ridgeway's report on the SIB-R, Mr. Thomas as an adolescent was unable to carry out many basic household tasks, such as preparing and cooking a recipe with different ingredients, preparing a shopping list, using a vacuum cleaner to clean a carpet, washing and drying dishes, make a bed, changing

---

[174] Petitioner's Ex. 22 at 162 (emphasis supplied).

sheets on a bed, or using a washing machine.  These areas of impairment in adaptive living skills were also corroborated by Ms. Carole Russell (formerly Heery) during her validated SIB-R report.[175]

5.      *Findings*

Thomas contends that the foregoing evidence establishes that his adaptive behavioral skills during the developmental period were substantially below average in the areas of "functional academics, work, social and interpersonal skills, home living, and self-direction."[176]   Respondent's arguments in opposition to that contention are not persuasive in light of the evidence of record.

For example, respondent asserts that petitioner's placement in special education classes during grades K–12 does not, standing alone, "prove he had significant or substantial limitations in his functional academics."   However, respondent offered no evidence to substantiate his implication that petitioner might be "learning disabled," as opposed to mentally retarded.  Thus, respondent's argument on this point is reduced to mere speculation.[177]

---

[175] Doc. no. 111-2 (Report of Dr. Daniel Marson and Dr. Kristen Triebel) at 7; *see also id*. at 12 (same).  David Siebert testified that, in his opinion, and based upon teaching Thomas from the tenth through the twelfth grades, "he would have had a hard time with the idea of paying your bills on time, allocating a budget, just like a lot of people have.  Those kind of things.  I think he would have had trouble."  Siebert, Tr. Vol. I. at 279.

[176] Doc. no. 127 (petitioner's brief) at 6.

[177] *See* doc. no. 126 (respondent's brief) at 18-19.

Respondent notes that Thomas was able to obtain a driver's license (but, only on the third attempt), and that he purchased a high school class ring, and then argues that those facts demonstrate "good" adaptive functioning in the areas of "goals and perseverance."[178]   Respondent declares that Thomas showed the ability to utilize "community resources" when he asked Carole Russell (the DPS caseworker who managed his protective services) to help him obtain a copy of his birth certificate in connection with his application for a driver's license, and to assist him in acquiring a pair of glasses.[179]  Other facts that respondent believes to have demonstrated "good" adaptive functioning skills were these:  Thomas drove tractors, picked strawberries and peppers, exhibited respect for his foster mother, and played baseball while living with the Ridgeways; he understood the worth of small amounts of money; he possessed an interest in mechanics; he attempted to enlist in the Navy; and, he was manipulative.[180]

This court rejects those contentions; the foregoing facts do not establish that Thomas's adaptive skills during the developmental period were "good."  As Dr. Salekin observed, none "of these abilities are . . . inconsistent with the diagnosis of

---

[178] *Id.* at 20.

[179] *Id.* at 19-22.

[180] *Id*. at 19-22.  *See also* Petitioner's Ex. 21 (quoting a mental health case worker's impression of Thomas as "a child who is extremely sharp at manipulating those in his environment and pretty much getting his way").

mental retardation and in fact typify the skill set that is commonly seen for individuals that fall within this diagnostic category." Doc. 110-2 (Report of Karen Salekin, Ph.D.), at 41.

This court finds that petitioner has shown, by a preponderance of the credible evidence of record, that he had significant deficits in adaptive functioning prior to the age of eighteen years in the following, five adaptive skills:  functional academics; work; social and interpersonal skills; home living; and, self-direction. *See Atkins*, 536 U.S. at 309 n.3.

**B**.   **Petitioner's Deficiencies at the Time of the Offense**

The Eleventh Circuit recently held that Alabama's legal standard for proof of a claim of mental retardation in the context of the *Atkins* decision implicitly requires a habeas petitioner to establish that he suffered from significantly subaverage intellectual functioning abilities, accompanied by substantial limitations in his adaptive functioning skills, on the date of the capital offense. *See Holladay v. Allen*, 555 F.3d 1346, 1353 (11th Cir. 2009) (citing *Smith v. State*, No. 1060427, 2007 WL 1519869, at *7-*8 (Ala. May 25, 2007)).  Evaluation of that issue is complicated by the following facts.  Petitioner committed the offense of conviction in 1984, when he was twenty-five years of age.  In March of the following year and January of 1986, he was administered the intelligence assessment instruments discussed in Parts

106

IV(C)(1) and (2) *supra*.   There is, however, no evidence that either of the psychologists who conducted those intellectual assessments evaluated petitioner's adaptive functioning skills.   Further, there is no evidence of any formal assessment of petitioner between that time and 1993, when, at age thirty-three, he was administered a battery of standardized tests by Dr. Terry Goldberg, a neuropsychologist, as part of an assessment conducted during state post-conviction proceedings.[181]   Petitioner also was examined in that same year by Dr. Daniel Weinberger, a neuropsychiatrist.[182]   The 1993 examinations — performed nine years after the date of the crime for which Thomas was convicted — are too remote in time from the date of the offense to provide dispositive evidence of Thomas's adaptive functioning ability on the date of the capital offense.

---

[181] *See* Petitioner's Ex. 13 at 9-50.   At the time of the post-conviction evidentiary hearing, Dr. Goldberg had been Chief of the Neuropsychology Unit at the National Institute of Mental Health (NIMH) in Washington, D.C. for three years.   *Id.* at 10.   He performed research pertaining to serious mental disorders, maintained a private practice consisting primarily of neuropsychological testing of patients with different psychiatric and neurological disorders, and consulted at an agency designed to habilitate mentally retarded persons.   *Id.*   Dr. Goldberg testified that Thomas had been mentally retarded all of his life, *id.* at 30, and that the condition was "due to brain damage.   Brain damage is the etiology of his mental retardation."   *Id.* at 40.   Goldberg opined that the cause of Thomas's brain damage could be birth trauma or prenatal events, and qualified this possibility with the statement: "it's all very speculative — there is no smoking gun."   *Id.* at 30.

[182] *See* Petitioner's Ex. 13 at 51-72.   Dr. Weinberger received his undergraduate degree from Johns Hopkins University, and attended medical school at the University of Pennsylvania.   *Id.*   He performed his medical internship at U.C.L.A., his psychiatry internship at Harvard Medical School, and his neurology internship at George Washington University.   *Id.*   Dr. Weinberger testified that "Mr. Thomas, to put it in very unsophisticated terms, does not have a neurologically full deck of cards.   He's mildly mentally retarded.   He has some subtle form of brain damage or maldevelopment from very early in life, and he has signs of that, objective signs of that on neurological evaluation."   *Id.* at 55.

107

Because of the absence of any formal adaptive behavior examinations performed on or about the date of the offense of conviction, this court finds that an evaluation of Thomas's adaptive functioning skills during that timeframe must focus upon such evidence as was preserved by DPS social workers, schools, courts, and prisons during the sixteen-year-period between 1977 (*i.e.*, seven years before the offense, when Thomas was eighteen years of age) and 1993 (*i.e.*, nine years after the offense, when he was thirty-three years of age), together with Thomas's self-report, and the recollections of third-party informants who were acquainted with Thomas during the relevant time period (as prompted by questions included in standardized, adaptive-functioning assessment instruments).

Thomas contends, based upon such sources, that he has shown significant deficits in five out of the ten adaptive functioning skill sets described in the Ninth (1992) edition of AAMR's manual on *Mental Retardation* — *i.e.*, functional academics, home living, work, social/interpersonal skills, and self-direction — as well as all three adaptive behavior skill sets specified in the Tenth (2002) edition of that same manual.[183]  The experts who testified before this court spoke of Thomas's adaptive functioning skills, or the lack thereof, in terminology that fluctuated between the descriptions contained in both editions of the AAMR manual.  The following

---

[183] *See* doc. no. 127 at 2, 13-14.

table compares the diagnostic criteria contained in the Ninth (1992) edition of

AAMR's manual — the manual referenced in the *Atkins* opinion — to the diagnostic

criteria included in the Tenth (2002) edition, adopted shortly after the *Atkins* decision

was handed down.

| Descriptions of Adaptive Behavioral Skills Contained in the Ninth and Tenth Editions of AAMR's Manual on Mental Retardation | |
| --- | --- |
| **Ninth (1992) Edition** | **Tenth (2002) Edition** |
| Adaptive skills refer to an array of competencies that reflect both the ability to fit into a given niche as well as the ability to change one's behavior to suit the demands of a situation.  Ten adaptive skill areas were specified with the requirement that an individual evidence sufficiently comprehensive limitations, interpreted as being limitation[s] in 2 or more skills areas applicable to his or her age.  The ten areas [are]:  communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work[.] | Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives.  Limitations in adaptive behavior affect both daily life and the ability to respond to life changes and environmental demands, and should be considered in light of four other dimensions: Intellectual Abilities; Participation, Interactions, and Social Roles; Health; and Context.  Significant limitations in adaptive behavior can be established only through the use of standardized measures normed on the general population including people with disabilities and people without disabilities, and are defined as performance that is at least two *SDs* [standard deviations] below the *M* [mean] of (a) one of the following three types of adaptive behavior:  conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills. |

The AAMR warned readers of its current manual that "[t]he field of mental

retardation is currently in a state of flux regarding not just a fuller understanding of

the condition of mental retardation, but also the language and process used in naming,

defining, and classifying" the condition. *Mental Retardation* at xiii.  For example, the definition of "mental retardation" was revised nine times between 1908 and 2002.[184]  As the AAMR observed in a classic understatement, this "state of flux is both frustrating and challenging." *Mental Retardation* at xiii.  It is *especially* "frustrating" in cases like this one, where so many important social and legal policy considerations collide.  In any event, the skill sets described in both editions of the AAMR's manual share a common conceptual linkage; further, the APA's DSM-IV-TR still utilizes the same terminology found in the Ninth (1992) edition of AAMR's manual as its adaptive functioning diagnostic criteria.  Taking all of the foregoing considerations into account, this court will organize its discussion of petitioner's adaptive functioning skills at the time of the offense around the diagnostic criteria specified in the Ninth (1992) edition of the AAMR manual on *Mental Retardation* referenced in the *Atkins* opinion.

---

[184] *See* AAMR, *Mental Retardation* at 5 ("The history of the condition we now know as mental retardation is replete with name changes, including feebleminded, mentally defective, mentally deficient, and others.  These new names arose as new theoretical frameworks appeared and older names came to signal stigma and distorted power relationships.  It is likely that the name mental retardation will change in the near future."); *id.*, Table 2.1, at 20-23; AAIDD, *User's Guide*: *Mental Retardation Definition, Classification and Systems of Support – 10th Edition* 3-4 (2007) ("Each update or revision of the definition has been based on four phenomena whose relative importance and influence has varied during the late 20th and early 21st centuries.  These four are (a) increased understanding of the cause of the condition, (b) improved professional practices toward individuals with the condition, (c) changing societal attitudes about disablement, and (d) more recently more assertive consumer and reform movements that emphasize equality, inclusion, empowerment, and subjective well-being.  The 2002 system, including the definition and operational assumptions, captures the current status of each of these phenomena.").

Dr. Salekin reported that, between the ages of 18 and 25, petitioner's "abilities in relation to work were limited to unskilled labor that did not require much skill, planning or forethought."[185]  Dr. Marson confirmed that observation in the report he tendered to this court, stating that petitioner's

> first job was working for Mr. Wayne Ridgeway, the son of Mrs. Annie Ridgeway (foster parent) from age 15 to 18.  He reportedly worked in the garden picking fruits and vegetables, and operated a tractor on the farm.  He reported earning $120 per week at this job.  It should be noted that this was a structured and supervised setting and did not represent a competitive work environment.  At age 19, Mr. Thomas stated that he worked for three or four months as a truck driver for Common Industrial in Muscle Shoals, Alabama.[186]  Mr. Thomas said that he quit this job, though he did not recall why he quit.  Mr. Thomas was also reportedly employed with an apartment complex in Houston, Texas doing custodial work (i.e. mowing lawns) for about 3 or 4 months.[187]   When Mr. Thomas was about 25 years old, he reported working as a painter's

---

[185] Doc. no. 110-2 (Report of Karen L. Salekin, Ph.D.) at 41.

[186] Thomas described his duties on this job (which lasted only "a few months") as driving "from job site to job site, dropping things off."  Salekin, Tr. Vol. I at 100.

[187] Thomas lived in Houston, Texas on two occasions, with each stint lasting only a few months.  While in Houston, Thomas worked as

> a carpenter's helper where he toted things around for people.  Did this off and on probably for three or four months.  He's guessing.  This was a time when he had gone to Houston and took on a job.  And he left Houston to come back to Alabama.  That was the reason for leaving that job.

> Another job when he went back to Houston was picking up trash on the ground with a stick.  Again, probably three to four months. . . .  This was in an apartment complex in Houston where he was basically functioning as a groundskeeper and left to come back to Alabama.

Salekin, Tr. Vol. I at 101.

assistant, which paid $5.50 per hour.  He stated that he was responsible for filling paint in a paint machine.[188]

Doc. no. 111-2 (Report of Dr. Daniel Marson and Dr. Kristen Triebel) at 7.

On March 28, 1979, Thomas reported to DPS social workers that he had attempted to join the Navy, but he was rejected because of a "heart condition."[189]

In addition to legitimate employment, Thomas's episodic use of controlled substances may have led him to sell illegal drugs.  Dr. Salekin testified that information available in records reviewed by her — which she described as "only a little bit" — suggests that Thomas sold drugs with (or for) an individual identified as Lou Ann Haggerty[190] from an apartment he shared with her.  In any event, Thomas "did not function as a major drug dealer."[191]  He described his activities for Dr. Salekin as

assisting with putting the marijuana in bags, rolling it up, selling it.  I talked to him about. . . how much money [exchanged hands]. . . .  He

---

[188] Thomas reported to Dr. Salekin that, before becoming a painter's helper, he had washed dishes "at Jerry's Restaurant," but he quit after a short time "because he didn't like it."  In his last job prior to the offense of conviction, as a painter's helper, Thomas "filled up paint containers," and "kept kept the paint machines running, which means getting the paint, putting it in the machine, making sure that th[e] painters actually had paint to paint with.  [H]e did say the odd time he would paint, but wasn't his main role, but it wasn't outside of his job description that he might paint a door or might paint a baseboard or something like that.  But that was not his primary job." *Id.* at 101-103 (bracketed alterations added).

[189] Petitioner's Ex. 22 at 118.

[190] DPS records spell this last name as "Haggard."  *See* Petitioner's Ex. 2 at 5.

[191] Salekin, Tr. Vol. I at 103.

112

said, oh, it wasn't a lot.  It was, you know, $10, $20.  They weren't selling volumes of drugs.  It was very low level.[192]

He also described working for another individual.  This was farther along in his drug career when he got involved in intravenous drug use. . . . Kenny would go to this person . . . [who] would give him an amount of drugs to sell to a known person.  And then Kenny would come back with the money, hand it over to the drug dealer.

The drug dealer, in exchange would allow Kenny to use the drugs.  Little tiny bits of money would be exchanged, but the transaction wasn't for money.  It was for drugs. . . .  He [Thomas] thought this was a very good deal.

And again, this gets to cost-benefit ratio. . .  It wasn't clear to me in my discussions with Kenny that he understood that . . . he might be being used at this point.  A gullable [sic] individual who would be exchanging drugs for much less value than the money.

Salekin, Tr. Vol. I at 103-05.

Petitioner's adult work history was frequently interrupted by periods of

incarceration in county jails and in the Alabama prison system.  Those circumstances

---

[192] This testimony may have been derived from December 1981 Limestone County DPS records.  *See* Petitioner's Ex. 22 at 1-13.  The records are the result of an investigation by a social worker after the Department had received complaints that Ms. Betty Eubanks's children were residing in an unhealthy and unsafe environment, were unsupervised, and that Ms. Eubanks and her live-in boyfriend (petitioner, Kenneth Thomas) had no visible means of support and were involved in manufacturing and selling crystal meth and marijuana.  Ms. Eubanks was described as a transient alcoholic, and as a "'40 year old strong woman' who would move her sick parents out of their own home" and steal their "air conditioner in the hottest part of the summer," as well as a "liar who takes advantage of everyone she comes into contact with."  *Id*. at 6, 12.  Another person reported to be "hanging out" at in Ms. Eubanks's home was Jimmy Haggard.  Thomas was accused of sexually abusing one of the children, but the eleven-year-old alleged victim adamantly denied it.  *Id.* at 8-9.  As a result of the DPS investigation, and Thomas's admission that he had knowingly sold a stolen gun, he was arrested and placed in the county jail.  Found in his and Ms. Eubanks belongings were "sophisticated roach clips, scales, pipes and records of 'dope' sales."  *Id.* at 12.

relieved him of the necessity to earn a living, and lend credence to the observations

of Dr. Salekin, who reported that petitioner never lived independently,[193] but instead

relied on other people to meet the essential needs of daily existence.

> For example, shortly after Mr. Thomas left the Ridgeway home he moved into a camper (the type that fits on to the bed of a pick-up truck) at the home of Gyndell Rose. During a telephone conversation with Mr. Rose it was clear that Mr. Thomas had the basic abilities to reside in the camper (e.g., was able to keep it relatively tidy), but did not engage in any independent living skills. He stated that Mr. Thomas would eat with the Rose family and that he did not attend to any of the tasks typical of independent living. Specifically, Mr. Rose stated that they provided him with food and shelter (free of charge) and even washed his clothes for him. When asked if he believed that Mr. Thomas could have resided on his own he stated that he did not believe that he could have. Mr. Rose articulated that independent living would likely have been hard for him because "everything that I know him to do he he needed help with — couldn't really do stuff on his own." During our telephone conversation, Mr. Rose stated that Mr. Thomas could be taught to do simple tasks but that he would not have trusted him to complete a complex task because "he didn't seem like he had the education or whatever to do the stuff — his mind didn't think quick or good." According to Gyndell Rose, Mr. Thomas was not always in need of assistance and provided examples such as maintaining his car, being on time for work, and maintaining a relatively neat and clean living environment as evidence of some of the functional abilities of Mr. Thomas. He further noted that he was able to drive, but added that this was easy because it was typically to the store and back home.

> Similar statements were made by multiple respondents and are set out in the list that follows:

---

[193] *Accord* doc. 111-2 (Report of Dr. Daniel Marson and Dr. Karen Triebel) at 12 (recording that Thomas "never leased an apartment or house in his name, and he never lived alone independently").

1.  **Mrs. Carolyn Rose (daughter of Ms. Ridgeway, Mr. Thomas's foster mother):**  described him to be of low intellectual ability and of limited functioning.  For example, when asked if she believed that Mr. Thomas had the ability to live on his own Mrs. Rose stated that "he could barely [have] got by — I don't think that it would be a productive lifestyle because I don't think he was capable of doing stuff like that.  I don't think that he had the ability to take care of all the things needed to live independently."

2.  **Ms. Ann Ashworth-Speegle (the wife of the minister that mentored Mr. Thomas):**  described Mr. Thomas to be "simple-minded" and stated that he had "an inability to understand life the way other people do."  She noted that she had been a teacher and was familiar with people of low intellectual functioning and on the basis of her experience believes that Mr. Thomas would have been someone that would have needed placement in special education class.

3.  **Mr. Billy Thomas (older brother of Mr. Thomas):**  stated that he did not believe that Mr. Thomas could have managed his money or maintained a household:  "In other words, he didn't have the ability to manage his funds — he couldn't have managed a home, a mobile home or an apartment like I could and keep the bills paid."; "I believe he'd be like a lot of children and go waste their money on things he didn't need instead of taking care of business"; "He never did this [referring to lived independently], when he lived with Momma and me."

4.  **Ms. Carole Russell (DPS casework** [sic] **for the Thomas family)**:  Ms. Russell did not think that Mr. Thomas could live independently because she did not perceive him to be mature enough to manage his finances, take care of a home on a long-term basis, and would only have the ability to purchase food on a daily basis but would not have the ability to plan ahead for future needs.  Ms. Russell further noted that he would likely need some assistance in renting an apartment and probably in

establishing telephone service.  He was not so disabled that he could not make a phone call.

5.  **Mr. Wayne Ridgeway (employer and son of foster mother)**: Mr. Ridgeway unequivocally stated that he did not believe that Mr. Thomas had the ability to function independently.  He stated that "he couldn't live on his own because he wouldn't know what to do.  Wouldn't clean his clothes or know what to buy.  He'd find someone to keep him going."  Mr. Ridgeway further articulated that Mr. Thomas was unable to manage his finances — "you could hand him $20, after $20, after $20 and he would spend it all."

6.  **Mr. David Seibert (special education teacher):**  Mr. Seibert believed that Mr. Thomas would have a difficult time functioning independently in a community setting.  He stated that "he could have survived by finding his way through each day — he could have worked and held a job, but probably not independent living.  It would be hard for him to keep up with budgeting money and paying bills and stuff like that.  Would need help."

Mr. Mitchell Rose was also asked this question and stated that he was not sure but noted that Mr. Thomas did not have problems functioning within the home environment of the Ridgeway home.

Doc. 110-2 (Report of Karen Salekin, Ph.D), at 25-26 (emphasis in original).

Thomas twice hitchhiked to-and-from Texas (he never owned an automobile).[194]  While in that State, he did not live independently, but "with Jimmy

---

[194] Thomas, Tr. Vol. II at 133.

[and] Lou Haggert."[195]  He knew Lou because "she used to live in foster home over there with Ms. Stevenson."[196]

As reported by Dr. Marson, petitioner also had only limited skills in dealing with finances and money.  For example, even though he reported having a checking account, he did not know how to use it.

> He reportedly asked other people, sometimes strangers, to write his checks for him and he would sign the check.  He said that he did not know how to keep an accurate record of funds in his checking account, which reportedly resulted in him overdrawing his account and getting overdraft fines.  Mr. Thomas said he never learned how to use a money order, and never had any bills to pay.  In the interview, Mr. Thomas demonstrated significant difficulty calculating simple math computations.  For example, when asked how many pennies were in $1.30, he began wrote [sic] the number "1" 30 times on a piece of paper and counted each one.  He then figured out that there were 100 pennies in each dollar and added 100 to 30.  After about two minutes, he correctly responded stating that there were 130 pennies in $1.30, but it took him much longer than the average person to arrive at this answer.

Doc. 111-2 (Report of Dr. Daniel Marson and Dr. Karen Triebel) at 12.

Evidence of petitioner's social and interpersonal skills shows "developmental arrest and impairment."  *Id*.  That is particularly true of his sexual and intimate relationships, which appear to have been

> very stunted.  Mr. Thomas reported having a heterosexual orientation.  However, he indicated that he never had a romantic relationship with a

---

[195] *Id*. at 132 (bracketed alteration added).  As previously noted, DPS records spell this last name as "Haggard."  *See* Petitioner's Ex. 2 at 5.

[196] Thomas, Tr. Vol. II at 132.

woman prior to the age of 18, outside of a sexual encounter he had with an older foster sister at age 12. Mr. Thomas had a few brief sexual relationships with women when he was in his twenties, but has never been married and he has no children.

*Id.*[197]

Additionally, the records are replete with evidence of petitioner's history of serious mental illness. Dr. Salekin reported that:

> Available information indicated that Mr. Thomas has undergone numerous mental health evaluations and received treatment for mental health related concerns as a young child. There is information in his records indicating that during one or more incarcerations Mr. Thomas had reported experiencing hallucinations and has been treated with a variety of medications including, but not limited to, antipsychotics, antidepressants, anxiolytics. Review of records indicates that the treatment for psychosis may have been initiated based on self-report data in the absence of any external corroboration (e.g.. There was no observation consistent with the presence of psychosis or prior treatment for a psychotic disorder; there is evidence that he was observed to racing thoughts and appeared to be restless and agitated).

---

[197] Elsewhere in this same document it is reported that, even though Thomas professed "having a heterosexual sexual orientation," he admitted to having experimented "sexually with men in the past."

> Mr. Thomas indicated did [sic] not have any real romantic relationships before age 18. Mr. Thomas stated that age 12, he was "molested" by a 16 year old girl and member of their foster home, which he said was the closest thing he ever had to a "real girlfriend." Mr. Thomas initially reported to examiners of having other girlfriends before age 18, but later commented that these relationships were "in my mind." He reportedly never actually went on a date with a woman until he was in his twenties. Although Mr. Thomas reported having a few transient romantic encounters after age 18, these relationships were not sustained or serious. . . .

Doc. 111-2 (Report of Dr. Daniel Marson and Dr. Karen Triebel) at 4.

In addition to receiving the diagnosis of and treatment for schizophrenia, Mr. Thomas has received numerous psychiatric diagnoses over the course of his life.

In addition to the aforementioned clinical diagnoses, Mr. Thomas also has a history of self-mutilatory behavior dating back to 1979. Available information suggests that he swallowed a razor blade (see records related to medical treatment while at Holman Correctional Facility), and has lacerated his arms in response to self-reported feelings of anxiety and/or a desire to initial himself (see records from Athens-Limestone Hospital). There are also numerous notations in records provided from the Alabama Department of Corrections that Mr. Thomas has a history of medication seeking behavior.

Doc. 110-2 (Report of Karen Salekin, Ph.D.), at 29 (footnote omitted).

Respondent argues, in essence, that the evidence shows that Thomas was not significantly limited in adaptive functioning at the time of the offense because he has managed to survive, both before and since his incarceration. Respondent's contention seems to rest on the unfounded premise that a mentally retarded individual cannot survive on his own, in any environment. In other words, it is respondent's position that, because Thomas was able to function — at even the most basic of levels — in the years before and shortly after the date he committed the capital offense at issue, he cannot be said to have been significantly limited in adaptive functioning skills. Respondent bases this contention primarily upon the testimony of Dr. McClaren that petitioner was not, at the time of the crime, substantially limited in his adaptive

behavior skills because of his ability to interact socially within the prison population and to "bargain" with other inmates for personal items or favors.

Dr. McClaren administered a SIB-R assessment instrument to a female Corrections Officer named Myers,[198] who remembered Thomas from his incarceration at Donaldson Correctional Facility in 1998. During Dr. McClaren's assessment, Myers rated Thomas as being able to perform the following tasks "very well": "Completes written application forms for credit, bank accounts, or contract services"; "Excluding school assignments, makes oral reports to groups, for example, club, scouts, community meetings, sales presentations"; and "Explains the terms of a written contract, such as an installment purchase agreement."[199] She also recalled that Thomas worked well with radios and puzzles.[200]

Dr. McClaren admitted that Officer Myers's assessments were obviously, grossly inconsistent with the descriptions provided by all other third-party informants, and that her assessments were "wildly inconsistent" with what even he knew about Thomas.[201] The conclusion that Officer Myers was exaggerating for purposes of a private agenda is underscored by the fact that, when Dr. McClaren scored her

---

[198] *See* Respondent's Ex. 19C.

[199] McClaren, Tr. Vol. II at 252-53.

[200] *Id*. at 160.

[201] *Id*. at 253.

120

responses to the questions on the SIB-R assessment instrument, he "came out with a standard score of, like, 119, *which would be almost superior intelligence.*"[202] Nonetheless, Dr. McClaren testified that, in his "conversations with the correctional officers [who] knew Mr. Thomas at Donaldson, he was described as the kind of person that had almost nothing[,] but would bargain with other inmates[,] that he would do things, like, fix broken radios as a way to get extra tobacco or food."[203]  A Corrections Officer named Michael Pitman told Dr. McClaren that Thomas "would repay other inmates by washing their clothes."[204]

Dr. McClaren also noted that Thomas was described throughout the Department of Corrections' files as being manipulative.  Examples given by Dr. McClaren of Thomas's manipulative abilities included his act of "cutting himself because he felt like he was going through drug withdrawal and he wanted to get a drug to feel better,"[205] and the fact that, over time, Thomas "told different stories about [his] memory of the offense[,] and didn't mention his invisible dog."[206]

---

[202] *Id.* at 260 (emphasis supplied).

[203] *Id.* at 188

[204] McClaren, Tr. Vol. II at 190-91.

[205] *Id.* at 195.

[206] *Id.* at 195-96.  The reference to Thomas's "invisible dog" relates to the fact that, during his March 1985 competency evaluation, Thomas reported that a dog, his childhood pet, was with him in his cell.  *See* Petitioner's Ex. 9.

121

Case 5:01-cv-00772-CLS-RRA   Document 130   Filed 04/21/09   Page 122 of 126

Respondent's arguments are not persuasive.  They are directly refuted by Dr. Salekin's report, finding that Thomas's history of functioning poorly in the skill areas of home living, work, social/interpersonal skills, and self-direction is not "inconsistent with the diagnosis of mental retardation and in fact typif[ies] the skill set that is commonly seen in individuals that fall within this diagnostic category."[207]

Even if respondent's contentions were correct, he could only hope to show that Thomas is not presently limited in the areas of communication, social skills, and, possibly, community use.  Because this court finds that petitioner was, at the time of the crime, substantially limited in more than two adaptive behavior skills (other than communication, social skills, and community use), petitioner falls within the *Atkins* definition of an individual who had significant limitations in adaptive functioning at the time he committed the offense for which he has been sentenced to death.  *See Atkins*, 536 U.S. at 309 n.3.  Those deficiencies satisfy the diagnostic criteria of the DSM-IV-TR, as well as the Ninth (1992) edition of the AAMR manual on *Mental Retardation* referenced in the *Atkins* opinion.

C.   **Petitioner's Present Adaptive Functioning Abilities**

Respondent does not substantively dispute petitioner's assertion that he has proven by a preponderance of the evidence that he presently has significant deficits

---

[207] Doc. no. 110-2 (Report of Dr. Karen Salekin), at 41.

in adaptive functioning with regard to five skills: functional academics, work, social and interpersonal skills, home living, and self-direction.[208]   Because respondent has chosen to ignore petitioner's assertion on this point, the court will not address it. Issues and contentions not raised by an opposing party are deemed abandoned.  As the Supreme Court stated in *Greenlaw v. United States*, — U.S. —, 128 S. Ct. 2559, 2564 (2008):

> In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.

In other words, by failing to frame the question of whether Thomas's present adaptive functioning ability meets the definition for mental retardation for decision by this court, respondent has tacitly conceded the point.   Nevertheless, the court has considered the evidence of record in light of the legal and diagnostic standards discussed above.

Even though it is extremely difficult to assess Thomas's present adaptive functioning skills in the highly-restrictive, maximum-security environment in which

---

[208] Respondent argues that Dr. Marson's extensive neuropsychological testing of petitioner "has nothing to do with Thomas's functioning during the developmental period," and was "used to assess Thomas's current adaptive functioning."  Doc. no. 126 at 25.  However, respondent does not dispute Marson's opinion that petitioner showed "[g]lobal impairments on neuropsychological testing consistent with mild mental retardation."  Doc. no. 111-2 (Report of Dr. Daniel Marson and Dr. Karen Triebel), at 14-15.

he has been incarcerated for many years — an environment in which virtually all of his daily needs are satisfied by others — two prison wardens who have known Thomas for more than twenty years described him to Dr. Salekin "as being cognitively limited and were clear in stating that he would have trouble functioning in the community setting."   Salekin, Tr. Vol. I at 41 (attributing observation to Corrections Officers "Shufford and Ethridge").   Officer Ethridge further described petitioner as

> the kind of person . . . who would do things to get what he needed but lacked the judgment and talked about his [Officer Ethridge's] concerns about him [Thomas] being exploited by other people, one of which was for some sexual favors, which is, again, not uncommon for people with mental retardation to be exploited sexually.  But he's noticing it in the facility.
>
> He was then talking about [Thomas being placed in the prison's] general population and what that might be like around — you know, without having the structure of death row.   And he thought that his signs, this sort of exploitation and gullibility would be a real danger to Mr. Thomas, specifically.  That was volunteered.  It wasn't something that I was asking about.

Salekin, Tr. Vol. I at 109-110.  Of particular note to Dr. Salekin was the fact that the foregoing descriptions of petitioner's present deficits "were commensurate with those made by individuals who were familiar with his abilities outside of the [maximum-security penal] institution."  *Id*. at 41.

124

This court once again finds Dr. Salekin's testimony to be persuasive, and concludes that petitioner has shown, by a preponderance of the evidence, that he currently suffers substantial limitations in at least two adaptive behavioral skill areas: social and interpersonal skills, and self-direction.

## VI. CONCLUSIONS

Upon consideration of all of the evidence, this court accepts the well-supported, well-reasoned, and inherently-consistent analysis presented in the written reports and testimony of petitioner's experts, and finds that petitioner has carried his burden of proving, by a preponderance of the credible evidence, that he suffers from significant limitations in intellectual functioning that: (*i*) originated before the age of eighteen years; (*ii*) were present on the date of the offense of conviction; and (*iii*) have persisted into the present.  In reaching those conclusions, this court rejects Dr. McClaren's opinion about the significance of the raw IQ score obtained on April 11, 1977, one month after petitioner's eighteenth birthday, when a 22 year-old WAIS intelligence assessment instrument was administered to petitioner by West Limestone School counselor Joyce Raley, and credits Dr. Salekin's opinion that, with the exception of that one aberrational score, all other intelligence assessment instruments administered to petitioner over the course of his life have produced full-scale IQ scores that are consistent over time — *i.e.*, reveal a "trend of functioning between 65

125

and 70"[209] — and, therefore, are indicative of mild mental retardation.  Stated differently, petitioner has consistently tested within the mild mental retardation range of intellectual functioning, and he has done so during the developmental period, at the time of the offense, and currently.  This court further finds that a preponderance of the evidence establishes that petitioner's adaptive functioning abilities have been substantially impaired throughout his life, including the so-called developmental period, the time period surrounding the offense of conviction, and at present.  In sum, this court finds that petitioner is mentally retarded as defined by *Atkins*, and decisions of the Supreme Court of Alabama.  As such, he is not eligible for execution, because the imposition of the death penalty would violate the Eighth Amendment's prohibition against cruel and unusual punishment.  Therefore, petitioner must be resentenced by the Circuit Court of Limestone County, Alabama, to a term of life imprisonment without the possibility of parole.

A separate order, consistent with the findings and conclusions of this memorandum opinion, will be entered contemporaneously herewith.

DONE on this 21st day of April, 2009.

_____
United States District Judge

---

[209] Salekin, Tr. Vol. I at 127.